FOSTER LAW OFFICES, LLC
JEFFREY E. FOSTER #9857
P.O. Box 127
Captain Cook, HI 96704
Telephone: (808) 348-7800
Facsimile:  (808) 443-0277

*Counsel for Plaintiffs*

[Additional Counsel in Signature Block]

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| STEPHEN G. AQUILINA and LUCINA J. AQUILINA, Individually and on Behalf of All Others Similarly Situated; and AUDRA M. LANE and SCOTT K. LANE, Individually and as Trustees of the Lane Family Trust, dated March 28, 1998, and on Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>   vs.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S LONDON; LLOYD'S SYNDICATE #2003; LLOYD'S SYNDICATE #318; LLOYD'S SYNDICATE #4020; LLOYD'S SYNDICATE #2121; LLOYD'S SYNDICATE #2007; LLOYD'S SYNDICATE #1183; LLOYD'S SYNDICATE #1729; BORISOFF INSURANCE SERVICES, INC. d/b/a MONARCH E&S INSURANCE SERVICES; SPECIALTY PROGRAM GROUP, LLC d/b/a SPG INSURANCE SOLUTIONS, LLC; PYRAMID INSURANCE CENTRE, LTD.; ILIKEA LLC d/b/a MOA INSURANCE SERVICES HAWAII; and DOES 1-100,<br><br>               Defendants. | No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Stephen G. Aquilina and Lucina J. Aquilina; and Audra M. Lane and Scott K. Lane, individually and as Trustees of the Lane Family Trust, dated March 28, 1998 (collectively, "Plaintiffs"), allege the following based on personal knowledge, as to themselves and their own acts, and upon information and belief and the investigation by Plaintiffs' counsel as to all other matters.   Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## <u>INTRODUCTION</u>

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a Class (defined below) of similarly situated consumers with a residential property located in the State of Hawaii, who purchased a Lloyd's of London surplus lines homeowner's insurance policy, which contains numerous exclusions, such as an exclusion for the peril of lava and/or lava flow causing direct or indirect physical damage or loss of use of the insured property (the "Lava Exclusion"), from Defendants Pyramid Insurance Centre, Ltd. ("Pyramid") and Ilikea LLC d/b/a Moa Insurance Services Hawaii ("Moa"), which was underwritten by Defendants Borisoff Insurance Services, Inc. d/b/a Monarch E&S Insurance Services ("Monarch") and Specialty Program Group, LLC d/b/a SPG Insurance Solutions, LLC ("SPG") (collectively, with Moa and Pyramid, the "Broker Defendants"), and, upon information and belief, subscribed to by syndicates of

Defendant Certain Underwriters at Lloyd's London, including Defendants Lloyd's Syndicate #2003; Lloyd's Syndicate #318; Lloyd's Syndicate #4020; Lloyd's Syndicate #2121; Lloyd's Syndicate #2007; Lloyd's Syndicate #1183; Lloyd's Syndicate #1729; and other currently-unknown syndicates of Lloyd's London (collectively, "Lloyd's").

2.     Despite known risks that were insurable without resorting to surplus lines insurance, Broker Defendants, together with Lloyd's and Doe Defendants 1-100 (collectively, "Defendants"), improperly steered Plaintiffs and the Class into purchasing Lloyd's surplus lines homeowner's insurance to insure their homes against peril.  These Lloyd's surplus lines insurance policies, which contained numerous exclusions, including a Lava Exclusion, are essentially worthless – amounting to no coverage at all.

3.     As set forth below, solely in order to unjustly enrich themselves, Defendants misrepresented, in bad faith, to Plaintiffs and the Class that Lloyd's surplus lines insurance was the only homeowner's insurance available to them without performing the due diligence required under Hawaii law to place surplus lines insurance.

4.     In furtherance of their undisclosed scheme to drive profits and commissions and lower payouts for claims, Defendants improperly steered Plaintiffs and the Class into Lloyd's surplus lines homeowner's insurance policies

by: (a) failing to perform various duties and due diligence, including the duties and due diligence required under HRS §431:8-301(a); (b) omitting that non-surplus lines insurance was available; and/or (c) artificially inflating the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically through the government-established Hawaii Property Insurance Association ("HPIA").

5. Specifically, the Broker Defendants steered Plaintiffs and the Class into surplus lines insurance policies that were provided by Lloyd's. Defendants knew that they were not allowed to place Plaintiffs and the Class with surplus lines insurance unless the insurance coverage amounts exceeded the coverage available through traditional insurance carriers, including the state's own HPIA insurance program. Therefore, since as early as 2012 to the present (the "Class Period"), instead of performing their required duties and due diligence and ascertaining whether comparable non-surplus lines insurance existed, the Broker Defendants and Lloyd's steered Plaintiffs and the Class to Lloyd's policies, including by artificially inflating the insurance coverage amounts in the policies – such as, the home value or the personal liability coverage – beyond the HPIA coverage limits so that they could place Plaintiffs and the Class with Lloyd's surplus lines insurance policies.

6.    The Broker Defendants received kickbacks from Lloyd's for steering Plaintiffs and the Class to the Lloyd's surplus lines policies in the form of increased commissions.  The Broker Defendants' commissions were directly tied to the amount of premium steered to Lloyd's, thereby incentivizing the Broker Defendants to maximize the amount of surplus lines insurance placed with Lloyd's.  Defendants' scheme to steer Plaintiffs and the Class into these surplus lines policies enabled Lloyd's to maximize the volume of surplus lines premium, thereby increasing its revenues and profits by writing insurance that Lloyd's otherwise would not be able to write if Plaintiffs and the Class were to obtain non-surplus lines property and casualty insurance.  Steering Plaintiffs and the Class into Lloyd's surplus lines insurance policies, which inevitably contain numerous exclusions, also served to reduce loss ratios and payouts for claims, which, in turn, increased the Broker Defendants commissions and Lloyd's profits.

7.    Defendants' unlawful scheme came to light in May 2018, when Kilauea Volcano, which has been erupting continuously since 1983, erupted from new fissures, displacing hundreds of residents in the lower Puna District of Hawaii Island.  As people throughout the world have become aware through the images of loss and media interviews, these residents have suffered tremendously.  To date, thousands of residents have been displaced and over 700 homes have been lost due to fire or rendered a total loss due to destruction, inhabitability, and a lack of

structural integrity.[1]   Residents not only lost their homes, but many, including Plaintiffs, lost virtually everything they owned, including, but not limited to: pets, clothing, furniture, toiletries, food, electronics, tools, machinery, identification, birth records, marriage certificates and other records, photographs, letters, and diplomas.  With such catastrophic losses come extreme and debilitating emotional distress, anxiety, and panic.

8.   To make matters even worse, Plaintiffs and many Class members discovered in the aftermath of this tragedy that they unknowingly were sold virtually worthless homeowner's insurance that did not provide coverage for the losses they have suffered, due to the exclusions included in the Lloyd's surplus lines policies and post-claim coverage denials.

9.   Because of the numerous exclusions inevitably associated with Lloyd's surplus lines homeowner's insurance, Plaintiffs and the Class were harmed as they were provided less comprehensive coverage.  For example, Plaintiffs and many Class members own or owned homes in Hawaii Lava Zones 1 and 2, the areas that the U.S. Geological Survey has determined are the most hazardous. These areas therefore are extremely vulnerable to property damage as a result of volcanic events.  Because Kilauea is an active volcano and continuously erupting.

---

[1]   Casey Lund, '*A Mixture of joy and sadness' as Leilani Estates residents return home after eruption*, HAW. NEWS NOW (Sept. 8, 2018, 8:47 PM HST), http://www.hawaiinewsnow.com/story/39053568/a-mixture-of-joy-and-sadness-as-leilani-estates-residents-return-home-after-eruption/.

By wrongfully steering Plaintiffs and the Class into surplus lines insurance, Defendants have been able to deny coverage to Plaintiffs and many Class members impacted by the recent eruption of the Kilauea Volcano on the basis of the Lava Exclusion.

10.     In the absence of Defendants' unlawful scheme, Plaintiffs and the Class would have been offered more comprehensive insurance, including insurance through HPIA, which provides for coverage against 16 perils, including fire and volcanic eruption.

11.     Accordingly, Plaintiffs bring this action individually and on behalf of those similarly situated to recover for their injuries arising from violations of the HRS §§480-1, *et seq*. and HRS §§481A-1, *et seq*., breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, and negligence. Plaintiffs also seek to recover in restitution all excessive amounts that were paid to and unjustly enriched Defendants. Finally, Plaintiffs seek a declaration of their right and ancillary equitable relief.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2)(A) ("CAFA"). The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative class

members defined below; and minimal diversity exists because the majority of putative class members are citizens of a different state than certain Defendants. Plaintiffs are citizens of the State of Hawaii who own real property situated in the Island of Hawaii.  Lloyd's is a foreign citizen, Monarch is a citizen of California, SPG is a citizen of Delaware, and Pyramid and Moa are citizens of Hawaii.

13.    This Court has personal jurisdiction over Lloyd's because it regularly conducts business in Hawaii, and therefore, has sufficient minimum contacts with Hawaii and/or intentionally avails itself of the privilege of doing business in the Hawaii insurance market through the promotion, sale, and service of insurance policies in Hawaii.   This Court has personal jurisdiction over the Broker Defendants because each is authorized to conduct business in this State and each regularly does conduct business in this State and purposefully avails itself of this jurisdiction.

14.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because Defendants are subject to personal jurisdiction in this District, regularly transact business in this District, and therefore, are deemed citizens of this District. Additionally, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

# PARTIES

15.     Plaintiffs Stephen G. Aquilina and Lucina J. Aquilina (collectively, the "Aquilina Plaintiffs") resided together as husband and wife in their home located at 13-3573 Alapai Street, Pahoa, Hawaii.   This property is located in Hawaii Lava Zone 1.  Each of the Aquilina Plaintiffs is over 61 years of age and was also over 61 years of age for at least part of the relevant time period, when Defendants' conduct was directed and targeted toward them.   During the Class Period, the Aquilina Plaintiffs purchased a Lloyd's surplus lines insurance policy and subsequently renewed their policy through Broker Defendant Moa that was underwritten by Monarch.     The renewal policy number assigned was HGMH18518.  The Aquilina Plaintiffs' policy contained dwelling coverage up to $252,000, other structures up to $25,200, personal property up to $50,000, personal liability up to $300,000, medical payments up to $1,000.  The Aquilina Plaintiffs' premium cost $1,300.68.  Although the Aquilina Plaintiffs' coverage amounts were less than the coverage limits under HPIA, Monarch and Moa, along with Lloyd's, improperly steered the Aquilina Plaintiffs to a Lloyd's surplus lines insurance policy that contained a Lava Exclusion.  The Aquilina Plaintiffs were not aware that other homeowner's insurance policies were available to them.  Defendants have relied on the Lava Exclusion to deny the Aquilina Plaintiffs' claim to cover losses suffered as a result of the Kilauea Volcano eruption.

16.     Plaintiffs Audra M. Lane and Scott K. Lane[2] (collectively, the "Lane Plaintiffs") resided together as husband and wife in their home located at 13-3610 Kupono Street, Pahoa, Hawaii.  This property is located in Hawaii Lava Zone 1. Each of the Aquilina Plaintiffs is currently over 61 years of age and was also over 61 years of age for at least part of the relevant time period, when Defendants' conduct was directed and targeted toward them.  During the Class Period, the Lane Plaintiffs purchased a Lloyd's surplus lines insurance policy and subsequently renewed their policy through Broker Defendant Pyramid that was underwritten by Monarch.  The renewal policy number assigned was HGMH17750.  The Lane Plaintiffs' policy contained dwelling coverage up to $351,000, other structures up to $10,000, personal property up to $140,400, loss of use up to $30,000, personal liability up to $500,000, and medical payments up to $1,000.  The Lane Plaintiffs' premium cost $2,230.24.  Monarch and Pyramid, along with Lloyd's, improperly steered the Lane Plaintiffs to a Lloyd's surplus lines insurance policy with a Lava Exclusion by artificially inflating the value of the Lane Plaintiffs' property (which was valued at $263,600 in 2017) to increase the coverage beyond the $350,000 dwelling coverage limit under the HPIA policy and by artificially inflating the personal liability coverage needed beyond the coverage limit under the HPIA policy, when a personal liability umbrella policy could have been affordably

---

[2]     Lloyd's misprinted the name on the Certificate as "Scott L. Lane."  In this complaint, only references to Scott K. Lane's proper name shall be used.

obtained while keeping the coverage within HPIA limits.  The Lane Plaintiffs were not aware that another homeowner's insurance policy was available to them. Defendants have relied on the Lava Exclusion to deny the Lane Plaintiffs' claim to cover losses suffered as a result of the Kilauea Volcano eruption.

17.      Plaintiffs Audra M. Lane and Scott K. Lane's home is deeded in the name of the Lane Family Trust.  The Lane Plaintiffs sue Defendants in their individual capacities and in their capacities as trustees of the Lane Family Trust, dated March 28, 1998.  The Lane Family Trust is a third-party beneficiary of insurance policy number HGMH17750.

18.      Defendant Certain Underwriters of Lloyd's London is a foreign business entity headquartered at One Lime Street, London, England, with administrative offices in the United States located at 42 West 54th Street, 14th Floor, New York, New York 10019.  Lloyd's is an organization that provides insurance underwriting services and is comprised of separate syndicates that underwrite insurance in an insurance marketplace known as Lloyd's of London. Lloyd's has provided insurance for over 330 years in over 200 countries and territories.  According to A.M. Best, Lloyd's is the largest surplus lines insurer in the United States with approximately 22.6% of the U.S. surplus lines market, accounting for approximately $9.6 billion in surplus lines premium written in 2016.

19.     Lloyd's offers surplus lines insurance within the State of Hawaii by placing surplus lines insurance policies through a network of resident and non-resident surplus lines brokers that are required to be licensed in Hawaii.   As a surplus lines insurer, Lloyd's is not required to file its rates with the state insurance regulators and its rates and forms are not reviewed or approved by any regulatory agency.   Lloyd's issued the surplus lines insurance policies on Plaintiffs' and the Class's properties during the Class Period.

20.     The identity of the syndicates subscribing to the Aquilina Plaintiffs' Policy No. HGMH18518 is currently unknown and is solely in the possession of Defendants.

21.     Defendant Lloyd's Syndicate #2003 is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750.   Catlin Underwriting Agencies Limited ("Catlin"), wholly supported by XL Group Ltd., is the Lloyd's managing agent for Lloyd's Syndicate #2003.   Catlin is a foreign business entity headquartered at 20 Gracechurch Street, London, England.   In 2017, Lloyd's Syndicate #2003 wrote $3.05 billion in gross written premiums.

22.     Defendant Lloyd's Syndicate #318, or MSF Pritchard Syndicate 318, is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750.   Beaufort Underwriting Agency Limited ("Beaufort") is the Lloyd's managing agent for Lloyd's Syndicate #318.   Beaufort is a foreign

business entity headquartered at One Minster Court, Mincing Lane, London, England.  In 2017, Lloyd's Syndicate #318 wrote $127.18 million in gross written premiums.[3]  Lloyd's Syndicate #318 underwrites in two core business areas of International and U.S. property and aviation.

23.     Defendant Lloyd's Syndicate #4020 is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750.  Ark Syndicate Management Limited ("Ark") is the Lloyd's managing agent for Lloyd's Syndicate #4020.  Ark is a foreign business entity headquartered at 30 Fenchurch Avenue, London, England.  In 2017, Lloyd's Syndicate #4020 wrote $198 million in gross written premiums.

24.     Defendant Lloyd's Syndicate #2121 is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750.  Argenta Syndicate Management Limited ("Argenta") is the Lloyd's managing agent for Lloyd's Syndicate #2121.  Argenta is a foreign business entity headquartered at 70 Gracechurch Street, London, England.  In 2017, Lloyd's Syndicate #2121 wrote $279.6 million in gross written premiums.  Lloyd's Syndicate #2121's property

---

[3]     Gross written premiums of Lloyd's in British pound sterling have been converted to U.S. dollars using the average foreign exchange rate from 2017.

coverage has a "bias towards the US market" and "is predominately US focused" in excess and surplus lines business.[4]

25.     Defendant Lloyd's Syndicate #2007 is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750.  AXIS Managing Agency Limited ("AXIS") is the Lloyd's managing agent for Lloyd's Syndicate #2007.  AXIS is a foreign business entity headquartered at 21 Lonbard Street, London, England.  AXIS has several offices in the United States, including one at 1211 Avenue of the Americas, 24th Floor, New York, New York 10036.  In 2017, Lloyd's Syndicate #2007 wrote $681.5 million in gross written premiums.

26.     Defendant Lloyd's Syndicate #1183 is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750.  Talbot Underwriting Ltd. ("Talbot") is the Lloyd's managing agent for Lloyd's Syndicate #1183.  Talbot is a foreign business entity headquartered at 60 Threadneedle Street, London, England.  Talbot has an office in the United States located at 600 Brickell Avenue, Suite 1850, Miami, Florida 33131.  In 2017, Lloyd's Syndicate #1183 wrote $921.1 million in gross written premiums.

27.     Defendant Lloyd's Syndicate #1729 is the syndicate that underwrote part of the insurance for the Lane Plaintiffs' Policy No. HGMH 17750. Asta Managing Agency Ltd. ("Asta") is the Lloyd's managing agent for Lloyd's

---

[4]     *Property (Direct and Faculative)*, ARGENTA GRP. (2018), http://www.argentagroup.com/property-direct-and-facultative (last visited Dec. 5, 2018).

Syndicate #1729.  Asta is a foreign business entity headquartered at 5th Floor, Camomile Court, 23 Camomile Street, London, England.  In 2017, Lloyd's Syndicate #1729 wrote $78.9 million in gross written premiums.

28.    At present, Plaintiffs do not know the identity of all the remaining syndicate(s) that underwrote and/or subscribed to the various policies that insured Plaintiffs' and the Class's properties and that are the subject of this lawsuit.

29.    Defendant Monarch is a California corporation with its principal offices located at 2250 North Hollywood Way, Suite 501, Burbank, California. Monarch is a wholly owned subsidiary of Defendant SPG, which is also located at 2550 North Hollywood Way, Suite 501, Burbank, California.  Monarch is a coverholder with Lloyd's, meaning it is a company "authorised by a Managing Agent to enter into a contract or contracts of insurance to be underwritten by the members of a syndicate managed by it in accordance with the terms of a Binding Authority."[5]  Monarch, through the participation and assistance of its authorized agents, including Moa and Pyramid, improperly steered Plaintiffs and the Class to surplus lines insurance from Lloyd's.

---

[5]    *Market Resources: About Coverholders*, LLOYD'S (2018), https://www.lloyds.com/market-resources/delegated-authorities/compliance-and-operations/about-coverholders (last visited Dec. 5, 2018).

30.   During the Class Period, the name "Monarch E&S Insurance Services" has alternately been utilized by Defendant Monarch or by Defendant SPG to place Lloyd's policies within the State of Hawaii.

31.   Before being wholly acquired by SPG in September 2017, Monarch transacted insurance business in Hawaii under the registered trade name "Monarch E&S Insurance Services."   Consequently, Monarch-brokered Lloyd's policies issued before September 2017 solely bear the name "Monarch E & S Insurance Services," while those policies issued after September 2017 bear the name "Monarch E & S Insurance Services, Division of SPG Insurance Solutions."

32.   Defendant Monarch is an active California Corporation that held a California Surplus Lines Broker license until that license became inactive on or about April 30, 2018.  The following allegations pertain to this Defendant:

(A)   The Business Registration Department of the Hawaii Department of Commerce and Consumer Affairs ("DCCA") identifies the name "Monarch E & S Insurance Services" as an expired trade name registered by Monarch (August 18, 2009 to August 17, 2014);

(B)   Monarch holds an active Hawaii Non-Resident Insurance Producer license (April 11, 2008 to April 16, 2020).  This license still notes that Monarch operates under the expired trade name "Monarch E & S Insurance Services";

(C)   The DCCA lists Monarch as possessing an inactive Hawaii Non-Resident Surplus Lines Broker license (September 5, 2018 to April 16, 2020).  This license also notes that Monarch operates under the expired trade name "Monarch E & S Insurance Services"; and

(D)   Monarch, operating under the expired trade name "Monarch E & S Insurance Services," procured and placed Lloyd's policies in the State of Hawaii from an undetermined date to approximately the end of August 2017.

33.   Defendant SPG is a Delaware Limited Liability Company registered in the State of Hawaii as an active Foreign Limited Liability Company since November 15, 2016.  The registration does not identify SPG as operating under the trade name "SPG Insurance Solutions, LLC."   However, the trade name is registered as SPG's trade name in California.  The following allegations pertain to this Defendant:

(A)   SPG acquired Monarch assets on or about September 2017;

(B)   After September 2017, all Lloyd's policies brokered by SPG identify "Monarch E & S Insurance Services, Division of SPG Insurance Solutions" as Lloyd's correspondent, agent, and the entity required to receive notification of a claim under the policies;

17

(C)   The DCCA does not identify the name "SPG Insurance Solutions, LLC" as a registered trade name;

(D)   The DCCA identifies Defendant SPG (without its d/b/a "SPG Insurance Solutions, LLC") as possessing an active Non-Resident Surplus Lines Broker license (January 19, 2017 to April 16, 2020);

(E)   SPG holds an active California Surplus Lines Broker license (January 27, 2017 to August 31, 2020); and

(F)   SPG procures and places Lloyd's policies in the State of Hawaii.

34.   Whether operating at the direction of Defendants Monarch or Defendant SPG, all Lloyd's policies issued during the Class Period identified Monarch as the Lloyd's coverholder, meaning it is a business entity "authorised by a Managing Agent to enter into a contract or contracts of insurance to be underwritten by the members of a syndicate managed by it in accordance with the terms of a Binding Authority."[6]

35.   Defendant Moa is a Hawaiian Limited Liability Company with offices located at 1321 Kino'ole Street, Hilo, Hawaii 96720, and 75-6082 Alii Drive #E, Kailua-Kona, Hawaii 96740.   Judy M. Moa (License #412784) of Moa sold the Aquilina Plaintiffs their policy with Lloyd's.   Moa is an authorized representative

---

[6]     *About Coverholders*, *supra* n.5.

of Defendant Monarch.  Moa improperly steered the Aquilina Plaintiffs and the Class to surplus lines insurance from Lloyd's that was underwritten by Monarch.

36.   Defendant Pyramid is a Hawaii corporation with its principal offices located at 48 Kamana Street, Hilo, Hawaii 96720.  Kevin G. Yee of Pyramid sold the Lane Plaintiffs their policy with Lloyd's.  Pyramid is an authorized representative of Defendant Monarch.  Pyramid improperly steered the Lane Plaintiffs and the Class to surplus lines insurance from Lloyd's that was underwritten by Monarch.

37.   Doe Defendants 1-100 are those insurance brokers, agents, and/or coverholders that placed surplus lines insurance through Lloyd's on Plaintiffs and the Class's properties, as well as those Lloyd's syndicate(s) that underwrote the various surplus lines insurance that are the subject of this lawsuit.  Plaintiffs will be able to identify the Doe Defendants through discovery of Plaintiffs' insurance certificates, Lloyd's coverholder agreements, binding authority agreements, and agreements between the Broker Defendants and Lloyd's.

## TOLLING OF STATUTES OF LIMITATIONS

38.   The applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and the Class could not have reasonably discovered the true, latent nature of the aforementioned facts relating to Defendants' improper steering

practices until shortly before this class action litigation was commenced. As a result of Defendants' active concealment, all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## ALLEGATIONS OF FACT

**A.  Surplus Lines Insurance Can Only Be Placed When No Other Insurance Is Available**

39.  Surplus lines insurance is available to individuals where the traditional insurance market is unable or unwilling to provide coverage due to risky characteristics.

40.  The majority of property-casualty risks in the United States are underwritten by admitted insurers in the admitted, or standard, market. An admitted insurer is an insurer to which a state insurance department has granted a license to do business within that state. In an effort to maintain insurer solvency and to protect consumers, state insurance departments require admitted insurers to file and obtain approval for their rates, forms, and underwriting rules. Because they cannot deviate from their approved filings, admitted insurers in the standard market do not have the flexibility to underwrite high-risk loss exposures profitably.

41.  Insurance purchased through the surplus lines market is provided by non-admitted insurers, which are not licensed to operate in the insured's home state. Non-admitted insurers are not required to obtain approval for their rates, forms, and underwriting rules in Hawaii. As a result, non-admitted insurers can

modify coverage and pricing in ways that allow them to underwrite special risks profitably. Therefore, surplus lines insurers often fill the gap to provide insurance coverage for high-risk perils, but are only permitted to do so under specified circumstances.

42. According to A.M. Best's Special Report, U.S. Surplus Lines, dated September 1, 2017, the surplus lines market has doubled in size over the past 20 years, growing from 3.4% of the total property/casualty direct premium written in 1995 to approximately 7% of direct premium written in 2016. In 1995, the total surplus lines direct premium written was approximately $9.2 billion, with approximately $273 million for the property and casualty market. For 2016, the total surplus lines direct premium written was approximately $42 billion, with approximately $612 million direct premium written for the property and casualty market.

43. Surplus lines insurers are not regulated by the Hawaii Insurance Commissioner's office within the Department of Commerce and Consumer Affairs and are not subject to any of the regulations that govern traditional insurers in Hawaii and protect Hawaii consumers.

44. Pursuant to HRS §431:8-301(a), surplus lines insurance may only be placed on property located in Hawaii through a licensed surplus lines broker. HRS §431:8-102 defines "Surplus Lines Insurance" as "any property and casualty

insurance on risks procured from or placed with an unauthorized insurer under the laws of the insured's home state" and a "Surplus Lines Broker" as "any person licensed under section 431:8-310 to place insurance on risks resident, located, or to be performed in this State with unauthorized insurers."

45.    Before placing a surplus lines policy, however, a surplus lines broker must perform a diligent search of the insurance market to determine whether: (i) "[t]he full amount or kind of insurance cannot be obtained from insurers who are authorized to do business in [Hawaii]; provided that a diligent search is made among the insurers who are authorized to transact and are actually writing the particular kind and class of insurance in [Hawaii] each time the insurance is placed or renewed"; (ii) "[t]he surplus lines insurance procured is in addition to or in excess of the amount and coverage which can be procured from the authorized insurers"; and (iii) "[t]he insurance is not procured at a rate lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the same protection." HRS §431:8-301(a)(2)-(4).

46.    This provision essentially requires that surplus lines policies are to be placed only as a last resort when no domestic admitted insurer can offer the same or comparable coverage for the same or less amount.  Pursuant to HRS §431:8-

312(b), the surplus lines broker must keep a list of attempts at placing with domestic admitted insurers.

47.    Surplus lines insurance policies sold by insurance brokers should be a last resort for an insurance broker.   However, due to the Broker Defendants' misleading actions in the placement of Plaintiffs' and the Class's insurance policies, such insurance was placed with Lloyd's surplus lines insurance policies, even though the criteria above were not met.  Defendants failed to place reasonably available alternative insurance products, instead steering Plaintiffs and the Class to the Lloyd's surplus lines insurance policies in order to unjustly enrich themselves.

**B.    Lloyd's Role in the Hawaii Insurance Market and Its Scheme with the Broker Defendants to Place Homeowners With Unnecessary Surplus Lines Insurance**

48.    Lloyd's is the top writer of surplus lines insurance in the United States – writing 23% of the U.S. surplus lines policies nationwide in 2017, totaling $10.3 billion in premiums.[7]   According to the National Association of Insurance Commissioners and the Center for Insurance Policy and Research, in 2017, Lloyd's syndicates wrote approximately $52 million in surplus lines premium in Hawaii.[8]

---

[7]    *Surplus Lines,* INS. INFO. INST. (2018), https://www.iii.org/publications/a-firm-foundation-how-insurance-supports-the-economy/driving-economic-progress/surplus-lines (last visited Dec. 5, 2018).

[8]    *IID Surplus Lines Industry Summary,* NAT'L ASS'N OF INS. COMM'RS & THE CTR. FOR INS. POLICY RESEARCH (2018), https://www.naic.org/documents/cmte_c_surplus_lines_related_2016_industry_summary.pdf.

49.    During the Class Period, Lloyd's, through the participation and cooperation of the Broker Defendants, misled and deceived consumers in order to sell surplus lines insurance instead of more comprehensive coverage, such as that available through HPIA.

50.    Coverage through HPIA is available to persons who are unable to obtain basic property insurance in the private market from a licensed insurer.[9]   The Hawaii Legislature undertook this legislative action because admitted insurers stopped writing homeowner's insurance policies to provide coverage for certain high risk perils for properties located in Hawaii, such as the ongoing risks of damage from volcanic eruption.

51.    By obtaining an insurance policy through HPIA, homeowners can purchase a maximum Dwelling Limit of $350,000, subject to a deductible of $500, $1,000, $2,000, or $3,000, Personal Property coverage of 50% of the Dwelling Limit, and Personal Liability Coverage of $100,000, $200,000, or $300,000.

52.    The HPIA Homeowner's 2 Broad Form policy, like HPIA's other broad form policies, provides comprehensive property insurance coverage for direct physical loss to the property caused by 16 different perils, including "**[f]ire or lightning**" and "**[v]olcanic eruption** other than loss caused by earthquake, land

---

[9]    HRS §431:21-110.

shock waves or tremors."[10]  HPIA pays homeowner's policyholders for damages to the house and to the structures attached to the house, including damage to fixtures, such as plumbing, electrical wiring, heating and permanently installed air-conditioning systems.

53.    Hawaii Island is divided into Zones 1 through 9 to reflect the potential hazards associated with living in an area.  One potential hazard, lava flows, is most likely in Zone 1 and least likely in Zone 9 based on estimates from the U.S. Geological Survey.  Figure 1 below depicts the division of Hawaii Island, with Hawaii's most active volcano, the Kilauea Volcano, located on the southeastern shore.  Leilani Estates, where Plaintiffs reside, is in Lava Zone 1.[11]

---

[10]    *HOMEOWNERS 2 BROAD FORM*, INS. SERVS. OFFICE, INC. (1990) http://www.hpiainfo.com/wp-content/uploads/2018/02/HO-0002-0491-Homeowners-2-Broad-Form.pdf.

[11]    *Lava Zones*, KOA REALTY, INC. (2018), https://www.koarealty.com/buying-property/lava-zones/ (last visited Dec. 5, 2018).

**Figure 1**



54.    The island of Maui is divided into Zones 1 through 4 to reflect the potential hazards associated with living in an area.  Figure 2 below depicts the division of Maui's hazard zones.

**Figure 2**



55. Aside from HPIA, the predominant insurer that writes homeowner insurance policies in Hawaii Lava Zones 1 and 2 is Lloyd's.[12]

56. Because the Lloyd's policies are more lucrative, Defendants are incentivized to not place Plaintiffs and the Class with HPIA policies.

57. In order to do so, Defendants knowingly failed to perform various duties and due diligence, including the duties and due diligence required under HRS §431:8-301(a), and/or artificially inflated the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically through HPIA.

58. By disregarding statutory due diligence requirements and other duties owed to Plaintiffs and the Class and/or artificially inflating the amount of coverage in the policies beyond the coverage limits provided under non-surplus lines insurance, such as HPIA, Defendants were able to represent that Plaintiffs and the Class could only purchase insurance through the surplus lines market and then specifically steer Plaintiffs and the Class to Lloyd's to provide insurance in order to unjustly enrich themselves.

59. The Broker Defendants received kickbacks from Lloyd's for steering Plaintiffs and the Class to the Lloyd's surplus lines policies in the form of increased commissions. The Broker Defendants' commissions were directly tied

---

[12] H.R. No. 39, House of Representatives Twenty-Ninth Legislature, State of Hawaii (Mar. 3, 2017).

to the amount of premium steered to Lloyd's, thereby incentivizing the Broker Defendants to maximize the amount of surplus lines insurance placed with Lloyd's. Defendants' scheme to steer Plaintiffs and the Class into these surplus lines policies enabled Lloyd's to maximize the volume of surplus lines premium, thereby increasing its revenues and profits by writing insurance that Lloyd's otherwise would not be able to write if Plaintiffs and the Class were to obtain non-surplus lines property and casualty insurance. Steering Plaintiffs and the Class into Lloyd's surplus lines insurance policies, which inevitably contain numerous exclusions, also served to reduce loss ratios and payouts for claims, which, in turn, increased the Broker Defendants' commissions and Lloyd's profits.

60. Because of the numerous exclusions inevitably associated with Lloyd's surplus lines homeowner's insurance, Plaintiffs and the Class were harmed as they were provided less comprehensive coverage.

61. For example, the surplus lines insurance policies that the Broker Defendants procured for the Plaintiffs and many Class members were missing important peril coverage against fire and lava and had specific exclusions for such damages. For a home located in Lava Zones 1 and 2, a homeowner's policy missing such important coverage amounted to no coverage at all. By wrongfully steering Plaintiffs and the Class into surplus lines insurance, Defendants have been

able to deny coverage to Plaintiffs and many Class members impacted by the recent eruption of the Kilauea Volcano on the basis of the Lava Exclusion.

62.    Figures 3 and 4 below are images from Zillow that depict the home values for houses that were recently sold in Leilani Estates, where Plaintiffs' homes were located.  Figure 3 is the eastern area of Leilani Estates, while Figure 4 is the western area.  The overwhelming majority of homes were sold, and thus were valued, well below $350,000, which is the dwelling coverage limit under the HPIA policy.

**Figure 3**[13]



---

[13]    *Recently Sold Homes*, ZILLOW (2018), https://www.zillow.com/homes/recently_sold/globalrelevanceex_sort/19.47608,-154.900339,19.455444,-154.927805_rect/14_zm/ (last visited Dec. 5, 2018).

**Figure 4**[14]



63.    Similarly, according to Data USA, the median property value in Leilani Estates is $219,400.[15]

64.    Additionally, according to Zillow, the median value of a home in the Pahoa area, which is in the Puna District (through which the East Rift Zone runs) on Hawaii Island in April 2018, was approximately $182,000.[16]    Likewise

---

[14]    *Recently Sold Homes*, ZILLOW (2018), https://www.zillow.com/homes/recently_sold/globalrelevanceex_sort/19.47608,-154.900339,19.455444,-154.927805_rect/14_zm/ (last visited Dec. 5, 2018).

[15]    *Leilani Estates, HI*, DATA USA, https://datausa.io/profile/geo/leilani-estates-hi/ (last visited Dec. 5, 2018).

[16]    *Pahoa Home Prices & Values*, ZILLOW (2018), https://www.zillow.com/pahoa-hi/home-values/ (last visited Dec. 5, 2018).

according to Realtor.com, the median list price for a home in the Pahoa area in April 2018 was $219,000.[17]

65.    Given that these properties were valued for substantially under $350,000, homes in Lava Zones 1 and 2, and more specifically Plaintiffs' homes, likely would be eligible to be insured under HPIA, rather than surplus lines insurance.

66.    Upon information and belief, the Broker Defendants also inflated the amount of personal liability coverage as another tactic used to steer Plaintiffs and the Class away from HPIA insurance and into Lloyd's surplus lines insurance.  A personal liability umbrella insurance policy provides added liability protection without a large added cost.  Additional liability insurance is inexpensive, especially compared to the value of the coverage provided.  For example, it could cost as little as $100 a year for $1 million of coverage.  No reasonable consumer would select surplus lines insurance with numerous exclusions, such as the Lava Exclusion, in order to obtain increased personal liability coverage when a personal liability umbrella insurance policy could be affordably obtained in addition to a comprehensive non-surplus lines insurance policy, such as HPIA.

---

[17]    *Pahoa, HI Local Community Home Values, Housing Market & Schools*, REALTOR.COM (2018), https://www.realtor.com/local/Pahoa_HI (last visited Dec. 6, 2018).

67.    However, instead of being offered other non-surplus lines insurance product alternatives, such as HPIA, due to Lloyd's and the Broker Defendants' improper practices, Plaintiffs and the Class were steered into purchasing surplus lines insurance policies with Lloyd's.

68.    Specifically, Lloyd's, through the participation and assistance of the Broker Defendants, was able to steer Plaintiffs and the Class into purchasing Lloyd's surplus lines insurance through Defendants' artificial inflation of the amount of coverage in the policies beyond the HPIA policy coverage limits such that they would qualify for Lloyd's surplus lines insurance.   The artificially inflated coverage allowed the Broker Defendants to maximize the volume of surplus lines written by Lloyd's, which, in turn, allowed the Broker Defendants to receive increased and improper commissions from Lloyd's.

69.    Defendants' scheme to steer Plaintiffs and the Class into these surplus lines policies enables Lloyd's to maximize the volume of surplus lines premium, thereby increasing its revenues and profits by writing insurance that Lloyd's otherwise would not be able to write if Plaintiffs and the Class were to obtain non-surplus lines property and casualty insurance.

**C.     Plaintiffs and the Class Have Been Sold Less Comprehensive Insurance**

70.    In the absence of Defendants' unlawful scheme, Plaintiffs and the Class would have insured their homes with more comprehensive insurance,

32

including insurance through HPIA, which provides for coverage against 16 perils, including fire and volcanic eruption.

71.    On May 2, 2018, small ground cracks opened in the Lower East Rift Zone of the Kilauea Volcano (which runs through the Puna District on Hawaii Island).  The following day, by 5:00 p.m. HST, a fissure in the area of Mohala and Leilani Streets in Leilani Estates erupted, spewing lava into the air and flowing down Hawaii Island's eastern edge.  That same day, Hawaii Acting County Mayor Wil Okabe and the Governor of Hawaii, David Ige, issued Emergency Proclamations declaring states of emergency along the Lower East Rift Zone.  In the following days and months, 24 fissures opened in and around Leilani Estates, pouring lava into the residential area and causing fires that burned down structures.

72.    On May 31, 2018, County of Hawaii Mayor Harry Kim ("Mayor Kim") signed a mandatory evacuation order for half of Leilani Estates, giving residents in the 17-block area (*see* Figure 5 below) 24 hours to evacuate.  Persons who did not evacuate were subject to arrest and liability for recovery costs associated with any necessary rescue operations.  On September 8, 2018, Mayor Kim rescinded the mandatory evacuation, but declared that "a Voluntary Evacuation Advisory of all areas of Leilani Estates, Lanipuna Gardens, Pohoiki, Bay Estates, Kapoho Beach Lots, Vacationland, and Kapoho Farm Lots is in effect

due to the hazards presented by the eruptive event and that first responders may not be able to respond timely to those areas."

**Figure 5**[18]



73.    About 2,500 residents in and around Leilani Estates have been displaced to date.   Plaintiffs were forced to leave their homes without time to gather personal property.   Plaintiffs were displaced and incurred various costs to secure new shelter.

74.    To date, over 700 homes have been lost due to fire or rendered a total loss due to destruction, inhabitability, inaccessibility, and a lack of structural integrity.   Residents not only lost their home(s), but many, including Plaintiffs and the Class, lost virtually everything they owned.

---

[18]    Image, BIGISLANDNOW.COM, http://bigislandnow.com/wp-content/uploads/2018/05/Evacuation-Map.jpg (last visited Dec. 5, 2018).

75.    Because of the numerous exclusions inevitably associated with Lloyd's surplus lines homeowner's insurance, Plaintiffs and the Class were harmed as they were provided less comprehensive coverage.   By wrongfully steering Plaintiffs and the Class into surplus lines insurance, Defendants have been able to deny coverage to Plaintiffs and many Class members impacted by the recent eruption of the Kilauea Volcano on the basis of the Lava Exclusion.

76.    As a result of Defendants' unlawful steering scheme, Plaintiffs and the Class have been left with inferior and potentially worthless insurance.   Had Defendants performed their duties and due diligence, Plaintiffs and the Class would not have qualified for Lloyd's surplus lines insurance and would instead have received insurance under HPIA or other commercial insurers.   For Plaintiffs and Class members impacted by the recent eruption of the Kilauea Volcano, they would have been covered for the losses they suffered.   Plaintiffs and all Class members have paid, and continue to pay, premiums for essentially worthless insurance that they would not have purchased had they known more comprehensive insurance was available to them.

## CLASS ALLEGATIONS

77.    Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Class, defined as follows:

All persons with a home located in the State of Hawaii who purchased a surplus lines homeowner's insurance policy with a Lava Exclusion during the applicable statute of limitations from one or more of the Broker Defendants, where the policy of insurance was underwritten or subscribed to by Lloyd's.  Specifically excluded from this Class are Defendants; the officers, directors, or employees of Defendants; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants.  Also excluded are those who assert claims for personal injury, as well as any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

78.    The Class is sufficiently numerous, as each includes hundreds of persons who have purchased surplus lines insurance from the Broker Defendants underwritten by Lloyd's.  Thus, joinder of such persons in a single action or bringing all members of the Class before the Court is impracticable for purposes of Rule 23(a)(1).  The question is one of a general or common interest of many persons and it is impractical to bring them all before the Court.  The disposition of the claims of the members the Class in this class action will substantially benefit both the parties and the Court.

79.    There are questions of law and fact common to the Class for purposes of Rule 23(a)(2), including whether Defendants over-insured the Class without intending to pay for damage their property.  The members of the Class were and are similarly affected by having purchased surplus lines insurance policies through Lloyd's, as set forth in detail herein, and the relief sought herein is for the benefit of Plaintiffs and other members of the Class.  Thus, there is a well-defined

community of interest in the questions of law and fact involved in this action and affecting the parties.

80.     Plaintiffs assert claims that are typical of the claims of the Class for purposes of Rule 23(a)(3).   Plaintiffs and all members of the Class have been subjected to the same wrongful conduct because they were improperly steered into purchasing surplus lines insurance, which does not provide necessary coverage for their homes.  Plaintiffs paid a premium for their surplus lines policies, on the belief they were unable to obtain insurance elsewhere and that Lloyd's would provide coverage for damages to their home, over similar alternatives like HPIA homeowner's insurance, which would have provided coverage for damages to Plaintiffs' properties.   Defendants artificially inflated and/or manipulated the insurance market to place Plaintiffs and the Class into surplus lines insurance when other traditional insurance was available.  Plaintiffs and the members of the Class have thus all overpaid for their surplus lines insurance policies.

81.     Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class for purposes of Rule 23(a)(4).  Plaintiffs have no interests antagonistic to those of other members of the Class.   Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel experienced in litigation of this nature to represent them.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

82.    Class certification is appropriate under Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting each Class as a whole.   Defendants utilize an integrated, misleading practice to homeowners in Hawaii that includes uniform misrepresentations that misled Plaintiffs and the other members of the Class.

83.    Class certification is appropriate under Rule 23(b)(3) because common questions of law and fact substantially predominate over any questions that may affect only individual members of the Class.   Among these common questions of law and fact are:

a.    Whether Defendants wrongfully steered Plaintiffs and the Class into homeowner's insurance policies underwritten and/or subscribed to by Lloyd's;

b.    Whether the Broker Defendants failed to perform the due diligence required under HRS §431:8-301(a) to ascertain whether comparable non-surplus lines insurance was available;

c.    Whether Defendants failed to disclose that non-surplus lines insurance was available;

d.      Whether Defendants artificially inflated the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically through the government-established HPIA;

e.      Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class;

f.      Whether Defendants employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with content that others rely upon such concealment, suppression, or omission by Defendants' arrangement, whereby the Broker Defendants selected surplus lines insurance policies with inflated premiums through Lloyd's in order to receive kickbacks in the form of increased and unwarranted commissions in violation of HRS §§480-1, *et seq.* and HRS §§481A-1, *et seq.*;

g.      Whether Plaintiffs and members of the Class are entitled to damages and restitution as a result of Defendants' conduct; and

h.      Whether Plaintiffs and members of the Class are entitled to injunctive and other equitable relief.

84.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by the members of the Class.   Similar or

identical statutory and common law violations and deceptive business practices are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

85. The injuries sustained by Plaintiffs and the members of the Class flow, in each instance, from a common nucleus of operative facts – Defendants' misconduct.

86. Plaintiffs and the members of the Class have been damaged by Defendants' misconduct. Class members have paid for a product that would not have been purchased in the absence of Defendants' deceptive scheme, or, alternatively, would have purchased more comprehensive coverage.

87. Proceeding as a class action provides substantial benefits to both the parties and the Court because this is the most efficient method for the fair and efficient adjudication of the controversy. Class members have suffered damages and will suffer irreparable harm and continued damages as a result of Defendants' wrongful conduct. Because of the nature of the individual claims of the members of the Class, few, if any, could or would otherwise afford to seek legal redress against Defendants for the wrongs complained of herein, and a representative class action is therefore the appropriate, superior method of proceeding and essential to the interests of justice insofar as the resolution of claims of the members of the Class is concerned. Absent a representative class action, members of the Class

would continue to suffer losses for which they would have no remedy, and Defendants would unjustly retain the proceeds of their ill-gotten gains.  Even if separate actions could be brought by individual members of each Class, the resulting multiplicity of lawsuits would cause undue hardship, burden, and expense for the Court and the litigants, as well as create a risk of inconsistent rulings, which might be dispositive of the interests of the other members of the Class who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

## CAUSES OF ACTION

### COUNT I
### Violation of Haw. Rev. Stat. §§480-1, *et seq.*
### (Against All Defendants)

88.    Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

89.    Plaintiffs bring this claim individually and on behalf of members of the Class.

90.    Plaintiffs and each member of the Class are "consumers" as that term is defined in HRS §480-1.

91.    HRS §480-2(a) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

92.    The described acts and practices involved "trade and commerce" as those terms are used in HRS §480-2(a).

93.    Lloyd's and the Broker Defendants have engaged in unfair and deceptive acts or practices in violation of HRS §480-2(a) in the conduct of their trade and/or commerce in the State of Hawaii.  Lloyd's had a relationship with the Broker Defendants, whereby the Broker Defendants engaged in a kickback scheme where certain brokers wrongly steered Plaintiffs and the Class into homeowner's insurance policies underwritten and/or subscribed to by Lloyd's by selecting the Lloyd's surplus lines homeowner's insurance policies in order to receive unwarranted commissions by: (a) failing to perform various duties and due diligence, including the duties and due diligence required under HRS §431:8-301(a); (b) omitting that non-surplus lines insurance was available; and/or (c) artificially inflating the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically under HPIA.   Broker Defendants' and Lloyd's conduct of misrepresenting, concealing, steering, or otherwise omitting the foregoing created the likelihood of confusion or of misunderstanding.

94.    Lloyd's and the Broker Defendants' described acts and practices offend established public policy and/or were immoral, unethical, oppressive,

unscrupulous, and/or substantially injurious to consumers and were, therefore, unfair in violation of HRS §480-2(a).

95.    Lloyd's and the Broker Defendants' described acts and practices involved material representations, omissions, or practices that were likely to mislead consumers acting reasonably under the circumstances and were therefore deceptive in violations of H.R.S §480-2(a).

96.    The conduct described above caused Plaintiffs to suffer injury to their property, including, without limitation, wrongfully induced payment of money for insurance premiums and the loss of, or displacement from, their homes without proper insurance coverage.

97.    The conduct described above also was directed toward, targeted, and injured an "elder," as defined in HRS §480-13.5, as many members of the Class are retirees.  By way of their own records, which necessarily include personally identifying information such as data of birth, Defendants knew or should have known that their conduct was directed toward and targeted elders.  Elders are known to be more vulnerable to unfair and deceptive conduct than other consumers in particular with regard to the interpretation of confusing insurance contracts, such as the Lloyd's homeowner's policies Defendants offered.  Therefore, Defendants' conduct was done in willful disregard of the rights of elders.  As a result, pursuant to HRS §480-13.5, the Court may impose a civil penalty not to exceed $10,000, in

addition to any other civil penalty, for each violation of HRS §480-2 that involves an elder.

98.     Plaintiffs and the Class sustained damages as a direct and proximate result of Lloyd's and the Broker Defendants' deceptive and/or unfair trade practices.   Pursuant to HRS §480-13(b)(1), a consumer who is injured by a violation of this chapter is entitled, for each violation, to be awarded a sum not less than $1,000.00 or threefold any damages he or she sustained, whichever sum is the greater, and reasonable attorneys' fees together with costs of suit.

99.     Pursuant to HRS §480-13(b)(2), a consumer who is injured by a violation of this chapter may bring proceedings to enjoin the unlawful practices and be awarded reasonable attorneys' fees together with costs of suit.

100.   Pursuant to HRS §480-12, any contract or agreement in violation of HRS §§480-1, *et seq*., is void and is not enforceable at law or in equity.

101.   HRS §480-11(b) does not apply to the acts and practices described above.   Specifically, Defendants' acts and practices described herein involving a kickback scheme, where the Broker Defendants wrongly steered Plaintiffs and the Class into surplus lines insurance policies underwritten and/or subscribed to by Lloyd's, are not permitted insurance transactions and thus are a violation of Hawaii law.

## COUNT II
### Violation of Haw. Rev. Stat. §§481A-1, *et seq.*
### (Against All Defendants)

102.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

103.   Plaintiffs bring this claim individually and on behalf of members of the Class.

104.   The acts of Defendants complained of herein constitute unfair methods of competition under Hawaii's Uniform Deceptive Trade Practices Act because Lloyd's had a relationship with the Broker Defendants, whereby the Broker Defendants would select the Lloyd's surplus lines homeowner's insurance policy in order to receive unwarranted commissions by: (a) failing to perform various duties and due diligence, including the duties and due diligence required under HRS §431:8-301(a); (b) omitting that non-surplus lines insurance was available; and/or (c) artificially inflating the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically under the HPIA.   Broker Defendants' and Lloyd's conduct of misrepresenting, concealing, steering, or otherwise omitting the foregoing created the likelihood of confusion or of misunderstanding under HRS §481A-3(a)(12).

105.   As a result of the foregoing alleged actions of Defendants, Defendants have been unjustly enriched and Plaintiffs and the Class have been injured and

damaged.   Unless the foregoing alleged actions of Defendants are enjoined, Plaintiffs and the Class will continue to suffer injury and damage.

106.   Pursuant to HRS §481A-4(a), Plaintiffs seek injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendants, including, but not limited to, an order enjoining Defendants from improperly steering persons with a home located in the State of Hawaii into purchasing Lloyd's surplus lines homeowner's insurance to insure their homes against peril, instead of more comprehensive coverage, and enjoining the Broker Defendants from failing to perform their required duties and due diligence. Plaintiffs will be irreparably harmed if such an order is not granted.

**COUNT III**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against Defendants Lloyd's, Monarch, and SPG)**

107.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

108.   Plaintiffs bring this claim individually and on behalf of the Class.

109.   For good and valuable consideration tendered by Plaintiffs and the Class to, and accepted by, Lloyd's, Monarch, and SPG, a Lloyd's a homeowner's insurance policy was issued to Plaintiffs and the Class.

110.   In reasonable reliance upon the representations made to Plaintiffs and the Class by Lloyd's, Monarch, and SPG, and their agents Moa and Pyramid,

Plaintiffs and the Class regularly paid valuable consideration in the form of a premium to bind coverage and be included as a named insured under that policy.

111.   All conditions precedent to the filing of this cause of action have been performed by Plaintiffs and the Class or have been waived by Lloyd's, Monarch, and SPG, and their agents Moa and Pyramid.

112.   At all times material to this case, Plaintiffs and the Class have fully complied with their obligations as set forth in their respective policies.

113.   A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

114.   Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.  Lloyd's, with the participation and assistance of Monarch and SPG, and their agents Moa and Pyramid, improperly steered Plaintiffs and the Class into Lloyd's surplus lines insurance policies.

115.   Lloyd's is afforded substantial discretion offering coverage for its surplus lines insurance, but has an obligation to exercise the discretion afforded in good faith and not capriciously or in bad faith.

116.   Lloyd's also is afforded substantial discretion in determining the amount of insurance for Plaintiffs' and the Class's properties and to determine if that insurance is sufficient.   The policy documents do not state how Lloyd's determines the adequacy of the insurance.   Nevertheless, Lloyd's has an obligation to exercise the discretion afforded in good faith and not capriciously or in bad faith.

117.   The duty of good faith and fair dealing may spring from state statutory mandates upon all persons which transact the business of insurance.   The State of Hawaii Legislature has unequivocally declared in HRS §431:1-102 that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters [and further] [u]pon the insurer, the insured and their representatives rests the duty of preserving inviolate the integrity of insurance."   Consequently, HRS §431:1-101 clearly mandates that "[n]o person shall transact a business of insurance in [Hawaii] without complying with the applicable provisions of this code."

118.   Because of the adhesive quality of insurance contracts, the duty of good faith and fair dealing toward insureds is implied as a "consequence of the relationship established by contract."   The insured is a beneficiary of the contract

of insurance and so the duty extends to all persons acting under authority of that contractual relationship.

119.   Plaintiffs do not seek to vary the express terms of the insurance contracts, but to insure that Lloyd's exercises its discretion in good faith.  Lloyd's breached the implied covenant of good faith and fair dealing by: (1) steering Plaintiffs and the Class into surplus lines insurance with artificially inflated coverage amounts so that Lloyd's could place such insurance and to profit off of writing insurance that Lloyd's would otherwise not be able to write if Plaintiffs and the Class were to obtain non-surplus lines property and casualty insurance; (2) paying kickbacks and unwarranted commissions to the Broker Defendants for steering insureds to the higher priced surplus lines policies in the form of increased commissions from the sale of these policies; and (3) manipulating the surplus lines insurance market by selecting Broker Defendants that artificially inflated premiums and excessive surplus lines insurance coverage.

120.   Plaintiffs and the Class suffered damages as a result of breaches of the implied covenant of good faith and fair dealing by Lloyd's, Monarch, and SPG.

**COUNT IV**
**Unjust Enrichment**
**(Against All Defendants)**

121.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

49

122.   Plaintiffs' unjust enrichment claim is pleaded in the alternative to their contract-based claim against Lloyd's, Monarch, and SPG.  No contract between Plaintiffs and Moa or Pyramid exists and no contact between Plaintiffs and Lloyd's, Monarch, and SPG may cover the conduct alleged herein.

123.   Plaintiffs bring this claim individually, as well as on behalf of members of the Class.

124.   During the Class Period, Defendants deceptively marketed and sold surplus lines insurance to Plaintiffs and the Class.

125.   Plaintiffs and the Class conferred upon Defendants non-gratuitous payments for insurance and insurance-related services that they would not have but for Defendants' unfair, misleading, and deceptive actions.  Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and the Class, with full knowledge and awareness that, as a result of Defendants' misconduct, Plaintiffs and the Class were offered and sold less comprehensive surplus lines insurance that was inferior to other insurance available.

126.   Defendants have been unjustly enriched in retaining the revenues derived from the purchases of surplus lines insurance by Plaintiffs and the Class, which retention under these circumstances is unjust and inequitable because Defendants did not perform proper due diligence and/or artificially inflated the

insurance coverage such that they were sold less comprehensive coverage than insurance available through other insurers, including through the HPIA.

127.  The Broker Defendants received unwarranted commissions and kickbacks from Lloyd's for steering insureds to the surplus lines policies in the form of increased commissions from the sale of these policies.  Defendants' scheme to steer Plaintiffs and the Class into these surplus lines policies enables Lloyd's to profit off of writing insurance that Lloyd's would otherwise not be able to write if Plaintiffs and the Class were to obtain non-surplus lines property and casualty insurance.

128.  Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.  Thus, Defendants must pay restitution to Plaintiffs and the Class for its unjust enrichment, as ordered by the Court.

## COUNT V
### Breach of Fiduciary Duties
### (Against Broker Defendants)

129.  Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

130.  Plaintiffs bring this claim individually and on behalf of the Class.

131.   Because of their insured-broker relationship, Plaintiffs and the Class placed trust and confidence in Broker Defendants, relying on them for their judgment, expertise, and integrity.   As a consequence, a fiduciary relationship existed between Plaintiffs and the Class and Broker Defendants.

132.   At all relevant times, Broker Defendants were Plaintiffs' and the Class's agent for the procurement of insurance.   Plaintiffs and the Class relied on Broker Defendants to identify the types and amounts of coverage required and the insurance companies who could provide that coverage.   Plaintiffs and the Class also relied on Broker Defendants for advice regarding which insurance programs to select and to negotiate premiums with insurance companies.

133.   Defendants, however, engaged in a deceptive scheme to collect secret commissions, steer lucrative business to Lloyd's, charge Plaintiffs and the Class improper and inflated premiums, and misrepresent Plaintiffs' and the Class's insurance coverage.

134.   Because this scheme was lucrative for Broker Defendants, they had no incentive to find insurance programs for Plaintiffs and the Class that were better for Plaintiffs and the Class, but which were not written by Lloyd's.   As a consequence, Broker Defendants failed to reasonably canvas the market to identify programs that were better for Plaintiffs and the Class than those written by Lloyd's.

135.   Because Broker Defendants were taking an undisclosed commission that was a percentage of the premium, the Broker Defendants had no incentive to find Plaintiffs and the Class the best price and, consequently, failed to appropriately survey the market to see if lower cost programs were available. Accordingly, as a result of Defendants' fraudulent scheme, Plaintiffs and the Class paid more for insurance than they should have.

136.   Plaintiffs and the Class placed great trust and confidence in Broker Defendants and relied on them for their judgment, expertise, and integrity.  As such, Plaintiffs had a fiduciary relationship with Broker Defendants.

137.   Broker Defendants owed Plaintiffs and the Class a fiduciary duty of loyalty and full disclosure.

138.   Broker Defendants breached their fiduciary duties to Plaintiffs and the Class by: (1) steering Plaintiffs and the Class into surplus lines insurance with artificially inflated coverage amounts so that Lloyd's could place such insurance and to profit off of writing insurance that Lloyd's would otherwise not be able to write if Plaintiffs and the Class were to obtain non-surplus lines property and casualty insurance; (2) receiving kickbacks and unwarranted commissions for steering insureds to the higher priced surplus lines policies in the form of increased commissions from the sale of these policies; (3) failing to perform various duties and due diligence, including the duties and due diligence required under HRS

§431:8-301(a); and (4) falsely describing and failing to disclose relevant policy information and artificially inflating the amount of coverage beyond the coverage limits available under HPIA.

139.   The breaches of fiduciary duties owed to Plaintiffs and the Class proximately caused Plaintiffs and the Class to incur economic losses, including, without limitation, wrongfully induced payment of money for insurance premiums and the loss of, or displacement from, their homes without proper insurance coverage.

## COUNT VI
### Negligence
### (Against Broker Defendants)

140.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

141.   Plaintiffs bring this claim individually and on behalf of the Class.

142.   At all relevant times, Broker Defendants owed a duty to Plaintiffs and the Class to perform the due diligence required under HRS §431:8-301(a) to ascertain whether comparable non-surplus lines insurance was available.

143.   Defendants, however, engaged in a deceptive scheme to collect secret commissions, steer lucrative business to Lloyd's, charge Plaintiffs and the Class improper and inflated premiums, and misrepresent Plaintiffs' and the Class's insurance coverage.

144.   Because this scheme was lucrative for Broker Defendants, they had no incentive to find insurance programs for Plaintiffs and the Class that were better for Plaintiffs and the Class, but which were not written by Lloyd's.   As a consequence, Broker Defendants failed to reasonably canvas the market to identify whether non-surplus lines insurance was available.

145.   Broker Defendants failed to appropriately survey the market to see if non-surplus lines insurance was available.  As a result, Plaintiffs and the Class paid more for insurance than they should have and/or paid for insurance with illusory coverage that was therefore worthless.

146.   Broker Defendants breached their duties to Plaintiffs and the Class by failing to perform the due diligence required under HRS §431:8-301(a) to ascertain whether comparable non-surplus lines insurance was available.

147.   Defendants also had a duty of care in procuring, reviewing, and analyzing the Lloyd's policy and violated that duty of care and were grossly negligent.

148.   Broker Defendants failed to use ordinary care to understand the terms, conditions, and costs of the Lloyd's policy and were grossly negligent.

149.   The breaches of duties owed to Plaintiffs and the Class proximately caused Plaintiffs and the Class to incur economic losses, including, without

limitation, wrongfully induced payment of money for insurance premiums and the loss of, or displacement from, their homes without proper insurance coverage.

## COUNT VII
### Declaratory Judgment
### (Against All Defendants)

150.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

151.   Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.   Furthermore, the Court has broad authority to restrain acts, such as here, which are tortious and which violate the terms of the federal and state statutes described herein.

152.   An actual controversy has arisen in the wake of the eruption of the Kilauea Volcano regarding Defendants' duties to act reasonably with respect to issuing homeowner's insurance policies to homeowners in Hawaii, including Plaintiffs and members of the Class.   Plaintiffs allege Defendants' actions (and inaction) in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.   Additionally, Plaintiffs continue to suffer injury from Defendants' issuance of worthless insurance to cover their homes.

153.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (i) Broker Defendants owe a legal duty to perform their required duties and due diligence required under Hawaii law to place surplus lines insurance; (ii) Broker Defendants continue to breach this legal duty by failing to perform their required duties and due diligence; and (iii) Broker Defendants' ongoing breach of this legal duty continues to cause harm.

154.   The Court should also issue corresponding injunctive relief requiring Defendants to cease the unlawful practices alleged herein.   Without such an injunction Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief against the Defendants as follows:

A.   That the Court certify the Class under Fed. R. Civ. P. 23 and appoint Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the members of the Class;

B.      Awarding damages sustained by Plaintiffs and the Class as a result of Defendants' breaches of the implied covenant of good faith and fair dealing, breach of fiduciary duties, and negligence, together with pre-judgment interest;

C.      Awarding damages sustained by Plaintiffs and the Class as a result of Defendants' violations of HRS §480-2(a) and granting injunctive relief as a result of Defendants' violations of HRS §481A-1, together with pre-judgment interest;

D.      That Defendants have been unjustly enriched and requiring Defendants to disgorge and refund the amount of all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

E.      That the Court preliminarily and permanently enjoin Defendants from conducting its business through the unlawful, unfair, or fraudulent business acts or practices and other violations of law described in this Complaint;

F.      That the Court order the Defendants to implement whatever measures are necessary to remedy the unlawful, unfair, or fraudulent business acts or practices and other violations of law described in this Complaint;

G.      That the Court order Defendants to notify each and every individual who purchased surplus lines insurance from the Defendants of the pendency of the claims in this action in order to give such individuals an opportunity to obtain restitution from Defendants;

H.    That the Court order Defendants to pay restitution to restore to all affected persons all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or a fraudulent business act or practice, plus pre- and post-judgment interest thereon;

I.    That the Court order Defendants to disgorge all monies wrongfully obtained and all revenues and profits derived by Defendants as a result of its acts or practices as alleged in this Complaint;

J.    That the Court award damages to Plaintiffs and the Class;

K.    That the Court issue an injunction to prevent Defendants from engaging in the conduct alleged herein;

L.    That the Court enter a declaratory judgment in favor of Plaintiffs and the Class as described above;

M.    That the Court award attorneys' fees and expenses under the common fund doctrine and/or any other appropriate legal theory; and

N.    That the Court grant such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: December 21, 2018                    */s/ Jeffrey E. Foster*
                                             JEFFREY E. FOSTER #9857
                                             **FOSTER LAW OFFICES, LLC**
                                             PO Box 127

Captain Cook, HI 96704
Telephone: (808) 348-7800
Facsimile:  (808) 443-0277

E. Kirk Wood
(*pro hac vice forthcoming*)
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 908-4906
Facsimile:  (866) 747-3905
ekirkwood1@bellsouth.net

Joseph P. Guglielmo
(*pro hac vice forthcoming*)
Erin Green Comite
(*pro hac vice forthcoming*)
**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
jguglielmo@scott-scott.com
ecomite@scott-scott.com

*Counsel for Plaintiffs*