IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

_____

| | |
|---|---|
| STEPHEN G. AQUILINA and LUCINA, J. AQUILINA, Individually and on Behalf of all Others Similarly Situated; AUDRA M. LANE and SCOTT L. LANE, Individually and as Trustees of the Lane Family Trust, dated March 28, 1998, and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> CERTAIN UNDERWRITERS AT LLOYD'S SYNDICATE #2003; LLOYD'S SYNDICATE #318; LLOYD'S SYNDICATE #4020; LLOYD'S SYNDICATE #2121; LLOYD'S SYNDICATE #2007; LLOYD'S SYNDICATE #1183; LLOYD'S SYNDICATE #1729; BORISOFF INSURANCE SERVICES, INC. d/b/a MONARCH E&S INSURANCE SERVICES; SPECIALTY PROGRAM GROUP, LLC d/b/a SPG INSURANCE SOLUTIONS, LLC; PYRAMID INSURANCE CENTRE, LTD.; ILIKEA LLC d/b/a MOA INSURANCE SERVICES HAWAII; and DOES 1-100, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civ. No. 18-00496-ACK-KJM ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

_____

## ORDER GRANTING DEFENDANTS BORISOFF INSURANCE SERVICES, INC. d/b/a MONARCH E&S INSURANCE SERVICES AND SPG INSURANCE SOLUTIONS, LLC'S MOTION TO DISMISS

Plaintiffs are residents of the Puna District of Hawai'i Island who purchased surplus lines homeowner's insurance policies brokered and underwritten by the various Defendants.

- 1 -

In the aftermath of the May 2018 eruption of Kilauea Volcano, Plaintiffs sustained significant damages to their properties and sought coverage for the losses under their surplus lines policies. Such coverage was denied, primarily based on an exclusion precluding coverage for lava-related damage. Plaintiffs now allege that Defendants carried out a deceptive scheme by which they unlawfully "steered" Plaintiffs and other homeowners into purchasing, through the surplus lines market, what Plaintiffs call "essentially worthless" coverage, with the goal of increasing profits and commissions and lowering payouts for covered claims.

Defendants Borisoff Insurance Services d/b/a Monarch E&S Insurance Services ("Monarch") and Specialty Program Group, LLC d/b/a SPG Insurance Solutions, LLC ("SPG")[1/] have moved to dismiss the Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons explained in this Order, the Court GRANTS Monarch's Motion to Dismiss, ECF No. 30, insofar as it seeks dismissal of all Plaintiffs' claims against Monarch and SPG.

---

[1/] Monarch's assets are owned by SPG. For convenience, this Order primarily reference "Monarch" as the moving defendant.

# FACTUAL BACKGROUND

## I.  The Policies

Plaintiffs Stephen and Lucina Aquilina, and Audra and Scott Lane, individually and as Trustees of the Lane Family Trust (collectively, "Plaintiffs"), as well as a putative class of similarly-situated consumers (the "Class"),[2] purchased surplus lines homeowners insurance policies (the "Policies") to insure their residential properties in Hawai'i.  Compl. ¶ 1. The Policies were purchased with the assistance of two retail brokers, Defendants Pyramid Insurance Centre, Ltd. ("Pyramid") and Ilikea LLC d/b/a Moa Insurance Services Hawaii ("Moa"), and one coverholder, Defendant Monarch, whose assets are owned by SPG (collectively, "Broker Defendants").[3]  The Policies were underwritten by several syndicates of Defendants Certain Underwriters at Lloyd's London, including Syndicates #2003, #318, #4020, #2121, #2007, #1183, #1729 (collectively, "Underwriters").  Compl. ¶ 1.

Pyramid and Moa are both retail brokers who placed the Policies and worked on Plaintiffs' behalf to procure homeowner's insurance.  See Compl. ¶¶ 35-36.  Monarch is a licensed surplus

---

[2]  The Court notes that the Class has not been certified.  References to the "Class" are for purposes of convenience in addressing the allegations in the Complaint.

[3]  As will be discussed herein, the Complaint improperly groups the various Defendants together, often referring to them as "Defendants" or "Broker Defendants."  The Court does its best to distinguish the allegations with respect to each individual party while still accurately describing the allegations as framed in the Complaint.

lines broker, and coverholder to and authorized agent of Underwriters. See Compl. ¶¶ 29, 32-34. As the coverholder, Monarch is listed on the Policies as the point of contact for handling claim-related communications with Plaintiffs. Compl. ¶¶ 29-34; see also ECF Nos. 30-3 & 30-4.[4/] The Complaint also alleges that Monarch acted with the assistance of "its authorized agents, including Moa and Pyramid." Compl. ¶ 29.

## II. The Surplus Lines Insurance Market

Surplus lines insurance is available as a last resort when the traditional insurance market is "unable or unwilling to provide coverage due to risky characteristics." Compl. ¶ 39, 46-47. The surplus lines market exists to provide coverage for high-risk loss exposures when "admitted insurers in the standard market do not have the flexibility" to underwrite such risks. Compl. ¶ 40. Surplus lines insurance is provided by non-admitted insurers who are not licensed to operate in Hawai'i and who are not required to obtain approval for their rates, forms, and underwriting rules. Compl. ¶ 41. "[S]urplus lines insurers often fill the gap to provide insurance coverage for high-risk perils, but are only permitted to do so under specified circumstances." Compl. ¶ 41.

---

[4/] Before 2017, the Policies listed "Monarch E & S Insurance Services" as the point of contact. Compl. ¶ 31. After SPG acquired Monarch in 2017, the Policies listed "Monarch E & S Insurance Services, Division of SPG Insurance Solutions." Compl. ¶ 31; see also ECF Nos. 30-3 & 30-4.

The Hawai'i Insurance Code provides that surplus lines insurance may only be placed through a "licensed surplus lines broker." Compl. ¶ 44 (citing Haw. Rev. Stat. § 431:8-301(a)). The same provision requires that, "[b]efore placing a surplus lines policy, . . . a surplus lines broker must perform a diligent search of the insurance market" to determine whether the insurance can be obtained from authorized insurers; whether the insurance is in addition to or in excess of the amount and coverage that can be procured from authorized insurers; and whether the insurance is procured at a rate "lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the same protection." Compl. ¶ 45 (quoting Haw. Rev. Stat. § 431:8-301(a)(2)-(4)).

**III. The Steering Scheme**

The Complaint alleges a "steering scheme" through which Defendants allegedly sold surplus lines policies to Plaintiffs and the Class without complying with certain obligations under Hawai'i law. Compl. ¶ 47. As a result, in the devastating aftermath of the Kilauea Volcano eruption, Plaintiffs were denied coverage under their Policies for significant losses to their homes and properties. Compl. ¶¶ 7-8, 71-74.

The Complaint alleges that Defendants unlawfully placed surplus lines insurance instead of more comprehensive coverage, such as that available through the Hawaiʻi Property Insurance Association ("HPIA").[5/] Compl. ¶¶ 48-52. According to the Complaint, Plaintiffs' and the Class's properties qualified for HPIA insurance, but Defendants were incentivized not to place HPIA policies because Underwriters' policies were "more lucrative." Compl. ¶¶ 48-56, 62-66.

Defendants allegedly misrepresented to Plaintiffs that the Policies were the only available insurance without having performed the due diligence required under Hawaiʻi law to place surplus lines insurance. Compl. ¶ 3. According to Plaintiffs, Defendants "improperly steered" them into purchasing the Policies, which contain several exclusions that render coverage "essentially worthless." Compl. ¶¶ 1-4. Plaintiffs highlight one exclusion in particular, which precludes coverage for "the peril of lava and/or lava flow causing direct or indirect physical damage or loss of use of the insured property" (the "Lava Exclusion"). Compl. ¶ 1.

_____

[5/] HPIA coverage is "available to persons who are unable to obtain basic property insurance in the private market from a licensed insurer." Compl. ¶ 50 (citing HRS § 431:21-110). The Hawaiʻi Legislature, in creating HPIA, explained the policy underlying the program: "The purpose of this Act is to create an entity which will provide appropriately priced basic property insurance for owners and occupants of property in high risk areas for major natural disasters. This extraordinary action is being taken to provide limited relief to meet the unique and pressing needs of these persons who are currently unable to obtain any property insurance." 1991 Haw. Sess. Laws Act 284 § 2.

Plaintiffs allege that, since 2012, Broker Defendants and Underwriters "steered" Plaintiffs and the Class to purchase Lloyd's Policies. Among other things, Defendants artificially inflated the insurance coverage amounts—such as the home value or the personal liability coverage—beyond the HPIA coverage limits so that they could place Plaintiffs and the Class with Lloyd's surplus lines insurance policies." Compl. ¶¶ 4. Defendants allegedly knew that they were not allowed to place Plaintiffs and the Class with surplus lines insurance unless the coverage amounts exceeded the coverage available through traditional, non-surplus lines carriers. Compl. ¶ 5. According to Plaintiffs, the state's own HPIA insurance program could have provided them with more comprehensive coverage, yet Broker Defendants placed them with and Underwriters sold them surplus lines policies anyway. Compl. ¶¶ 5, 56–57.

This scheme is repeated in similar form throughout the Complaint to allege wrongdoing by Defendants in procuring the Policies for Plaintiffs and the Class. Compl. ¶¶ 58, 61, 66–69. The Complaint asserts that Defendants represented to Plaintiffs and the Class that they could only purchase insurance through the surplus lines market, thereby steering them into purchasing the Policies subscribed by Underwriters. Compl. ¶¶ 58, 67–69. The scheme in turn enabled Underwriters to increase their revenues and profits and Broker Defendants to collect

"kickbacks" from Underwriters in the form of increased commissions. Compl. ¶¶ 6, 59, 69. Plaintiffs allege that the commissions were "directly tied to the amount of premium steered to [Underwriters]" to incentivize Broker Defendants to "maximize the amount of surplus lines insurance placed with [Underwriters]." Compl. ¶ 59; see also Compl. ¶ 6.

As a result of the scheme, Plaintiffs were provided less comprehensive coverage because of "numerous exclusions inevitably associated with [Underwriters'] surplus lines homeowner's insurance"—in particular, the Lava Exclusion. Compl. ¶ 60. The Complaint alleges that, for a home located in a particularly risky Lava Zone, a homeowner's policy excluding lava coverage "amount[s] to no coverage at all." Compl. ¶ 1.

The Complaint frames the scheme this way:

> In furtherance of their undisclosed scheme to drive profits and commissions and lower payouts for claims, Defendants improperly steered Plaintiffs and the Class into Lloyd's surplus lines homeowner's insurance policies by: (a) failing to perform various duties and due diligence, including the duties and due diligence required under HRS §431:8-301(a); (b) omitting that non-surplus lines insurance was available; and/or (c) artificially inflating the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically through the government-established Hawaii Property Insurance Association ("HPIA").

Compl. ¶ 4; see also Compl. ¶¶ 93, 104, 119, 127, 138, 143.

Plaintiffs assert that, in the absence of the scheme, they would have insured their homes with more comprehensive insurance and would have had such coverage in the aftermath of the Kilauea eruption. Compl. ¶¶ 70-74. Now, because of the Lava and other exclusions associated with the Policies, Plaintiffs and the Class have received essentially worthless insurance coverage, enabling Underwriters to deny coverage under the Policies for resulting damages. Compl. ¶¶ 75-76.

## PROCEDURAL BACKGROUND

The named Plaintiffs, proceeding individually and on behalf of the Putative Class, filed their Complaint on December 21, 2018. See Compl. ECF No. 1. Therein, Plaintiffs assert seven causes of action:

1. *Count I*. Violation of the Unfair and Deceptive Acts or Trade Practices Act ("UDAP"), Hawaiʻi Revised Statutes ("HRS") §§ 480-1 et seq., against all Defendants. Compl. ¶¶ 88-101.

2. *Count II*. Violation of the Uniform Deceptive Trade Practices Act ("UDTPA") (together with Count I, the "UDAP Claims"), HRS §§ 481A-1 et seq., against all Defendants. Compl. ¶¶ 102-06.

3. *Count III*. Breach of the implied covenant of good faith and fair dealing ("bad faith") against Defendants Underwriters, Monarch, and SPG. Compl. ¶¶ 107-20.

- 9 -

4. *Count IV*.  Unjust enrichment against all Defendants.

   Compl. ¶¶ 121-28.

5. *Count V*.  Breach of fiduciary duties against Broker

   Defendants.  Compl. ¶¶ 129-139.

6. *Count VI*.  Negligence against Broker Defendants.

   Compl. ¶¶ 140-49.

7. *Count VII*.  Declaratory judgment against all Defendants.

   Compl. ¶¶ 150-54.

On March 6, 2019, Monarch filed a Motion to Dismiss. ECF No. 30.  The Parties completed briefing on the Motion on August 13.  ECF Nos. 77 (Opposition Brief) & 85 (Reply Brief). The Court heard oral arguments on the Motion on August 27, 2019.

## STANDARDS

### I.  Rule 12(b)

Rule 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the Court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff. Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere conclusory statements in a complaint or "formulaic recitation[s] of the elements of a cause of action" are not sufficient. Twombly, 550 U.S. at 555. Thus, the Court discounts conclusory statements, which are not entitled to a presumption of truth, before determining whether a claim is plausible. Iqbal, 556 U.S. at 678. However, "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment." Harris v. Cty. of Orange, 682 F.3d 1126, 1131 (9th Cir. 2012) (citation omitted).

## II.  Rule 9(b)

Where a party alleges fraud or mistake, the Rules require a heightened pleading standard. In particular, Rule 9(b) requires that, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Ninth Circuit has held

that "[t]o satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (quoting Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)); see also Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) ("To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." (quoting Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001))).

A motion to dismiss a claim grounded in fraud for failure to plead with particularly under Rule 9(b) is the functional equivalent of a motion to dismiss under Rule 12(b)(6).  See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003).  "As with Rule 12(b)(6) dismissals, dismissals for failure to comply with Rule 9(b) should ordinarily be without prejudice. Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect."  Id.

Monarch argues for dismissal on several grounds. The Court will address each of these arguments in turn. First, however, the Court holds that the Complaint as a whole is subject to Rule 9(b). Because the allegations in the Complaint fall short of meeting the heightened "particularity" standard, and because several causes of action are independently deficient, the Complaint is dismissed against Monarch, with leave to amend.

## I.   Rule 9(b) Heightened Pleading Standard

Although Monarch does not argue for dismissal under Rule 9(b), the Court concludes that the heightened standard applies because the same fraudulent conduct underlies all the claims. And because the pleading does not satisfy Rule 9(b)'s particularity requirement, the Complaint must be dismissed.

### a. Rule 9(b) Applies to the Complaint as a Whole Because the Allegations are Grounded in a Unified Course of Fraudulent Conduct

Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When an "entire claim within a complaint[] is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim." Vess, 317 F.3d at 1107. Under established Ninth

Circuit law, fraud need not be an essential element of a claim to subject it to the heightened pleading standard of Rule 9(b):

> In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a <u>unified course of fraudulent conduct</u> and <u>rely entirely on that course of conduct as the basis of a claim</u>. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

<u>Id.</u> at 1103-04 (emphasis added).

Here, Plaintiffs' claims are based on a single deceptive and fraudulent "scheme" to "steer" Plaintiffs into purchasing illusory surplus lines insurance that they otherwise would not have purchased. The primary allegations are as follows:

- Underwriters had a relationship with Broker Defendants;

- Broker Defendants engaged in a kickback scheme whereby they "wrongly steered" Plaintiffs into purchasing the Policies subscribed to by Underwriters;

- Broker Defendants received "unwarranted commissions" from Underwriters;

- Broker Defendants failed to perform duties and due diligence required under Section 301 of the Surplus Lines

Act, HRS § 431:8-301 ("Section 301"), including by

omitting that non-surplus lines insurance was available;

- Broker Defendants artificially inflated the amount of
  coverage beyond the limits provided under non-surplus
  lines insurance;

- Broker Defendants and Underwriters engaged in conduct of
  "misrepresenting, concealing, steering, or otherwise
  omitting" information to mislead Plaintiffs and the
  Class.

Compl. ¶¶ 82, 93, 104. Plaintiffs describe Defendants' conduct
as an "integrated, misleading practice to homeowners in Hawaii
that includes uniform misrepresentations that misled Plaintiffs
and the other members of the Class." Compl. ¶ 82.

These allegations, which underly all seven claims
against Monarch, are based on "a unified course of fraudulent
conduct." See Vess, 317 F.3d at 1103-04. Plaintiffs repeat the
same allegations of the "scheme" throughout the Complaint and
emphasize that they were "steered" into purchasing illusory
Policies. The allegations are grounded in the same fraudulent
conduct, and the Court must then review all the allegations
under Rule 9(b)'s more stringent standard.

That each individual cause of action against Monarch
does not require fraud as an element cannot save those claims
from the strict pleading requirements of Rule 9(b). See Vess,

317 F.3d at 1103-04. First, for example, bad faith and unjust enrichment do not typically require a showing of fraud. Yet the Complaint frames the allegations as asserting one underlying, fraudulent and "deceptive scheme." See Compl. ¶ 119 (bad faith claim alleging "deceptive" scheme where Defendants "artificially inflated coverage amounts" and "manipulate[ed] the surplus lines market" to increase profits and commissions); ¶ 124 (unjust enrichment claim alleging that "Defendants deceptively marketed and sold surplus lines insurance to Plaintiffs and the Class"). Doing so triggers Rule 9(b) with respect to both these claims. See Puri v. Khalsa, 674 F. App'x 679, 690 (9th Cir. 2017) (holding that where an "unjust enrichment claim is based on fraud, it too is subject to Rule 9(b)" (citing Vess, 317 F.3d at 1103-04)); In re Arris Cable Modem Consumer Litig., No. 17-CV-01834-LHK, 2018 WL 288085, at *10 (N.D. Cal. Jan. 4, 2018) (applying Rule 9(b) to unjust enrichment claim); Mostowfi v. I2 Telecom International, Inc., No. 03-5784 VRW, 2005 WL 8162717, at *11 (N.D. Cal. May 23, 2005) (same for breach of good faith and fair dealing claim).

As for the UDAP Claims, allegations made under the "unfair" prong do not ordinarily require compliance with the heightened pleading standard.[6/] See Bald v. Wells Fargo Bank,

---

[6/] It is well established in the Ninth Circuit that Rule 9(b)'s
(Continued . . . )

N.A., 688 F. App'x 472, 476 (9th Cir. 2017); Soule v. Hilton

Worldwide, Inc., 1 F. Supp. 3d 1084, 1090 (D. Haw. 2014).  But

that is only true when the claims are not grounded in fraudulent

conduct.  See Ryan v. Salisbury, 380 F. Supp. 3d 1031, 1049 (D.

Haw. 2019); Soule, 1 F. Supp. 3d at 1090.  Both the Ninth

Circuit and this Court have held that state-law UDAP claims must

be pleaded with particularity when the claims are based on

fraudulent conduct.  See Kearns v. Ford Motor Co., 567 F.3d

1120, 1122 (9th Cir. 2009) (holding that claims under

California's UDAP laws had to be pleaded with particularity);

Smallwood v. NCsoft Corp., 730 F. Supp. 2d 1213, 1232-33 (D.

Haw. 2010) (holding that claims under Hawai'i's UDAP laws were

based on "fraudulent concealment" and thus required pleading

with particularity); see also Long v. Deutsche Bank Nat'l Tr.

Co., No. 10-cv-00359 JMS/KSC, 2011 WL 2650219, at *7 (D. Haw.

July 5, 2011) ("[W]here a chapter 480 claim is based on

fraudulent acts, a plaintiff must plead with particularity.").

Here, the only possible basis for liability under UDAP

that Plaintiffs have alleged sounds in fraud.  Plaintiffs have

pointed to no factual allegations in the Complaint—and none are

evident to the Court—showing that they are alleging anything

other than an overarching deceptive scheme.  Nor have Plaintiffs

---

particularity requirement applies to state-law causes of action.  See Vess,
317 F.3d at 1103; Smallwood v. NCsoft Corp., 730 F. Supp. 2d 1213, 1232 (D.
Haw. 2010).

shown that the allegations of deceit can be separated from allegations of resulting unfairness. Thus, the allegations in Counts I and II that Plaintiffs were "steered" or "deceived" are the only possible basis for liability under the Hawai'i UDAP Claims, as the Complaint is currently framed. Cf. Long, 2011 WL 2650219 at *7 ("[A]t least part of Plaintiff's [UDAP] claim must sound in fraud, but the actual allegations as to Defendants' conduct are so vague that the court cannot determine what acts Plaintiff alleges are fraudulent." (footnote omitted)).

As to Count V, breach of fiduciary duties, the underlying allegations also sound in fraud. See, e.g., Compl. ¶¶ 133-35 (describing the "deceptive" and "fraudulent scheme" carried out by Defendants "to collect secret commissions, steer lucrative business to Lloyd's, charge Plaintiffs and the Class improper and inflated premiums, and misrepresent Plaintiffs' and the Class's insurance coverage"). Thus, to the extent that they "sound in fraud," the allegations of Count V are also subject to the heightened Rule 9(b) standard. See Gibson v. Credit Suisse AG, No. 1:10 CV 001-EJL-REB, 2012 WL 1253007, at *6 (D. Idaho Mar. 30, 2012) (holding that breach of fiduciary duty claim "sounds in fraud thereby necessitating that it satisfy Rule 9(b)'s heightened pleading standard" (citing Kearns, 567 F.3d at 1124)).

Finally, Count VI asserts a claim for negligence, alleging that Broker Defendants owed a duty to Plaintiffs and the Class stemming from Section 301 to perform "due diligence" to determine whether comparable non-surplus lines insurance was available. Compl. ¶ 142. Count VI asserts that Broker Defendants "failed to use ordinary care to understand the terms, conditions, and costs of the Lloyd's policy and were grossly negligent." Compl. ¶ 147. Plaintiffs again allege the same conduct and the same "deceptive scheme." Compl. ¶¶ 142-43.

Fraud is obviously not an essential element of a negligence claim. But the allegations in Count VI sound in fraud, bringing them within the scope of Rule 9(b). See Vess, 317 F.3d at 1103-04; see also Waikiki Trader Corp. v. Rip Squeak Inc., No. 09-00344 ACK-BMK, 2010 WL 11530615, at *14 (D. Haw. Apr. 15, 2010) (striking "negligence allegations" because the negligence claim "does not allege any separate facts but rather is based on the same alleged misrepresentations by Plaintiff" and thus is "grounded in fraud and subject to Rule 9(b)"). While it might seem counterintuitive to apply Rule 9(b) to a claim for negligence, Ninth Circuit case law is clear that allegations of a "unified course of fraudulent conduct" may subject claims—even those that ordinarily would not require a showing of fraud—to the heightened pleading standard. See Vess, 317 F.3d at 1103-04.

Here, the factual allegations in Count VI rest on a single deceptive and fraudulent scheme that was intentionally and willfully carried out by Defendants.  Plaintiffs do not allege conduct or facts to distinguish negligent activities from fraudulent activities.  Cf. Smallwood, 730 F. Supp. 2d at 1234-35 (declining to dismiss negligence claims for failing to comply with Rule 9(b) because the negligence claims were "separate and distinct from Plaintiff's fraud allegations").  In fact, the Complaint describes all the conduct alleged as intentional and willful, and as serving the same purpose:  to further the deceptive and fraudulent scheme.

The few paragraphs of the Complaint that use words associated with negligence—e.g., "ordinary care" or "grossly negligent"—would not pass muster under Rule 8(a) anyway.  See Compl. ¶¶ 146-49.  These allegations are conclusory at best and supported by only "formulaic recitation[s] of the elements of [the] cause of action."  Twombly, 550 U.S. at 555.  Neither Rule 8(a) nor Rule 9(b) allows such conclusory pleading.

To summarize, Rule 9(b) applies to all seven causes of action alleged against Monarch, even those claims that independently do not require a fraudulent element.[7]

---

[7]  This includes Count VII for declaratory judgment, which merely seeks declaratory relief based on the same fraudulent conduct alleged throughout the Complaint.  See Compl. ¶¶ 150-54.

**b. Applying the Heightened Standard of Rule 9(b), the Complaint Fails to Plead Facts With Adequate Particularity**

Having decided that Rule 9(b) applies to the Complaint as a whole, the Court now turns to whether the allegations against Monarch comply with the heightened pleading standard. For the reasons discussed below, they do not.

### i. Rule 9(b) Legal Standard

"Rule 9(b) requires particularized allegations of the circumstances constituting fraud." In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (en banc), superseded by statute on other grounds as recognized in Ronconi v. Larkin, 253 F.3d 423, 429 n.6 (9th Cir. 2001). The pleading must provide an "account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." See Swartz, 476 F.3d at 764 (quoting Edwards v. Marin Park, Inc., 356 F.3d 1058, 1066 (9th Cir. 2004)). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." Vess, 317 F.3d at 1106. Plaintiffs may not simply plead neutral facts to identify the transaction, but rather must also set forth what is false or misleading about a statement, and why it is false. See GlenFed, 42 F.3d at 1548. Moreover, group pleading is improper under Rule 9(b):

Rule 9(b) does not allow a complaint to merely

> lump multiple defendants together but
> require[s] plaintiffs to differentiate their
> allegations when suing more than one defendant
> . . . and inform each defendant separately of
> the allegations surrounding his alleged
> participation in the fraud.  In the context of
> a fraud suit involving multiple defendants, a
> plaintiff must, at a minimum, identif[y] the
> role of [each] defendant[] in the alleged
> fraudulent scheme.

Swartz, 476 F.3d at 764–65 (alterations in original) (internal citations omitted).

Rule 9(b)'s requirements may be relaxed for matters that are exclusively within the opposing party's knowledge. Rubenstein v. Neiman Marcus Grp. LLC, 687 F. App'x 564, 567 (9th Cir. 2017) (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989)).  For those matters, "[a]llegations of fraud based on information and belief may suffice . . . so long as the allegations are accompanied by a statement of the facts upon which the belief is founded."  Puri, 674 F. App'x at 687 (citing Wool v. Tandem Computs. Inc., 818 F.2d 1433, 1439 (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3 (9th Cir. 2002)).

### ii. The Alleged "Scheme" is Not Pleaded with Adequate Particularity

The Complaint repeats a common refrain:  Defendants engaged in a scheme to "steer" Plaintiffs to purchase "virtually worthless" surplus lines insurance so Broker Defendants could

collect unlawful commissions.  See gen. Compl.  Yet the
Complaint fails to allege specific facts plausibly giving rise
to Plaintiffs' suspicions of a "scheme," other than that they
ended up with unsatisfactory coverage. The Complaint contains
almost no particulars—including the who, what, when, where, and
how—of the alleged "scheme."  The allegations do not address who
made what specific representations or statements to Plaintiffs
and when; what representations or statements Plaintiffs relied
on; how Underwriters' paying commissions to brokers constitutes
"improper kickbacks"; and how Plaintiffs were "steered" into
purchasing the Policies.  See Siegel v. Shell Oil Co., 480 F.
Supp. 2d 1034, 1043 (N.D. Ill. 2007) (dismissing complaint
because plaintiffs failed to allege "any of the particulars
surrounding the[] averments of fraud").

Relevant to Monarch, the Complaint says nothing about
its specific acts or what it did or did not do.  See Reply Br. 2
(citing Adobe Sys. v. Blue Source Grp. Inc., 125 F. Supp. 3d
945, 964 (N.D. Cal 2015)); see also Reply Br. 4 (noting that
Complaint does not allege "that Monarch ever communicated with
[Plaintiffs] to decide what insurance to procure").  For
example, the Complaint alleges that, "[i]n reasonable reliance
upon the representations made to Plaintiffs and the Class by
Lloyd's, Monarch, and SPG, and their agents Moa and Pyramid,
Plaintiffs and the Class regularly paid valuable consideration

in the form of a premium to bind coverage and be included as a named insured under that policy." Compl. ¶ 110. This allegation says nothing about which party made what representations to Plaintiffs, and what those representations were.

While the Court recognizes that Rule 9(b) is relaxed as to matters within the opposing party's knowledge, Opp. Br. 9, that does not excuse Plaintiffs from alleging some <u>facts</u> that inform their allegations. <u>See</u> <u>Puri</u>, 674 F. App'x at 687 (citing <u>Wool</u>, 818 F.2d at 1439). Here, Plaintiffs are grasping at straws to point to particularized "facts" giving rise to their conclusion that <u>Monarch</u> participated in an alleged unlawful "scheme" to mislead Plaintiffs. While the Court acknowledges and is troubled by the allegations that Broker Defendants artificially inflated Plaintiffs' property values to preclude them from qualifying for HPIA coverage, Compl. ¶¶ 50-54, 62-68, Plaintiffs have not "identifie[d] the specific circumstances constituting fraud that put[] [Monarch] on notice" so it can adequately respond to the allegations against it. <u>See</u> <u>Muriu v. W. Coast Life Ins. Co.</u>, No. CV 17-380-GW(SKx), 2017 WL 10592124, at *5 (C.D. Cal. May 25, 2017).

The Court is also not persuaded that at least some information surrounding the specific actions or representations by Monarch is not within Plaintiffs' control. Plaintiffs allege

that they worked with their retail brokers to procure the at-
issue Policies and other coverage for their homes. Part of the
alleged "scheme" involved Broker Defendants' apparent failure to
make certain disclosures or perform due diligence required under
Rule 301. Surely Plaintiffs can at least allege what specific
representations were made to them and by whom, and what, if any,
Monarch's role was. As currently drafted, the Complaint does
not allege with particularity how Monarch misled Plaintiffs.
The Complaint is based on a theoretical "scheme" but fails to
provide the requisite factual basis.

To summarize, the Complaint has not pleaded facts with
specificity to satisfy Rule 9(b). Plaintiffs' "faint sketch of
fraud is insufficient," <u>Siegel</u>, 480 F. Supp. 2d at 1043, and the
Complaint does not comply with the particularity requirement of
Rule 9(b).[8]

### iii. The Complaint Engages in Impermissible "Group Pleading"

The Complaint also uses impermissible group pleading.
Reply Br. 2-3. As Monarch argues, a "complaint which 'lump[s]

---

[8] Notwithstanding the Complaint's shortcomings under Rule 9(b), the
Court reiterates its statement made at the hearing that the circumstances
here are concerning. It is difficult to understand how Plaintiffs—residents
of designated, high-risk lava zones—could have ended up with homeowner's
insurance policies expressly excluding the coverage that they presumably
sought. It is equally troubling that Plaintiffs were allegedly not made
aware that they may have qualified for non-surplus lines insurance, including
under the HPIA program, which may have provided coverage for at least some of
the losses Plaintiffs now face. That said, these concerns are not enough
under Rule 9(b), and any amended complaint must comply with the Federal
Rules.

together . . . multiple defendants in one broad allegation fails to satisfy [the] notice requirement of Rule 8(a)(2).'" Reply Br. 2 (quoting <u>Adobe</u>, 125 F. Supp. 3d at 964). If group pleading fails to satisfy the Rule 8(a) standard, it falls far short of satisfying the Rule 9(b) standard. <u>See Ciuffitelli for Tr. of Ciuffitelli Revocable Tr. v. Deloitte & Touche LLP</u>, No. 3:16-cv-580-AC, 2017 WL 2927481, at *14 (D. Or. Apr. 10, 2017) ("Plaintiffs fail to satisfy the requirements of either Rule 9(b) or Rule 8[(a)] by referring generally to [a group of different entities] making misrepresentations and omissions." (internal quotation marks omitted)).

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." <u>Swartz</u>, 476 F.3d at 764-65 (quoting <u>Haskin v. R.J. Reynolds Tobacco Co.</u>, 995 F. Supp. 1437, 1439 (M.D. Fla. 1998)); <u>see also Wieck v. CIT Grp., Inc.</u>, 308 F. Supp. 3d 1093, 1126 (D. Haw. 2018). A complaint governed by Rule 9(b) must "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." <u>Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.</u>, 940 F.2d 397, 405 (9th Cir. 1991).

Here, the Complaint improperly lumps the various
Broker Defendants together, without explaining each Defendant's—
or group of similarly situated Defendants'—particular role in
the steering scheme.  See Destfino v. Reiswig, 630 F.3d 952,
958-59 (9th Cir. 2011) (discussing approvingly the district
court's dismissals based on plaintiffs' "everyone did
everything" allegations); Wieck, 308 F. Supp. 3d at 1126
(dismissing RICO claims because the complaint improperly lumped
defendants together without explaining their roles in the
enterprise).  The Complaint generally refers to "Broker
Defendants," or it refers to "Defendants" collectively.  Doing
so violates Rules 8(a) and 9(b) by failing to attribute specific
misconduct to Monarch.  See Swartz, 476 F.3d at 765 (dismissing
complaint that was "shot through with general allegations that
the 'defendants' engaged in fraudulent conduct but attribute[d]
specific misconduct only to [some defendants]"); Wieck, 308 F.
Supp. 3d at 1126 (holding that group pleading did not comply
with Rule 9(b)); Sollberger v. Wachovia Secs., LLC, No. SACV 09-
0766 AG (ANx), 2010 WL 2674456, at *4-5 (C.D. Cal. June 30,
2010) (discussing pleading requirements of Rule 8(a), Rule 9(b),
Iqbal, and Twombly to describe improper "shotgun pleading" in
"cases with multiple defendants where the plaintiff uses the
omnibus term 'Defendants' throughout the complaint by grouping

defendants together without identifying what the particular

defendants specifically did wrong").

The agency theories that Plaintiffs purport to rely on

do not justify the Complaint's treatment of Defendants as

interchangeable.  Agency relationships between Defendants do not

exempt Plaintiffs from the federal pleading requirements,

especially when the facts underlying those relationships are not

plausibly alleged in the Complaint.  In fact, the only agency-

related facts in the Complaint are general allegations of the

business relationships between the parties.  The relationships

between insurance companies, syndicates, brokers, and the like

are notoriously complex.  While Plaintiffs need not specify

facts beyond their purview, their allegations must at least

describe the alleged "role of each defendant in the fraud."

Comwest, Inc. v. Am. Operater Servs., Inc., 765 F. Supp. 1467,

1471 (C.D. Cal. 1991).

Regardless, conclusory allegations that do not

identify the role of the defendants do not comply with Rule 8(a)

or Rule 9(b).  Id.; see also Twombly, 550 U.S. at 555.  In

Swartz, for example, the Ninth Circuit held that conclusory

allegations and group pleading under purported agency theories

failed to comply with Rule 9(b).  476 F.3d at 765.  The

complaint alleged that the "defendants" engaged in fraudulent

misconduct; that some defendants were acting as agents of

others; and that some defendants "knew" other defendants were making false statements to clients.  Id.  The Ninth Circuit held that, without any stated factual basis, these conclusory allegations were "insufficient as a matter of law."  Id.

Likewise, in Comwest, a district court in this circuit dismissed fraud claims as deficient because the complaint "made only conclusory allegations that 'defendants . . . , and each of them, directly and indirectly, aiding and abetting each other, and acting in concert, and through each other . . . fraudulently induced plaintiff [to enter the sales contractor agreements]."  765 F. Supp. at 1471 (alterations in original).  These allegations of overlapping liability were "patently inadequate."  Id.  According to the court, "[i]t is not enough for plaintiffs to make group allegations . . . because collective responsibility is not self-evident.  Each defendant is entitled to know what misrepresentations are attributable to them and what fraudulent conduct they are charged with."  Id.

For the reasons stated, the Complaint engages in impermissible group pleading and fails to comply with the plausibility requirement of Rule 8(a) and the particularity requirement under Rule 9(b).  The Complaint is therefore dismissed against Monarch.

## II.  Analysis of Plausibility of Each Cause of Action

As stated, dismissal is appropriate because the Complaint does not plead with particularity allegations of Monarch's purported fraudulent conduct.  Nonetheless, for the sake of completeness, the Court will address each individual count based on Monarch's arguments for dismissal on the merits.

### a. Whether Count I—UDAP, HRS § 480-2 Violation—States a Claim for Relief

Count I of the Complaint alleges that Defendants' conduct and participation in the steering scheme violated Hawaiʻi's UDAP statute, HRS § 480.  HRS § 480-2(a) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." To state a UDAP claim, a consumer[9] must allege: (1) a violation of HRS § 480-2; (2) injury to plaintiff's business or property resulting from such violation; and (3) proof of the amount of damages.  Lizza v. Deutsche Bank Nat. Trust Co., 1 F. Supp. 3d 1106, 1121 (D. Haw. 2014) (citing Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc., 113 Haw. 77, 113-14, 148 P.3d 1179, 1215-16 (2006)); see also HRS § 480-13(b)(1)); In re Kekauoha-Alisa, 674 F.3d 1083, 1092 (9th Cir. 2012).  A private cause of action

---

[9] HRS § 480-1 defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."  Monarch has not disputed that Plaintiffs are "consumers."

exists under the statute. HRS § 480-2(e) ("Any person may bring an action based on unfair methods of competition declared unlawful by this section.").

### i. Whether Count I Fails to Comply With the Federal Pleading Standards

As an initial matter, the Court reiterates that Count I is dismissed because it fails to comply with the federal pleading standards set forth in Rules 8(a) and 9(b).  The allegations underlying Count I fail to plead with particularity facts to support a UDAP claim.  The allegations are nothing more than a reiteration of certain legal elements and phrases, some quoted directly from Hawai'i Supreme Court case law.  Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [on a 12(b)(6) motion]."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 557)).  And applying Rule 9(b), Count I fails to allege with any particularity the "who, what, when, where, and how of the misconduct charged."  Vess, 317 F.3d at 1106.  The Complaint is otherwise devoid of any allegations (particularized or otherwise) of misrepresentations, omissions, or deceptive practices necessary to sustain a UDAP claim for deception.

The Complaint also characterizes Underwriters' and Broker Defendants' relationship as "unlawful" and part of the "deceptive" "scheme."  Yet it alleges no facts to support those

characterizations, other than Plaintiffs' dissatisfaction with their insurance coverage and suspicions that a scheme existed. These suspicions are not sufficient for a claim to survive the Rule 8(a) standard, let alone the heightened Rule 9(b) standard. See Twombly, 550 U.S. at 555 ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action" (quoting 5 C. Wright & A. Miller Fed. Prac. & Proc. § 1216, pp. 235-36 (3d ed. 2004)) (alteration in original)). Without more, broad allegations that Defendants misrepresented, concealed, steered, or omitted information fall short of alleging more than a "sheer possibility" of unlawful conduct, much less of meeting the heightened "particularity" requirement under Rule 9(b). See Twombly, 550 U.S. at 555.

Accordingly, the vague and conclusory allegations of Count I fail to meet both the "particularity" standard of Rule 9(b) and the "plausibility" standard of Rule 8(a). The Complaint is properly dismissed on that basis.

### ii. Whether Count I is an Improper Attempt to Bring a Private Cause of Action Under the Insurance Code

Count I is properly dismissed on the sole ground that it fails to comply with the federal pleading standards. The Court will nonetheless address Monarch's arguments on the merits of Count I, which relate to Plaintiffs' entitlement to sue for

unfair and deceptive acts and practices in the insurance

context.[10/]  While not explicitly argued by Monarch, the Court

first addresses whether Count I is an improper attempt to bring

a private right of action for alleged breaches of the Insurance

Code.  As Monarch implies, Count I is predicated on violations

of the Insurance Code—primarily, Section 301 of the Surplus

Lines Act.

It is well settled that there is no private right of

action for violations of the Hawai'i Insurance Code.  See The

Best Place, Inc. v. Penn Am. Ins. Co., 82 Haw. 120, 126, 920

P.2d 334, 340 (1996) ("Article 13 of the Hawaii Insurance Code

does not authorize a private cause of action pursuant to its

administrative remedies."); Hunt v. First Ins. Co. of Haw. Ltd.,

82 Haw. 363, 372, 922 P.2d 976, 985 (Ct. App. 1996) (holding

that "no private cause of action exists under HRS Chapter 431,

Article 13").  None of the parties disputes this principle.  The

question, then, is whether conduct that allegedly violates the

Insurance Code can support a valid cause of action under UDAP §

480-2.  Hawai'i case law suggests that it can.

---

[10/] Nothing in the forthcoming discussion should be construed as a final
determination on the merits.  The Court is merely analyzing the legal issues
raised by Defendants' motions and opining on these alternative arguments for
dismissal.  By implication of the Court's ruling that the Complaint fails to
comply with the federal pleading rules, additional factual allegations are
needed to move forward with any claim.  Whether such claims are legally
viable based upon facts that might eventually be alleged is a question the
Court cannot answer today.

This circuit has held that the Hawai'i Insurance Code does not preempt a private right of action under HRS § 480-2. Jenkins v. Commonwealth Land Title Ins. Co., 95 F.3d 791, 796-98 (9th Cir. 1996) (citing Gonsalves v. First Ins. Co. of Haw., Ltd., 55 Haw. 155, 516 P.2d 720 (1973), and Best Place, 82 Haw. 120, 920 P.2d 334). In Jenkins, the Ninth Circuit reasoned that the Hawai'i Supreme Court had reviewed insurance-related UDAP claims on the merits without any indication that the Insurance Code preempted liability. Id. at 797. Following the Ninth Circuit's guidance, this district has recognized private causes of action in the insurance context under Hawai'i's general UDAP statute. See, e.g., Wieck, 308 F. Supp. 3d at 1124 (denying motion to dismiss UDAP claim against Lloyd's); Donaldson v. Liberty Mut. Ins. Co., 947 F. Supp. 429, 432 (D. Haw. 1996) (holding that the Ninth Circuit's prediction that the Hawai'i Supreme Court would find UDAP claims not preempted by the Hawai'i Insurance Code "binds this court").

Hunt and Hough, cited by Monarch, do not undermine Jenkins. To the contrary, the three cases are consistent. If anything, Hunt and Hough cut against the argument that § 480-2 claims are preempted by the Insurance Code. Both, after all, dismiss the § 480 claims on grounds other than preemption.

Hunt and Hough stand for the familiar proposition that no private cause of action exists under the Hawai'i Insurance

- 34 -

Code. <u>Hough v. Pac. Ins. Co., Ltd.</u>, 83 Haw. 457, 470-71, 927
P.2d 858, 871-72 (1996); <u>Hunt</u>, 82 Haw. at 372, 922 P.2d at 985.
<u>Jenkins</u> recognized that same point. <u>See</u> <u>Jenkins</u>, 95 F.3d at 797
n.4 (noting that plaintiff "would not be entitled to bring a
private action . . . under § 431:13-102" because "the statute
was intended as a regulatory one, enforceable by the insurance
commissioner, and not one authorizing private remedies to
aggrieved individuals"). In any event, the plaintiffs in <u>Hough</u>
and <u>Hunt</u> also brought claims under HRS § 480. <u>See</u> <u>Hough</u>, 83
Haw. at 470, 927 P.2d at 871; <u>Hunt</u>, 82 Haw. at 372-73, 922 P.2d
at 985-86. And the Hawai'i Supreme Court and the Intermediate
Court of Appeals ("ICA") respectively dismissed those claims not
because they amounted to private causes of action under or were
preempted by the Insurance Code, but because the plaintiffs were
not "consumers" with standing to assert a claim under § 480.
<u>See</u> <u>Hough</u>, 83 Haw. at 470, 927 P.2d at 871 ("Hough is not a
consumer and therefore lacks standing to maintain a private
cause of action pursuant to HRS § 480-13."); <u>Hunt</u>, 82 Haw. at
372-73, 922 P.2d at 985-86 (holding that plaintiff had not
alleged that she "purchased or attempted to purchase, or was
solicited to purchase goods or services from First Insurance,"
and "[b]ecause she failed to allege the foregoing, Hunt is not a
'consumer' as defined by HRS Chapter 480 and, therefore, lacks

standing to maintain a private cause of action pursuant to HRS §
480-13.").

In short, Hawai'i law appears to recognize a private
right of action under § 480-2 in the insurance context.  The
Court sees no reason that conduct violative of both the
Insurance Code and § 480-2 could not support a UDAP claim.  The
Court thus rejects the argument that Count I is an improper
attempt to bring a private cause of action under the Insurance
Code, and the Court would not dismiss Count I on this basis.

### iii.  Whether Count I is Barred by HRS § 480-11(b)

Turning to Monarch's primary argument for dismissal of
Count I, it asserts that that Plaintiffs' UDAP claim is barred
by HRS § 480-11(b).  Mot. Dismiss 5.  HRS § 480-11(b) exempts
from the scope of UDAP any "transaction in the business of
insurance" if it is "expressly permitted" by the insurance laws
of Hawai'i:

> [Chapter 480] shall not apply to any
> transaction in the business of insurance that
> is in violation of any section of this chapter
> if the transaction is expressly permitted by
> the insurance laws of this State; provided
> that nothing in this section shall render this
> chapter inapplicable to any agreement to
> boycott, coerce, or intimidate or any act of
> boycott, coercion, or intimidation.

HRS § 480-11(b).  Monarch maintains that the insurance
transactions here fall within the scope of § 480-11(b) because
surplus lines insurance is generally permitted and regulated by

Hawai'i law.  Mot. Dismiss 5-6.  In Monarch's view, § 480-11(b)

is "consistent with Hawaii's statutory scheme, where only the

Insurance Commissioner has the right to enforce the Insurance

Code."  Id. (footnote omitted).  Plaintiffs respond by pointing

to their allegations that the transactions violated the Surplus

Lines Act, which is part of Hawai'i's Insurance Code.  Opp. Br.

12-13.  In other words, the transactions here were not

"expressly permitted by the insurance laws of [Hawai'i]" because

they technically violated those laws.  Id.

The Court begins by noting that neither party has

offered any case—and the Court is not aware of any published

state or federal court decision—applying § 480-11(b) at all, let

alone to exempt an insurance company or its agent from liability

under UDAP.[11]  To the contrary, claims under Hawai'i's general

UDAP law often have been recognized in the insurance context.

See, e.g., Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d

1087, 1092-94 (9th Cir. 2010); Wieck, 308 F. Supp. 3d at 1124.

In addition, the Ninth Circuit has, for all intents and

purposes, predicted that the Hawai'i Supreme Court would

recognize that a private right of action exists under UDAP §

---

[11]  The Ninth Circuit in Spinner Corp. v. Princeville Dev. Corp., 849
F.2d 388, 390 (9th Cir. 1988) noted in passing that UDAP "specifically
exempts certain groups and activities from its coverage such as . . .
insurance transactions."  But that is all the court had to say, and the case
focused on whether securities transactions were similarly exempt.  See id.

480-2 for claims arising out of insurance transactions.[12/]  See Jenkins, 95 F.3d at 796-98.  Although Jenkins concluded that the Insurance Code would not preempt general UDAP liability and did not specifically mention HRS § 480-11(b), it would seem to this Court that prematurely dismissing Plaintiffs' UDAP claim because it involves insurance transactions would be "implicitly inconsistent with the treatment of § 480-2" under existing law. See id.

With this backdrop in mind, the Court now turns to the interpretation and application of § 480-11(b) in these circumstances.  Having looked to the limited case law addressing similar statutes in other jurisdictions and having considered Hawai'i courts' prior treatment of UDAP claims in the insurance context, the Court predicts that the Hawai'i Supreme Court would find Plaintiffs' interpretation of § 480-11(b) persuasive. Accordingly, the Court would not dismiss Plaintiffs' UDAP claim as barred by § 480-11(b).

Appellate courts in several states—including Arkansas, Tennessee, and Colorado—have addressed their state's own respective statutes that operate much like HRS § 480-11(b) purports to operate.  See, e.g., Air Evac EMS, Inc. v. USAble Mut. Ins. Co., 533 S.W.3d 572, 573-76 (Ark. 2017) (interpreting

---

[12/]  The court in Jenkins did not expressly address the possible effect of § 480-11(b) on a UDAP cause of action in the insurance context, even though the statutory language was identical to the language in effect today.

safe-harbor provision exempting "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner . . ." (emphasis added)); Showpiece Homes Corp. v. Assurance Co. of Am., 38 P.3d 47, 56-57 (Colo. 2001) (same for provision exempting "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency" (emphasis added)); Skinner v. Steele, 730 S.W.2d 335, 337-38 (Tenn. Ct. App. 1987) (same for provision exempting "[a]cts or transactions required or specifically authorized under the laws . . .").

In each case, the courts applied the so-called "specific-conduct rule" to hold that the exemptions precluded claims only when the conduct or transactions were "specifically permitted or authorized under laws administered by a state or federal regulatory body or officer." Air Evac EMS, 533 S.W.3d at 575-76; see also Showpiece Homes, 38 P.3d at 56 (holding that provision "exempts only those actions that are 'in compliance' with other laws" and "[c]onduct amounting to deceptive or unfair trade practices . . . would not appear to be 'in compliance with other laws'"); Skinner, 730 S.W.2d at 338 (applying the specific-conduct rule and holding that authorization to engage in the business of selling annuities "is not specific authorization to employ unfair or deceptive practices in that activity"); see also Nathan Price Chaney, The Arkansas Deceptive Trade Practices

Act: the Arkansas Supreme Court Should Adopt the Specific-Conduct Rule, 67 Ark. L. Rev. 299, 326-46 (2014) (analyzing the "specific conduct" and "general activity" approaches and surveying all fifty states' approaches to the same).

The specific-conduct approach is one of two approaches to interpreting safe-harbor provisions in deceptive trade practices statutes:

> (1) the majority "specific conduct" rule, which looks to whether state law permits or prohibits the conduct at issue and only exempts permitted conduct from [deceptive trade practices act] claims; and (2) the minority "general activity" rule, which looks to whether a state agency regulates the conduct, in which case a regulated party enjoys a full exemption from the [deceptive trade practices statute].

Air EVAC EMS, 533 S.W.3d at 574 (citing Cheney, supra at 300). In Skinner, the Tennessee Court of Appeals described the rationale of safe-harbor provisions exempting acts or transactions "required or specifically authorized" under state or federal law:

> The purpose of the exemption is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would otherwise be a violation of the Act, but which is allowed under other statutes or regulations. It is intended to avoid conflict between laws, not to exclude from the Act's coverage every activity that is authorized or regulated by another statute or agency. Virtually every activity is regulated to some degree. The defendant's interpretation of the exemption

would deprive consumers of a meaningful remedy
in many situations.

Skinner, 730 S.W.2d at 337 (emphasis added).

The Court is aware of one case in this district
implicitly using the specific-conduct rule to apply an exemption
under the UDTPA, HRS § 481A-5(a)(1). See Paragon Metals, Inc.
v. Schnitzer Steel Haw. Corp., No. 08-00292 DAE-LEK, 2009 WL
2700278, at *6 n.9 (D. Haw. Aug. 24, 2009). Under that
exemption, § 481A of the UDTPA does not apply to "conduct in
compliance with the orders or rules of, or a statute
administered by, a federal, State, or local governmental
agency." HRS § 481A-5(a)(1). After holding that the plaintiff
failed to allege facts to state a claim under the UDTPA, the
judge observed, in a footnote, that the exemption would also
preclude liability because the defendant was "engaging in
conduct in compliance with the rules of the [state environmental
agency]."[13/] Paragon, 2009 WL 2700278 at *6 n.9.

The Ninth Circuit also implicitly applied the
specific-conduct rule when deciding whether the California "safe
harbor" doctrine exempted liability for various bank entities
under California's unfair competition law ("UCL"). See Davis v.

---

[13/] In addressing an additional claim brought under HRS § 480-2, the
court noted that the defendants' conduct had "complie[d] with state and
federal hazardous waste laws." Paragon, 2009 WL 2700278 at *6. This, among
other findings, led the court to reject the plaintiff's UDAP claim. See id.
Paragon did not involve insurance transactions such to implicate HRS § 480-
11(b), but the observation that the defendant had complied with state and
federal law is indicative of the specific-conduct approach.

HSBC Bank Nev., N.A., 691 F.3d 1152, 1164 (9th Cir. 2012).  In

Davis, the plaintiff alleged that the defendant banks had made

inadequate disclosures of the annual fee in their credit-card

application and advertising materials, in violation of the UCL.

Id.  The banks argued that their disclosures "complied with, and

w[ere] required by" TILA and an associated regulation.  Id.

Therefore, the banks argued, their conduct fell within a "safe

harbor," precluding UCL liability.  Id.

        The Ninth Circuit held that certain of the disclosures

fell within the "safe harbor" while others did not.  Id.  First,

disclosures made in the online application created a safe harbor

because they fully complied with TILA and the regulation.  Id.

at 1165.  TILA and regulation required the banks to disclose any

annual fee in the credit-card application in a specified way,

and the banks' complied with those specifications.  Accordingly,

the banks' disclosure "clearly was permitted by federal law" and

could not serve as the basis for UCL liability.  Id.

        As to the advertising materials, however, the court

held that the banks' conduct could not "be swept into the ambit

of this safe harbor."  Id. at 1166.  Unlike the online

application, the advertisements lacked any disclosure of the

annual fee.  Id. at 1166.  Importantly, the advertisements were

not subject to the same disclosure requirement as the online

application.  Id. at 1167 (holding that the advertisements were

not "solicitations" requiring a disclosure under TILA or the regulation). This led the court to ask whether the "omission of the annual fee is permitted by some statute or regulation." Id. at 1167. To fall under a safe harbor, the court explained, "the omission of the annual disclosure from the advertisements must be expressly permitted by some other provision." Id. (emphasis added). It was not enough that TILA and the regulation "merely fail[ed] to prohibit such an omission." Id. (emphasis added). Because no provision in TILA, the regulation, or elsewhere clearly permitted the omission of the annual fee disclosure, the omission could not exempt the defendants from liability. See id. at 1167-68.

In both Paragon and Davis, the courts implied that the defendants' specific conduct—not just the general transaction—must be authorized, permitted, or required by law. Here, Plaintiffs allege that Monarch acted as the surplus lines broker to place surplus lines insurance—which is expressly permitted by Hawai'i law. But the specific conduct alleged is the failure to perform duties and due diligence specifically required by Section 301 of the Surplus Lines Act. Compl. ¶ 93. So Monarch's alleged omission or inaction violated a statute. It follows that Monarch's conduct was not specifically "permitted by some statute or regulation." Cf. Davis, 691 F.3d at 1166. Indeed, by alleging that Broker Defendants failed to perform the

due diligence required by Section 301, Plaintiffs, in effect,

allege that Monarch's specific conduct is prohibited by a

statute or regulation.  Davis provides a helpful backdrop:

First, looking to the online applications, TILA and

the regulation both required that the applications include

specified fee disclosures.  See Davis, 691 F.3d at 1165.

Because the applications complied with those requirements, the

banks' conduct was "permitted by federal law" and could not

serve as the basis for UCL liability.  Id.  Disclosures in the

advertisements, on the other hand, were not required by TILA,

the regulation, or any other provision.  Id. at 1167.  At the

same time, no provision of law "affirmatively permit[ted] the

absence of the annual fee disclosure from the advertisements."

Id.  Thus, safe harbor did not apply to preclude UCL liability.

Id.

Here, it is without question that Section 301 permits

the procurement of surplus lines insurance from unauthorized

insurers.  See HRS § 431:8-301 (titled, "Insurance placed with

unauthorized insurer permitted").  But it also imposes several

conditions on the placement of such insurance.  Id. § 431:8-

301(a).  Applying a similar analysis to Davis, Monarch would

only be entitled to safe harbor if its due diligence and conduct

in the surplus-lines transactions complied with—and was

therefore "permitted by"—Section 301 or another provision of

law.  See Davis, 691 F.3d at 1165.  Or, alternatively, safe
harbor would apply if the law expressly permitted surplus lines
transactions without the due diligence and coverage comparisons.
The allegations in the Complaint certainly do not suggest that
Monarch complied with Section 301's requirements.  And Monarch
has not offered any other provision of law clearly permitting
its alleged failure to conduct due diligence when placing
surplus-lines policies.  Cf. id. ("[T]he parties have not
provided, and we have not located, any provision in TILA,
Regulation Z, or elsewhere that clearly permits the omission of
the annual fee disclosure from such advertisements.").
Following the rationale in Davis—as well as the majority
specific-conduct approach—HRS § 480-11(b) would not exempt
Monarch from liability here, where Plaintiffs have alleged that
Monarch's specific conduct was not permitted—and indeed was
prohibited—by Hawaiʻi law.

    Monarch argues that applying the specific-conduct rule
would render HRS § 480-11(b) a nullity, such that it would never
apply.  Mot. Dismiss 6-7; see also E&J Lounge Operating Co.,
Inc. v. Liquor Comm'n of City & Cty. of Honolulu, 118 Haw. 320,
349, 189 P.3d 432, 461 (2008) (discussing the "well-established
tenet of statutory construction that 'an interpreting court
should not fashion a construction of statutory text that
effectively renders the statute a nullity or creates an absurd

or unjust result"). The Court rejects this argument. <u>Cf.</u>
<u>Showpiece Homes</u>, 38 P.3d at 56 (rejecting argument that
specific-conduct interpretation "renders the statutory exclusion
a nullity").

As other states have recognized, the purpose of an
exemption like § 480-11(b) is to avoid conflicts and preclude
lawsuits "based on practices that are 'in compliance' with other
laws." <u>See id.</u> So, for example, § 480-11(b) might create a
safe harbor from a lawsuit alleging that the placement or sale
of surplus lines insurance underwritten by unauthorized
insurers—even with the requisite due diligence and rate
comparisons having been performed— is itself an unfair or
deceptive act or practice. It is undisputed that surplus lines
insurance is "expressly permitted" by Section 301, subject to
certain conditions. So § 480-11(b) would presumably exempt
Monarch from a lawsuit alleging that transactions in compliance
with those conditions violates UDAP. Such a lawsuit would be
"based on practices that are 'in compliance' with other laws."
<u>See</u> <u>Showpiece Homes</u>, 38 P.3d at 56. Or, to borrow a different
example offered by Plaintiffs' counsel at the motions hearing, §
480-11(b) could apply if a policyholder were to bring a UDAP
claim alleging that a traditional insurance carrier's rates of
insurance were "unfair." Because rates of insurance are
regulated and indeed specifically established by the Insurance

Commissioner, a lawsuit taking issue with those rates would involve conduct "expressly permitted by the insurance laws of [Hawai'i]."[14/]  Accordingly, to the extent that § 480-11(b) might, under some circumstances, excuse a defendant from liability in the insurance context, those circumstances do not exist here.

Because Plaintiffs have alleged that Monarch's conduct did not comply with and was not "expressly permitted by" the Insurance Code, § 480-11(b) would not apply.  The Court, then, would not dismiss Count I as barred by § 480-11(b).

### b. Whether Count II—UDTPA § 481A-3 Violation—States a Claim for Relief

HRS § 481A-3 sets forth eleven categories that constitute deceptive trade practices, and the list ends with a catch-all provision for "any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  HRS § 481A-3(a)(1)-(12).  To prevail in an action under the UDTPA, "a complainant need not prove . . . actual confusion or misunderstanding."  Id. § 481A-3(b).  And "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity

---

[14/]  Of course, this example is only relevant to admitted insurers transacting in the traditional, non-surplus lines market.  As discussed, surplus lines insurance is not regulated in the same way and is provided by non-admitted insurers who need not obtain approval for the rates, forms, and underwriting rules.  See Compl. ¶ 41; see also HRS § 431:8-301 (allowing surplus lines insurance to be placed with unauthorized insurers under certain conditions).

that the court considers reasonable.  Proof of monetary damage,
loss of profits, or intent to deceive is not required." Id. §
481A-4(a).  The Hawai'i Supreme Court has defined "the meaning
of deceptive practice by citing the definition employed by
federal courts with respect to 'an act causing, as a natural and
probable result, a person to do that which he [or she] would not
otherwise do.'" Balthazar v. Verizon Haw., Inc., 109 Haw. 69,
77, 123 P.3d at 194, 202 (2005) (quoting Haw. Cmty. Fed. Credit
Union v. Keka, 94 Haw. 213, 228, 11 P.3d 1, 16 (2000))
(alteration in original).

        Monarch argues that Count II does not allege conduct
of the type actionable under the UDTPA.  Mot. Dismiss 8-13.
Practically speaking, it would be impossible to decide that
Plaintiffs have alleged actionable conduct under the UDTPA when
the Court has already decided that the allegations are
insufficiently pleaded.  Assuming the Complaint had complied
with the federal pleading requirements, the Court notes that it
disagrees with Monarch's narrow reading of the UDTPA and would
not necessarily dismiss Count II as failing to allege conduct
within the catch-all provision.

        Plaintiffs' UDTPA claim is plainly alleged under the
catch-all provision, HRS § 481A-3(a)(12).  Compl. ¶ 104 ("Broker
Defendants' and Lloyd's conduct of misrepresenting, concealing,
steering, or otherwise omitting the foregoing created the

likelihood of confusion or of misunderstanding under HRS §481A-3(a)(12).").  Count II alleges that the same conduct underlying Count I also constitutes deceptive trade practices in violation of Chapter 481A.  Compl. ¶¶ 102-06.

The catch-all clause is a "sweeping provision" that encompasses "any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  Gas Co., LLC v. Amerigas Propane, L.P., No. 16-00366 LEK-KSC, 2017 WL 3613986, at *4 (D. Haw. Jan. 27, 2017) (discussing HRS § 481A-3(a)(12)).  Monarch would have the Court ignore the "sweeping" nature of the catch-all clause and recognize as actionable only conduct that falls within one of the eleven enumerated categories.  See Mot. Dismiss 8-9.  The Court does not read the catch-all clause in those narrow terms.

Monarch's reliance on True Value Co. v. Hills, No. 16-cv-00237 JMS-RLP, 2016 WL 7191540 (D. Haw. Nov. 16, 2016), adopted by 2016 WL 7191562 (D. Haw. Dec. 12, 2016), to limit the scope of HRS § 481A-3 is also misplaced.  See Mot. Dismiss 8-9; Opp. Br. 17.  Monarch accurately describes the True Value holding that the plaintiff stated a plausible claim under HRS § 481A-3 by alleging that the defendant's actions resulted in confusion "as to the source, sponsorship, or affiliation" of its website.  True Value, 2016 WL 7191540 at *5.  But that holding does not imply that confusion as to the "source, sponsorship, or

affiliation" is the only context for liability under the UDTPA.
To the contrary, the quoted language is straight from one of the
eleven enumerated categories of conduct. See HRS § 481A-
3(a)(2). That is, the catch-all provision was not implicated
because the conduct fell squarely within one of the enumerated
categories. Thus, True Value is not useful here insofar as it
merely held that a claim existed within the scope of subsection
(2). Monarch has not cited any cases to show that the scope of
the UDTPA § 481A-3 is limited in the way it suggests.

In its Reply Brief, Monarch expands its argument to
assert that "Plaintiffs have still not sufficiently plead what
Monarch supposedly did to create the likelihood of confusion or
misunderstanding to support this claim." Reply Br. 6. This the
Court agrees with. For many of the same reasons they were
insufficient to state a claim under Count I, the allegations in
Count II are insufficient to state a claim under the UDTPA. The
allegations are in superficial and conclusory terms, and
Plaintiffs add no facts to flesh out their allegation that
Monarch's and other Defendants' conduct created a likelihood of
confusion or misunderstanding. See Bank of N.Y. Mellon v.
Sakala, CV No. 11-00618 DAE-BMK, 2012 WL 12892444, at *8 (D.
Haw. Aug. 13, 2012) ("[V]ague and conclusory allegations cannot,
in and of themselves, state a claim for relief."). The Court
acknowledges Plaintiffs' allegation in the Complaint that they

did something that they would not otherwise do—i.e., purchase surplus lines insurance policies.  But this allegation alone, without any non-conclusory facts to show wrongful conduct on the part of Monarch, cannot support a claim for relief under the UDTPA.

As to Monarch's second argument, that injunctive relief is unworkable, the Court holds that any injunctive relief is necessarily derivative of Plaintiffs' claims under the UDTPA. Because they have not adequately pleaded those claims, Plaintiffs are likewise not entitled to injunctive relief.[15]

Plaintiffs have failed to state a claim under HRS § 481A.  Insofar as it seeks dismissal of Count II against Monarch, the Motion to Dismiss is granted.  The Court grants leave to Plaintiffs to amend their Complaint to plead a cause of action under the UDTPA, including under the catch-all provision.

### c. Whether Count III—Breach of the Implied Covenant of Good Faith and Fair Dealing—Fails to State a Claim for Relief

The Hawai'i Supreme Court first recognized a "bad faith cause of action in the first-party insurance context" in Best Place.  The court held that "there is a legal duty, implied

---

[15]  To the extent that Plaintiffs intend to pursue injunctive relief in an amended complaint, the Court reminds them that "Rule 65(d) requires the language of injunctions to be reasonably clear so that ordinary persons will know precisely what action is proscribed."  United States v. Holtzman, 762 F.2d 720, 726 (9th Cir. 1985); see also Civil Rights Educ. & Enj't Ctr. V. Hosp. Props. Tr., 317 F.R.D. 91, 105 (N.D. Cal. 2016) (denying class certification in part because the proposed injunction was nothing more than a "bare injunction to follow the law").

in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." Best Place, 82 Haw. at 132, 920 P.2d at 347. In 2013, the Supreme Court expanded its recognition of the bad faith tort to claims brought pursuant to unlawful claims practices in Hawai'i's Joint Underwriting Plan ("JUP"), where no express contract is formed between the insurers and assignees.[16/] Willis v. Swain, 129 Haw. 478, 486, 304 P.3d 619, 627 (2013). In both Willis and Best Place, the Hawai'i Supreme Court emphasized the "special relationship between the insurers and their insureds," which justified a tort cause of action for bad faith. Id.; Best Place, 82 Haw. at 132, 920 P.2d at 347.

The allegations underlying Count III are the same as those underlying the other causes of action: Defendants steered Plaintiffs into purchasing surplus lines insurance coverage to increase profits and collect unlawful commissions. See Compl. ¶¶ 107-20. Monarch argues that dismissal of the bad faith claim is warranted because it had no contractual relationship with and did not insure Plaintiffs. Mot. Dismiss 14. Plaintiffs read Hawai'i law more broadly to argue that

---

[16/] The JUP provides public assistance to individuals who cannot otherwise obtain insurance. Willis, 129 Haw. at 482-83, 304 P.3d at 623-24. It operates in the form of a risk-pooling arrangement and was created by statute, HRS § 431:10c-401. See id.

contractual privity is not a prerequisite to a bad faith claim

and that a duty of good faith and fair dealing attaches to an

insurer's agent.  Opp. Br. 18-24.

The Court is not persuaded by Plaintiffs' expansive

reading of Best Place and subsequent case law to include bad

faith causes of action against brokers or agents.  It is well

established in this district that a tort claim for bad faith is

predicated on the existence of a contract:

> "In Best Place, the Hawaii Supreme Court
> noted that although Hawaii law imposes a duty
> of good faith and fair dealing in all
> contracts, whether a breach of this duty will
> give rise to a bad faith tort cause of action
> depends on the duties inherent in a particular
> type of contract."  . . .  "The court concluded
> that special characteristics distinguished
> insurance contracts from other contracts and
> justified the recognition of a bad faith tort
> cause of action for the insured in the context
> of first- and third-party insurance
> contracts."  . . .  Indeed, "the Hawaii Supreme
> Court emphasized that the tort of bad faith,
> as adopted in Best Place, requires
> a contractual relationship between an
> insurer and an insured."  . . .

Mier v. Lordsman Inc., No. 10-00584 JMS-KSC, 2011 WL 285862, at

*5 (D. Haw. Jan. 27, 2011) (quoting Jou v. Nat'l Interstate ins.

Co. of Haw., 114 Haw. 122, 129, 157 P.3d 561, 568 (Ct. App.

2007)) (internal citations omitted); see also Lynch v. Fed.

Nat'l Mortg. Ass'n, No. 16-00213 DKW-KSC, 2016 WL 6776283, at *9

(D. Haw. Nov. 15, 2016) (citing Jou, 114 Haw. at 129, 157 P.3d

at 568, for its holding that bad faith "requires a contractual

relationship between an insurer and insured"). <u>Willis</u> arguably diverges from this strict rule in the context of the Hawaiʻi JUP program, where no actual contract is formed. But the JUP operates under a statute that expressly imposes obligations on the insurer "as if it had" issued a policy to the assignees. <u>See</u> <u>Willis</u>, 129 Haw. at 484, 304 P.3d at 624 (quoting the JUP provisions in HRS § 431:10C-403 and noting that "the JUP creates an insurer-insured relationship, and under that plan, no underlying contract is necessary to give rise to that relationship and its concomitant rights and obligations because that relationship is created by statute"). No such statute is at play here; Plaintiffs' claims are purely based on the relationship formed by the Policies.

Plaintiffs have also offered no cases to support their theory that an agent of an insurer can be the subject of a bad faith claim under Hawaiʻi law. In fact, at least one case in this district held the opposite, dismissing bad faith claims against an agent. <u>See</u> <u>Haw. Isle Adventures v. N. Am. Capacity Ins. Co.</u>, Civ. No. 08-00574 SOM, 2009 WL 330211, at *3 (D. Haw. Feb. 10, 2009). Further, the Hawaiʻi Supreme Court was clear in <u>Best Place</u> that the bad faith tort rests on the relationship between an "insurer and an insured." <u>Mier</u>, 2011 WL 285862 at *5 (citing <u>Best Place</u>, 82 Haw. at 127, 920 P.2d at 341).

The Supreme Court in <u>Best Place</u> also expressly adopted the bad faith standards set forth in the California case, <u>Gruenberg v. Aetna Ins. Co.</u>, 510 P.2d 1032 (Cal. 1973). <u>See</u> <u>Best Place</u>, 82 Haw. at 133, 920 P.2d at 347. In <u>Gruenberg</u>, the court affirmed the dismissal of bad faith claims against "non-insurer defendants," including the insurance adjusting firm and its employee. 510 P.2d at 576. A judge in this district has also relied on <u>Gruenberg</u> to hold that third parties to insurance contracts, including adjuster-agents, cannot be the subject of an insurance bad faith claim. <u>See</u> <u>Haw. Isle Adventures</u>, 2009 WL 330211 at *3.[17/]

At minimum, the Complaint lacks adequate factual allegations to determine the nature of the relationship, communications, and interactions between Plaintiffs, Monarch, and Underwriters. Without such allegations, Plaintiffs have failed to adequately plead a bad faith claim against Monarch. Accordingly, the Court holds that, in addition to the pleading inadequacies discussed throughout this Order, Plaintiffs fail to

---

[17/] Plaintiffs try to distinguish the decision in <u>Hawaiian Isle</u> by arguing that the plaintiff had conceded that the defendant was not a party to the insurance contract and assumed no contractual obligations. Opp. Br. 23. Whether or not that is true, the decision plainly decided that a non-party to the insurance contract—including an adjuster administering claims on the insurer's behalf—cannot be the subject of a bad faith claim in Hawaii. The Complaint here has not adequately alleged that Monarch is in any contractual relationship with Plaintiffs. In fact, Plaintiffs spend the first part of their Opposition Brief arguing why contractual privity is not a prerequisite to bad faith liability. <u>See</u> Opp. Br. 17-19, 23.

state a plausible bad faith claim against Monarch.  Count III is thus dismissed against Monarch without prejudice.

### d. Whether Count IV—Unjust Enrichment—States a Claim for Relief

The Complaint pleads unjust enrichment "in the alternative" to Plaintiffs' "contract-based claim." Compl. ¶ 122.  To recover on an unjust enrichment claim, a plaintiff must show that (1) the defendant received a benefit without adequate legal basis; and (2) the defendant unjustly retained the benefit at the expense of the plaintiff.  Chapman v. Journal Concepts, Inc., No. 27-00002 JMS/LEK, 2008 WL 5381353, at *21 (D. Haw. Dec. 24, 2008) (citing Small v. Badenhop, 67 Haw. 626, 635, 701 P.2d 647, 654 (1985)); see also Durrette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 502-04, 100 P.3d 60, 72-74 (2004).  Unjust enrichment is a "broad and imprecise term." Durrette, 105 Haw. at 502, 100 P.3d at 72 (internal citation and quotation marks omitted).  In reviewing unjust enrichment claims, courts must be guided by the "underlying conception of restitution, the prevention of injustice." Id.

Monarch argues that Plaintiffs' unjust enrichment claim is based on an "indirect" benefit and thus requires a showing of a "clear legal entitlement."  Mot. Dismiss 20-21. Its rationale is, the Complaint alleges that Broker Defendants

received unwarranted commissions <u>from Lloyd's</u>, not from

Plaintiffs.  Whereas Plaintiffs argue that they directly

conferred an unjust benefit on Defendants and Monarch, but that

"[o]nly Defendants know the exact money flow."  Plaintiffs

allege that they paid "one lump sum as a premium," which

contributed in some way to the resulting commissions paid to

Monarch and the other Broker Defendants.  <u>See</u> Opp. Br. 27.

A review of Hawai'i law suggests that courts tend to

apply unjust enrichment broadly and flexibly.  <u>See</u> <u>Lumford v.</u>

<u>Yoshio Ota</u>, 144 Haw. 20, 26-27, 434 P.3d 1215, 1221-22 (Ct. App.

2018).  In <u>Lumford</u>, the ICA adopted the rationale of the

Restatement 3d, which narrows the relief for "indirect" unjust

enrichment claims, where a third party makes a payment to the

defendant.  <u>Id.</u>  The court held that, "in limited circumstances,

a claim for unjust enrichment may be stated by allegations that

a third party has conferred a benefit upon a defendant to which

the plaintiff claims he or she has a superior legal or equitable

right."  <u>Id.</u> at 27, 434 P.3d at 1222.

According to Monarch, the Complaint pleads no such

superior legal or equitable right, regardless of whether the

alleged benefit was direct or indirect.  The Court agrees.  This

is unsurprising given the other shortcomings of the Complaint.

Without more particularized allegations, Defendants can only

speculate as to what benefit was conferred on what Defendant,

and as to what "superior legal or equitable right" Plaintiffs apparently have. Even though, as Plaintiffs note, a motion to dismiss is not the appropriate vehicle for deciding who has the superior right, Opp. Br. 28, the facts as pleaded in the Complaint do not support a plausible claim for relief.

What is more, "Hawai'i law has approved 'the principle, long-invoked in the federal courts, that equity has always acted only when legal remedies were inadequate.'" Swartz v. City Mortg., Inc., 911 F. Supp. 2d 916, 938 (D. Haw. 2012) (quoting Porter v. Hu, 116 Haw. 42, 55, 169 P.3d 994, 1007 (Ct. App. 2007)) (internal quotation marks omitted), abrogated on other grounds as stated in Compton v. Countrywide Fin. Corp., 761 F.3d 1046 (9th Cir. 2014)). Thus, the absence of an adequate remedy at law is a "necessary prerequisite" to maintaining an equitable claim. Soule, 1 F. Supp. at 1102 (citing Swartz, 911 F. Supp. 2d at 938).

Here, Plaintiffs allege in the Complaint that they have a legal remedy in the form of the UDAP Claims. See Compl., Counts I-II; see also Compl., Prayer For Relief. Thus, following this Court's decision in Soule, Plaintiffs' unjust enrichment claim would not survive a motion to dismiss for the additional reason that the Complaint fails to plead that the legal claims are inadequate. See Soule, 1 F. Supp. 3d at 1102-03. Plaintiffs' unjust enrichment claim "merely incorporates

the other facts of the [Complaint] by reference and makes a conclusory allegation" that Plaintiffs and the Class conferred upon Defendants the benefit of non-gratuitous payments for insurance. Id.; see also Compl. ¶ 125. In short, Plaintiffs do not explain how their UDAP claims "do[] not fully address [the] injustice' [they] allegedly suffered at the hands of [Monarch]." Soule, 1 F. Supp. 3d at 1103 (quoting Porter, 116 Haw. at 55, 169 P.3d at 1007).

None of this is to say that Plaintiffs cannot allege an unjust enrichment claim in the alternative to their legal claims. The Federal Rules certainly allow them to do so. See Rule 8(a)(3) (requiring "a demand for the relief sought, which may include relief in the alternative or different types of relief"); Rule 8(d) (allowing alternative statements of a claim or defense)[18]; see also Soule, 1 F. Supp. 3d at 1103 (discussing Rule 8's alternative pleading rules in the context of unjust enrichment). But even an alternative equitable claim must plead any "necessary prerequisite" to such a claim. Put another way, for their unjust enrichment claim to survive a motion to dismiss, Plaintiffs must at least plead that their equitable claim would provide a remedy in the event that their legal claims or remedies are found to be inadequate. As currently

_____

[18] Although, as discussed, Rule 9(b) is the relevant standard here for factual allegations of fraud, Rule 8 contains the general rules of pleading, which includes permitting pleading in the alternative.

pleaded, the Complaint fails to allege, even in the alternative, the inadequacy of the legal remedies.

The unjust enrichment claim is dismissed against Monarch without prejudice.

### e. Whether Count V—Breach of Fiduciary Duties—States a Claim for Relief

In Count V, the Complaint alleges that Broker Defendants breached fiduciary duties by participating in the deceptive "steering" scheme. Compl. ¶¶ 132-38. The Complaint describes the fiduciary relationship as follows:

> At all relevant times, Broker Defendants were Plaintiffs' and the Class's agent for the procurement of insurance. Plaintiffs and the Class relied on Broker Defendants to identify the types and amounts of coverage required and the insurance companies who could provide that coverage. Plaintiffs and the Class also relied on Broker Defendants for advice regarding which insurance programs to select and to negotiate premiums with insurance companies.

Compl. ¶ 132. Count V alleges a fiduciary duty owed by the collective "Broker Defendants." <u>See</u> Compl. ¶¶ 131-39.

"In general, '[t]he elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage.'" <u>Seo Kyoung Won v. England</u>, Civ. No. 07-00606 JMS/LEK, Civ. No. 08-00158 JMS/LEK, 2009 WL 10677756, at *7 (D. Haw. Aug. 13, 2009) (quoting <u>Pellegrini v. Weiss</u>, 165 Cal

App. 4th 515, 524 (Cal. Ct. App. 2008)); see also Swift v.

Swift, No. CAAP-13-0000101, 2016 WL 3573970, at *3 (Ct. App.

June 30, 2016). Whether a fiduciary duty exists is generally a

question of law. Lahaina Fashions, Inc. v. Bank of Haw., 131

Haw. 437, 453–54, 319 P.3d 356, 372–73 (2014).

Monarch contends that this claim fails because there

is no fiduciary relationship between Monarch and Plaintiffs.

Mot. Dismiss 22. As Plaintiffs allege several times in the

Complaint, Monarch is an agent of Underwriters. Monarch's

rationale, then, is that it cannot have a fiduciary relationship

with the insureds. See id. at 22-23 (citing Hough, 83 Haw. at

469, 927 P.2d at 870 for the proposition that "Insurers

generally do not owe a fiduciary duty to their insured").

Plaintiffs offer a theory that Monarch had a "relationship of

trust and confidence with its customers in Hawaiʻi, including

Plaintiffs and the Class." Opp. Br. 32.

The Court concludes that Plaintiffs have failed to

make allegations sufficient to support an inference that

Monarch—distinct from the other Broker Defendants, Pyramid and

Moa—owed Plaintiffs a fiduciary duty. Monarch was the surplus

lines broker and coverholder who acted on behalf of

Underwriters. Plaintiffs have not alleged that they had any

interactions with Monarch; instead, they lump Monarch together

with the retail brokers and assert, without any factual basis, the existence of a fiduciary relationship.

The cases Plaintiffs cite are either inapposite or reaffirm the point that Monarch and Plaintiffs did not have the "special relationship" of the type to support a fiduciary claim against a broker. See Opp. Br. 31-32 (collecting cases); Compare Lake v. Rutherfoord Int'l, Inc._, No. 14-cv-02431-H-NLS, 2014 WL 12526276, at *4-5 (S.D. Cal. Nov. 25, 2014) (discussing lack of California law on whether fiduciary duties exist between insureds and brokers, and declining to dismiss the fiduciary cause of action at that early stage because of the "uncertainty of the issue"); Advanced Salon Visions Inc. v. Lincoln Benefit Life Co., No. 08-cv-02346-LAB-WMC, 2010 WL 3341803, at *15 (S.D. Cal. Aug. 25, 2010) (dismissing fiduciary duty claims against brokers who "provided customized advice about which types of [ERISA] plans would be best for Plaintiffs" and "sold them those plans," because brokers did not appear to be agents of the insured), with Cole v. Asurion Corp., no. 06-cv-06649-PSG-JTLx, 2008 WL 5423859, at *8 (C.D. Cal. Dec. 30, 2008) (holding that allegations of plaintiff's direct contact with sales representatives of defendant cell phone carriers in the course of purchasing equipment insurance "could lead to a determination that [defendants] acted as insurance brokers and owed Plaintiff a fiduciary duty"). Here, Plaintiffs have not pleaded any

facts—other than a few conclusory allegations of agency relationships—to support an inference of a "special relationship" or fiduciary duty on the part of Monarch owed to Plaintiffs.  Again, such vague and conclusory allegations—not to mention impermissible group pleading—cannot support a claim for relief.

Accordingly, Count V is dismissed against Monarch without prejudice.

### f. Whether Count VI—Negligence—States a Claim for Relief

Plaintiffs' sixth cause of action asserts a claim for negligence. The Complaint alleges that "Broker Defendants owed a duty to Plaintiffs and the Class to perform the due diligence required under HRS §431:8-301(a) to ascertain whether comparable non-surplus lines insurance was available."  Compl. ¶ 142.  The Complaint asserts that Broker Defendants breached this duty by participating in the steering scheme, failing to "appropriately survey the market to see if non-surplus lines insurance was available," and generally failing to perform due diligence under Section 301 of the Surplus Lines Act.  Compl. ¶¶ 143-147.

Monarch argues that it, as the agent to and coverholder for Underwriters, owed no duty of due diligence to the insured Plaintiffs.  Mot. Dismiss 24-25 ("no duty of due diligence is owed to the insured when the agent is only the agent of the insurer" (quoting 4 Couch on Ins., Agent's Duties

to Insured, § 55:4 (3d 2018))).  Plaintiffs in their Opposition

Brief appear to suggest a dual-agency theory, whereby Monarch

had a duty to Plaintiffs to "conduct a diligent search to place

them with insurance that accurately reflected the premiums

necessary to cover Plaintiffs' homes."  Opp. Br. 29-30.

For many of the same reasons Plaintiffs' other claims

fail, the allegations against Monarch do not support a plausible

claim for relief under Count VI.  The Complaint does not allege

with particularity facts to support an inference of an agency

relationship between Plaintiffs and Monarch or a duty of care

owed by Monarch to Plaintiffs.  Bottom line, Plaintiffs have not

alleged that they had the broker-client relationship with

Monarch of the type to establish a duty of care.  See Certain

Underwriters at Lloyd's London Subscribing to Policy No.

LL001HI0300520 v. Vreeken, No. 30156, 2014 WL 2949463, at *3

(Ct. App. June 30, 2014) (explaining that a broker's duty is

owed "to the extent of the responsibilities that the agent had

in rendering help and providing advice to the insured" (quoting

Quality Furniture, Inc. v. Hay, 61 Haw. 89, 93, 595 P.2d 1066,

1068 (1979))).  Even putting aside these issues, the allegations

in the Complaint of noncompliance with Section 301 are

conclusory at best, and engage in impermissible group pleading.

Accordingly, the Court concludes that Plaintiffs'

factual allegations are insufficient to support a negligence

claim against Monarch and that claim is dismissed against
Monarch without prejudice.

### g. Whether Count VII—Declaratory Judgment—States a Claim for Relief

Finally, Plaintiffs seek declaratory relief in the form
of a declaration that "(i) Broker Defendants owe a legal duty to
perform their required duties and due diligence required under
Hawaii law to place surplus lines insurance; (ii) Broker
Defendants continue to breach this legal duty by failing to
perform their required duties and due diligence; and (iii)
Broker Defendants' ongoing breach of this legal duty continues
to cause harm." Compl. ¶ 153. Under the same cause of action,
Plaintiffs ask the Court to "issue corresponding injunctive
relief requiring Defendants to cease the unlawful practices
alleged herein." Compl. ¶ 154.

Monarch argues that Plaintiffs' declaratory judgment
claim "improperly and needlessly duplicates their claims for
negligence, as well as other claims," and asks for "a vague and
unspecific declaration that Defendants have to comply with the
law in performing their duties and due diligence." Mot. Dismiss
26-27. The Court agrees with Monarch and holds that Count VII
fails to state a claim.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides
that in "a case of actual controversy," a court may "declare the

rights and other legal relations of any interest party seeking such declaration, whether or not further relief is or could be sought." McGraw-Edison Co. v. Preformed Line Products Co., 362 F.2d 339, 342 (9th Cir. 1966). In deciding whether to hear a claim for declaratory relief, courts consider (1) whether the judgment "will serve a useful purpose in clarifying and settling the legal relations at issue" and (2) whether the judgment "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Id. As for injunctive relief, this district "follows the well-settled rule that a claim for 'injunctive relief' standing alone is not a cause of action. Phillips v. Bank of Am., Civ. No. 10-00551 JMS-KSC, 2011 WL 240813, at *4 (D. Haw. Jan. 21, 2011) (collecting cases). Injunctive relief may be available only as a remedy on an independent cause of action. Id.

Count VII is deficient for several reasons. First, "because Plaintiffs' claims are based on allegations regarding Defendants' past wrongs, a claim under the Declaratory Relief Act is improper and in essence duplicates Plaintiffs' other causes of action." Id. (collecting cases and dismissing claims for injunctive and declaratory relief). Count VII essentially incorporates by reference the other allegations of the Complaint and identifies "Defendants' actions (and inaction)" as "inadequate and unreasonable." Compl. ¶ 152. These allegations

cannot support a cognizable claim for relief under the
Declaratory Relief Act.  See Phillips, 2011 WL 240813 at *4
(collecting cases holding that declaratory relief is unnecessary
when adequate remedies exist under other causes of action).

Second, Count VII does not allege any entitlement to
relief for "future interactions between these parties," nor does
it purport to seek different relief from that sought through
other causes of action.  See TK v. Adobe Sys. Inc., No. 17-cv-
04595-LHK, 2018 WL 1812200, at *13 (N.D. Cal. Apr. 17, 2018);
Servco Pac., Inc. v. SyBridge Global, Inc., Civ. No. 16-00266
DKW-KSC, 2016 WL 6996987, at *10 (D. Haw. Nov. 29, 2016).  The
only allegations in the Complaint that could remotely be
construed as alleging future harm are in ¶ 152 (alleging that
Defendants' actions "upon information and belief, remain
inadequate and unreasonable") and ¶ 153 (noting "Broker
Defendants' ongoing breach of this legal duty").  Neither of
these pleads sufficient facts to support a cognizable,
independent claim for declaratory relief.  See Isagawa v.
Homestreet Bank, 769 F. Supp. 2d 1225, 1231–32 (D. Haw. 2011)
(dismissing claims for declaratory and injunctive relief where
plaintiffs alleged they "suffered and will continue to suffer in
the future unless Defendants wrongful conduct is restrained and
enjoined").

Servco Pacific, cited by Plaintiffs, does not compel a different conclusion.  In that case, the declaratory relief claim was "plainly not duplicative" of a breach of contract claim because the two sought different remedies:  one sought damages for material breaches of a statement of work and the other sought a declaration that the non-breaching party was not required to compensate the breaching party for services rendered.  Servco Pac., 2016 WL 6996987 at *10.  Likewise, Plaintiffs' arguments about a declaration governing "future interactions between these parties," which they base on TK v. Adobe Systems, are not adequately alleged in the Complaint.

Plaintiffs have also not pleaded any factual allegations to support entitlement to injunctive relief.[19/]  Regardless, injunctive relief is not an independent cause of action and, "if injunctive relief is proper, it will be because Plaintiffs prevail . . . on an independent cause of action."  Phillips, 2011 WL 240813 at *5; see also HRS § 481A-4(a) (providing for relief under the UDTPA in the form of an injunction).

For these reasons, Count VII is dismissed against Monarch without prejudice.

_____

[19/]  To be entitled to injunctive relief, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Monarch's Motion to Dismiss, ECF No. 30, insofar as it seeks dismissal of all Plaintiffs' claims against Monarch and SPG.  Because Plaintiffs may be able to cure some of the pleading defects via amendment, leave to amend is granted and the Complaint is dismissed against Monarch and SPG without prejudice.  Any amended complaint must be filed within thirty days of the issuance of this Order and should comply with the guidance and standards set forth herein.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, September 26, 2019.



_____
Alan C. Kay
Sr. United States District Judge

Aquilina v. Certain Underwriters at Lloyd's, Civ. No. 18-0496-ACK-KJM, Order Granting Defendants Borisoff Insurance Services, Inc. d/b/a Monarch E&S Insurance Services and SPG Insurance Solutions, LLC's Motion to Dismiss.