IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

_____

| | |
|---|---|
| STEPHEN G. AQUILINA and LUCINA, J. AQUILINA, Individually and on Behalf of all Others Similarly Situated; AUDRA M. LANE and SCOTT L. LANE, Individually and as Trustees of the Lane Family Trust, dated March 28, 1998, and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S SYNDICATE #2003; LLOYD'S SYNDICATE #318; LLOYD'S SYNDICATE #4020; LLOYD'S SYNDICATE #2121; LLOYD'S SYNDICATE #2007; LLOYD'S SYNDICATE #1183; LLOYD'S SYNDICATE #1729; BORISOFF INSURANCE SERVICES, INC. d/b/a MONARCH E&S INSURANCE SERVICES; SPECIALTY PROGRAM GROUP, LLC d/b/a SPG INSURANCE SOLUTIONS, LLC; PYRAMID INSURANCE CENTRE, LTD.; ILIKEA LLC d/b/a MOA INSURANCE SERVICES HAWAII; and DOES 1-100,<br><br>          Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civ. No. 18-00496-ACK-KJM ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

_____)

## ORDER GRANTING DEFENDANTS CERTAIN UNDERWRITERS AT LLOYD'S MOTION TO DISMISS

Plaintiffs are residents of the Puna District of Hawai'i Island who purchased surplus lines homeowner's insurance policies brokered and underwritten by the various Defendants. In the aftermath of the May 2018 eruption of Kilauea Volcano,

- 1 -

Plaintiffs sustained significant damages to their properties and sought coverage for the losses under their surplus lines policies. Such coverage was denied, primarily based on an exclusion precluding coverage for lava-related damage. Plaintiffs now allege that Defendants carried out a deceptive scheme by which they unlawfully "steered" Plaintiffs and other homeowners into purchasing, through the surplus lines market, what Plaintiffs call "essentially worthless" coverage, with the goal of increasing profits and commissions and lowering payouts for covered claims.

Defendants Certain Underwriters at Lloyd's London have moved to dismiss the Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons explained in this Order, the Court GRANTS the Underwriters' Motion to Dismiss, ECF No. 32, insofar as it seeks dismissal of all Plaintiffs' claims against the Underwriters.

## FACTUAL BACKGROUND

### I.   The Policies

Plaintiffs Stephen and Lucina Aquilina, and Audra and Scott Lane, individually and as Trustees of the Lane Family Trust (collectively, "Plaintiffs"), as well as a putative class of similarly-situated consumers (the "Class"),[1] purchased

---

[1]   The Court notes that the Class has not been certified. References to the "Class" are for purposes of convenience in addressing the allegations in the Complaint.

surplus lines homeowners insurance policies (the "Policies") to insure their residential properties in Hawai'i. Compl. ¶ 1. The Policies were purchased with the assistance of two retail brokers, Defendants Pyramid Insurance Centre, Ltd. ("Pyramid") and Ilikea LLC d/b/a Moa Insurance Services Hawaii ("Moa"), and one coverholder, Defendant Borisoff Insurance Services, Inc. d/b/a Monarch E&S Insurance Services ("Monarch"), whose assets are owned by Specialty Program Group, LLC d/b/a SPG Insurance Solutions, LLC ("SPG") (collectively, "Broker Defendants").[2/] The Policies were underwritten by several syndicates of Defendants Certain Underwriters at Lloyd's London, including Syndicates #2003, #318, #4020, #2121, #2007, #1183, #1729 (collectively, "Underwriters"). Compl. ¶ 1.

Pyramid and Moa are both retail brokers who placed the Policies and worked on Plaintiffs' behalf to procure homeowner's insurance. See Compl. ¶¶ 35-36. Monarch is a licensed surplus lines broker, and coverholder to and authorized agent of Underwriters. See Compl. ¶¶ 29, 32-34. As the coverholder, Monarch is listed on the Policies as the point of contact for handling claim-related communications with Plaintiffs.

---

[2/] As will be discussed herein, the Complaint improperly groups the various Defendants together, often referring to them as "Defendants" or "Broker Defendants." The Court does its best to distinguish the allegations with respect to each individual party while still accurately describing the allegations as framed in the Complaint.

Compl. ¶¶ 29-34; see also ECF Nos. 30-3 & 30-4.[3/]  The Complaint also alleges that Monarch acted with the assistance of "its authorized agents, including Moa and Pyramid."  Compl. ¶ 29.

## II.  The Surplus Lines Insurance Market

Surplus lines insurance is available as a last resort when the traditional insurance market is "unable or unwilling to provide coverage due to risky characteristics."  Compl. ¶ 39, 46-47.  The surplus lines market exists to provide coverage for high-risk loss exposures when "admitted insurers in the standard market do not have the flexibility" to underwrite such risks.  Compl. ¶ 40.  Surplus lines insurance is provided by non-admitted insurers who are not licensed to operate in Hawai'i and who are not required to obtain approval for their rates, forms, and underwriting rules.  Compl. ¶ 41.  "[S]urplus lines insurers often fill the gap to provide insurance coverage for high-risk perils, but are only permitted to do so under specified circumstances."  Compl. ¶ 41.

The Hawai'i Insurance Code provides that surplus lines insurance may only be placed through a "licensed surplus lines broker."  Compl. ¶ 44 (citing Haw. Rev. Stat. § 431:8-301(a)).  The same provision requires that, "[b]efore placing a surplus

---

[3/]  Before 2017, the Policies listed "Monarch E & S Insurance Services" as the point of contact.  Compl. ¶ 31.  After SPG acquired Monarch in 2017, the Policies listed "Monarch E & S Insurance Services, Division of SPG Insurance Solutions."  Compl. ¶ 31; see also ECF Nos. 30-3 & 30-4.

- 4 -

lines policy, . . . a surplus lines broker must perform a diligent search of the insurance market" to determine whether the insurance can be obtained from authorized insurers; whether the insurance is in addition to or in excess of the amount and coverage that can be procured from authorized insurers; and whether the insurance is procured at a rate "lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the same protection."  Compl. ¶ 45 (quoting Haw. Rev. Stat. § 431:8-301(a)(2)-(4)).

**III. The Steering Scheme**

The Complaint alleges a "steering scheme" through which Defendants allegedly sold surplus lines policies to Plaintiffs and the Class without complying with certain obligations under Hawai'i law.  Compl. ¶ 47.  As a result, in the devastating aftermath of the Kilauea Volcano eruption, Plaintiffs were denied coverage under their Policies for significant losses to their homes and properties.  Compl. ¶¶ 7-8, 71-74.

The Complaint alleges that Defendants unlawfully placed surplus lines insurance instead of more comprehensive coverage, such as that available through the Hawai'i Property

Insurance Association ("HPIA").[4/]  Compl. ¶¶ 48-52.  According to

the Complaint, Plaintiffs' and the Class's properties qualified

for HPIA insurance, but Defendants were incentivized not to

place HPIA policies because Underwriters' policies were "more

lucrative."  Compl. ¶¶ 48-56, 62-66.

Defendants allegedly misrepresented to Plaintiffs that

the Policies were the only available insurance without having

performed the due diligence required under Hawai'i law to place

surplus lines insurance.  Compl. ¶ 3.  According to Plaintiffs,

Defendants "improperly steered" them into purchasing the

Policies, which contain several exclusions that render coverage

"essentially worthless."  Compl. ¶¶ 1-4.  Plaintiffs highlight

one exclusion in particular, which precludes coverage for "the

peril of lava and/or lava flow causing direct or indirect

physical damage or loss of use of the insured property" (the

"Lava Exclusion").  Compl. ¶ 1.

Plaintiffs allege that, since 2012, Broker Defendants

and Underwriters "steered" Plaintiffs and the Class to purchase

Lloyd's Policies.  Among other things, Defendants artificially

_____

[4/]  HPIA coverage is "available to persons who are unable to obtain
basic property insurance in the private market from a licensed insurer."
Compl. ¶ 50 (citing HRS § 431:21-110).  The Hawai'i Legislature, in creating
HPIA, explained the policy underlying the program:  "The purpose of this Act
is to create an entity which will provide appropriately priced basic property
insurance for owners and occupants of property in high risk areas for major
natural disasters.  This extraordinary action is being taken to provide
limited relief to meet the unique and pressing needs of these persons who are
currently unable to obtain any property insurance."  1991 Haw. Sess. Laws Act
284 § 2.

inflated the insurance coverage amounts—such as the home value
or the personal liability coverage—beyond the HPIA coverage
limits so that they could place Plaintiffs and the Class with
Lloyd's surplus lines insurance policies." Compl. ¶ 4.
Defendants allegedly knew that they were not allowed to place
Plaintiffs and the Class with surplus lines insurance unless the
coverage amounts exceeded the coverage available through
traditional, non-surplus lines carriers. Compl. ¶ 5. According
to Plaintiffs, the state's own HPIA insurance program could have
provided them with more comprehensive coverage, yet Broker
Defendants placed them with and Underwriters sold them surplus
lines policies anyway. Compl. ¶¶ 5, 56-57.

This scheme is repeated in similar form throughout the
Complaint to allege wrongdoing by Defendants in procuring the
Policies for Plaintiffs and the Class. Compl. ¶¶ 58, 61, 66-69.
The Complaint asserts that Defendants represented to Plaintiffs
and the Class that they could only purchase insurance through
the surplus lines market, thereby steering them into purchasing
the Policies subscribed by Underwriters. Compl. ¶¶ 58, 67-69.
The scheme in turn enabled Underwriters to increase their
revenues and profits and Broker Defendants to collect
"kickbacks" from Underwriters in the form of increased
commissions. Compl. ¶¶ 6, 59, 69. Plaintiffs allege that the
commissions were "directly tied to the amount of premium steered

to [Underwriters]" to incentivize Broker Defendants to "maximize the amount of surplus lines insurance placed with [Underwriters]." Compl. ¶ 59; see also Compl. ¶ 6.

As a result of the scheme, Plaintiffs were provided less comprehensive coverage because of "numerous exclusions inevitably associated with [Underwriters'] surplus lines homeowner's insurance"—in particular, the Lava Exclusion. Compl. ¶ 60. The Complaint alleges that, for a home located in a particularly risky Lava Zone, a homeowner's policy excluding lava coverage "amount[s] to no coverage at all." Compl. ¶ 1.

The Complaint frames the scheme this way:

> In furtherance of their undisclosed scheme to drive profits and commissions and lower payouts for claims, Defendants improperly steered Plaintiffs and the Class into Lloyd's surplus lines homeowner's insurance policies by: (a) failing to perform various duties and due diligence, including the duties and due diligence required under HRS §431:8-301(a); (b) omitting that non-surplus lines insurance was available; and/or (c) artificially inflating the amount of coverage beyond the coverage limits provided under non-surplus lines insurance, specifically through the government-established Hawaii Property Insurance Association ("HPIA").

Compl. ¶ 4; see also Compl. ¶ 93, 104, 119, 127, 138, 143.

Plaintiffs assert that, in the absence of the scheme, they would have insured their homes with more comprehensive insurance and would have had such coverage in the aftermath of the Kilauea eruption. Compl. ¶¶ 70-74. Now, because of the

Lava and other exclusions associated with the Policies, Plaintiffs and the Class have received essentially worthless insurance coverage, enabling Underwriters to deny coverage under the Policies for resulting damages.  Compl. ¶¶ 75-76.

## PROCEDURAL BACKGROUND

The named Plaintiffs, proceeding individually and on behalf of the Class, filed their Complaint on December 21, 2018. See Compl. ECF No. 1.  Therein, Plaintiffs assert seven causes of action:

1. *Count I*.  Violation of the Unfair and Deceptive Acts or Trade Practices Act ("UDAP"), Hawai'i Revised Statutes ("HRS") §§ 480-1 et seq., against all Defendants. Compl. ¶¶ 88-101.

2. *Count II*.  Violation of the Uniform Deceptive Trade Practices Act ("UDTPA") (together with Count I, the "UDAP Claims"), HRS §§ 481A-1 et seq., against all Defendants. Compl. ¶¶ 102-06.

3. *Count III*.  Breach of the implied covenant of good faith and fair dealing ("bad faith") against Defendants Underwriters, Monarch, and SPG.  Compl. ¶¶ 107-20.

4. *Count IV*.  Unjust enrichment against all Defendants. Compl. ¶¶ 121-28.

5. *Count V*.  Breach of fiduciary duties against Broker Defendants.  Compl. ¶¶ 129-139.

6. *Count VI*.  Negligence against Broker Defendants.  Compl.
   ¶¶ 140-49.

7. *Count VII*.  Declarator y judgment against all Defendants.
   Compl. ¶¶ 150-54.

Only Counts I, II, III, IV, and VII are alleged against
Underwriters.

On March 6, 2019, Underwriters filed a Motion to
Dismiss.  ECF No. 32.  The Parties completed briefing on the
Motion on August 13.  ECF Nos. 78 (Opposition Brief) & 86 (Reply
Brief).  The Court heard oral arguments on the Motion on August
27, 2019.

**STANDARDS**

**I.  Rule 12(b)**

Rule 12(b)(6) authorizes the Court to dismiss a
complaint that fails "to state a claim upon which relief can be
granted."  Rule 12(b)(6) is read in conjunction with Rule 8(a),
which requires "a short and plain statement of the claim showing
that the pleader is entitled to relief."  Fed. R. Civ. P.
8(a)(2).  The Court may dismiss a complaint either because it
lacks a cognizable legal theory or because it lacks sufficient
factual allegations to support a cognizable legal theory.
Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.
1988).

In resolving a Rule 12(b)(6) motion, the Court must

accept all well-pleaded factual allegations as true and construe
them in the light most favorable to the plaintiff.  Sateriale v.
R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012).
The complaint "must contain sufficient factual matter, accepted
as true, to 'state a claim to relief that is plausible on its
face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Mere
conclusory statements in a complaint or "formulaic recitation[s]
of the elements of a cause of action" are not sufficient.
Twombly, 550 U.S. at 555.  Thus, the Court discounts conclusory
statements, which are not entitled to a presumption of truth,
before determining whether a claim is plausible.  Iqbal, 556
U.S. at 678.  However, "[d]ismissal with prejudice and without
leave to amend is not appropriate unless it is clear . . . that
the complaint could not be saved by amendment."  Harris v. Cty.
of Orange, 682 F.3d 1126, 1131 (9th Cir. 2012) (citation
omitted).

**II.  Rule 9(b)**

Where a party alleges fraud or mistake, the Rules
require a heightened pleading standard. In particular, Rule 9(b)
requires that, "In alleging fraud or mistake, a party must state
with particularity the circumstances constituting fraud or
mistake." Fed. R. Civ. P. 9(b).  The Ninth Circuit has held
that "[t]o satisfy Rule 9(b), a pleading must identify 'the who,

what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" <u>Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.</u>, 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (quoting <u>Ebeid ex rel. United States v. Lungwitz</u>, 616 F.3d 993, 998 (9th Cir. 2010)); see also <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764 (9th Cir. 2007) ("To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." (quoting <u>Bly-Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir. 2001))).

A motion to dismiss a claim grounded in fraud for failure to plead with particularly under Rule 9(b) is the functional equivalent of a motion to dismiss under Rule 12(b)(6). <u>See</u> <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1107 (9th Cir. 2003). "As with Rule 12(b)(6) dismissals, dismissals for failure to comply with Rule 9(b) should ordinarily be without prejudice. Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." <u>Id.</u>

## DISCUSSION

Underwriters argue for dismissal on several grounds.
First, they argue that the entire Complaint is subject to the
heightened Rule 9(b) pleading standard and that it should be
dismissed because it fails to plead the claims against
Underwriters with particularity.  Mot. Dismiss 10-15.  Second,
Underwriters argue that Plaintiffs' claims cannot rest on
violations of Section 301 of the Surplus Lines Act, HRS § 431:8-
301 ("Section 301").  Mot. Dismiss 16-21.  Finally, Underwriters
argue that, regardless of the applicable pleading standard, each
cause of action against them is independently defective and
should be dismissed.  Mot. Dismiss 22-31.

Having closely reviewed the allegations in the
Complaint and considered the arguments at the motions hearing,
the Court concludes that the Complaint as a whole is subject to
Rule 9(b).  Applying the heightened "particularity" standard,
the allegations of the Complaint fall short.  The Complaint is
therefore dismissed against Underwriters, with leave to amend.

## I.    Rule 9(b) Heightened Pleading Standard

Underwriters maintain that the entire Complaint is
subject to the heightened Rule 9(b) pleading standard.  Mot.
Dismiss 12.  Plaintiffs concede that some, but not all, of their
claims are subject to Rule 9(b).  Opp. Br. 5-6.  They admit that
the "deceptive" prong of the UDAP Claims are subject to the

heightened standard but argue that their bad faith claim (Count III), unjust enrichment claim (Count IV), and the allegations under the "unfair" prong of the UDAP claim (Count I) need only satisfy the ordinary standard under Rule 8(a). Opp. Br. 5-6. The Court agrees with Underwriters that, because the same fraudulent conduct underlies all the claims, Rule 9(b) properly applies to the Complaint as a whole. And because the pleading does not satisfy Rule 9(b)'s particularity requirement, the Complaint must be dismissed.

> **a. Rule 9(b) Applies to the Complaint as a Whole Because the Allegations are Grounded in a Unified Course of Fraudulent Conduct**

Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When an "entire claim within a complaint[] is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint or claim." Vess, 317 F.3d at 1107. Under established Ninth Circuit law, fraud need not be an essential element of a claim to subject it to the heightened pleading standard of Rule 9(b):

> In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as

- 14 -

> the basis of a claim. In that event, the claim
> is said to be "grounded in fraud" or to "sound
> in fraud," and the pleading of that claim as
> a whole must satisfy the particularity
> requirement of Rule 9(b).

Id. at 1103-04 (emphasis added).

Here, Plaintiffs' claims are based on a single deceptive and fraudulent "scheme" to "steer" Plaintiffs into purchasing illusory surplus lines insurance that they otherwise would not have purchased. The primary allegations are as follows:

- Underwriters had a relationship with Broker Defendants;

- Broker Defendants engaged in a kickback scheme whereby they "wrongly steered" Plaintiffs into purchasing the Policies subscribed to by Underwriters;

- Broker Defendants received "unwarranted commissions" from Underwriters;

- Broker Defendants failed to perform duties and due diligence required under Section 301 of the Surplus Lines Act, including by omitting that non-surplus lines insurance was available;

- Broker Defendants artificially inflated the amount of coverage beyond the limits provided under non-surplus lines insurance;

- Broker Defendants and Underwriters engaged in conduct of
  "misrepresenting, concealing, steering, or otherwise
  omitting" information to mislead Plaintiffs and the
  Class.

Compl. ¶¶ 82, 93, 104.  Plaintiffs describe Defendants' conduct
as an "integrated, misleading practice to homeowners in Hawaii
that includes uniform misrepresentations that misled Plaintiffs
and the other members of the Class."  Compl. ¶ 82.

These allegations, which underly all five claims
against Underwriters, are based on "a unified course of
fraudulent conduct."  See Vess, 317 F.3d at 1103-04.  Plaintiffs
repeat the same allegations of the "scheme" throughout the
Complaint and emphasize that they were "steered" into purchasing
illusory Policies.  The allegations are grounded in the same
fraudulent conduct, and the Court must then review all the
allegations under Rule 9(b)'s more stringent standard.

That each individual cause of action against
Underwriters does not require fraud as an element cannot save
those claims from the strict pleading requirements of Rule 9(b).
See Vess, 317 F.3d at 1103-04.  For example, neither bad faith
nor unjust enrichment typically requires a showing of fraud.
Yet they trigger Rule 9(b) here because the claims are based on
one underlying fraudulent scheme.  See Compl. ¶ 124 (unjust
enrichment claim alleging that "Defendants deceptively marketed

and sold surplus lines insurance to Plaintiffs and the Class");

id. ¶ 119 (bad faith claim alleging the same "deceptive"

scheme); see also Puri v. Khalsa, 674 F. App'x 679, 690 (9th

Cir. 2017) (holding that where an "unjust enrichment claim is

based on fraud, it too is subject to Rule 9(b)" (citing Vess,

317 F.3d at 1103-04)); In re Arris Cable Modem Consumer Litig.,

No. 17-CV-01834-LHK, 2018 WL 288085, at *10 (N.D. Cal. Jan. 4,

2018) (applying Rule 9(b) to unjust enrichment claim); Mostowfi

v. I2 Telecom International, Inc., No. 03-5784 VRW, 2005 WL

8162717, at *11 (N.D. Cal. May 23, 2005) (same for breach of

duty of good faith and fair dealing claim).[5/]

Plaintiffs also point to the "unfair" prong of UDAP to

argue that Rule 9(b) does not apply to at least some allegations

in Count I.[6/]  Opp. Br. 6.  Plaintiffs are right that claims made

under the "unfair" prong of UDAP do not ordinarily require

compliance with the heightened pleading standard.  See Opp. Br.

6 (citing Bald v. Wells Fargo Bank, N.A., 688 F. App'x 472, 476

(9th Cir. 2017); Soule v. Hilton Worldwide, Inc., 1 F. Supp. 3d

_____

[5/]  The cases that Plaintiffs cite to argue that their bad faith and
unjust enrichment claims should be reviewed under Rule 8(a) are inapposite.
See Opp. Br. 5 (citing Sunday's Child, LLC v. Irongate AZREP BW LLC, No. 13-
cv-00502-DKW-RLP, 2017 WL 561338, at *6 (D. Haw. Feb. 10, 2017); Aloha
Petroleum, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 13-cv-
00296-DKW-RLP, 2014 WL 3359933, at *3-5 (D. Haw. July 8, 2014)).  Neither of
the complaints in those cases involved any allegations of deceit, fraud, or
fraud-related conduct such that Rule 9(b) would apply to even some of the
allegations.
[6/]  It is well established in the Ninth Circuit that Rule 9(b)'s
particularity requirement applies to state-law causes of action.  See Vess,
317 F.3d at 1103; Smallwood, 730 F. Supp. 2d 1213, 1232 (D. Haw. 2010).

1084, 1090 (D. Haw. 2014)).  But that is only true when the
claims are not grounded in fraudulent conduct.  <u>See</u> <u>Ryan v.
Salisbury</u>, 380 F. Supp. 3d 1031, 1049 (D. Haw. 2019); <u>Soule</u>, 1
F. Supp. 3d at 1090.  Both the Ninth Circuit and this Court have
held that state-law UDAP claims must be pleaded with
particularity when the claims are based on fraudulent conduct.
<u>See</u> <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1122 (9th Cir.
2009) (affirming district court's Rule 9(b) dismissal of
California UDAP claim even though the district court had not
separately analyzed the allegations under the unfair prong);
<u>Smallwood v. NCsoft Corp.</u>, 730 F. Supp. 2d 1213, 1232-33 (D.
Haw. 2010) (holding that claims under Hawaiʻi's UDAP laws were
based on "fraudulent concealment" and thus required pleading
with particularity); <u>see also</u> <u>Long v. Deutsche Bank Nat'l Tr.
Co.</u>, No. 10-cv-00359 JMS/KSC, 2011 WL 2650219, at *7 (D. Haw.
July 5, 2011) ("[W]here a chapter 480 claim is based on
fraudulent acts, a plaintiff must plead with particularity.").

    Here, the only possible basis for liability under UDAP
that Plaintiffs have alleged sounds in fraud.  Plaintiffs have
pointed to no factual allegations in the Complaint—and none are
evident to the Court—showing that they are alleging anything
other than an overarching deceptive scheme.  Nor have they shown
that the allegations of deceit can be separated from allegations
of resulting unfairness.  <u>Cf.</u> Opp. Br. 15 ("Underwriters'

conduct that Plaintiffs allege was deceptive is also unfair."). Thus, the allegations in Counts I and II that Plaintiffs were "steered" or "deceived" are the only possible bases for liability under UDAP, as the Complaint is currently framed. <u>Cf.</u> <u>Long</u>, 2011 WL 2650219 at *7 ("[A]t least part of Plaintiff's [UDAP] claim must sound in fraud, but the actual allegations as to Defendants' conduct are so vague that the court cannot determine what acts Plaintiff alleges are fraudulent." (footnote omitted)).

To summarize, Rule 9(b) applies to all five causes of action alleged against Underwriters, even those claims that independently do not require a fraudulent element.[7/]

### b. Applying Rule 9(b), the Complaint Fails to Plead Facts With Adequate Particularity

Having decided that Rule 9(b) applies to the Complaint as a whole, the Court now turns to whether the allegations against Underwriters comply with the heightened pleading standard. For the reasons discussed below, they do not.

### i. Rule 9(b) Legal Standard

"Rule 9(b) requires particularized allegations of the circumstances constituting fraud." <u>In re GlenFed, Inc.</u> <u>Securities Litigation</u>, 42 F.3d 1541, 1547–48 (9th Cir. 1994) (en

---

[7/] This includes Count VII for declaratory judgment, which merely seeks declaratory relief based on the same fraudulent conduct alleged throughout the Complaint. <u>See</u> Compl. ¶¶ 150–54.

banc), _superseded by statute on other grounds as recognized in_

_Ronconi v. Larkin_, 253 F.3d 423, 429 n.6 (9th Cir. 2001).  The

pleading must provide an "account of the time, place, and

specific content of the false representations as well as the

identities of the parties to the misrepresentations." _See_

_Swartz_, 476 F.3d at 764 (quoting _Edwards v. Marin Park, Inc._,

356 F.3d 1058, 1066 (9th Cir. 2004)).  "Averments of fraud must

be accompanied by the who, what, when, where, and how of the

misconduct charged." _Vess_, 317 F.3d at 1106.  Plaintiffs may

not simply plead neutral facts to identify the transaction, but

rather must also set forth what is false or misleading about a

statement, and why it is false.  _See GlenFed_, 42 F.3d at 1548.

Moreover, group pleading is improper under Rule 9(b):

> Rule 9(b) does not allow a complaint to merely
> lump multiple defendants together but
> require[s] plaintiffs to differentiate their
> allegations when suing more than one defendant
> . . . and inform each defendant separately of
> the allegations surrounding his alleged
> participation in the fraud.  In the context of
> a fraud suit involving multiple defendants, a
> plaintiff must, at a minimum, identif[y] the
> role of [each] defendant[] in the alleged
> fraudulent scheme.

_Swartz_, 476 F.3d at 764–65 (alterations in original) (internal

citations omitted).

Rule 9(b)'s requirements may be relaxed for matters

that are exclusively within the opposing party's knowledge.

_Rubenstein v. Neiman Marcus Grp. LLC_, 687 F. App'x 564, 567 (9th

Cir. 2017) (quoting <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 540 (9th Cir. 1989)).  For those matters, "[a]llegations of fraud based on information and belief may suffice . . . so long as the allegations are accompanied by a statement of the facts upon which the belief is founded." <u>Puri</u>, 674 F. App'x at 687 (citing <u>Wool v. Tandem Computs. Inc.</u>, 818 F.2d 1433, 1439 (9th Cir. 1987), <u>overruled on other grounds as stated in</u> <u>Flood v. Miller</u>, 35 F. App'x 701, 703 n.3 (9th Cir. 2002)).

### ii. The Alleged "Scheme" is Not Pleaded With Adequate Particularity

The Complaint repeats a common refrain:  Defendants engaged in a scheme to "steer" Plaintiffs to purchase "virtually worthless" surplus lines insurance so Broker Defendants could collect unlawful commissions. <u>See gen.</u> Compl.; <u>see also</u> Opp. Br. 1 ("scheme of unfair and deceptive conduct"), 2 ("improper and unlawful scheme"), 4 ("improper steering scheme"), 7 ("overall scheme"), 26 ("scheme to drive up profits and commissions").  The Complaint contains almost no particulars—including the who, what, when, where, and how—of the alleged "scheme."  To avoid rehashing the allegations of the Complaint, the Court will borrow Plaintiffs' summary from their Opposition Brief:

> The scheme is straightforward—Underwriters paid improper kickbacks in the form of

> commissions to Broker Defendants, in exchange
> for Broker Defendants improperly steering
> Hawaii Homeowners' business to Underwriters.
> . . . This scheme enabled Underwriters to
> underwrite surplus lines insurance, which
> contained a lava exclusion, that they
> otherwise would not have been able to write
> because Plaintiffs and Class would have been
> placed with non-surplus lines insurance
> . . . .

Opp. Br. 7 (internal citations to Complaint omitted).

"Straightforward" as this scheme may be, the Complaint fails to allege specific facts giving rise to Plaintiffs' suspicions about a "scheme," other than that they ended up with unsatisfactory coverage. The allegations do not address who made what specific representations or statements to Plaintiffs and when; what representations or statements Plaintiffs relied on; how Underwriters paying commissions to brokers constitutes "improper kickbacks"; and how Plaintiffs were "steered" into purchasing the Policies. See Siegel v. Shell Oil Co., 480 F. Supp. 2d 1034, 1043 (N.D. Ill. 2007) (dismissing complaint because plaintiffs failed to allege "any of the particulars surrounding the[] averments of fraud").

Relevant to Underwriters, the Complaint says nothing about their specific acts or what they did or did not do. See Mot. Dismiss 12-14. For example, the Complaint alleges that, "[i]n reasonable reliance upon the representations made to Plaintiffs and the Class by Lloyd's, Monarch, and SPG, and their

agents Moa and Pyramid, Plaintiffs and the Class regularly paid valuable consideration in the form of a premium to bind coverage and be included as a named insured under that policy." Compl. ¶ 110. This allegation says nothing about which party made what representations to Plaintiffs, and what those representations were.

While the Court recognizes that Rule 9(b) is relaxed as to matters within the opposing party's knowledge, that does not excuse Plaintiffs from alleging some <u>facts</u> that inform their allegations. See <u>Puri</u>, 674 F. App'x at 687 (citing <u>Wool</u>, 818 F.2d at 1439). For instance, in the California district court case Plaintiff cited on this point, Opp. Br. 9, the judge carefully pointed to specific communications and misrepresentations allegedly made by the defendant:

> Indeed, Plaintiff identifies Defendant's assertion that it was paying commission to her—the assertion that was included on her 1099 forms for 2012, 2013, 2014, and 2015—as the specific falsity, because Defendants allegedly paid her nothing for those years . . . . Complaint ¶¶ 26-27 (alleging that Defendant issued the 1099 forms for the past four years in which it claimed that it paid Plaintiff $146,043.76); <u>id.</u> ¶ 15 (setting forth the payments that Defendant represented on the 1099 forms that it made to Plaintiff, but without actually doing so, according to Plaintiff). As such, the Court agrees with Plaintiff that she has set forth the alleged falsity with sufficient particularity, which identifies the specific circumstances constituting fraud that puts [sic] Defendant on notice so it can prepare its answer . . . .

> Moreover, the information on the basis of which the 1099 forms were prepared is within Defendant's control; therefore, the application of Rule 9(b) in this situation would be relaxed. . . .

Muriu v. West Coast Life Insurance Co., No. 17-cv-00380-GW-SKx, 2017 WL 10592124, at *5 (C.D. Cal. May 25, 2017) (some internal citations omitted).  Here, Plaintiffs are grasping at straws to point to particularized "facts" in the Complaint giving rise to their conclusion that Underwriters participated in an alleged unlawful "scheme" to mislead Plaintiffs.  While the Court acknowledges and is troubled by the allegations that Broker Defendants—allegedly with Underwriters' knowledge—artificially inflated Plaintiffs' property values to preclude them from qualifying for HPIA coverage, Compl. ¶¶ 50-54, 62-68, Plaintiffs have not "identifie[d] the specific circumstances constituting fraud that put[] [Underwriters] on notice" so they can adequately respond to the allegations against them.  See Muriu, 2017 WL 10592124 at *5.

The Court is also not persuaded that at least some information surrounding the specific actions or representations by Underwriters is not within Plaintiffs' control.  Plaintiffs allege that they worked with their retail brokers to procure the at-issue Policies and other coverage for their homes.  Part of the alleged "scheme" involved Broker Defendants' apparent failure to make certain disclosures or perform due diligence

required under Rule 301.  Surely Plaintiffs can at least allege what specific representations were made to them and by whom, and what, if any, Underwriters' role was.  As currently drafted, the Complaint does not allege with particularity how Underwriters misled Plaintiffs.  The Complaint is based on a theoretical "scheme" but fails to provide the requisite factual basis.

To summarize, the Complaint has not pleaded facts with specificity to satisfy Rule 9(b).  Plaintiffs' "faint sketch of fraud is insufficient," Siegel, 480 F. Supp. 2d at 1043, and the Complaint does not comply with the particularity requirement of Rule 9(b).[8/]

### iii.  The Complaint Engages in Impermissible "Group Pleading"

The Complaint also uses impermissible group pleading, which violates not only Rule 9(b), but also Rule 8(a).  See Sollberger v. Wachovia Secs., LLC, No. SACV 09-0766 AG (ANx), 2010 WL 2674456, at *4-5 (C.D. Cal. June 30, 2010) (discussing pleading requirements of Rule 8(a), Rule 9(b), Iqbal, and Twombly to describe improper "shotgun pleading").  As

---

[8/]  Notwithstanding the Complaint's shortcomings under Rule 9(b), the Court reiterates its statement made at the hearing that the circumstances here are concerning.  It is difficult to understand how Plaintiffs—residents of designated, high-risk lava zones—could have ended up with homeowner's insurance policies expressly excluding the coverage that they presumably sought.  It is equally troubling that Plaintiffs were allegedly not made aware that they may have qualified for non-surplus lines insurance, including under the HPIA program, which may have provided coverage for at least some of the losses Plaintiffs now face.  That said, these concerns are not enough under Rule 9(b), and any amended complaint must comply with the Federal Rules.

Underwriters argue, the "Complaint is utterly lacking in specific facts relating to or describing Underwriters' conduct," and the "overwhelming majority of Plaintiffs' allegations refer broadly to 'Defendants' or the 'Broker Defendants.'"  Mot. Dismiss 12.  The Court agrees that Plaintiffs' failure to differentiate between the various Defendants is inadequate under both Rule 8(a) and Rule 9(b), and dismissal is warranted on that ground as well.

"Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." Swartz, 476 F.3d at 764–65 (quoting Haskin v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437, 1439 (M.D. Fla. 1998)); see also Wieck v. CIT Grp., Inc., 308 F. Supp. 3d 1093, 1126 (D. Haw. 2018).  A complaint governed by Rule 9(b) must "detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme."  Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991).

Here, the Complaint improperly lumps the various Defendants together, without explaining each Defendant's—or group of similarly situated Defendants'—particular role in the

steering scheme.  See Destfino v. Reiswig, 630 F.3d 952, 958-59 (9th Cir. 2011) (discussing approvingly the district court's dismissals based on plaintiffs' "everyone did everything" allegations); Wieck, 308 F. Supp. 3d at 1126 (dismissing RICO claims because the complaint improperly lumped defendants together without explaining their roles in the enterprise).  The Complaint generally refers to "Broker Defendants," or it refers to "Defendants" collectively, grouping Underwriters' conduct together with the actions allegedly taken by Broker Defendants. E.g., Compl ¶ 49 ("Lloyd's, through the participation and cooperation of Broker Defendants . . .").  Doing so violates Rules 8(a) and 9(b) by failing to attribute specific misconduct to Underwriters.  See Swartz, 476 F.3d at 765 (dismissing complaint that was "shot through with general allegations that the 'defendants' engaged in fraudulent conduct but attribute[d] specific misconduct only to [some defendants]"); Wieck, 308 F. Supp. 3d at 1126 (holding that group pleading did not comply with Rule 9(b)); Ciuffitelli for Tr. of Ciuffitelli Revocable Tr. v. Deloitte & Touche LLP, No. 3:16-cv-580-AC, 2017 WL 2927481, at *14 (D. Or. Apr. 10, 2017) ("Plaintiffs fail to satisfy the requirements of either Rule 9(b) or Rule 8[(a)] by referring generally to [a group of different entities] making misrepresentations and omissions." (internal quotation marks omitted)).

Plaintiffs introduce several agency theories in their Opposition Brief to try to justify the Complaint's treatment of Defendants as interchangeable.  See Opp. Br. 8-9.  Agency relationships between Defendants do not exempt Plaintiffs from the federal pleading requirements, especially when the facts underlying those relationships are not plausibly alleged in the Complaint.  In fact, the only agency-related facts in the Complaint are general allegations of the business relationships between the parties.  The relationships between insurance companies, syndicates, brokers, and the like are notoriously complex.  While Plaintiffs need not specify facts beyond their purview, their allegations must at least describe the alleged "source of the fraud" and the specific "role of each defendant in the fraud."  Comwest, Inc. v. Am. Operater Servs., Inc., 765 F. Supp. 1467, 1471 (C.D. Cal. 1991); see also Twombly, 550 U.S. at 555.

It is not enough to allege generally and in conclusory terms that the various Defendants have agency relationships.  In Swartz, for example, the Ninth Circuit held that conclusory allegations and group pleading under purported agency theories failed to comply with Rule 9(b).  476 F.3d at 765.  The complaint alleged that the "defendants" engaged in fraudulent misconduct; that some defendants were acting as agents of others; and that some defendants "knew" other defendants were

making false statements to clients.  Id.  The Ninth Circuit held that, without any stated factual basis, these conclusory allegations were "insufficient as a matter of law."  Id.

Likewise, in Comwest, a district court in this circuit dismissed fraud claims as deficient because the complaint "made only conclusory allegations that 'defendants . . . , and each of them, directly and indirectly, aiding and abetting each other, and acting in concert, and through each other . . . fraudulently induced plaintiff [to enter the sales contractor agreements]."  Comwest, 765 F. Supp. at 1471 (alterations in original).  These allegations of overlapping liability were "patently inadequate."  Id.  According to the court, "[i]t is not enough for plaintiffs to make group allegations . . . because collective responsibility is not self-evident.  Each defendant is entitled to know what misrepresentations are attributable to them and what fraudulent conduct they are charged with."  Id.

For the reasons stated, the Complaint engages in impermissible group pleading and fails to comply with the plausibility requirement of Rule 8(a) and the particularity requirement of Rule 9(b).[9/]  Because Plaintiffs' allegations are

_____

[9/]  Although Underwriters also argue that the Complaint errs by failing to include allegations singling out each individual Lloyd's syndicate, such specificity is not required at this stage.  As Plaintiffs explain in their (Continued . . . )

grounded in fraud and not pleaded with specificity, the causes

of action against Underwriters—Counts I, II, III, IV, and VII of

the Complaint—must be dismissed.

## II.  Additional Bases for Dismissal

As stated, dismissal is appropriate because the

Complaint does not plead with particularity allegations of

Underwriters' purported fraudulent conduct.  Nonetheless, for

the sake of completeness, the Court will address each individual

count based on Underwriters' additional arguments for dismissal

on the merits.

### a. Insurer Liability under Section 301

Section 301 of the Surplus Lines Act, HRS § 431:8-301,

regulates the placement of insurance with insurers not

authorized to transact business in Hawai'i.  <u>See</u> HRS § 431:8-101

(discussing the scope of the Act).  At the outset, the Court

notes that the Complaint does not state a cause of action under

Section 301 or any other part of the Hawai'i Insurance Code.

Plaintiffs do, however, rely on purported Section 301 violations

---

Opposition Brief, Lloyd's operates such that "multiple syndicates agree to insure part of a risk <u>on identical terms</u>."  Opp. Br. 11 (quoting <u>In re Ins. Brokerage Antitrust Litig.</u>, 2017 WL 3642003, at *2 (D.N.J. Aug. 23, 2017)). Thus, to the extent that Plaintiffs are alleging identical conduct by the similarly-situated group of Underwriters, they need not make individual allegations as to each separate syndicate to satisfy Rule 9(b).  <u>See In re Ins. Brokerage</u>, 2017 WL 3642003 at *9 n.9.  Moreover, much of the information relevant to each individual syndicate presumably is in Underwriters' possession, relaxing the Rule 9(b) requirements.

to argue that Defendants engaged in unfair or deceptive acts or practices to support the UDAP Claims (Counts I and II).

Under Section 301, "insurance may be procured from an authorized insurer; provided that:"

1) The insurance is procured through a surplus lines broker licensed in the insured's home state;

2) The full amount or kind of insurance cannot be obtained from insurers who are authorized to do business in this State; provided that a diligent search is made among the insurers who are authorized to transact and are actually writing the particular kind and class of insurance in this State each time the insurance is placed or reviewed;

3) The surplus lines insurance procured is in addition to or in excess of the amount and coverage which can be procured from the authorized insurers; and

4) The insurance is not procured at a rate lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the same protection.

HRS § 431:8-301(a).

The Complaint generally alleges that Underwriters had a relationship with Broker Defendants who in turn "fail[ed] to perform various duties and due diligence, including the duties and due diligence required under [Section 301(a)]." Compl. ¶ 93 (Count I); see also Compl. ¶ 104 (virtually identical

allegations in Count II).[10/] Underwriters argue that they cannot be liable for violations of Section 301 because "the burdens of Section 301 rest on the surplus lines brokers," not the insurers. Reply Br. 12-13; see also Mot. Dismiss 16-22. The Court agrees, with some caveats.

First, the Court notes that Plaintiffs are correct that deciding whether a practice is "unfair" to support a UDAP claim does not require a precise violation of a statute. See Kapunakea Partners v. Equilon Enters. LLC, 679 F. Supp. 2d 1203, 1209-10 (D. Haw. 2009). In the context of UDAP claims, this Court has held that "unfair" conduct includes conduct that "(1) threatens an incipient violation of an antitrust law, or (2) violated the policy or spirit of one of those laws because its effects are comparable or the same as a violation of the law, or (3) otherwise significantly threatens or harms competition." Id. at 1210 (quoting Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 91 Hawai'i 224, 255 n.34, 982 P.2d 853, 884 n.34 (1999), superseded by statute on other grounds). Thus, even conduct that violates the "policy or spirit" of a law may support a claim under the "unfair" prong of a UDAP cause of action.

---

[10/] Counts V (breach of fiduciary duties) and VI (negligence) also rely on Section 301 violations, but these counts are alleged solely against Broker Defendants. Compl. ¶¶ 138, 142.

At the same time, it is difficult to see how Plaintiffs could predicate claims against <u>Underwriters</u> on conclusory statements alleging violations <u>by Broker Defendants</u> of a statute that purports to impose due diligence and procurement obligations on brokers, not carriers. Most notably, the statute creates the need for a licensed "surplus lines broker" to procure the insurance. <u>See</u> HRS § 431:8-301(a)(1). From there, the statute goes on to list several other rules associated with the procurement of a surplus lines insurance policy, including that a "diligent search is made among the insurers who are <u>authorized</u> to transact" the insurance—which would not include Underwriters. <u>Id.</u> § 431:8-301(a)(2) (emphasis added). Section 301(b) even carves out "due diligence" that a "surplus lines broker is not required to make," indicating that compliance is the responsibility of the surplus lines broker, not the carrier. <u>See</u> <u>id.</u> § 431:8-301(b).

The "spirit" of Section 301 is plainly to ensure that surplus lines brokers provide prospective policyholders with the requisite information and materials when procuring additional coverage for unique risks. Regardless, such conclusory statements as, Defendants "fail[ed] to perform various duties and due diligence," do not provide Underwriters or any Defendant with notice of the specific factual allegations against them. There may be independent factual allegations against

Underwriters that would support a UDAP claim under the "unfair" or "deceptive" prongs, but the Complaint as it now stands is devoid of such facts.

Accordingly, Plaintiffs' conclusory allegation that Broker Defendants failed to comply with Section 301 would not support UDAP liability as to Underwriters.

### b. Plausibility of Each Individual Cause of Action

Underwriters next argue that each individual cause of action against Underwriters is defective and should be dismissed. See Mot. Dismiss 22. The Court will address each of the five counts against Underwriters in turn.

### i. Whether Count I—UDAP, HRS § 480-2 Violation—States a Claim for Relief

Count I of the Complaint alleges that Defendants' conduct and participation in the steering scheme violated Hawaiʻi's UDAP statute, HRS § 480. HRS § 480-2(a) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." To state a UDAP claim, a consumer[11] must allege: (1) a violation of HRS § 480-2; (2) injury to plaintiff's business or property resulting from such violation; and (3) proof of the amount of

---

[11] HRS § 480-1 defines "consumer" as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Underwriters have not disputed that Plaintiffs are "consumers."

damages.  <u>Lizza v. Deutsche Bank Nat. Trust Co.</u>, 1 F. Supp. 3d 1106, 1121 (D. Haw. 2014) (citing <u>Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc.</u>, 113 Haw. 77, 113–14, 148 P.3d 1179, 1215–16 (2006)); <u>see also</u> HRS § 480-13(b)(1)); <u>In re Kekauoha–Alisa</u>, 674 F.3d 1083, 1092 (9th Cir. 2012).  A private cause of action exists under the statute.  HRS § 480-2(e) ("Any person may bring an action based on unfair methods of competition declared unlawful by this section.").

### 1. Whether Count I Fails to Comply With the Federal Pleading Standards

First, Underwriters argue that Count I should be dismissed because it fails to comply with the federal pleading standards set forth in Rules 8(a) and 9(b).  Mot. Dismiss 22-23.  Consistent with the discussion above, the Court agrees.

The allegations underlying Count I fail to plead with particularity facts to support a UDAP claim.  The allegations are nothing more than a reiteration of certain legal elements and phrases, some quoted directly from Hawai'i Supreme Court case law.  Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [on a 12(b)(6) motion]." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 557)).  And applying Rule 9(b), Count I fails to allege with any particularity the "who, what, when, where, and how of the misconduct charged." <u>Vess</u>, 317 F.3d at

1106.  The Complaint is otherwise devoid of any allegations

(particularized or otherwise) of misrepresentations, omissions,

or deceptive practices necessary to sustain a UDAP claim for

deception.

The Complaint also characterizes Underwriters' and

Broker Defendants' relationship as "unlawful" and part of the

"deceptive" "scheme."  Yet it alleges no facts to support those

characterizations, other than Plaintiffs' dissatisfaction with

their insurance coverage and suspicions that a scheme existed.

These suspicions are not sufficient for a claim to survive the

Rule 8(a) standard, let alone the heightened Rule 9(b) standard.

See Twombly, 550 U.S. at 555 ("[T]he pleading must contain

something more . . . than . . . a statement of facts that merely

creates a suspicion [of] a legally cognizable right of action"

(quoting 5 C. Wright & A. Miller Fed. Prac. & Proc. § 1216, pp.

235-36 (3d ed. 2004)) (alteration in original)).  Without more,

broad allegations that Defendants misrepresented, concealed,

steered, or omitted information fall short of alleging more than

a "sheer possibility" of unlawful conduct, much less of meeting

the heightened "particularity" requirement under Rule 9(b).  See

Twombly, 550 U.S. at 555.

Accordingly, the vague and conclusory allegations of

Count I fail to meet both the "particularity" standard of Rule

9(b) and the "plausibility" standard of Rule 8(a).  The

Complaint is properly dismissed on that basis.

> **2. Whether Count I is an Improper Attempt to Bring a Private Cause of Action Under the Insurance Code**

Count I is properly dismissed on the sole ground that it fails to comply with the federal pleading standards. The Court will nonetheless address Underwriters' alternative arguments on the merits of Count I—including those made in Pyramid's and Monarch's briefs, which Underwriters have incorporated by reference. These issues relate to Plaintiffs' entitlement to sue for unfair and deceptive acts and practices in the insurance context.[12]

The Court first addresses whether Count I is an improper attempt to bring a private right of action for alleged breaches of the Insurance Code. As Underwriters note, Count I is predicated on violations of the Insurance Code—primarily, Section 301 of the Surplus Lines Act. Mot. Dismiss 16-19.

It is well settled that there is no private right of action for violations of the Hawai'i Insurance Code. See The Best Place, Inc. v. Penn Am. Ins. Co., 82 Haw. 120, 126, 920 P.2d 334, 340 (1996) ("Article 13 of the Hawai'i Insurance Code

---

[12] Nothing in the forthcoming discussion should be construed as a final determination on the merits. The Court is merely analyzing the legal issues raised by Underwriters' Motion to Dismiss and opining on these alternative arguments for dismissal. By implication of the Court's ruling that the Complaint fails to comply with the federal pleading rules, additional factual allegations are needed to move forward with any claim. Whether such claims are legally viable based upon facts that might eventually be alleged is a question the Court cannot answer today.

does not authorize a private cause of action pursuant to its administrative remedies."); Hunt v. First Ins. Co. of Haw. Ltd., 82 Haw. 363, 372, 922 P.2d 976, 985 (Ct. App. 1996) (holding that "no private cause of action exists under HRS Chapter 431, Article 13"). None of the parties disputes this principle. The question, then, is whether conduct that allegedly violates the Insurance Code can support a valid cause of action under UDAP § 480-2. Hawai'i case law suggests that it can.

This circuit has held that the Hawai'i Insurance Code does not preempt a private right of action under HRS § 480-2. Jenkins v. Commonwealth Land Title Ins. Co., 95 F.3d 791, 796-98 (9th Cir. 1996) (citing Gonsalves v. First Ins. Co. of Haw., Ltd., 55 Haw. 155, 516 P.2d 720 (1973), and Best Place, 82 Haw. 120, 920 P.2d 334). In Jenkins, the Ninth Circuit reasoned that the Hawai'i Supreme Court had reviewed insurance-related UDAP claims on the merits without any indication that the Insurance Code preempted liability. Id. at 797. Following the Ninth Circuit's guidance, this district has recognized private causes of action in the insurance context under Hawai'i's general UDAP statute. See, e.g., Wieck, 308 F. Supp. 3d at 1124 (denying motion to dismiss UDAP claim against Lloyd's); Donaldson v. Liberty Mut. Ins. Co., 947 F. Supp. 429, 432 (D. Haw. 1996) (holding that the Ninth Circuit's prediction that the Hawai'i Supreme Court would find UDAP claims not preempted by the

Hawai'i Insurance Code "binds this court").

Defendants' reliance on <u>Hunt</u> and <u>Hough</u> to undermine <u>Jenkins</u> is unpersuasive. <u>See</u> Pyramid Mot. Dismiss 6-7, ECF No. 64-1; Monarch's Mot. Dismiss 6, ECF No. 30-1 (both incorporated by Underwriters' Mot. Dismiss 13 n.9). The three cases are consistent. If anything, <u>Hunt</u> and <u>Hough</u> cut against the argument that § 480-2 claims are preempted by the Insurance Code. Both, after all, dismiss the § 480 claims on grounds other than preemption.

<u>Hunt</u> and <u>Hough</u> stand for the familiar proposition that no private cause of action exists under the Hawai'i Insurance Code. <u>Hough v. Pac. Ins. Co., Ltd.</u>, 83 Haw. 457, 470-71, 927 P.2d 858, 871-72 (1996); <u>Hunt</u>, 82 Haw. at 372, 922 P.2d at 985. <u>Jenkins</u> recognized that same point. <u>See</u> <u>Jenkins</u>, 95 F.3d at 797 n.4 (noting that plaintiff "would not be entitled to bring a private action . . . under § 431:13-102" because "the statute was intended as a regulatory one, enforceable by the insurance commissioner, and not one authorizing private remedies to aggrieved individuals"). In any event, the plaintiffs in <u>Hough</u> and <u>Hunt</u> also brought claims under HRS § 480. <u>See</u> <u>Hough</u>, 83 Haw. at 470, 927 P.2d at 871; <u>Hunt</u>, 82 Haw. at 372-73, 922 P.2d at 985-86. And the Hawai'i Supreme Court and the Intermediate Court of Appeals respectively dismissed those claims not because they amounted to private causes of action under or were

preempted by the Insurance Code, but because the plaintiffs were not "consumers" with standing to assert a claim under § 480. See Hough, 83 Haw. at 470, 927 P.2d at 871 ("Hough is not a consumer and therefore lacks standing to maintain a private cause of action pursuant to HRS § 480-13."); Hunt, 82 Haw. at 372-73, 922 P.2d at 985-86 (holding that plaintiff had not alleged that she "purchased or attempted to purchase, or was solicited to purchase goods or services from First Insurance," and "[b]ecause she failed to allege the foregoing, Hunt is not a 'consumer' as defined by HRS Chapter 480 and, therefore, lacks standing to maintain a private cause of action pursuant to HRS § 480-13.").

In short, the Court is not convinced that Hawai'i does not recognize a private right of action under § 480-2 in the insurance context.  Nor is it convinced that conduct violative of both the Insurance Code and § 480-2 cannot support a UDAP claim.  The Court thus rejects the argument that Count I is an improper attempt to bring a private cause of action under the Insurance Code, and the Court would not dismiss Count I on this basis.

### 3. Whether Count I is Barred by HRS § 480-11(b)

Underwriters' next argument is that Plaintiffs' UDAP claim is barred by HRS § 480-11(b).  Mot. Dismiss 23; Reply Br. 13-14.  HRS § 480-11(b) exempts from the scope of UDAP any

"transaction in the business of insurance" if it is "expressly permitted" by the insurance laws of Hawaiʻi:

> [Chapter 480] shall not apply to any transaction in the business of insurance that is in violation of any section of this chapter if the transaction is expressly permitted by the insurance laws of this State; provided that nothing in this section shall render this chapter inapplicable to any agreement to boycott, coerce, or intimidate or any act of boycott, coercion, or intimidation.

HRS § 480-11(b). By adopting and incorporating by reference the arguments of Monarch and Pyramid, it is Underwriters' position that the insurance transactions here fall within the scope of § 480-11(b) because surplus lines insurance is generally permitted and regulated by Hawaiʻi law. Reply Br. 13 n.9. Plaintiffs point to their allegations that the transactions violated the Surplus Lines Act, which is part of Hawaiʻi's Insurance Code. Opp. Br. 20-21. In other words, the transactions here were not "expressly permitted by the insurance laws of [Hawaiʻi]" because they technically violated those laws. See id.

The Court begins by noting that neither party has offered any case—and the Court is not aware of any published state or federal court decision—applying § 480-11(b) at all, let alone to exempt an insurance company from liability under UDAP.[13] To the contrary, claims under Hawaiʻi's general UDAP

_____

[13] The Ninth Circuit in Spinner Corp. v. Princeville Dev. Corp., 849 (Continued . . . )

law often have been recognized in the insurance context.  <u>See,</u>
<u>e.g.</u>, <u>Yokoyama v. Midland Nat'l Life Ins. Co.</u>, 594 F.3d 1087,
1092-94 (9th Cir. 2010); <u>Wieck</u>, 308 F. Supp. 3d at 1124.  In
addition, the Ninth Circuit has, for all intents and purposes,
predicted that the Hawai'i Supreme Court would recognize that a
private right of action exists under UDAP § 480-2 for claims
arising out of insurance transactions.[14/]  <u>See</u> <u>Jenkins</u>, 95 F.3d
at 796-98.  Although <u>Jenkins</u> concluded that the Insurance Code
would not preempt general UDAP liability and did not
specifically mention HRS § 480-11(b), it would seem to this
Court that prematurely dismissing Plaintiffs' UDAP claim because
it involves insurance transactions would be "implicitly
inconsistent with the treatment of § 480-2" under existing law.
<u>Id.</u>

　　　　With this backdrop in mind, the Court now turns to the
interpretation and application of § 480-11(b) in these
circumstances.  Having looked to the limited case law addressing
similar statutes in other jurisdictions and having considered
Hawai'i courts' prior treatment of UDAP claims in the insurance
context, the Court predicts that the Hawai'i Supreme Court would

---

F.2d 388, 390 (9th Cir. 1988) noted in passing that UDAP "specifically
exempts certain groups and activities from its coverage such as . . .
insurance transactions."  But that is all the court had to say, and the case
focused on whether securities transactions were similarly exempt.  <u>See</u> <u>id.</u>
　　　[14/]  The court in <u>Jenkins</u> did not expressly address the possible effect of
§ 480-11(b) on a UDAP cause of action in the insurance context, even though the
statutory language was identical to the language in effect today.

find Plaintiffs' interpretation of § 480-11(b) persuasive. Accordingly, the Court would not dismiss Plaintiffs' UDAP claim as barred by § 480-11(b).

Appellate courts in several states—including Arkansas, Tennessee, and Colorado—have addressed their state's own respective statutes that operate much like HRS § 480-11(b) purports to operate. See, e.g., Air Evac EMS, Inc. v. USAble Mut. Ins. Co., 533 S.W.3d 572, 573-76 (Ark. 2017) (interpreting safe-harbor provision exempting "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner . . ." (emphasis added)); Showpiece Homes Corp. v. Assurance Co. of Am., 38 P.3d 47, 56-57 (Colo. 2001) (same for provision exempting "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency" (emphasis added)); Skinner v. Steele, 730 S.W.2d 335, 337-38 (Tenn. Ct. App. 1987) (same for provision exempting "[a]cts or transactions required or specifically authorized under the laws . . .").

In each case, the courts applied the so-called "specific-conduct rule" to hold that the exemptions precluded claims only when the conduct or transactions were "specifically permitted or authorized under laws administered by a state or federal regulatory body or officer." Air Evac EMS, 533 S.W.3d at 575-76; see also Showpiece Homes, 38 P.3d at 56 (holding that

provision "exempts only those actions that are 'in compliance' with other laws" and "[c]onduct amounting to deceptive or unfair trade practices . . . would not appear to be 'in compliance with other laws'"); Skinner, 730 S.W.2d at 338 (applying the specific-conduct rule and holding that authorization to engage in the business of selling annuities "is not specific authorization to employ unfair or deceptive practices in that activity"); see also Nathan Price Chaney, The Arkansas Deceptive Trade Practices Act: the Arkansas Supreme Court Should Adopt the Specific-Conduct Rule, 67 Ark. L. Rev. 299, 326-46 (2014) (analyzing the "specific conduct" and "general activity" approaches and surveying all fifty states' approaches to the same).

   The specific-conduct approach is one of two approaches to interpreting safe-harbor provisions in deceptive trade practices statutes:

> (1) the majority "specific conduct" rule, which looks to whether state law permits or prohibits the conduct at issue and only exempts permitted conduct from [deceptive trade practices act] claims; and (2) the minority "general activity" rule, which looks to whether a state agency regulates the conduct, in which case a regulated party enjoys a full exemption from the [deceptive trade practices statute].

Air EVAC EMS, 533 S.W.3d at 574 (citing Cheney, supra at 300). In Skinner, the Tennessee Court of Appeals described the rationale of safe-harbor provisions exempting acts or

transactions "<u>required or specifically authorized</u>" under state

or federal law:

> The purpose of the exemption is to insure that
> a business is not subjected to a lawsuit under
> the Act when it does something required by
> law, or does something that would otherwise be
> a violation of the Act, but which is allowed
> under other statutes or regulations.  <u>It is</u>
> <u>intended to avoid conflict between laws, not</u>
> <u>to exclude from the Act's coverage every</u>
> <u>activity that is authorized or regulated by</u>
> <u>another statute or agency</u>.  Virtually every
> activity is regulated to some degree.  The
> defendant's interpretation of the exemption
> would deprive consumers of a meaningful remedy
> in many situations.

730 S.W.2d at 337 (emphasis added).

The Court is aware of one case in this district

implicitly using the specific-conduct rule to apply an exemption

under the UDTPA, HRS § 481A-5(a)(1).  See <u>Paragon Metals, Inc.</u>

<u>v. Schnitzer Steel Haw. Corp.</u>, No. 08-00292 DAE-LEK, 2009 WL

2700278, at *6 n.9 (D. Haw. Aug. 24, 2009).  Under that

exemption, § 481A of the UDTPA does not apply to "conduct in

compliance with the orders or rules of, or a statute

administered by, a federal, State, or local governmental

agency."  HRS § 481A-5(a)(1).  After holding that the plaintiff

failed to allege facts to state a claim under the UDTPA, the

judge observed, in a footnote, that the exemption would also

preclude liability because the defendant was "engaging in

conduct in compliance with the rules of the [state environmental agency]."[15/]  _Paragon_, 2009 WL 2700278 at *6 n.9.

The Ninth Circuit also implicitly applied the specific-conduct rule when deciding whether the California "safe harbor" doctrine exempted liability for various bank entities under California's unfair competition law ("UCL").  _See_ _Davis v. HSBC Bank Nev., N.A._, 691 F.3d 1152, 1164 (9th Cir. 2012).  In _Davis_, the plaintiff alleged that the defendant banks had made inadequate disclosures of the annual fee in their credit-card application and advertising materials, in violation of the UCL.  _Id._  The banks argued that their disclosures "complied with, and w[ere] required by" TILA and an associated regulation.  _Id._ Therefore, the banks argued, their conduct fell within a "safe harbor," precluding UCL liability.  _Id._

The Ninth Circuit held that certain of the disclosures fell within the "safe harbor" while others did not.  _Id._  First, disclosures made in the online application created a safe harbor because they fully complied with TILA and the regulation.  _Id._ at 1165.  TILA and regulation _required_ the banks to disclose any annual fee in the credit-card application in a specified way,

_____

[15/]  In addressing an additional claim brought under HRS § 480-2, the court noted that the defendants' conduct had "complie[d] with state and federal hazardous waste laws."  _Paragon_, 2009 WL 2700278 at *6.  This, among other findings, led the court to reject the plaintiff's UDAP claim.  _See id._ _Paragon_ did not involve insurance transactions such to implicate HRS § 480-11(b), but the observation that the defendant had complied with state and federal law is indicative of the specific-conduct approach.

and the banks' complied with those specifications. Accordingly, the banks' disclosure "clearly was permitted by federal law" and could not serve as the basis for UCL liability. Id.

As to the advertising materials, however, the court held that the banks' conduct could not "be swept into the ambit of this safe harbor." Id. at 1166. Unlike the online application, the advertisements lacked any disclosure of the annual fee. Id. at 1166. Importantly, the advertisements were not subject to the same disclosure requirement as the online application. Id. at 1167 (holding that the advertisements were not "solicitations" requiring a disclosure under TILA or the regulation). This led the court to ask whether the "omission of the annual fee is permitted by some statute or regulation." Id. at 1167. To fall under a safe harbor, the court explained, "the omission of the annual disclosure from the advertisements must be expressly permitted by some other provision." Id. (emphasis added). It was not enough that TILA and the regulation "merely fail[ed] to prohibit such an omission." Id. (emphasis added). Because no provision in TILA, the regulation, or elsewhere clearly permitted the omission of the annual fee disclosure, the omission could not exempt the defendants from liability. See id. at 1167-68.

In both Paragon and Davis, the courts implied that the defendants' specific conduct—not just the general transaction—

- 47 -

must be authorized, permitted, or required by law.  Here,
Plaintiffs allege that Underwriters sold surplus lines
insurance—which is expressly permitted by Hawai'i law.  But the
specific conduct alleged is the failure to perform duties and
due diligence <u>specifically required</u> by Section 301 of the
Surplus Lines Act.  Compl. ¶ 93.  So Underwriters' alleged
omission or inaction violated a statute.  It follows that
Undewriters' conduct was not specifically "permitted by some
statute or regulation."  <u>Cf.</u> <u>Davis</u>, 691 F.3d at 1166.  Indeed,
by alleging that Broker Defendants and—by extension
Underwriters—failed to perform the due diligence <u>required by</u>
Section 301, Plaintiffs, in effect, allege that Defendants'
specific conduct is <u>prohibited by</u> a statute or regulation.
<u>Davis</u> provides a helpful backdrop:

> First, looking to the online applications, TILA and
the regulation both <u>required</u> that the applications include
specified fee disclosures.  <u>See</u> <u>Davis</u>, 691 F.3d at 1165.
Because the applications complied with those requirements, the
banks' conduct was "permitted by federal law" and could not
serve as the basis for UCL liability.  <u>Id.</u>  Disclosures in the
advertisements, on the other hand, were not required by TILA,
the regulation, or any other provision.  <u>Id.</u> at 1167.  At the
same time, no provision of law "affirmatively permit[ted] the
absence of the annual fee disclosure from the advertisements."

Id.  Thus, safe harbor did not apply to preclude UCL liability.
Id.

Here, it is without question that Section 301 permits
the procurement of surplus lines insurance from unauthorized
insurers.  See HRS § 431:8-301 (titled, "Insurance placed with
unauthorized insurer permitted").  But it also imposes several
conditions on the placement of such insurance.  Id. § 431:8-
301(a).  Applying a similar analysis to Davis, Underwriters
would only be entitled to safe harbor if their conduct in the
surplus-lines transactions complied with—and was therefore
"permitted by"—Section 301 or another provision of law.  See
Davis, 691 F.3d at 1165.  Or, alternatively, safe harbor would
apply if the law expressly permitted surplus lines transactions
without the due diligence and coverage comparisons.  The
allegations in the Complaint certainly do not suggest that
Defendants complied with Section 301's requirements.  And
Underwriters have not offered any other provision of law clearly
permitting their alleged failure to conduct due diligence when
placing surplus-lines policies.  Cf. id. ("[T]he parties have
not provided, and we have not located, any provision in TILA,
Regulation Z, or elsewhere that clearly permits the omission of
the annual fee disclosure from such advertisements.").
Following the rationale in Davis—as well as the majority
specific-conduct approach—HRS § 480-11(b) would not exempt

Defendants from liability here, where Plaintiffs have alleged that Defendants' specific conduct was not permitted—and indeed was prohibited—by Hawai'i law.

Underwriters argue that applying the specific-conduct rule would "eviscerate" and "circumvent" HRS § 480-11(b), such that it would never apply.  Reply Br. 13; see also E&J Lounge Operating Co., Inc. v. Liquor Comm'n of City & Cty. of Honolulu, 118 Haw. 320, 349, 189 P.3d 432, 461 (2008) (discussing the "well-established tenet of statutory construction that 'an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result").  The Court rejects this argument.  Cf. Showpiece Homes, 38 P.3d at 56 (rejecting argument that specific-conduct interpretation "renders the statutory exclusion a nullity").

As other states have recognized, the purpose of an exemption like § 480-11(b) is to avoid conflicts and preclude lawsuits "based on practices that are 'in compliance' with other laws."  See id.  So, for example, § 480-11(b) might create a safe harbor from a lawsuit alleging that the placement or sale of surplus lines insurance underwritten by unauthorized insurers—even with the requisite due diligence and rate comparisons having been performed—is itself an unfair or deceptive act or practice.  It is undisputed that surplus lines

insurance is "expressly permitted" by Section 301, subject to certain conditions. So § 480-11(b) would presumably exempt Underwriters from a lawsuit alleging that transactions in compliance with those conditions violates UDAP. Such a lawsuit would be "based on practices that are 'in compliance' with other laws." See Showpiece Homes, 38 P.3d at 56. Or, to borrow a different example offered by Plaintiffs' counsel at the motions hearing, § 480-11(b) could apply if a policyholder were to bring a UDAP claim alleging that a traditional insurance carrier's rates of insurance were "unfair." Because rates of insurance are regulated and indeed specifically established by the Insurance Commissioner, a lawsuit taking issue with those rates would involve conduct "expressly permitted by the insurance laws of [Hawai'i]."[16/] Accordingly, to the extent that § 480-11(b) might, under some circumstances, excuse a defendant from liability in the insurance context, those circumstances do not exist here.

Because Plaintiffs have alleged that Defendants' conduct did not comply with and was not "expressly permitted by"

---

[16/] Of course, this example is only relevant to admitted insurers transacting in the traditional, non-surplus lines market. As discussed, surplus lines insurance is not regulated in the same way and is provided by non-admitted insurers who need not obtain approval for the rates, forms, and underwriting rules. See Compl. ¶ 41; see also HRS § 431:8-301 (allowing surplus lines insurance to be placed with unauthorized insurers under certain conditions).

the Insurance Code, § 480-11(b) would not apply.[17/]  The Court,

then, would not dismiss Count I as barred by § 480-11(b).

### i. Whether Count II—UDTPA § 481A-3 Violation— States a Claim for Relief

HRS § 481A-3 sets forth eleven categories that

constitute deceptive trade practices, and the list ends with a

catch-all provision for "any other conduct which similarly

creates a likelihood of confusion or of misunderstanding."  HRS

§ 481A-3(a)(1)-(12).  To prevail in an action under the UDTPA,

"a complainant need not prove . . . actual confusion or

misunderstanding."  Id. § 481A-3(b).  And "[a] person likely to

be damaged by a deceptive trade practice of another may be

granted an injunction against it under the principles of equity

that the court considers reasonable.  Proof of monetary damage,

loss of profits, or intent to deceive is not required."  Id. §

481A-4(a).  The Hawai'i Supreme Court has defined "the meaning

of deceptive practice by citing the definition employed by

federal courts with respect to 'an act causing, as a natural and

probable result, a person to do that which he [or she] would not

otherwise do.'"  Balthazar v. Verizon Haw., Inc., 109 Haw. 69,

77, 123 P.3d at 194, 202 (2005) (quoting Haw. Cmty. Fed. Credit

---

[17/]  The Court notes, however, that Plaintiffs may face some difficulty in future pleadings to the extent that they are trying to attribute Broker Defendants' conduct to Underwriters.  The specific-conduct approach asks whether the specific conduct of the defendant entitles it to a safe harbor. As currently framed, the Complaint arguably does not allege viable Insurance Code violations against Underwriters—only Broker Defendants.

Union v. Keka, 94 Haw. 213, 228, 11 P.3d 1, 16 (2000))
(alteration in original).

Plaintiffs' UDTPA claim is plainly alleged under the
catch-all provision, HRS § 481A-3(a)(12). Compl. ¶ 104 ("Broker
Defendants' and Lloyd's conduct of misrepresenting, concealing,
steering, or otherwise omitting the foregoing created the
likelihood of confusion or of misunderstanding under HRS §481A-
3(a)(12)."). Count II alleges that the same conduct underlying
Count I also constitutes deceptive trade practices in violation
of Chapter 481A. Compl. ¶¶ 102-06.

For many of the same reasons they were insufficient to
state a claim under Count I, the allegations in Count II are
insufficient to state a claim under the UDTPA. The allegations
are in superficial and conclusory terms, and Plaintiffs add no
facts to flesh out their allegations that Underwriters' conduct
created a likelihood of confusion or misunderstanding. See Bank
of N.Y. Mellon v. Sakala, CV No. 11-00618 DAE-BMK, 2012 WL
12892444, at *8 (D. Haw. Aug. 13, 2012) ("[V]ague and conclusory
allegations cannot, in and of themselves, state a claim for
relief."). Plaintiffs' assertion in their Opposition Brief that
they were "not fully informed as to the insurance transactions,"
Opp. Br. 22, is not enough to show specific deceptive practices
that Underwriters must have engaged in to state a claim.

The Court acknowledges Plaintiffs' allegation that they were compelled to do something that they would not otherwise have done: purchase surplus lines insurance policies. But this allegation alone, without any non-conclusory facts to show wrongful conduct on the part of Underwriters, cannot support a claim for relief under the UDTPA.

Accordingly, Plaintiffs have failed to state a claim under HRS § 481A. Insofar as it seeks dismissal of Count II against Underwriters, the Motion to Dismiss is granted.

### ii. Whether Count III—Breach of the Implied Covenant of Good Faith and Fair Dealing—Fails to State a Claim for Relief

The Hawaiʻi Supreme Court first recognized a bad faith cause of action in the first-party insurance context in Best Place. The court held that "there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action." Best Place, 82 Haw. at 132, 920 P.2d at 347. In 2013, the Supreme Court expanded its recognition of the bad faith tort to claims brought pursuant to unlawful claims practices in Hawaiʻi's Joint Underwriting Plan ("JUP"), where no express contract is formed between the insurers and the

assignees.[18/] <u>Willis v. Swain</u>, 129 Haw. 478, 486, 304 P.3d 619, 627 (2013).  In both <u>Willis</u> and <u>Best Place</u>, the Hawaiʻi Supreme Court emphasized the "special relationship between the insurers and their insureds," which justified a tort cause of action for bad faith.  <u>Id.</u>; <u>Best Place</u>, 82 Haw. at 132, 920 P.2d at 347.

The allegations underlying Count III are the same as those underlying the other causes of action:  Defendants steered Plaintiffs into purchasing surplus lines insurance coverage to increase profits and collect unlawful commissions.  <u>See</u> Compl. ¶¶ 107-20.  Underwriters argue that dismissal of Count III is warranted because no cause of action exists for the breach of the implied covenant of good faith and fair dealing when the underlying misconduct occurred before the contract's formation.  Mot. Dismiss 25-26.  Plaintiffs read Hawaiʻi law more broadly to argue that pre-contractual conduct can serve as the predicate for a bad faith claim.  <u>See</u> Opp. Br. 25-26, 28-29.  Alternatively, Plaintiffs argue that the Complaint alleges a "continuing" course of conduct.  <u>Id.</u>

Without expressly ruling on the merits of Defendants' position, given the limited facts currently pleaded, the Court notes that it is not persuaded by Defendants' attempt to limit

---

[18/]  The JUP provides public assistance to individuals who cannot otherwise obtain insurance.  <u>Willis</u>, 129 Haw. at 482-83, 304 P.3d at 623-24. It operates in the form of a risk-pooling arrangement and was created by statute, HRS § 431:10c-401.

the bad-faith cause of action as a matter of law to conduct

occurring after the contract was formed.  To be sure, this

district has recognized that a tort claim for bad faith is

predicated on the existence of a contract:

> "In Best Place, the Hawaii Supreme Court
> noted that although Hawaii law imposes a duty
> of good faith and fair dealing in all
> contracts, whether a breach of this duty will
> give rise to a bad faith tort cause of action
> depends on the duties inherent in a particular
> type of contract." . . . "The court concluded
> that special characteristics distinguished
> insurance contracts from other contracts and
> justified the recognition of a bad faith tort
> cause of action for the insured in the context
> of first- and third-party insurance
> contracts." . . . Indeed, "the Hawaii Supreme
> Court emphasized that the tort of bad faith,
> as adopted in Best Place, requires
> a contractual relationship between an
> insurer and an insured." . . .

Mier v. Lordsman Inc., Civ. No. 10-00584 JMS-KSC, 2011 WL

285862, at *5 (D. Haw. Jan. 27, 2011) (quoting Jou v. Nat'l

Interstate ins. Co. of Haw., 114 Haw. 122, 129, 157 P.3d 561,

568 (Ct. App. 2007)) (internal citations omitted); see also

Lynch v. Fed. Nat'l Mortg. Ass'n, No. 16-00213 DKW-KSC, 2016 WL

6776283, at *9 (D. Haw. Nov. 15, 2016) (citing Jou, 114 Haw. at

129, 157 P.3d at 568, for its holding that bad faith "requires a

contractual relationship between an insurer and insured").  But

Hawai'i courts have not spoken on whether pre-contract conduct

may form the basis for a bad faith cause of action by an insured against an insurer.[19]

The Supreme Court in _Willis_ diverged from the contract requirement in the context of the Hawaiʻi JUP program, where no actual contract is formed. But the JUP operates under a statute that expressly imposes obligations on the insurer "as if it had" issued a policy to the assignees. _Willis_, 129 Haw. 478 at 484, 304 P.3d at 624 ("The assigned claims plan under the JUP creates an insurer-insured relationship, and under that plan, no underlying contract is necessary to give rise to that relationship and its concomitant rights and obligations because that relationship is created by statute."). No such statute is at play here; Plaintiffs' claims are purely based on the contractual relationship with Underwriters, created by the Policies themselves.

At the same time, the _Willis_ decision stated that "the common law duty of good faith and fair dealing of insurers is incorporated in the insurance code." 129 Haw. at 493 n.29, 304 P.3d at 634 n.29 (quoting HRS § 431:1-102, which provides that "[t]he business of insurance is one affected by the public

---

[19] At least one judge in this district has recognized—in _dicta_—that "[a] party cannot breach the covenant of good faith and fair dealing before a contract is formed." _Fabian v. Guild Mortg. Co._, no. 13-00585 LEK-KSC, 2014 WL 12573004, at *11-12 (D. Haw. Feb. 11, 2014) (quoting _Contreras v. Master Fin., Inc._, No. 3:10-cv-0477-LRH-VPC, 2011 WL 32513, at *3 (D. Nev. Jan. 4, 2011)). However, that case involved a loan contract, so it did not implicate the statutory framework essentially codifying the broad duty of good faith in the insurance context. _Id._

interest, requiring that all persons be actuated by good faith"). And earlier, in Best Place, the court had expressed concern that the administrative remedies provided in the Insurance Code are inadequate to "provide sufficient incentive to insurers to perform their obligations in good faith." 82 Haw. at 127, 920 P.2d at 341. Based on those principles, this district has declined to restrictively limit the tort of bad faith to only specified contexts. See, e.g., Aloha Petroleum, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 13-cv-00296-DKW-RLP, 2014 WL 3359933, at *5 (D. Haw. July 8, 2014) (extending bad faith tort beyond "claims and settlement practices" to circumstances involving insurer's unilateral issuance of an endorsement); CIM Ins. Corp. v. Masamitsu, 74 F. Supp. 2d 975, 988 (D. Haw. 1999) (holding that insurer may be liable for bad faith for "improper conduct of the defense of its insured" even if it is ultimately determined that the contract did not trigger any duty to defend or indemnify); Wailua Assocs. v. Aetna Cas. & Sur. Co., 27 F. Supp. 2d 1211, 1220-21 (D. Haw. 1998) (holding that violations of the Insurance Code's unfair settlement provision, § 431:13-103(a), "may be used as evidence to indicate bad faith").

That said, all of these cases involved conduct occurring after the parties had entered into an insurance contract. And Plaintiffs have not cited any Hawai'i cases

suggesting that the duty of good faith and fair dealing attaches before the contract—or, in the case of Willis, the statutory relationship—is formed. In Simmons v. Puu, the Hawai'i Supreme Court even recognized the purpose of the bad faith tort as, "to avoid 'depriv[ing] the insured of the benefits for which he or she ha[d] contracted." 205 Haw. 112, 120, 94 P.3d 667, 675 (2004) (quoting Best Place, 82 Haw. at 120, 920 P.2d at 343) (emphasis in Simmons).[20]

Of course, this Court also recognizes "the decidedly pro-insured principles set forth in Hawai'i case law." Aloha Petroleum, 2014 WL 3359933 at *5 (quoting U.S. Fire Ins. Co. v. Estate of Campbell, Civ. No. 11-00006 LEK-KSC, 2011 WL 6934566, at *11 (D. Haw. Dec. 30, 2011)). Likewise, it recognizes the statutory requirements that, among other things, the "business of insurance" be conducted in "good faith." H.R.S. § 431:1-102; see also id. § 431:13-103 (discussing unfair and deceptive acts or practices in the business of insurance). It is not clear, then, that the associated common-law duty of good faith and fair dealing would only be relevant to post-contract conduct. As an example, the Hawai'i Insurance Code proscribes, among other things,

> [m]isrepresentations and false advertising of
> insurance policies. Making, issuing,
> circulating, or causing to be made, issued or

---

[20] Unlike the circumstances here, Simmons involved a third-party injured claimant bringing a bad-faith claim against an insurer.

> circulated, any estimate, illustration,
> circular, statement, sales presentation,
> omission, or comparison which:
> . . . Misrepresents the benefits, advantages,
> conditions or terms of any insurance policy
> . . . .

H.R.S. § 431:13-103(a)(1)(A). Practically speaking, conduct

misrepresenting the "benefits, advantages, conditions or terms"

of an insurance policy would occur <u>before</u> parties enter into an

contract. In other words, such conduct would occur before the

insurer-insured relationship is expressly formed.

All in all, <u>Willis</u> acknowledged that the bad-faith

cause of action is essentially codified in the Insurance Code,

and other courts have refused to restrict the tort to a limited

set of circumstances. That being the case, the Court is

hesitant to prohibit Plaintiffs from bringing a bad faith claim

against Underwriters merely because the alleged conduct took

place in the course of procuring the Policies, before the

Policies technically took effect. It does not strike the Court

as fair or consistent with Hawaiʻi's developing bad-faith law

that an insurer would be free to engage in bad-faith business

tactics leading up to the contract formation, and would only be

held accountable for misconduct after the contract is formally

executed. <u>Cf.</u> <u>Wailua Assocs.</u>, 27 F. Supp. 2d at 1220-21

(holding that H.R.S. § 431:13-103 could be used to show bad

faith because "the insurance industry should not be encouraged

to commit the types of unfair practices contained therein").
Accordingly, the Court would not dismiss Count III on the ground
that it alleges only pre-contract conduct.  Deciding otherwise
would incentivize insurers to act without concern for their
good-faith obligations at crucial points leading up to contract
execution.

Notwithstanding the above, Plaintiffs raise an
additional argument in their Opposition Brief to save their bad
faith claim:  that the alleged scheme "involves a continuing
course of conduct such that Underwriters breached the implied
duty of good faith and fair dealing every time Plaintiffs and
the Class paid premiums and reviewed a contract with
Underwriters, which then led to the payment of unlawful
commissions and kickbacks."  Opp. Br. 27.  Plaintiffs cite
several paragraphs of the Complaint to support this new theory,
but none plausibly alleges a "continuing course of conduct."
See Opp. Br. 27 (citing Compl. ¶¶ 6, 59, 68, 119, 127, 133).
The cited paragraphs merely reiterate the conclusory explanation
of the scheme to steer Plaintiffs into procuring the Policies.
By virtue of alleging misconduct in transactions leading up to
the procurement of insurance, the Complaint alleges activities
occurring before the formation of any insurance contract between
Plaintiffs and Underwriters.    E.g., Compl. ¶ 6 ("The Broker
Defendants received kickbacks from Lloyd's for steering

Plaintiffs and the Class to the Lloyd's surplus lines policies in the form of increased commissions." (emphasis added)).

In any event, because neither party has fully and adequately briefed the issue, the Court declines to address whether a "continuing course of conduct" theory could support a bad faith claim in the insurance context. To the extent that Plaintiffs intend to press this theory in an amended complaint, they should allege factual allegations of such conduct with particularity, including the timing and specifics to satisfy Rule 9(b).

Because it otherwise fails to comply with the federal pleading requirements, Count III is dismissed without prejudice.

### iii. Whether Count IV—Unjust Enrichment—States a Claim for Relief

The Complaint pleads unjust enrichment "in the alternative" to Plaintiffs' "contract-based claim." Compl. ¶ 122. To recover on an unjust enrichment claim, a plaintiff must show that (1) the defendant received a benefit without adequate legal basis; and (2) the defendant unjustly retained the benefit at the expense of the plaintiff. Chapman v. Journal Concepts, Inc., Civ. No. 27-00002 JMS/LEK, 2008 WL 5381353, at *21 (D. Haw. Dec. 24, 2008) (citing Small v. Badenhop, 701 P.2d 647, 654 (1985); see also Durrette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 502-04, 100 P.3d 60, 72-

74 (2004). Unjust enrichment is a "broad and imprecise term." Durrette, 105 Haw. at 502, 100 P.3d at 72 (internal citation and quotation marks omitted). In reviewing unjust enrichment claims, courts must be guided by the "underlying conception of restitution, the prevention of injustice." Id.

"Hawai'i law has approved 'the principle, long-invoked in the federal courts, that equity has always acted only when legal remedies were inadequate.'" Swartz v. City Mortg., Inc., 911 F. Supp. 2d 916, 938 (D. Haw. 2012) (quoting Porter v. Hu, 116 Haw. 42, 55, 169 P.3d 994, 1007 (Ct. App. 2007)) (internal quotation marks omitted), abrogated on other grounds as stated in Compton v. Countrywide Fin. Corp., 761 F.3d 1046 (9th Cir. 2014)). Thus, the absence of an adequate remedy at law is a "necessary prerequisite" to maintaining an equitable claim. Soule, 1 F. Supp. at 1102 (citing Swartz, 911 F. Supp. 2d at 938).

Here, Plaintiffs allege in the Complaint that they have a legal remedy in the form of the UDAP Claims. See Compl., Counts I-II; see also Compl., Prayer For Relief. Following this Court's decision in Soule, Plaintiffs' unjust enrichment claim would not survive a motion to dismiss for the additional reason that the Complaint fails to plead that the legal claims are inadequate. See Soule, 1 F. Supp. 3d at 1102-03. Plaintiffs' unjust enrichment claim "merely incorporates the other facts of

the [Complaint] by reference and makes a conclusory allegation"
that Plaintiffs and the Class conferred upon Defendants the
benefit of non-gratuitous payments for insurance.  _Id._; _see also_
Compl. ¶ 125.  In short, Plaintiffs do not explain how their
UDAP or other legal claims "do[] not fully address [the]
injustice' [they] allegedly suffered at the hands of
[Underwriters]."  _Soule_, 1 F. Supp. 3d at 1103 (quoting _Porter_,
116 Haw. at 55, 169 P.3d at 1007).

　　　None of this is to say that Plaintiffs cannot allege
an unjust enrichment claim in the alternative to their statutory
claims.  The Federal Rules certainly allow them to do so.  _See_
8(a)(3) (requiring "a demand for the relief sought, which may
include relief in the alternative or different types of
relief"); Rule 8(d) (allowing alternative statements of a claim
or defense)[21/]; _see also_ _Soule_, 1 F. Supp. 3d at 1103 (discussing
Rule 8's alternative pleading rules in the context of unjust
enrichment).  The same goes for Plaintiffs' "contract-based"
claims, for which Plaintiffs have in fact pleaded unjust
enrichment "in the alternative."[22/]  Compl. ¶ 122.  But even an

---

[21/]  Although, as discussed, Rule 9(b) is the relevant standard here for
factual allegations of fraud, Rule 8 contains the general rules of pleading,
which includes permitting pleading in the alternative.

[22/]  On this point, Underwriters argue that the Policies and the parallel
coverage litigation pending in state court preclude the unjust enrichment
claim in this case.  Mot. Dismiss 29.  Indeed, it is well-settled in this
circuit that "equitable remedies are not available when an express contract
exists between the parties concerning the same subject matter."  _Soule_, 1 F.
(Continued . . . )

alternative equitable claim must plead any "necessary prerequisite" to such a claim.  Put another way, for their unjust enrichment claim to survive a motion to dismiss, Plaintiffs must at least plead that their equitable claim would provide a remedy in the event that their legal claims or remedies are found to be inadequate.  As currently pleaded, the Complaint fails to allege, even in the alternative, the inadequacy of the legal remedies.[23/]

The unjust enrichment claim is dismissed against Underwriters without prejudice.

_____

Supp. at 1102 (quoting Swartz, 911 F. Supp. 2d at 938).  However, it is not clear that the relief sought in this lawsuit is necessarily predicated on the terms of the insurance contracts.  At the least, the Policies may not "fully address the injustice."  See Porter, 116 Haw. at 55, 169 P.3d at 1007 (affirming circuit court's ruling imposing equitable remedy because restitution may be appropriate "where an express contract does not fully address an injustice").  The Policies establish rights and obligations with respect to coverage; whereas Plaintiffs' allegations in this lawsuit focus on Defendants profiting from their misrepresentations and manipulation of the contract-negotiation process.  Accordingly, at this early stage, the Court would not dismiss Plaintiffs' unjust enrichment claim as precluded by the insurance Policies or the state-court coverage litigation.

[23/]  It would not, as Plaintiffs argue, be premature to dismiss the unjust enrichment claim for failing to plead the lack of an adequate legal remedy.  Plaintiffs rely on Sunday's Child, LLC v. Irongate AZREP BW LLC, 2017 WL 561338, at *6-7 (D. Haw. Feb. 10, 2017), in which Judge Watson found dismissal of unjust enrichment at an early stage was not warranted.  But in that case, it was not clear from the complaint whether the dispute could be "answered entirely" by the legal and contract claims.  Id. at *6.  And, notably, Judge Watson later rejected the unjust enrichment claim on summary judgment, citing Soule for the proposition that an inadequate remedy at law is a necessary prerequisite to an unjust enrichment claim.  Sunday's Child, LLC v. Irongate AZREP BW LLC, 327 F. Supp. 3d 1322, 1341 (D. Haw. 2018), appeal filed Sept. 26, 2018.

### iv. Whether Count VII—Declaratory Judgment—States a Claim for Relief

Finally, Plaintiffs seek declaratory relief in the form of a declaration that "(i) Broker Defendants owe a legal duty to perform their required duties and due diligence required under Hawaii law to place surplus lines insurance; (ii) Broker Defendants continue to breach this legal duty by failing to perform their required duties and due diligence; and (iii) Broker Defendants' ongoing breach of this legal duty continues to cause harm." Compl. ¶ 153. Under the same cause of action, Plaintiffs ask the Court to "issue corresponding injunctive relief requiring Defendants to cease the unlawful practices alleged herein." Compl. ¶ 154.

Underwriters argue that Count VII should be dismissed against them because it alleges nothing as to the obligations of Underwriters; declaratory relief is not an appropriate remedy for past conduct; and the claim is duplicative of other causes of action in the Complaint. The Court agrees that Count VII fails to state a claim.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that in "a case of actual controversy," a court may "declare the rights and other legal relations of any interest party seeking such declaration, whether or not further relief is or could be sought." McGraw-Edison Co. v. Preformed Line Products Co., 362

F.2d 339, 342 (9th Cir. 1966).  In deciding whether to hear a
claim for declaratory relief, courts consider (1) whether the
judgment "will serve a useful purpose in clarifying and settling
the legal relations at issue" and (2) whether the judgment "will
terminate and afford relief from the uncertainty, insecurity,
and controversy giving rise to the proceeding."  Id.  As for
injunctive relief, this district "follows the well-settled rule
that a claim for 'injunctive relief' standing alone is not a
cause of action.  Phillips v. Bank of Am., Civ. No. 10-00551
JMS-KSC, 2011 WL 240813, at *4 (D. Haw. Jan. 21, 2011)
(collecting cases).  Injunctive relief may be available only as
a remedy on an independent cause of action.  Id.

       Count VII is deficient for several reasons.  First,
Plaintiffs have failed to seek any declaration of the "rights
and other legal relations" of Underwriters.  See Mot. Dismiss
29-20; see also Compl. ¶ 153.  The declaration they seek names
only Broker Defendants.  Compl. ¶ 153.  Plaintiffs dismiss this
as a "scrivener's error," Opp. Br. 35, but the Court is not
willing to overlook this apparent mistake.  Doing so would only
add to the confusion and uncertainty of the declaration
Plaintiffs seek and of the obligations of each party going
forward.  Moreover, because the Complaint is subject to Rule
9(b), the Court cannot accept sloppy pleading that lumps

Defendants together and does not identify the distinct duties purportedly owed by each Defendant.

Second, "because Plaintiffs' claims are based on allegations regarding Defendants' past wrongs, a claim under the Declaratory Relief Act is improper and in essence duplicates Plaintiffs' other causes of action." Phillips, 2011 WL 240813 at *4 (collecting cases and dismissing claims for injunctive and declaratory relief). Count VII essentially incorporates by reference the other allegations of the Complaint and identifies "Defendants' actions (and inaction)" as "inadequate and unreasonable." Compl. ¶ 152. These allegations cannot support a cognizable claim for relief under the Declaratory Relief Act. See Phillips, 2011 WL 240813 at *4 (collecting cases holding that declaratory relief is unnecessary when adequate remedies exist under other causes of action).

Third, Count VII does not allege any entitlement to relief for "future interactions between these parties." Opp. Br. 37 (citing TK v. Adobe Sys. Inc., No. 17-cv-04595-LHK, 2018 WL 1812200, at *13 (N.D. Cal. Apr. 17, 2018); Servco Pac., Inc. v. SyBridge Global, Inc., Civ. No. 16-00266 DKW-KSC, 2016 WL 6996987, at *10 (D. Haw. Nov. 29, 2016)). The only allegations in the Complaint that could remotely be construed as alleging future harm are in ¶ 152 (alleging that Defendants' actions "upon information and belief, remain inadequate and

unreasonable") and ¶ 153 (noting "Broker Defendants' ongoing breach of this legal duty").  Neither of these pleads sufficient facts to support a cognizable, independent claim for declaratory relief.  See Isagawa v. Homestreet Bank, 769 F. Supp. 2d 1225, 1231-32 (D. Haw. 2011) (dismissing claims for declaratory and injunctive relief where plaintiffs alleged they "suffered and will continue to suffer in the future unless Defendants wrongful conduct is restrained and enjoined").

Servco Pacific, cited by Plaintiffs, does not compel a different conclusion.  In that case, the declaratory relief claim was "plainly not duplicative" of a breach of contract claim because the two sought different remedies:  one sought damages for material breaches of a statement of work and the other sought a declaration that the non-breaching party was not required to compensate the breaching party for services rendered.  Servco Pac., 2016 WL 6996987 at *10.  Likewise, Plaintiffs' arguments in their Opposition Brief about a declaration governing "future interactions between these parties," which they base on T.K. v. Adobe Systems, are not adequately alleged in the Complaint.

Finally, with respect to injunctive relief, Plaintiffs have not pleaded factual allegations to support entitlement to

such relief.[24/] Regardless, injunctive relief is not an

independent cause of action and, "if injunctive relief is

proper, it will be because Plaintiffs prevail . . . on an

independent cause of action." <u>Phillips</u>, 2011 WL 240813 at *5;

<u>see also</u> HRS § 481A-4(a) (providing for relief under the UDTPA

in the form of an injunction).

Plaintiffs request leave to "correct the scrivener's

error and to clarify the declaratory relief sought." Opp. Br.

25. Such leave is granted and Count VII is dismissed against

Underwriters without prejudice.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court GRANTS

Underwriters' Motion to Dismiss, ECF No. 32, insofar as it seeks

dismissal of all Plaintiffs' claims against Underwriters.

Counts I, II, III, IV, and VII are dismissed against

Underwriters. Because Plaintiffs may be able to cure some of

the pleading defects via amendment, leave to amend is granted

and the causes of action dismissed herein are dismissed without

prejudice. Any amended complaint must be filed within thirty

days of the issuance of this Order and should comply with the

---

[24/] To be entitled to injunctive relief, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).

guidance and standards set forth herein.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, September 26, 2019.



_____
Alan C. Kay
Sr. United States District Judge

<u>Aquilina v. Certain Underwriters at Lloyd's</u>, Civ. No. 18-0496-ACK-KJM, Order Granting Defendants Certain Underwriters at Lloyd's Motion to Dismiss.