**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
JOSEPH P. GUGLIELMO (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
jguglielmo@scott-scott.com

*Counsel for Plaintiffs*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| STEPHEN G. AQUILINA and LUCINA J. AQUILINA, Individually and on Behalf of All Others Similarly Situated; and DONNA J. CORRIGAN and TODD L. CORRIGAN, Individually and on Behalf of All Others Similarly Situated, | No. 1:18-cv-00496-ACK-KJM |
| | |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | |
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON; LLOYD'S SYNDICATE #2003; LLOYD'S SYNDICATE #318; LLOYD'S SYNDICATE #4020; LLOYD'S SYNDICATE #2121; LLOYD'S SYNDICATE #2007; LLOYD'S SYNDICATE #1183; LLOYD'S SYNDICATE #1729; BORISOFF INSURANCE SERVICES, INC. d/b/a MONARCH E&S INSURANCE SERVICES; SPECIALTY PROGRAM GROUP, LLC d/b/a SPG INSURANCE SOLUTIONS, LLC; ALOHA INSURANCE SERVICES, INC.; ILIKEA LLC d/b/a MOA INSURANCE SERVICES HAWAII; and DOES 1-100, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Stephen G. Aquilina, Lucina J. Aquilina, Donna J. Corrigan, and Todd L. Corrigan (collectively, "Plaintiffs") allege the following based on personal knowledge, as to themselves and their own acts, and upon information and belief and the investigation by Plaintiffs' counsel, as to all other matters. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## INTRODUCTION

1. This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a Class (defined below) of similarly situated consumers with a residential property located in Lava Zones 1 and 2 on the island of Hawaii and who purchased a Lloyd's of London ("Lloyd's") surplus lines homeowner's insurance policy that contains an exclusion for the peril of lava and/or lava flow causing direct or indirect physical damage or loss of use of the insured property (the "Lava Exclusion") from retail brokers, including Defendants Ilikea LLC d/b/a Moa Insurance Services Hawaii ("Moa") and Aloha Insurance Services, Inc. ("Aloha"), through wholesale brokers Defendants Borisoff Insurance Services, Inc. d/b/a Monarch E&S Insurance Services ("Monarch") and Specialty Program Group, LLC d/b/a SPG Insurance Solutions, LLC ("SPG"), that was underwritten and/or subscribed to by syndicates of Defendant Certain Underwriters at Lloyd's London,

including Defendants Lloyd's Syndicates #2003, #318, #4020, #2121, #2007, #1183, and #1729 (collectively, "Underwriters"), and Doe Defendants 1-100.

2.     Surplus lines insurance, such as that sold to Plaintiffs and the Class, is a supplemental insurance market that serves to insure catastrophic risks that the standard insurance market cannot or will not insure.  Surplus lines insurance is designed to be the insurance option of last resort because the insurance offered cannot be obtained in the standard insurance market and therefore is placed through unauthorized insurers, like Underwriters, which are not licensed in Hawaii.  To protect policyholders from predatory and unfair practices by unauthorized insurers, Hawaii law requires that surplus lines insurance only be offered when no licensed insurer can offer the same or comparable insurance coverage for the same or lower price.  *See* HRS §431:8-301(a)(2)-(4).

3.     On the island of Hawaii, where Kilauea Volcano has been continuously erupting since 1983, volcanic eruption is one of the catastrophic risks that the standard insurance market historically has not insured.  In 1991, because the standard insurance market stopped writing homeowner's insurance in Lava Zones 1 and 2 (the areas most prone to damage when Kilauea erupts), the Hawaii Legislature created the Hawaii Property Insurance Association ("HPIA") to provide homeowner's insurance coverage for 16 perils, including fire and volcanic eruption,

to homeowners in Lava Zones 1 and 2 who are unable to obtain homeowner's insurance in the standard insurance market.

4.     Instead of filling the gap in the insurance market and providing insurance coverage for damage caused by volcanic eruption, Underwriters, Monarch, Moa, and Aloha (collectively, with SPG, "Defendants") did the opposite. Since as early as 2012 to the present (the "Class Period"), Defendants sold Plaintiffs and the Class – who reside in Lava Zones 1 and 2 and are the most vulnerable to the catastrophic losses associated with the eruption of Kilauea Volcano – surplus lines insurance *without* coverage for damage caused by volcanic eruption when more comprehensive coverage was available through HPIA and even other Lloyd's policies, offered through different brokers, that did not contain a Lava Exclusion.

5.     Defendants effectively exploited the lack of regulation of rates and forms in the surplus lines market in order to provide only basic homeowner's insurance coverage that excludes coverage for the very catastrophic risks that the admitted market cannot or will not cover, which defeats the very purpose of surplus lines insurance.

6.     In selling surplus lines homeowner's insurance with a Lava Exclusion to homeowners with properties in Lava Zones 1 and 2 without regard to the availability of more comprehensive coverage, Defendants engaged in unfair conduct and breached various duties owed to Plaintiffs and the Class.   Defendants'

misconduct resulted in the unlawful placement of surplus lines insurance that never should have been offered for sale.  As a result, Plaintiffs and the Class paid premiums and commissions to Defendants that Defendants otherwise would not have received, but for their wrongdoing, injuring Plaintiffs and the Class and unjustly enriching Defendants.

7.     Defendants' wrongdoing came to light in May 2018, when Kilauea Volcano erupted from new fissures, displacing hundreds of residents in the lower Puna District of Hawaii Island.  As people throughout the world became aware through the images of loss and media interviews, these residents suffered tremendously.  Thousands of residents were displaced and over 700 homes were lost due to fire or rendered a total loss due to destruction, inhabitability, and a lack of structural integrity.[1]  Residents not only lost their homes, but many, including Plaintiffs, lost virtually everything they owned, including, but not limited to: pets, clothing, furniture, toiletries, food, electronics, tools, machinery, identification, birth records, marriage certificates and other records, photographs, letters, and diplomas. With such catastrophic losses come extreme and debilitating emotional distress, anxiety, and panic.

---

[1]     Casey Lund, *'A mixture of joy and sadness' as Leilani Estates residents return home after eruption*, HAW. NEWS NOW (Sept. 8, 2018, 8:47 PM HST), http://www.hawaiinewsnow.com/story/39053568/a-mixture-of-joy-and-sadness-as-leilani-estates-residents-return-home-after-eruption/.

8.      To make matters even worse, in the aftermath of this tragedy, Plaintiffs and Class members were faced with the ramifications of having been sold virtually worthless homeowner's insurance that did not provide coverage for the losses they suffered due to the Lava Exclusions contained in Underwriters' surplus lines policies.  Because Defendants wrongfully placed Plaintiffs and the Class into surplus lines insurance with a Lava Exclusion, Underwriters have been able to deny coverage to Plaintiffs and Class members impacted by the 2018 eruption of the Kilauea Volcano on the basis of the Lava Exclusion – leaving some without any ability to repair or replace their damaged or destroyed homes.

9.      In the absence of Defendants' misconduct, Plaintiffs and the Class would have been offered more comprehensive HPIA insurance, which provides for coverage against 16 perils, including fire and volcanic eruption, or even could have obtained a Lloyd's policy (not brokered by Monarch) without the Lava Exclusion.

10.     Accordingly, Plaintiffs bring this action individually and on behalf of a Class of those similarly situated to recover for their injuries arising from Defendants' violations of HRS §§480-1, *et seq*., Underwriters' breach of the implied covenant of good faith and fair dealing, and Moa and Aloha's negligence.  Plaintiffs also seek to recover in restitution all excessive amounts that were paid to and unjustly enriched Defendants.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d)(2)(A), (C) ("CAFA").  The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative Class members; and minimal diversity exists because at least one Class member is a citizen of a different state than at least one Defendant, at least one Class member is a citizen of a state and at least one Defendant is a foreign citizen, and the primary Defendants are each citizens of different states.  Specifically, Plaintiffs Stephen G. and Lucina J. Aquilina are citizens of Hawaii and Plaintiffs Donna J. and Todd L. Corrigan are citizens of Maryland, while each Underwriter is a foreign citizen, Monarch is a citizen of California, SPG is a citizen of Delaware, and Moa and Aloha are citizens of Hawaii.

12.     This Court has personal jurisdiction over Defendants.  Underwriters regularly market and sell insurance products in Hawaii and, therefore, have sufficient minimum contacts with Hawaii and/or intentionally avail themselves of the privilege of doing business in the Hawaii insurance market through the promotion, sale, and service of insurance policies in Hawaii.  In 2017, Lloyd's syndicates wrote approximately $52 million in surplus lines premium in Hawaii. Monarch and SPG are each licensed in Hawaii as a Non-Resident Surplus Lines Broker and thus each regularly conducts business in Hawaii and/or has purposefully

availed itself of the privilege of doing business in the Hawaii insurance market through the promotion, sale, and service of insurance policies in Hawaii. Moa and Aloha are licensed in Hawaii as Resident Surplus Lines Brokers and are authorized to, and regularly do, conduct business in this State and purposefully avail themselves of this jurisdiction.

13.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because Defendants are subject to personal jurisdiction in this District, regularly transact business in this District and, therefore, are deemed citizens of this District. Additionally, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

## PARTIES

14.    Plaintiffs Stephen G. Aquilina and Lucina J. Aquilina (the "Aquilina Plaintiffs") resided together as husband and wife in their home located at 13-3573 Alapai Street, Pāhoa, Hawaii 96778. The Aquilina Plaintiffs purchased their home in March 2015 for approximately $190,000. This property is located in Hawaii Lava Zone 1. Each of the Aquilina Plaintiffs is over 61 years of age and was over 61 years of age for at least part of the Class Period, when Defendants' conduct was directed and targeted toward them. In 2015, the Aquilina Plaintiffs purchased a surplus lines homeowner's insurance policy from resident surplus lines retail broker Moa and renewed this policy annually from 2016 to 2018. The original policy and each

renewal policy was procured through non-resident surplus line wholesale broker Monarch and was underwritten and/or subscribed to by Underwriters. The certificate of insurance for the Aquilina Plaintiffs' 2018-2019 was for the period of April 6, 2018 to April 6, 2019, and the policy identified "certain Underwriters at Lloyd's, London" as the insurer and Monarch as the "correspondent." The Aquilina Plaintiffs' policy for 2018-2019 contained dwelling coverage up to $252,000, other structures up to $25,200, personal property up to $50,000, personal liability up to $300,000, and medical payments up to $1,000. For the 2018-2019 policy, the Aquilina Plaintiffs' premium cost $1,300.68, which the Aquilina Plaintiffs paid to Moa and was remitted to Underwriters, net of the brokers' commissions. Each policy contained a Lava Exclusion. Although the Aquilina Plaintiffs' coverage amounts were less than the coverage limits under HPIA, Defendants improperly placed the Aquilina Plaintiffs in surplus lines insurance policies that contained a Lava Exclusion when other homeowner's insurance policies with lava coverage were available to them. The Aquilina Plaintiffs had no knowledge that alternative insurance that would cover damage caused by volcanic eruption was available to them. The Aquilina Plaintiffs' claim to cover losses suffered as a result of the Kilauea Volcano eruption has been denied on the basis of the Lava Exclusion.

15. Plaintiffs Donna J. Corrigan and Todd L. Corrigan (the "Corrigan Plaintiffs") purchased their home located at 13-1028 Malama Street, Pāhoa, Hawaii

96778, in September 2013 for approximately $217,500.  This property is located in Lava Zone 1.  In September 2013, the Corrigan Plaintiffs purchased a surplus lines homeowner's insurance policy from resident surplus lines retail broker Aloha and renewed this policy annually from 2013 to 2018.  The original policy and each renewal policy was underwritten and/or subscribed to by Underwriters.  The certificate of insurance for the Corrigan Plaintiffs' 2017-2018 policy was for the period of September 26, 2017 to September 26, 2018, and identified "certain Underwriters at Lloyd's, London" as the insurer and Monarch as the "correspondent."  The Corrigan Plaintiffs' policy for 2017-2018 contained dwelling coverage up to $279,000, personal property up to $50,000, personal liability up to $100,000, and medical payments up to $1,000.  For the 2017-2018 policy, the Corrigan Plaintiffs' premium cost $2,005.18, which the Corrigan Plaintiffs paid to Aloha and was remitted to Underwriters, net of the brokers' commissions.  Each policy contained a Lava Exclusion.  Although the Corrigan Plaintiffs' coverage amounts were less than the coverage limits under HPIA, Defendants improperly placed the Corrigan Plaintiffs in surplus lines insurance policies that contained a Lava Exclusion when other homeowner's insurance policies with lava coverage were available to them.  The Corrigan Plaintiffs had no knowledge that alternative insurance that included coverage for lava was available to them.  The Corrigan

Plaintiffs' claim to cover losses suffered as a result of the Kilauea Volcano eruption has been denied on the basis of the Lava Exclusion.

16.    Defendant Certain Underwriters of Lloyd's London is a foreign business entity headquartered at One Lime Street, London, England, with administrative offices in the United States located at 42 West 54th Street, 14th Floor, New York, New York 10019.   Certain Underwriters of Lloyd's London is an organization that provides insurance underwriting services and comprised of separate syndicates that underwrite insurance in an insurance marketplace, known as Lloyd's.  Syndicates in the Lloyd's market have provided insurance for over 330 years in over 200 countries and territories.  According to *A.M. Best*, syndicates in the Lloyd's market are the largest surplus lines insurers in the United States with approximately 22.6% of the U.S. surplus lines market, accounting for approximately $9.6 billion in surplus lines premium written in 2016.

17.    Lloyd's syndicates, such as Underwriters, offer surplus lines insurance in Hawaii by placing surplus lines insurance policies through a network of resident and non-resident surplus lines brokers that are required to be licensed in Hawaii.  As surplus lines insurers, Underwriters are not required to file their rates with the state insurance regulators and their rates and forms are not reviewed or approved by any regulatory agency.  Underwriters underwrote and/or subscribed to the surplus lines

insurance policies placed on Plaintiffs and the Class's properties during the Class Period.

18.     The identity of the syndicates underwriting and/or subscribing to the Aquilina Plaintiffs' policy purchased in 2015 and renewed in 2016, 2017, and 2018 (the "Aquilina Policy") and the Corrigan Plaintiffs' policy purchased in 2013 and renewed in 2014, 2015, 2016, and 2017 (the "Corrigan Policy") includes the Underwriters that are named as defendants herein.

19.     Defendant Lloyd's Syndicate #2003 is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  Catlin Underwriting Agencies Limited ("Catlin"), wholly supported by XL Group Ltd., is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #2003 that governed the policies issued to the Plaintiffs.  Catlin is a foreign business entity headquartered at 20 Gracechurch Street, London, England.  In 2017, Lloyd's Syndicate #2003 wrote $3.05 billion in gross written premiums.

20.     Defendant Lloyd's Syndicate #318, or MSF Pritchard Syndicate 318, is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  Beaufort Underwriting Agency Limited ("Beaufort") is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #318 that governed the policies issued to Plaintiffs.

Beaufort is a foreign business entity headquartered at One Minster Court, Mincing Lane, London, England.  In 2017, Lloyd's Syndicate #318 wrote $127.18 million in gross written premiums.[2]  Lloyd's Syndicate #318 underwrites in two core business areas of International and U.S. property and aviation.

21.    Defendant Lloyd's Syndicate #4020 is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  Ark Syndicate Management Limited ("Ark") is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #4020 that governed the policies issued to Plaintiffs.  Ark is a foreign business entity headquartered at 30 Fenchurch Avenue, London, England.  In 2017, Lloyd's Syndicate #4020 wrote $198 million in gross written premiums.

22.    Defendant Lloyd's Syndicate #2121 is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  Argenta Syndicate Management Limited ("Argenta") is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #2121 that governed the policies issued to Plaintiffs.  Argenta is a foreign business entity headquartered at 70 Gracechurch Street, London, England.  In 2017, Lloyd's Syndicate #2121 wrote $279.6 million in gross written premiums.    Lloyd's

---

[2]    Gross written premiums of Lloyd's in British pound sterling have been converted to U.S. dollars using the average foreign exchange rate from 2017.

Syndicate #2121's property coverage has a "bias towards the US market" and "is predominately US focused" in excess and surplus lines business.[3]

23.    Defendant Lloyd's Syndicate #2007 is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  AXIS Managing Agency Limited ("AXIS") is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #2007 that governed the policies issued to Plaintiffs.  AXIS is a foreign business entity headquartered at 21 Lonbard Street, London, England.  AXIS has several offices in the United States, including one at 1211 Avenue of the Americas, 24th Floor, New York, New York 10036.  In 2017, Lloyd's Syndicate #2007 wrote $681.5 million in gross written premiums.

24.    Defendant Lloyd's Syndicate #1183 is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  Talbot Underwriting Ltd. ("Talbot") is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #1183 that governed the policies issued to Plaintiffs.  Talbot is a foreign business entity headquartered at 60 Threadneedle Street, London, England.  Talbot has an office in

---

[3]    *Property (Direct and Facultative)*, ARGENTA GRP., http://www.argentagroup.com/property-direct-and-facultative (last visited Dec. 12, 2019).

the United States located at 600 Brickell Avenue, Suite 1850, Miami, Florida 33131. In 2017, Lloyd's Syndicate #1183 wrote $921.1 million in gross written premiums.

25.     Defendant Lloyd's Syndicate #1729 is the syndicate that underwrote part of the insurance for the Aquilina and Corrigan Policies.  Asta Managing Agency Ltd. ("Asta") is the Lloyd's managing agent and signatory to the applicable binding authority agreement between Monarch and Lloyd's Syndicate #1729 that governed the policies issued to Plaintiffs.  Asta is a foreign business entity headquartered at 5th Floor, Camomile Court, 23 Camomile Street, London, England.   In 2017, Lloyd's Syndicate #1729 wrote $78.9 million in gross written premiums.

26.     Despite that Plaintiffs' insurance policies were required to identify the syndicates that underwrote the risk and the specific percentage of risk that each syndicate subscribed to, Plaintiffs' policies did not identify the syndicates or risk percentage.  Thus, at present, Plaintiffs do not know the identity of the remaining syndicate(s) that underwrote and/or subscribed to the various policies that insured Plaintiffs and the Class's properties and that are the subject of this lawsuit.

27.     Defendant Monarch is a California corporation with its principal offices located at 2250 North Hollywood Way, Suite 501, Burbank, California 91505. Monarch is currently a wholly owned subsidiary of SPG.  Monarch (under the vendor name Borisoff Insurance Services Inc.) holds an inactive Hawaii Non-Resident Surplus Lines Broker license (License No. 359581) (September 5, 2018 to

April 16, 2020).  Upon information and belief, Monarch held an active Hawaii Non-Resident Surplus Lines Broker license prior to the license becoming inactive on or about September 5, 2018, and now engages in surplus lines transactions in Hawaii under SPG's Non-Resident Surplus Lines Broker license.

28.    Monarch sold Plaintiffs and the Class Underwriters' surplus lines homeowner's insurance policies during the Class Period.  Before being wholly acquired by SPG in September 2017, Monarch transacted insurance business in Hawaii under the registered trade name "Monarch E&S Insurance Services."  Consequently, Monarch-brokered policies, underwritten and subscribed to by Underwriters that were issued before September 2017 bear the name "Monarch E & S Insurance Services," while those policies issued after September 2017 bear the name "Monarch E & S Insurance Services, Division of SPG Insurance Solutions."  At all relevant times, Monarch has been an authorized Lloyd's coverholder, meaning it is a business entity "authorised by a Managing Agent to enter into a contract or contracts of insurance to be underwritten by the members of a syndicate managed by it in accordance with the terms of a Binding Authority."[4]

---

[4]     *See Market resources: Delegated Authorities: Compliance & Operations: About Coverholders*, LLOYD'S, https://www.lloyds.com/market-resources/delegated-authorities/compliance-and-operations/about-coverholders (last visited Dec. 12, 2019).

Between January 2015 and June 2018, Monarch brokered approximately $7 million in total premiums for surplus lines policies placed with Lloyd's syndicates.

29.     Defendant SPG is a Delaware Limited Liability Company registered in Hawaii as an active Foreign Limited Liability Company since November 15, 2016, and has its principal offices located at 2250 North Hollywood Way, Suite 501, Burbank, California 95105.  SPG acquired Monarch's assets on or about September 2017.  SPG is licensed in Hawaii as an active Non-Resident Surplus Lines Broker license (License No. 449103) (January 19, 2017 to April 16, 2020).  Since September 2017, SPG, as the parent of Monarch, sold Plaintiffs and the Class the surplus lines insurance policies that were underwritten and/or subscribed to by Underwriters.

30.     Defendant Moa is a Hawaii Limited Liability Company with offices located at 1321 Kino'ole Street, Hilo, Hawaii 96720, and 75-6082 Alii Drive #E, Kailua-Kona, Hawaii 96740.  Moa is licensed as an active Resident Surplus Lines Broker (License No. 412785) (July 20, 2017 to July 16, 2021).  Judy M. Moa ("Ms. Moa"), a broker of Defendant Moa, and who also is licensed in Hawaii as an active Resident Surplus Lines Broker (License No. 412784) (May 12, 2014 to October 16, 2020), placed the Aquilina Plaintiffs in Underwriters' surplus lines insurance policies that she procured through Monarch.

31.     Defendant Aloha is a Hawaii corporation with offices located at 75-5931 Walua Road, Kailua-Kona, Hawaii 96740.  Aloha is licensed as an active

Resident Surplus Lines Broker (License No. 200862) (March 23, 2005 to July 16, 2021).  Prior to becoming a broker at Moa, Judy Moa was a broker at Aloha.  She placed the Corrigan Plaintiffs in Lloyd's surplus lines policies that she procured through Monarch while she was a broker at Aloha.

32.    Doe Defendants 1-100 ("Doe Defendants") are those insurance brokers, agents, and/or coverholders that placed surplus lines insurance through Underwriters on Plaintiffs and the Class's properties, as well as those Lloyd's syndicate(s) that underwrote and/or subscribed to the various surplus lines insurance that are the subject of this lawsuit.  Plaintiffs will be able to identify the Doe Defendants through discovery of Plaintiffs' insurance certificates, Lloyd's coverholder agreements, binding authority agreements, and agreements between and among Monarch, Moa/Aloha, and Underwriters.

## TOLLING OF STATUTES OF LIMITATIONS

33.    The applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and the Class could not have reasonably discovered the true latent nature of the aforementioned facts until shortly before this class action litigation was commenced.  As a result of Defendants' active concealment, all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## ALLEGATIONS OF FACT

A.  **Plaintiffs and the Class, as Homeowners in Lava Zones 1 and 2, Were Foreseeably Subject to Catastrophic Risk that Could Have Been Covered by Homeowner's Insurance Obtained Through HPIA or Certain Syndicates of Lloyd's**

34.     Hawaii Island is divided into Zones 1 through 9 to reflect the potential hazards associated with living in an area.  One potential hazard, lava flows, is most likely in Zone 1 and least likely in Zone 9 based on estimates from the U.S. Geological Survey.  Figure 1 below depicts the division of Hawaii Island, with Hawaii's most active volcano, the Kilauea Volcano, located on the southeastern shore.  Leilani Estates, where Plaintiffs' homes are located, is in Lava Zone 1.[5]

### Figure 1



---

[5]     *Buyers: Lava Zones*, KOA REALTY, INC., https://www.koarealty.com/buying-property/lava-zones/ (last visited Dec. 12, 2019).

35.     Because Kilauea Volcano has been continuously erupting since 1983, insurers in the standard insurance market stopped writing homeowner's insurance in Lava Zones 1 and 2.  However, in 1991, the Hawaii Legislature created HPIA to provide homeowner's insurance coverage for 16 perils, including fire and volcanic eruption, to homeowners in Lava Zones 1 and 2, who are unable to obtain homeowner's insurance in the standard insurance market.

36.     The Hawaii Legislature explained:

> The legislature finds that the recent Kilauea volcano eruption and lava flows have caused a serious problem for residents of certain areas of the Big Island. The actual and potential losses caused by the volcanic activity has also resulted in the unavailability of basic property insurance for persons having insurable interests in properties in the vicinity which has caused great personal suffering and financial hardship and has contributed to uncertainty in the community. The legislature finds it is in the interest of the State to foster stability for people adversely affected by major natural disasters, and this purpose will be served by making basic property insurance available to such persons.

> The purpose of this Act is to create an entity which will provide appropriately priced basic property insurance for owners and occupants of property in high risk areas for major natural disasters. This extraordinary action is being taken to provide limited relief to meet the unique and pressing needs of these persons who are currently unable to obtain any property insurance.

Act of June 18, 1991, No. 284, §1, 1991 Haw. Sess. Laws 8.

37.     By obtaining an insurance policy through HPIA, homeowners can purchase a maximum Dwelling Limit of $350,000, subject to a deductible of $500,

$1,000, $2,000, or $3,000, Personal Property coverage of 50% of the Dwelling Limit, and Personal Liability Coverage of $100,000, $200,000, or $300,000.

38.    The HPIA Homeowner's 2 Broad Form policy, like HPIA's other broad form policies, provides comprehensive property insurance coverage for direct physical loss to the property caused by 16 different perils, including "*[f]ire or lightning*" and "*[v]olcanic eruption* other than loss caused by earthquake, land shock waves or tremors."[6]    [Emphasis added].    HPIA pays homeowner's policyholders for damages to the house and structures attached to the house, including damage to fixtures, such as plumbing, electrical wiring, heating, and permanently installed air-conditioning systems.

39.    Figures 2 and 3 below are images from Zillow that depict the home values for houses that were recently sold in Leilani Estates, where Plaintiffs' homes were located.  Figure 2 is the eastern area of Leilani Estates, while Figure 3 is the western area.  The overwhelming majority of homes were sold, and thus were valued, well below $350,000, which is the dwelling coverage limit under the HPIA policy.

---

[6]    *HOMEOWNERS 2 BROAD FORM*, INS. SERVS. OFFICE, INC. (1990) http://www.hpiainfo.com/wp-content/uploads/2018/02/HO-0002-0491-Homeowne rs-2-Broad-Form.pdf.

**Figure 2**[7]



---

[7]    *Recently Sold Homes*, ZILLOW, https://www.zillow.com/homes/recently_so ld/globalrelevanceex_sort/19.47608,-154.900339,19.455444,-154.927805_rect/14_ zm/ (last visited Dec. 12, 2019).

**Figure 3**[8]



40.     Similarly, according to Data USA, the median property value in Leilani Estates is $228,700.[9]

41.     Additionally, according to Zillow, the median value of a home in the Pāhoa area, which is in the Puna District (through which the East Rift Zone runs) on Hawaii Island, was approximately $177,200 in October 2019.[10]  Likewise, according

---

[8]      *Id.*

[9]      *Leilani Estates, HI*, DATA USA, https://datausa.io/profile/geo/leilani-estates-hi/ (last visited Dec. 12, 2019).

[10]     *Pahoa Home Prices & Values*, ZILLOW, https://www.zillow.com/pahoa-hi/home-values/ (last visited Dec. 12, 2019).

to Realtor.com, the median list price for a home in the Pāhoa area in October 2019 was $200,000.[11]

42.     Given that these properties were valued for substantially under HPIA $350,000 dwelling coverage limit, homes in Lava Zones 1 and 2, and more specifically Plaintiffs' homes, could have been insured under HPIA.

43.     Aside from HPIA, the predominant insurers that write homeowner's insurance policies in Hawaii Lava Zones 1 and 2 are Lloyd's syndicates, including Underwriters.[12]  During the Class Period, other brokers were able to procure Lloyd's homeowner's insurance policies that did not contain a Lava Exclusion for properties located in Lava Zones 1 and 2.

**B.     Plaintiffs and the Class Desired Homeowner's Insurance that Provided Coverage for Damage Caused as a Result of Volcanic Eruption**

44.     As homeowner's in Lava Zones 1 and 2, Plaintiffs and the Class desired homeowner's insurance that provided coverage for damage caused as a result of volcanic eruption.

**The Aquilina Plaintiffs**

45.     Upon purchasing their home on Alapai Street in March 2015, the Aquilina Plaintiffs contacted Judy Moa and inquired about purchasing insurance for

---

[11]    *Home Values in Pahoa, HI*, REALTOR.COM, https://www.realtor.com/local/Pahoa_HI (last visited Dec. 12, 2019).

[12]    H.R. 39, 29th Leg., 25th Sess. (Haw. 2017).

their home.  Because the Aquilina Plaintiffs resided in Lava Zone 1, they sought appropriate coverage for their home, including coverage for losses caused by volcanic eruption.  Indeed, given the location of homes in Lava Zones 1 and 2, reasonable consumers would desire coverage for such losses and would want complete information regarding the availability of such coverage.  Based on Ms. Moa's advice and recommendations, the Aquilina Plaintiffs purchased a surplus lines homeowner's insurance policy from Moa that was procured through Monarch and underwritten and/or subscribed to by Underwriters.  The original policy issued in March 2015 contained a Lava Exclusion.

46.    The Aquilina Plaintiffs relied on Moa, Monarch, and Underwriters' knowledge, experience, and expertise regarding the appropriateness and availability of coverages in the Hawaii insurance market and with respect to compliance with the Hawaii insurance laws and surplus lines statutory requirements in procuring and underwriting homeowner's insurance in Lava Zone 1.  In 2015, during the period when the Aquilina Plaintiffs sought to obtain homeowner's insurance, Moa failed to inform the Aquilina Plaintiffs that coverage for damage caused by volcanic eruption was available, whether through HPIA or a non-Monarch brokered Lloyd's policy. Moa, which specialized in placing homeowner's insurance in Lava Zones 1 and 2, knew the Aquilina Plaintiffs resided in Lava Zone 1 and desired as comprehensive coverage as possible (including lava coverage) and that the Monarch-brokered

Underwriters' surplus lines policy contained a Lava Exclusion.  Moa, Monarch, and Underwriters knew and understood at the time that the Aquilina Plaintiffs' home was located in Lava Zone 1 and that they were offering insurance to the Aquilina Plaintiffs with a Lava Exclusion.

47.    In March 2015, Moa sent the Aquilina Plaintiffs an invoice, which included the insurance term, premium, policy fee, and surplus lines tax.  The invoice also included the quotation from Monarch for the coverage through Underwriters and requested that the Aquilina Plaintiffs remit payment to Moa.  Upon receipt of the invoice, the Aquilina Plaintiffs paid their insurance premium to Moa, which, in turn, remitted the premium to Monarch after Moa deducted its commission for placing the insurance through Underwriters and Monarch.  Monarch then, in turn, remitted the premium to Underwriters after it deducted its commission for placing the insurance through Underwriters.

48.    Annually thereafter, the Aquilina Plaintiffs sought to renew their homeowner's insurance policy through Moa.  The Aquilina Plaintiffs obtained a renewal policy each year from Moa, brokered through Monarch, that was underwritten and/or subscribed to by Underwriters.  A renewal policy was issued in April of 2016, 2017, and 2018.  Each policy contained a Lava Exclusion.  During each renewal period, Moa failed to advise the Aquilina Plaintiffs that coverage for damage caused by volcanic eruption was available, whether through HPIA or a non-

Monarch brokered Lloyd's policy, despite that the Aquilina Plaintiffs relied on Moa for its specialized knowledge, experience, and expertise with respect to the Hawaii insurance market and Hawaii surplus lines laws.  Moa, Monarch, and Lloyd's knew and understood at the time that the Aquilina Plaintiffs' home was located in Lava Zone 1 and that they were offering insurance to the Aquilina Plaintiffs with a Lava Exclusion.

49.     Each year upon renewal, in April of 2016, 2017, and 2018, Moa sent the Aquilina Plaintiffs an invoice, which included the insurance term, premium, policy fee, and surplus lines tax.  The invoice also included the renewal quotation from Monarch for the coverage through Underwriters and requested that the Aquilina Plaintiffs remit payment to Moa.  Upon receipt of the invoice, the Aquilina Plaintiffs paid their insurance premium to Moa, which, in turn, remitted the premium to Monarch after Moa deducted its commission for placing the insurance through Underwriters and Monarch.   Monarch then, in turn, remitted the premium to Underwriters after it deducted its commission for placing the insurance through Underwriters.

50.     The Aquilina Plaintiffs' policy for 2018-2019 contained dwelling coverage up to $252,000, $25,200 for other structures, personal property up to $50,000, personal liability up to $300,000, and medical payments up to $1,000.  For the 2018-2019 policy, the Aquilina Plaintiffs' premium cost $1,300.68.  Although

the Aquilina Plaintiffs' coverage amounts were less than the coverage limits under HPIA, Monarch and Moa, along with Underwriters, failed inform the Aquilina Plaintiffs of the existence of insurance through HPIA or that coverage for damage caused by volcanic eruption was available through HPIA or a non-Monarch brokered Lloyd's policy. The Aquilina Plaintiffs' claim to cover losses suffered as a result of the Kilauea Volcano eruption has been denied based on the Lava Exclusion.

51.     Monarch and Moa's commissions were directly tied to the amount of premium written on behalf of Underwriters, thereby incentivizing them to maximize the amount of surplus lines insurance placed with Underwriters. This also enabled Underwriters to maximize the volume of surplus lines premium, thereby increasing their revenues and profits by writing insurance that Underwriters otherwise would not have been able to write, but for Defendants' failure to comply with law and bad faith conduct.

**The Corrigan Plaintiffs**

52.     Before purchasing their home at 13-1028 Malama Street on September 2013, the Corrigan Plaintiffs contacted Judy Moa, who was employed by Aloha at that time, and inquired about purchasing insurance for their home. The Corrigan Plaintiffs asked Ms. Moa several times for lava coverage, but Ms. Moa told them it was unavailable. Therefore, the Corrigan Plaintiffs relied on Ms. Moa's recommendations and advice, which they understood to mean they were purchasing

the only insurance option available for their home.   Based on Ms. Moa's recommendations and advice, the Corrigan Plaintiffs purchased a surplus lines insurance policy from Aloha procured for them through Monarch and underwritten and/or subscribed to by Underwriters.   The original policy issued in September 2013 contained a Lava Exclusion.

53.   Aloha issued an invoice to Honolulu Homeloans[13] on behalf of the Corrigan Plaintiffs, which included the insurance term, premium, policy fee, and surplus lines tax.   The invoice also included the quotation from Monarch for the coverage through Underwriters and requested that Honolulu Homeloans, on behalf of the Corrigan Plaintiffs, remit payment to Aloha.   Upon receipt of the invoice, Honolulu Homeloans, on behalf of the Corrigan Plaintiffs, paid the insurance premium to Aloha.   On September 26, 2013, Judy Moa confirmed receipt of payment of the insurance premium.   Aloha remitted the premium to Monarch after Aloha deducted its commission for placing the insurance through Underwriters and Monarch.   Monarch then, in turn, remitted the premium to Underwriters after it deducted its commission for placing the insurance through Underwriters.

---

[13]   The Corrigan Plaintiffs had a mortgage for their home from Honolulu HomeLoans.   Payments for their homeowner's insurance came from an escrow account for their mortgage.   Each month, the Corrigan Plaintiffs' payment of their mortgage premium included the payment for their homeowner's insurance.   On September 16, 2014, First Hawaiian Bank ISAOA ("First Hawaiian Bank") acquired the Corrigan Plaintiffs' mortgage from Honolulu Homeloans.

54.     Their original policy issued in September 2013 was assigned Policy No. HGMH11700 and contained a Lava Exclusion.  The Corrigan Plaintiffs relied upon Aloha, Monarch, and Underwriters' knowledge, experience, and expertise of the insurance market in Hawaii, the insurance laws of Hawaii, Hawaii surplus lines requirements, and the existence of HPIA in offering and underwriting insurance in Lava Zone 1.  At no time in 2013 during the period which the Corrigan Plaintiffs sought to obtain coverage for their home, did Aloha, Monarch, or Underwriters inform the Corrigan Plaintiffs of the existence of insurance through HPIA or that coverage for damage caused by volcanic eruption was available through HPIA or a non-Monarch brokered Lloyd's policy.   Aloha, which specialized in placing homeowner's insurance in Lava Zones 1 and 2, knew the Corrigan Plaintiffs resided in Lava Zone 1 and desired as comprehensive coverage as possible (including lava coverage) and that the Monarch-brokered Underwriters' surplus lines policy contained a Lava Exclusion.  Monarch and Underwriters knew and understood at the time that the Corrigan Plaintiffs' home was located in Lava Zone 1 and that they were offering insurance to the Corrigan Plaintiffs with a Lava Exclusion.

55.     In August 2014, the Corrigan Plaintiffs received an email from Peter "Tad" Nottage notifying them that Ms. Moa was no longer employed by Aloha. Subsequently, the Corrigan Plaintiffs mostly corresponded with LaToya Johnson at Aloha about the renewal of their policy.

56.     On September 24, 2016, the Corrigan Plaintiffs received an email from Robin Munetake notifying them that LaToya Johnson was no longer employed by Aloha.   Subsequently, the Corrigan Plaintiffs mostly corresponded with Robin Munetake and Marilou Schmidt at Aloha about the renewal of their policy.

57.     In September of 2014, 2015, 2016, 2017, and 2018, the Corrigan Plaintiffs sought to renew their insurance for their home.   Each renewal policy offered to them contained a Lava Exclusion.   The policy number for each renewal policy is as follows: HGMH13173 (2014-2015); HGMH14630 (2015-2016); HGMH16138 (2016-2017); and HGMH17647 (2017-2018).   At no time during any renewal period in which the Corrigan Plaintiffs sought to obtain insurance for their home did Aloha, Monarch, or Underwriters inform the Corrigan Plaintiffs of the existence of insurance through HPIA or that coverage for damage caused by volcanic eruption was available through HPIA or a non-Monarch brokered Lloyd's policy. Aloha, which specialized in placing homeowner's insurance in Lava Zones 1 and 2, knew the Corrigan Plaintiffs resided in Lava Zone 1 and desired as comprehensive coverage as possible (including lava coverage) and that the Monarch-brokered Lloyd's surplus lines policy contained a Lava Exclusion.   Aloha, Monarch, and Underwriters all knew and understood at the time that the Corrigan Plaintiffs resided in Lava Zone 1 and that they were offering insurance to the Corrigan Plaintiffs with a Lava Exclusion.

58.     In September of 2014, 2015, 2016, 2017, and 2018, Aloha issued an invoice to First Hawaiian Bank, on behalf of the Corrigan Plaintiffs, which included the insurance term, premium, policy fee, and surplus lines tax.  The invoice also included the quotation from Monarch for the coverage through Underwriters and requested that First Hawaiian Bank, on behalf of the Corrigan Plaintiffs, remit payment to Aloha.  Upon receipt of the invoice, First Hawaiian Bank, on behalf of the Corrigan Plaintiffs, paid the insurance premium to Aloha.  Aloha remitted the premium to Monarch after Aloha deducted its commission for placing the insurance through Underwriters and Monarch.  Monarch then, in turn, remitted the premium to Underwriters after it deducted its commission for placing the insurance through Underwriters.

59.     For policy year 2017-2018, the Corrigan Plaintiffs' policy contained dwelling coverage up to $279,000, no coverage for other structures, personal property up to $50,000, personal liability up to $100,000, and medical payments up to $1,000.   For policy year 2017-2018, the Corrigan Plaintiffs' premium cost $2,005.18.  Although the Corrigan Plaintiffs' coverage amounts were less than the coverage limits under HPIA, Monarch and Aloha, along with the Underwriters, failed to inform the Corrigan Plaintiffs of the existence of insurance through HPIA or that coverage for damage caused by volcanic eruption was available through HPIA or a non-Monarch brokered Lloyd's policy.  The Corrigan Plaintiffs' claim to

cover losses suffered as a result of the Kilauea Volcano eruption has been denied based on the Lava Exclusion.

60.    Monarch and Aloha's commissions were directly tied to the amount of premium written on behalf of the Underwriters, thereby incentivizing them to maximize the amount of surplus lines insurance placed with Underwriters.  This also enabled the Underwriters to maximize the volume of surplus lines premium, thereby increasing their revenues and profits by writing insurance that they otherwise would not have been able to write, but for their failure to comply with law and bad faith conduct.

61.    As discussed below, each Defendant owed certain duties to Plaintiffs and the Class – duties that Defendants violated when they improperly placed Plaintiffs and the Class in surplus lines insurance with a Lava Exclusion without regard to whether more comprehensive coverage was available.

## C.    Defendants Procured Surplus Lines Insurance for Plaintiffs and the Class in the Lloyd's Market

62.    Instead of placing Plaintiffs and the Class in HPIA or other available insurance that covered damage caused by volcanic eruption, Defendants procured homeowner's surplus lines insurance through the Lloyd's market.

63.    Lloyd's is an insurance "marketplace" based in London.  It is not one insurance company.  Rather, it is the self-proclaimed "world's specialist insurance

and reinsurance market" in which underwriters join together to form "syndicates" to insure risks throughout the world, including in the United States.[14]

64.     The vast majority of insurance underwritten in the Lloyd's market is placed by subscription, where more than one syndicate takes a share of the same risk on identical terms.  Under the subscription model of underwriting insurance, a lead underwriter sets the price and terms pursuant to which the risk is underwritten.  Other syndicates "follow the leader" and agree to insure a percentage of the risk at the same price and terms.

65.     Lloyd's syndicates are the top writers of surplus lines insurance in the United States – writing 23% of the U.S. surplus lines policies nationwide in 2017, totaling $10.3 billion in premiums.[15]  According to the National Association of Insurance Commissioners and the Center for Insurance Policy and Research, in 2017, Lloyd's syndicates wrote approximately $52 million in surplus lines premium in Hawaii.[16]

---

[14]     *See About: What is Lloyd's*, LLOYD'S, https://www.lloyds.com/about-lloyds/what-is-lloyds (last visited Dec. 12, 2019); *Lloyd's around the world: North America: United States: Welcome to Lloyd's in the US*, LLOYD'S, http://www.lloyds.com/lloyds/offices/americas/us-homepage.

[15]     *Surplus Lines,* INS. INFO. INST., https://www.iii.org/publications/a-firm-foundation-how-insurance-supports-the-economy/driving-economic-progress/surplus-lines (last visited Dec. 12, 2019).

[16]     *IID Surplus Lines Industry Summary,* NAT'L ASS'N OF INS. COMM'RS (2018), https://naic-cms.org/sites/default/files/inline-files/cmte_c_surplus_lines_related_2016_industry_summary.pdf.

66.     Syndicates in the Lloyd's market cannot conduct business directly with potential insureds. All business transacted in the Lloyd's market is required to go through Lloyd's-approved intermediaries, such as a coverholder.  In the United States, these intermediaries must be licensed surplus lines brokers in order for surplus lines insurance to be lawfully placed.[17]   The scope of a coverholder's delegated authority is set forth in a "binding authority" agreement.

67.     A binding authority agreement is negotiated between a coverholder and lead syndicate prior to placing insurance and relates to risks in a particular line of insurance.  Under this agreement, the syndicate delegates its authority to enter into a contract of insurance to be underwritten to the coverholder in accordance with the terms of the agreement.   Frequently, multiple insurers will join together on a subscription basis to delegate the authority to write insurance.  Each time an insured purchases a policy from a coverholder that meets the criteria set forth in the binding authority agreement, the risk is bound (and binds the syndicates who have agreements with the coverholder) based on parameters predetermined by the terms of the binding authority.

---

[17]     *See Lloyd's around the world: Americas: United States: Placing Risk: How to place a risk at Lloyd's*, LLOYD'S, https://www.lloyds.com/lloyds-around-the-world/americas/us-homepage/placing-risk/how-to-access-lloyds (last visited Dec. 12, 2019); *see also* HRS §431:8-301(a)(1).

68.     Lloyd's website represents that a coverholder is authorized by its binding authority agreement to enter into contracts on behalf of Lloyd's syndicates:

### What is a Coverholder?

"Coverholder" means a company or partnership authorised by a Managing Agent to enter into a contract or contracts of insurance to be underwritten by the members of a syndicate managed by it in accordance with the terms of a Binding Authority. For more information please see Definitions Byelaw.

### What is a Binding Authority?

A "Binding Authority" is an agreement between a Managing Agent and a Coverholder under which the Managing Agent delegates its authority to enter into a contract or contracts of insurance to be underwritten by the members of a syndicate managed by it to the Coverholder in accordance with the terms of the agreement. For more information please see Definitions Byelaw.

A Binding Authority agreement can also be used to give a Coverholder the authority to issue insurance documents on behalf of Lloyd's syndicates. The Binding Authority agreement will also set out the Coverholder's other responsibilities, such as handling insurance monies or agreeing claims. The relationship between the Coverholder and the members of a syndicate is one of agency delegating authority. The contract setting out the extent and terms of the Coverholder's delegated authority is known as a Binding Authority.[18]

69.     Lloyd's states that coverholders can perform certain functions on behalf of Underwriters, including collecting premiums on their behalf:

### The role of the Coverholder

When a Lloyd's Managing Agent delegates its authority to an approved Coverholder under a Binding Authority, the approved Coverholder may

---

[18]     *See About Coverholders*, *supra* n.4.

enter into contracts of insurance and issue insurance documents as evidence that contracts of insurance have been accepted.

An approved Coverholder will normally also be allowed to collect premiums, and may be allowed to handle claims or perform other functions. The scope of its authority will be set out in the contract called the Binding Authority agreement.[19]

70.     Lloyd's further touts the benefits of its relationships with coverholders, including the expertise they have as to the products being offered to insureds:

**Benefits for Lloyd's syndicates**

Coverholders enable syndicates to underwrite locally without the need for expensive local infrastructure. The key to this is finding Coverholder partners with the right experience and quality.

These businesses will usually have considerable expertise in particular niche products and regions and have excellent local relationships. They can also help develop new products in partnership with Lloyd's Syndicates and Lloyd's Brokers.[20]

71.     Here, Monarch is a Lloyd's authorized coverholder and issued insurance policies to Plaintiffs and the Class on behalf of Underwriters.[21] Underwriters retained Monarch to act on their behalf to place insurance as their coverholder and authorized Monarch to enter into surplus lines insurance

---

[19]     *Id.*

[20]     *Id.*

[21]     *See Market Directory: Coverholders*, LLOYD'S, https://www.lloyds.com/market-directory/results?cobc=0&cob=&bro_num=&pseudo=&name=&loc=&bro=0&cov=1&man=0&mem=0&omc=0&run=0&mode=cov&cov_letter=M&c_page=23 (last visited Dec. 12, 2019).

transactions with Plaintiffs and the Class.  Monarch thus acted as Underwriters' agent in the placement of Plaintiffs and the Class in surplus lines insurance.

72.   Lloyd's model Binding Authority Agreement ("Model Binding Authority") details the scope of the agency relationship between Underwriters and Monarch.[22]  Under the Model Binding Authority, syndicates authorize coverholders to "bind insurances and amendments thereto for the Underwriters' account" and "act as the Underwriters' agent . . . for the purpose of receiving premiums from insureds[.]"  *Id.* §§4.1.1-1.2.

73.   Coverholders are required to "collect and process premiums and return premiums on the Underwriters' behalf."  *Id.* §4.4.2.  Coverholders "[p]ay[] the premiums collected, net of their commission, . . . to their Broker in London[.]"[23]

74.   Underwriters exercise authority and control over coverholders by requiring, *e.g.*, that "[a]ll contract documentation (and any endorsements issued) [ ] comply with all applicable laws and regulations, contain all the agreed terms of the contract (or the endorsement) between the insured and the Underwriters and" over a

---

[22]     *United States of America Binding Authority Agreement (Multi-year)*, LLOYD'S MKT. ASS'N (Oct. 9, 2015), https://www.lloyds.com/~/media/files/the-market/i-am-a/delegated-authority/lma-wordings/lma-multi-year-contract-wordings/lma-3114m-multiyear-us-model-binding-authority-agreement.pdf?la=en.

[23]     *Market resources: Delegated Authorities: Compliance and Operations: Premium & Claims Handling*, LLOYD'S, https://www.lloyds.com/market-resources/delegated-authorities/compliance-and-operations/premium-and-claims-handling (last visited Dec. 12, 2019).

dozen other specified items.  Model Binding Authority §20.6.  Coverholders are also required to "maintain, for the duration of the Agreement, indemnity insurance acceptable to the Underwriters providing coverage in connection with the operation of the Agreement for any liability arising out of negligent acts, errors or omissions by the Coverholder."  *Id*. §30.1.

75.     The Model Binding Authority provides that coverholders are bound to adhere to any Lloyd's market rules and requirements to which the Underwriters themselves would be bound: "The Coverholder shall comply with any direction, condition or requirement . . . given by Lloyd's to the Underwriters."  *Id*. §4.3.

76.     Monarch, as a wholesale surplus lines broker, does not interact directly with insureds.  Instead, Monarch relies on a network of retail surplus lines brokers, including Moa and Aloha, to procure the customers to buy Underwriters' surplus lines policies.  The Model Binding Authority requires that Monarch "use its best endeavours to ensure that any other parties with whom it deals [*e.g.*, retail brokers] in carrying out its duties under the Agreement comply with such laws where applicable[.]"  *Id.* §34.1.

77.     The Model Binding Authority also requires that the "Coverholder shall not take any step(s) or undertake any act(s) or omit to do anything in relation to the services to be provided by it under the Agreement, including failing to act fairly to insureds[.]"  *Id*. §4.9.

78.     In short, the Model Binding Authority – and any confidential schedules, amendments, and riders to which Plaintiffs do not have access – defines the scope of the agency relationship between Monarch and Underwriters.   Monarch's misconduct in the development, marketing, and sale of surplus lines insurance with a Lava Exclusion, without regard to the existence of more comprehensive insurance, occurred in the scope of its delegated authority under its Binding Agreement with Underwriters.   Accordingly, while Underwriters are directly liable for their own misconduct, Underwriters also are vicariously liable for Monarch's misconduct, as discussed below.

**D.     Lloyd's Minimum Standards Required Underwriters and Monarch to Act in Good Faith and the Insured's Best Interests in Order to Operate in the Lloyd's Market**

79.     To be allowed to participate in the Lloyd's market, syndicates and third parties with delegated authority, which includes Underwriters and Monarch, must abide by Lloyd's Minimum Standards.[24]  The Minimum Standards are statements of business conduct that provide guidance to syndicate managing agents, including

---

[24]     *See Market resources: Requirements and Standards: Minimum Standards*, LLOYD'S,   https://www.lloyds.com/market-resources/requirements-and-standards/ minimum-standards (last visited Dec. 12, 2019).  Although the Minimum Standards presently available on the Lloyd's website are dated 2020, prior versions of the Minimum Standards are substantially similar with regard to the duties owed to customers and obligation to comply with all applicable legal requirements, including the monitoring of third parties with delegated authority.

syndicates that follow the leader,[25] as well as third parties with delegated authority, for their operations in the Lloyd's market.[26]  Failure to follow Lloyd's Minimum Standards can constitute misconduct that can be sanctioned under Lloyd's Byelaws. The duties espoused in Lloyd's Minimum Standards mirror the common law and statutory duties to act in good faith toward insureds.

80.    Lloyd's Minimum Standards required Underwriters and Monarch to comply with U.S. surplus lines laws and act in good faith and the best interests of the insureds, such as Plaintiffs and the Class.  Underwriters also were responsible for ensuring that Monarch complied with Lloyd's Minimum Standards.

81.    Specifically, the Minimum Standards state that syndicate "[m]anaging agents are expected to design and implement effective and efficient processes and controls to meet the Minimum Standards and requirements (*as well as any other regulatory requirements*); and ensure that their effectiveness is regularly reviewed. . . . [A] managing agent must always ensure that Customers [*i.e.*, insureds] receive fair outcomes."  MS9 at 4 [emphasis added].

---

[25]    *Lloyd's Minimum Standards MS9 – Customer*, LLOYD'S (Jan. 2020), https://www.lloyds.com/market-resources/requirements-and-standards/minimum-standards (hereinafter, "MS9").

[26]    *See Minimum Standards*, *supra* n.24; *Market resources: Delegated Authorities: Compliance & Operations: Minimum Standards*, LLOYD'S, https://www.lloyds.com/market-resources/delegated-authorities/compliance-and-operations/minimum-standards (last visited Dec. 12, 2019).

82.    Lloyd's Minimum Standards that relate to regulatory compliance,

states:

> Lloyd's expects that managing agents will operate in compliance with all applicable UK and international laws and regulations and do business according to accepted ethical standards. This supports and protects Lloyd's globally recognised brand and reputation and enables Lloyd's to meet the expectation of UK and international regulators for regulated firms to be able to evidence compliant and ethical conduct. Managing agents should demonstrate that they can meet these expectations and have systems and controls to ensure that they:
>
> *       *       *
>
> - Do business in accordance with Lloyd's UK and international licensing permissions and with due regard to applicable laws and regulations;
>
> - Have due regard to business conduct standards and embedding principles of integrity and fairness in all dealings with customers; [and]
>
> - Implement all applicable laws and regulations appropriately[.][27]

83.    MS10 also requires: "All those carrying on insurance business should

do so equipped with appropriate levels of knowledge of international regulatory

requirements and access to appropriate sources of information. . . . Managing agents

bear responsibility for providing clear guidance to all relevant employees,

---

[27]    *Lloyd's Minimum Standards MS10 – Regulatory* at 3, LLOYD'S (Jan. 2020), https://www.lloyds.com/market-resources/requirements-and-standards/minimum-standards (hereinafter, "MS10").

representatives and agents that ensures a clear understanding of regulatory compliance requirements." *Id.* at 6.

84.    MS9 addresses the fair treatment of insureds, or "Customers." MS9 regulates "**Conduct Risk**," which is the "risk that a managing agent (or its agents) will fail to pay due regard to the best interests of Customers or will fail to treat them fairly at all times," and requires the managing agent and any third party with delegated authority to maintain systems and controls "for each product that it sells to ensure that due regard is given to the best interests of Customers and that they are treated fairly throughout the Product Lifecycle." MS9 at 4, 6; *see also id*. at 20-29, 34-40.

85.    MS9 states that "[t]reating Customers fairly and paying due regard to their best interests should be central to a managing agent's decision making and when determining what is or is not acceptable." *Id.* at 8.  This mandate extends to the development and design of insurance products.  For example, CS 5.2 states:

> Managing agents must have a customer focused Product Development and Design process which:
>
> *        *        *
>
> - ***ensures that the Product will provide Customers with valuable insurance cover which meets their needs and reasonable expectations, on which they can realistically claim, and which is not generally provided in some other way***; [and]
>
> - ensures that a Product developed and designed by a Distributor or other third party meets these Minimum Standards[.]

43

*Id.* at 20 [emphasis added]; *see also id*. at 20-29.

86.    To satisfy this requirement, managing agents and third parties with delegated authority must have a sufficiently granular and comprehensive understanding of the target market and must be able to identify customers for whom its insurance product would not be compatible.  *Id*. at 23.

87.    CS 5.3 states that "[p]rior to underwriting, managing agents must make an assessment of the Product Risk of each Product and decide whether or not it is appropriate to sell that Product."  *Id*. at 21.  And CS 5.4 states that managing agents must test their Product "to assess whether the Product meets their Customers' needs and reasonable expectations and achieves fair customer outcomes throughout the Product Lifecycle."  *Id*.

88.    In other words, managing agents must ensure that their insurance product provides customers with valuable insurance coverage and should specifically consider:

> whether the coverage provided by the Product is aligned with the needs of the Customer. ***In particular, consideration may need to be given as to the impact of any exclusions of cover***. Whilst exclusions can ensure that a Product is priced competitively and provides value for money, care needs to be taken to ensure that this is not at the expense of meeting Customers' needs and reasonable expectations.

*Id.* at 24 [emphasis added].

89.    In short, an "insurance product must be compatible with the needs, characteristics and objectives of the Customers in the target market."  *Id.* at 26.

90.    These requirements specifically apply to "risks written through a binding authority" and thus managing agents must monitor third parties with delegated authority, such as coverholders, to ensure their compliance with the Minimum Standards. *Id.* at 22.  Specifically, managing agents must conduct due diligence throughout the period of the binding authority contract to "ensure that a Third Party will pay due regard to the best interests of Customers and treat them fairly at all times[.]" *Id.* at 34.

91.    MS9 specifically requires that managing agents must "proactively manage" and audit third parties, "ensuring that: [ ] there is regular monitoring of compliance with . . . applicable local regulatory requirements[.]" *Id.* at 35.

92.    Lloyd's periodically publishes market bulletins to provide syndicates, such as Underwriters, with guidance with respect to compliance with Lloyd's Minimum Standards.  One such market bulletin advises: "In the case of binding authority business, underwriters should instruct coverholders to ensure that all placements comply with relevant legislation."[28]

93.    Further evidence supporting that Underwriters were required to oversee Monarch comes from Lloyd's webpage, where Monarch is listed as an authorized coverholder and which states:

---

[28]    *Market Bulletin Y2967* at 2, LLOYD'S (Jan. 9, 2003), https://www.lloyds.com/~/media/lloyds/archive/marketbulletin/market-bulletins/2003/y2967.pdf.

Please note that while Coverholders may have been approved by Lloyd's to accept business from the regions shown; it is the responsibility of the parties, including the Coverholder *and any Lloyd's managing agent appointing them to ensure that the Coverholder complies with all local regulatory and legal requirements*[.][29]

94.    Additionally, another Lloyd's Market Bulletin specifically provides that Lloyd's Underwriters are to comply with the surplus lines laws of the states which they conduct business:

*Placement in accordance with surplus lines laws:* The exact procedures for exporting business pursuant to U.S. state surplus lines laws vary from state to state. In general a risk can be exported to the surplus lines market only if it is not available in the licensed market, and the surplus lines broker is required to offer a risk (or verify that it has been offered) to licensed insurers authorised to write that type of risk before it can be placed with a nonadmitted insurer. Depending upon the law of the relevant state, three to five declinations typically will constitute sufficient proof that coverage is not available in the licensed market. This process is sometimes referred to as "the declination process" or "the diligent search".[30]

95.    In summary, under the Minimum Standards and Market Bulletins, which are reflective of common law and statutory duties owed to Plaintiffs and the Class, Underwriters were required to, among other things, conduct business in accordance with all applicable international laws and regulations, maintain policies and procedures that ensure the fair treatment of insureds, such as Plaintiffs and the

---

[29]    *Market Directory: Coverholders*, *supra* n.21 [emphasis added].

[30]    *Market Bulletin Y3587* at Appendix, LLOYD'S (July 7, 2005), https://www.lloyds.com/market-resources/market-communications/~/media/files/the-market/communications/market-bulletins/market-bulletins-pre-05-2010/2005/y3587.pdf.

Class; and provide adequate oversight of Monarch to which Underwriters delegated authority to place surplus lines insurance policies.  Monarch was required to abide by these same Minimum Standards.

96.     In placing Plaintiffs and the Class in surplus lines homeowner's insurance policies with a Lava Exclusion, Underwriters and Monarch developed, marketed, and sold a surplus lines insurance product that was wholly inadequate for Plaintiffs and the Class's needs, who reside in Lava Zones 1 and 2, and therefore, failed to act in good faith and in the best interests of Plaintiffs and the Class, violating numerous Lloyd's Minimum Standards.  Underwriters also did not have appropriate systems and controls to conduct proper oversight of Monarch to ensure Monarch complied with the Hawaii Surplus Lines Act, which Monarch violated when it placed Plaintiffs and the Class in surplus lines insurance with a Lava Exclusion without conducting the required due diligence, as discussed below.

**E.    The Hawaii Surplus Lines Act Requires that Surplus Lines Insurance Only Be Placed When No Comparable Insurance Is Available in the Standard Insurance Market**

97.     The Insurance Division of the Hawaii Department of Commerce and Consumer Affairs ("DCCA") oversees the insurance industry by enforcing State insurance laws and regulations, examining the fiscal condition of Hawaii-based insurance companies, reviewing rate and policy filings, and issuing licenses to qualified producers, brokers, and adjusters.  HRS Chapter 431, the Hawaii Insurance

Code, governs the insurance industry.  The interpretation of these statutes is guided by the State Legislature's clear articulation in HRS §431:1-102 that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters. Upon the insurer, the insured[,] and their representatives rests the duty of preserving inviolate the integrity of insurance."

98.    The majority of property-casualty risks in the United States is underwritten by admitted insurers in the admitted, or standard, market.  An admitted insurer is an insurer to which a state insurance department has granted a license to do business within that state.  In an effort to maintain insurer solvency and protect consumers, state insurance departments require admitted insurers to file and obtain approval for their rates, forms, and underwriting rules.  Because they cannot deviate from their approved filings, admitted insurers in the standard market do not have the flexibility to underwrite high-risk loss exposures profitably.

99.    Insurance purchased through the surplus lines market is provided by non-admitted insurers, which are not licensed to operate in the insured's home state. Non-admitted insurers are not required to obtain approval for their rates, forms, and underwriting rules in Hawaii.  As a result, non-admitted insurers can modify coverage and pricing in ways that allow them to underwrite special risks profitably.

Therefore, surplus lines insurers often fill the gap to provide insurance coverage for high-risk perils, but are only permitted to do so under specified circumstances.

100.   Surplus lines insurers, like Underwriters, are considered "unauthorized insurers" and, as such, are not directly regulated by the Hawaii Insurance Division. Hawaii's regulatory strategy therefore relies heavily on strict compliance with all the provisions of the Hawaii Surplus Lines Act, HRS §§431:8-101, *et seq.*, to protect the State's citizens from predatory and unfair practices by unauthorized insurers. Indeed, HRS §431:1-101 mandates that "[n]o person shall transact a business of insurance in this State without complying with the applicable provisions of this code."

101.   Pursuant to HRS §431:8-301(a), surplus lines insurance may only be placed on property located in Hawaii through a licensed surplus lines broker.  HRS §431:8-102 defines "'[s]urplus lines insurance'" as "any property and casualty insurance on risks procured from or placed with an unauthorized insurer under the laws of the insured's home state" and a "'[s]urplus lines broker'" as "any person licensed under section 431:8-310 to place insurance on risks resident, located, or to be performed in this State with unauthorized insurers."  However, an unauthorized insurer can only place surplus lines insurance to the extent such transaction is "lawful."  HRS §431:8-201(1).  Hawaii law strictly prohibits acting for or aiding unauthorized insurers.  HRS §431:8-202.  And, "contract[s] of insurance effectuated

by an unauthorized insurer in violation of this article shall be voidable."  HRS §431:8-203.

102.   For a surplus lines transaction to be considered "lawful," a surplus lines broker must perform a diligent search of the insurance market prior to placing the surplus lines policy to determine whether: (i) "[t]he full amount or kind of insurance cannot be obtained from insurers who are authorized to do business in [Hawaii]; provided that a diligent search is made among the insurers who are authorized to transact and are actually writing the particular kind and class of insurance in [Hawaii] each time the insurance is placed or renewed"; (ii) "[t]he surplus lines insurance procured is in addition to or in excess of the amount and coverage which can be procured from the authorized insurers"; and (iii) "[t]he insurance is not procured at a rate lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the same protection."  HRS §431:8-301(a)(2)-(4).

103.   This provision requires that surplus lines policies are to be placed only as a last resort when no domestic admitted insurer can offer the same or comparable coverage for the same or less amount.  Pursuant to HRS §431:8-312(b), the surplus lines broker must keep a list of attempts at placing with domestic admitted insurers.

104.   As set forth herein, Defendants failed to comply with the foregoing statutory requirements.  Indeed, Defendants exploited the lack of regulation of rates

and forms in the surplus lines market in order to provide only basic homeowner's insurance coverage that excludes coverage for the very catastrophic risks that the admitted market cannot or will not cover, which defeats the very purpose of surplus lines insurance.   In offering surplus lines insurance with a Lava Exclusion, Defendants breached various duties owed to Plaintiffs and the Class, as discussed below.   Defendants' misconduct resulted in the unlawful sale of surplus lines insurance that never should have been placed.   As a result, Plaintiffs and the Class paid premiums and commissions to Defendants that Defendants otherwise would not have received but for their wrongdoing, injuring Plaintiffs and the Class and unjustly enriching Defendants.

**F.     Defendants Acted Unfairly, Breached Duties Owed to Plaintiffs and the Class, and Were Unjustly Enriched**

105.   Retail brokers that are licensed in Hawaii as Resident Surplus Lines Brokers, including Moa and Aloha, are considered to be agents of the insured and are required to perform due diligence each time surplus lines insurance is placed or renewed by ensuring that: (i) the full amount or kind of insurance cannot be obtained from insurers who are authorized to do business in this State; (ii) the surplus lines insurance procured is in addition to or excess of the amount and coverage which can be procured from the authorized insurers; and (iii) the insurance is not procured at a rate lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the

same protection.  *See* HRS §431:8-301(a).  Monarch, Moa, and Aloha each failed to comply with the Hawaii Surplus Lines Act by failing to perform the required due diligence to ascertain whether the requested coverage was available in the standard market.  In fact, the requested coverage was available through HPIA, but Monarch, Moa, and Aloha each failed to advise Plaintiffs and the Class of the availability of HPIA and that it provided coverage for damage caused by volcanic eruption.

106.   Moa holds itself out as providing specialized advice in the area of catastrophic insurance coverage, including in Lava Zones 1 and 2.  The Aquilina Plaintiffs and Class members relied on Moa specifically for its expertise in this area, since homeowner's insurance in Lava Zones 1 and 2 is so difficult to obtain.  In placing the Aquilina Plaintiffs and Class members in Underwriters' surplus lines insurance with a Lava Exclusion, Moa failed to comply with the due diligence requirements of the Hawaii Surplus Lines Act and failed to disclose to the Aquilina Plaintiffs and Class members that more comprehensive coverage was available through either HPIA or even a non-Monarch brokered Lloyd's policy.  As a result, Moa acted unfairly in violation of HRS §480-2.  Moa also failed to exercise reasonable care in procuring the insurance requested and failed to act in the Aquilina Plaintiffs or the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Moa received unjust benefits from Plaintiffs

and the Class in the form of commissions it never should have received for policies that were unfairly, unlawfully, and negligently placed.

107.   Aloha holds itself out as providing specialized advice in the area of catastrophic insurance coverage, including in Lava Zones 1 and 2.  The Corrigan Plaintiffs and Class members relied on Aloha specifically for its expertise in this area, since homeowner's insurance in Lava Zones 1 and 2 is so difficult to obtain. In placing the Corrigan Plaintiffs and Class members in Lloyd's surplus lines insurance with a Lava Exclusion, Aloha failed to comply with the due diligence requirements of the Hawaii Surplus Lines Act and failed to disclose to the Corrigan Plaintiffs and Class members that more comprehensive coverage was available through either HPIA or even a non-Monarch brokered Lloyd's policy.  As a result, Aloha acted unfairly in violation of HRS §480-2.  Aloha also failed to exercise reasonable care in procuring the insurance requested and failed to act in the Corrigan Plaintiffs or Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Aloha received unjust benefits from Plaintiffs and the Class in the form of commissions it never should have received for policies that were unfairly, unlawfully, and negligently placed.

108.   Retail surplus brokers, including Moa and Aloha, procured Plaintiffs and the Class's surplus lines policies through Monarch, a wholesale broker. Licensed in Hawaii as a Non-Resident Surplus Lines Broker, Monarch also was

obligated to comply with the requirements of the Hawaii Surplus Lines Act. Monarch itself failed to comply with the Surplus Lines Act by failing to perform, or ensuring that retail brokers, such as Moa and Aloha, performed, the required due diligence to ascertain whether the requested coverage was available in the standard market and also failed to ensure that the retail brokers, including Moa and Aloha, performed the required due diligence under the Hawaii Surplus Lines Act, instead placing Plaintiffs and the Class in Underwriters' surplus lines insurance with a Lava Exclusion without regard to whether more comprehensive coverage was available. Monarch's development, marketing, and sale of homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2 was not in Plaintiffs and the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Monarch was financially motivated to sell Underwriters' surplus lines policies with a Lava Exclusion in order to increase its commissions, which were based, in part, on the claims rate of the insurance portfolio it held with Underwriters – the lower the claims rate of the portfolio as a whole, the higher the commissions.  *See* Model Binding Authority §16.2 (providing for the payment of "Profit Commissions").  As a result of its failure to comply with the Surplus Lines Act, and its statutory obligation to act in good faith, Monarch violated HRS §480-2.  Monarch also received unjust benefits from Plaintiffs and the Class in

the form of commissions it never should have received for policies that were unfairly and unlawfully placed.

109.   Underwriters' development and sale of surplus lines insurance policies that contain a Lava Exclusion violates the good faith owed Plaintiffs and the Class that is embodied in common law, as expressed in Lloyd's Minimum Standards, and codified in the Hawaii Insurance Code, HRS §431:1-102.  The development and sale of homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2 was not in Plaintiffs or the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.

110.   Furthermore, Monarch acted as the agent of Underwriters in placing Plaintiffs and the Class with Underwriters' surplus lines insurance policies.  Indeed, Underwriters, as unauthorized insurers, are only able to access the U.S. insurance market through a licensed surplus lines broker, such as Monarch.  Monarch is designated as a "coverholder" of Underwriters.  As a coverholder, Monarch is authorized by a "binding authority" agreement to enter into contracts on behalf of Underwriters.  Although Underwriters delegated certain responsibilities to Monarch through the binding authority, Underwriters remained responsible for ensuring that all placements into surplus lines insurance complied with all legal requirements and were undertaken in the insureds' best interests.

111.   Underwriters failed to ensure their agent Monarch complied with its legal obligations to lawfully place surplus lines insurance and therefore acted unfairly in violation of HRS §480-2 and breached its implied covenant of good faith and fair dealing.  Moreover, Underwriters, as the principal of their agent Monarch, are vicariously liable for Monarch's failure to comply with Hawaii law and bad faith conduct because Monarch's misconduct occurred within the scope of its agency. Underwriters also received unjust benefits from Plaintiffs and the Class in the form of premiums they never should have received for policies that were unlawfully placed.

112.   By disregarding due diligence requirements and good faith duties owed to Plaintiffs and the Class, Defendants were able to represent that Plaintiffs and the Class could only purchase insurance through the surplus lines market and therefore, Underwriters, Monarch, Moa, and Aloha acted unfairly and in bad faith in failing to comply with HRS §431:1-102 and/or failing to ensure Monarch complied with HRS §431:8-301.

113.   Specifically, the surplus lines insurance policies that Monarch, Moa, and Aloha procured for Plaintiffs and the Class were missing important peril coverage against fire and lava and had specific exclusions for such damages.  For a home located in Lava Zones 1 and 2, a homeowner's policy missing such important coverage amounted to no coverage at all.  Underwriters have been able to deny

coverage to Plaintiffs and Class members impacted by the recent eruption of the Kilauea Volcano on the basis of the Lava Exclusion.

114.    On May 2, 2018, small ground cracks opened in the Lower East Rift Zone of the Kilauea Volcano (which runs through the Puna District on Hawaii Island).  The following day, by 5:00 p.m. HST, a fissure in the area of Mohala and Leilani Streets in Leilani Estates erupted, spewing lava into the air and flowing down Hawaii Island's eastern edge.  That same day, Hawaii Acting County Mayor Wil Okabe and the Governor of Hawaii, David Ige, issued Emergency Proclamations declaring states of emergency along the Lower East Rift Zone.  In the following days and months, 24 fissures opened in and around Leilani Estates, pouring lava into the residential area and causing fires that burned down structures.

115.    On May 31, 2018, County of Hawaii Mayor Harry Kim ("Mayor Kim") signed a mandatory evacuation order for half of Leilani Estates, giving residents in the 17-block area (*see* Figure 4 below) 24 hours to evacuate.  Persons who did not evacuate were subject to arrest and liability for recovery costs associated with any necessary rescue operations.  On September 8, 2018, Mayor Kim rescinded the mandatory evacuation, but declared that "a Voluntary Evacuation Advisory of all areas of Leilani Estates, Lanipuna Gardens, Pohoiki, Bay Estates, Kapoho Beach Lots, Vacationland, and Kapoho Farm Lots is in effect due to the hazards presented

by the eruptive event and that first responders may not be able to respond timely to those areas."

**Figure 4**[31]



Mandatory Evacuation Area

116.   About 2,500 residents in and around Leilani Estates have been displaced to date.  Plaintiffs were forced to leave their homes without time to gather personal property.  Plaintiffs were displaced and incurred various costs to secure new shelter.

117.   To date, over 700 homes have been lost due to fire or rendered a total loss due to destruction, inhabitability, inaccessibility, and a lack of structural

---

[31]      Image, OFF. OF HAW. CTY. MAYOR http://records.hawaiicounty.gov/weblink/ DocView.aspx?dbid=1&id=93536 (last visited Dec. 12, 2019).

integrity.  Residents not only lost their home(s), but many, including members of the Class, lost virtually everything they owned.

118.   Because of the Lava Exclusions associated with Underwriters' surplus lines homeowner's insurance policies, Plaintiffs and the Class were harmed as they were provided less comprehensive coverage than other available alternatives.

119.   As a result of Defendants' misconduct, Plaintiffs and the Class were underinsured with less comprehensive insurance than they otherwise would have had.  But for Defendants' wrongdoing, Plaintiffs and the Class would have received insurance under HPIA or a non-Monarch brokered Lloyd's policy that offered coverage for damage incurred as a result of volcanic eruption.  Therefore, Plaintiffs and the Class paid premiums and commissions to Defendants that Defendants otherwise would not have received, but for their wrongdoing, injuring Plaintiffs and unjustly enriching Defendants.

## CLASS ALLEGATIONS

120.   Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the Class, defined as follows:

> All persons with a home located in Lava Zones 1 or 2 on the island of Hawaii who purchased a surplus lines homeowner's insurance policy with a Lava Exclusion during the applicable statute of limitations that was brokered through Monarch, where the policy of insurance was underwritten and/or subscribed to by Underwriters.  Specifically excluded from this Class are Defendants; the officers, directors, or

employees of Defendants; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants.  Also excluded are those who assert claims for personal injury, as well as any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

121.   The Class is sufficiently numerous, as it includes hundreds of persons who have purchased surplus lines insurance through Monarch that were underwritten and/or subscribed to by Lloyd's.  Thus, joinder of such persons in a single action or bringing all members of the Class before the Court is impracticable for purposes of Rule 23(a)(1).  The question is one of a general or common interest of many persons and it is impractical to bring them all before the Court.  The disposition of the claims of the members the Class in this class action will substantially benefit both the parties and the Court.

122.   Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

(a)   Whether Underwriters acted unfairly and in bad faith in failing to comply with HRS §431:1-102 and/or failing to ensure its agent Monarch complied with HRS §431:8-301;

(b)   Whether Monarch, Moa, and Aloha acted unfairly by failing to comply with HRS §§431:1-102 and 431:8-301;

(c)     Whether Moa and Aloha owed duties to Plaintiffs and the Class and breached those duties;

(d)     Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class; and

(e)     Whether Plaintiffs and members of the Class are entitled to damages and/or restitution as a result of Defendants' conduct.

123.   Plaintiffs assert claims that are typical of the claims of the Class for purposes of Rule 23(a)(3).  Plaintiffs and all members of the Class have been subjected to the same wrongful conduct because they were improperly placed with surplus lines insurance in violation of HRS §§431:1-102 and 431:8-301.  Plaintiffs and all Class members suffered monetary and economic injuries arising out of Defendants' wrongful conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

124.   Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class for purposes of Rule 23(a)(4).  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel experienced in litigation of this nature to represent them.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

125.   A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class.  The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation resulting from Defendants' conduct.  It would be virtually impossible for members of the Class to individually and effectively redress Defendants' misconduct.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### Violation of Haw. Rev. Stat. §§480-1, *et seq.*
### (Against All Defendants)

126.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

127.   Plaintiffs bring this claim individually and on behalf of the members of the Class.

62

128.   Plaintiffs and each member of the Class are "consumers" as that term is defined in HRS §480-1 because they are natural persons who purchased homeowner's insurance for personal, family, or household purposes.

129.   HRS §480-2(a) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

130.   The purchase of homeowner's insurance involved "trade and commerce" as those terms are used in HRS §480-2(a).

131.   Unfair acts and practices are those that offend established public policy and/or were immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

**<u>Underwriters</u>**

132.   Underwriters have engaged in unfair acts or practices in violation of HRS §480-2(a) in the conduct of their trade and/or commerce in Hawaii.

133.   Underwriters knew they were underwriting surplus lines insurance, which, by its nature, is an insurance option of last resort reserved for insuring catastrophic risks that cannot be insured in the standard insurance market; knew or should have known Plaintiffs and the Class owned properties in Lava Zones 1 and 2; knew or should have known the standard market was not writing homeowner's insurance policies in Lava Zones 1 and 2; knew they and their agents were required to comply with the Hawaii Surplus Lines Act and act in good faith; and knew they

were required to oversee and audit their agent, Monarch, to ensure its was complying with the Hawaii Surplus Lines Act and acting in the best interests of insureds, such as Plaintiffs and the Class.

134.   Yet, Underwriters, with Monarch, developed and sold a surplus lines insurance product – homeowner's insurance with a Lava Exclusion – that was wholly inappropriate for Plaintiffs and the Class, who were at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2. The development and sale of homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2 was not in Plaintiffs or the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Highlighting the unfair nature of Underwriters' conduct is that more comprehensive insurance covering damage incurred as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy.  Underwriters' development and sale of surplus lines insurance policies that contain a Lava Exclusion violates the good faith owed to Plaintiffs and the Class that is embodied in common law, as expressed in Lloyd's Minimum Standards, and codified in the Hawaii Insurance Code, HRS §431:1-102.

135.   Therefore, Underwriters' acts and practices were immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and the Class, who were never even informed of the availability of more comprehensive insurance

that would have provided necessary coverage for damage resulting from volcanic eruption.  Underwriters took advantage of the lack of regulation over surplus lines insurance rates and forms to sell insurance that excluded coverage for the very catastrophic risk that the standard insurance market cannot and will not cover – defeating the very purpose of surplus lines insurance.  Underwriters are now relying on the Lava Exclusion to deny coverage for losses Plaintiffs and the Class suffered as a result of the 2018 Kilauea Volcano eruption, when other more comprehensive insurance options were available.

136.   Underwriters' development and sale of homeowner's insurance with a Lava Exclusion also contravenes the purpose behind establishing HPIA.  *See* HRS §§431:21-101, *et seq.*; Act of June 18, 1991, No. 284, §1, 1991 Haw. Sess. Laws 8. Underwriters' acts and practices plainly violate the express public policy that Hawaiian homeowners should be afforded property insurance with coverage for damage caused by "major national disasters," specifically the Kilauea Volcano eruption.

137.   Underwriters' acts and practices also offend the public policy espoused elsewhere throughout the Hawaii Insurance Code, specifically HRS §§431:1-102, 431:8-102, and 431:8-301(a).  Underwriters failed to oversee Monarch and verify that Monarch complied with HRS §431:8-301(a)(2)-(4), which it did not. Alternatively, Monarch's failure to conduct the required due diligence under HRS

§431:8-301(a), or ensure that retail brokers, including Moa and Aloha, conducted the required due diligence, can be imputed to Underwriters due to their agency relationship with Monarch.  As a result of their agency relationship, Underwriters are vicariously liable for Monarch's misconduct that occurred within the scope of its delegated authority.

**<u>Monarch</u>**

138.   Monarch has engaged in unfair acts or practices in violation of HRS §480-2(a) in the conduct of its trade and/or commerce in Hawaii.

139.   Monarch knew it was brokering surplus lines insurance, which, by its nature, is an insurance option of last resort reserved for insuring catastrophic risks that cannot be insured in the standard insurance market; knew or should have known Plaintiffs and the Class owned properties in Lava Zones 1 and 2; knew or should have known the standard market was not writing homeowner's insurance policies in Lava Zones 1 and 2; knew it was required to comply with Hawaii's surplus lines laws; and knew it was required to oversee retail brokers, including Moa and Aloha, to ensure they complied with the Hawaii Surplus Lines Act and acted in the best interests of insureds, such as Plaintiffs and the Class.

140.   Yet, Monarch, with Underwriters, developed, marketed and sold a surplus lines insurance product – homeowner's insurance with a Lava Exclusion – on behalf of Underwriters that was wholly inappropriate for Plaintiffs and the Class,

who were at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  Monarch's development, marketing, and sale of homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2 was not in Plaintiffs and the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Punctuating the unfair nature of Monarch's conduct is that more comprehensive insurance covering damage incurred as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy.  Monarch's development, marketing, and sale of surplus lines insurance policies that contain a Lava Exclusion violates the good faith owed to Plaintiffs and the Class that is embodied in common law, as expressed in Lloyd's Minimum Standards, and codified in the Hawaii Insurance Code, HRS §431:1-102.

141.   Therefore, Monarch's acts and practices also were immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and the Class, who were never even informed of the availability of more comprehensive insurance that would have provided necessary coverage for damage resulting from volcanic eruption.  Monarch took advantage of the lack of regulation over surplus lines insurance rates and forms to sell insurance that excluded coverage for the very catastrophic risk that the standard insurance market cannot and will not cover – defeating the very purpose of surplus lines insurance.  Underwriters are now relying

on the Lava Exclusion to deny coverage Plaintiffs and the Class suffered as a result of the 2018 Kilauea Volcano eruption when other more comprehensive insurance options were available.

142.   Monarch's development, or participation in the development of, homeowner's insurance with a Lava Exclusion also contravenes the purpose behind establishing HPIA.  *See* HRS §§431:21-101, *et seq.*; Act of June 18, 1991, No. 284, §1, 1991 Haw. Sess. Laws 8.  Monarch's acts and practices plainly violate the express public policy that Hawaiian homeowners should be afforded property insurance with coverage for damage caused by "major national disasters," specifically the Kilauea Volcano eruption.

143.   Monarch's acts and practices also offend the public policy espoused elsewhere throughout the Hawaii Insurance Code, specifically HRS §§431:1-102, 431:8-102, and 431:8-301(a).  Monarch, as a Non-Resident Surplus Lines Broker, was required to comply with the Hawaii Surplus Lines Act.  Monarch failed to comply with the Hawaii Surplus Lines Act by failing to perform, or ensuring that retail brokers, such as Moa and Aloha, performed, the required due diligence to ascertain whether the requested coverage was available in the standard market.  And, Monarch failed to oversee retail brokers, including Moa and Aloha, and verify that they complied with HRS §431:8-301(a)(2)-(4).

**Moa**

144.   Moa has engaged in unfair acts or practices in violation of HRS §480-2(a) in the conduct of its trade and/or commerce in Hawaii.

145.   Moa knew it was placing surplus lines insurance, which, by its nature, is an insurance option of last resort reserved for insuring catastrophic risks that cannot be insured in the standard insurance market; knew the Aquilina Plaintiffs and Class members owned properties in Lava Zones 1 and 2; knew the standard market was not writing homeowner's insurance policies in Lava Zones 1 and 2; knew it was required to comply with the Hawaii Surplus Lines Act; and knew it was required to act with reasonable care in procuring the requested insurance and in good faith towards the Aquilina Plaintiffs and Class members.

146.   Yet, Moa procured surplus lines insurance with a Lava Exclusion that was wholly inappropriate for the Aquilina Plaintiffs and Class members, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  In procuring surplus lines homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2, Moa failed to exercise reasonable care in procuring the insurance requested and failed to act in the Aquilina Plaintiffs or Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Furthermore, Moa failed to comply with the Hawaii Surplus Lines Act by failing to perform the required due

diligence to ascertain whether the requested coverage was available in the standard market.  Punctuating the unfair nature of Moa's conduct is that more comprehensive insurance covering damage incurred as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy.

147.   Moa's procuring of surplus lines insurance products containing a Lava Exclusion violates the good faith requirement that has been codified by the Hawaii Insurance Code.  *See* HRS §431:1-102.

148.   Moa's procuring of homeowner's insurance with a Lava Exclusion also contravenes the purpose behind establishing HPIA.  *See* HRS §§431:21-101, *et seq.*; Act of June 18, 1991, No. 284, §1, 1991 Haw. Sess. Laws 8.  Moa's acts and practices plainly violate the express public policy that Hawaiian homeowners should be afforded property insurance with coverage for damage caused by "major national disasters," specifically the Kilauea Volcano eruption.

149.   Moa's acts and practices also offend the public policy espoused elsewhere throughout the Hawaii Insurance Code, specifically HRS §§431:1-102, 431:8-102, and 431:8-301(a).  Moa, as a Hawaii Surplus Lines Broker, was required to comply with the Hawaii Surplus Lines Act.  Moa failed to comply with the Hawaii Surplus Lines Act by failing to conduct the required due diligence or ensure that Monarch conducted the required due diligence.

**Aloha**

150.    Aloha has engaged in unfair acts or practices in violation of HRS §480-2(a) in the conduct of its trade and/or commerce in Hawaii.

151.    Aloha knew it was placing surplus lines insurance, which, by its nature, is an insurance option of last resort reserved for insuring catastrophic risks that cannot be insured in the standard insurance market; knew the Corrigan Plaintiffs and Class members owned properties in Lava Zones 1 and 2; knew the standard market was not writing homeowner's insurance policies in Lava Zones 1 and 2; knew it was required to comply with the Hawaii Surplus Lines Act; and knew it was required to act with reasonable care in procuring the requested insurance and in good faith towards the Corrigan Plaintiffs and Class members.

152.    Yet, Aloha procured surplus lines insurance with a Lava Exclusion that was wholly inappropriate for the Corrigan Plaintiffs and Class members, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  In procuring surplus lines homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2, Aloha failed to exercise reasonable care in procuring the insurance requested and failed to act in the Corrigan Plaintiffs or Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Furthermore, Aloha failed to comply with the Hawaii Surplus Lines Act by failing to perform the required due

diligence to ascertain whether the requested coverage was available in the standard market.   Punctuating the unfair nature of Aloha's conduct is that more comprehensive insurance covering damage incurred as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy.

153.   Aloha's procuring of surplus lines insurance products containing a Lava Exclusion violates the good faith requirement that has been codified by the Hawaii Insurance Code.  *See* HRS §431:1-102.

154.   Aloha's procuring of homeowner's insurance with a Lava Exclusion also contravenes the purpose behind establishing HPIA.  *See* HRS §§431:21-101, *et seq.*; Act of June 18, 1991, No. 284, §1, 1991 Haw. Sess. Laws 8.  Aloha's acts and practices plainly violate the express public policy that Hawaiian homeowners should be afforded property insurance with coverage for damage caused by "major national disasters," specifically the Kilauea Volcano eruption.

155.   Aloha's acts and practices also offend the public policy espoused elsewhere throughout the Hawaii Insurance Code, specifically HRS §§431:1-102, 431:8-102, and 431:8-301(a).   Aloha, as a Hawaii Surplus Lines Broker, was required to comply with the Hawaii Surplus Lines Act.  Aloha failed to comply with the Hawaii Surplus Lines Act by failing to conduct the required due diligence or ensure that Monarch conducted the required due diligence.

**All Defendants**

156.   The conduct described above also was directed toward, targeted, and injured an "elder," as defined in HRS §480-13.5, as the Aquilina Plaintiffs and many members of the Class are 62 years of age or older.  By way of their own records, which necessarily include personally identifying information, such as data of birth, Defendants knew or should have known that their conduct was directed toward and targeted elders.  Elders are known to be more vulnerable to unfair conduct than other consumers in particular with regard to the interpretation of confusing insurance contracts, such as Underwriters' homeowner's policies offered by Defendants. Therefore, Defendants' conduct was done in willful disregard of the rights of elders. As a result, pursuant to HRS §480-13.5, the Court may impose a civil penalty not to exceed $10,000, in addition to any other civil penalty, for each violation of HRS §480-2 that involves an elder.

157.   The conduct described above caused Plaintiffs and the Class to suffer injury to their property, including, without limitation, wrongfully induced payment of money for insurance premiums and commissions.  As a result of Defendants' misconduct, Plaintiffs and the Class also were injured because they were underinsured with less comprehensive insurance than they otherwise would have had and suffered catastrophic losses when they were denied coverage for the damage they suffered in the 2018 Kilauea Volcano eruption.

158.   But for Defendants' misconduct, Plaintiffs and the Class would have been able to obtain homeowners insurance through HPIA or a non-Monarch brokered Lloyd's policy that offered coverage for damage incurred as a result of volcanic eruption.   Plaintiffs and the Class sustained damages as a direct and proximate result of Defendants' unfair trade practices.   Pursuant to HRS §480-13(b)(1), a consumer who is injured by a violation of this chapter is entitled, for each violation, to be awarded threefold any damages he or she sustained and reasonable attorneys' fees together with costs of suit.

159.   Pursuant to HRS §480-12, any contract or agreement in violation of HRS §§480-1, *et seq*., is void and is not enforceable at law or in equity.

160.   HRS §480-11(b) does not apply to the acts and practices described above.  Specifically, Defendants' acts and practices described herein, which violated the Hawaii Insurance Code and Hawaii Surplus Lines Act, are not lawful surplus lines insurance transactions and thus HRS §480-11(b) does not apply.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against Underwriters)

161.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

162.   Plaintiffs bring this claim individually and on behalf of the Class.

163.   Underwriters sold surplus lines homeowner's insurance policies to Plaintiffs and the Class for good and valuable consideration tendered by Plaintiffs and the Class to, and accepted by, Underwriters.

164.   Plaintiffs and the Class regularly paid valuable consideration in the form of premiums in order for Underwriters to bind coverage and include Plaintiffs and the Class as a named insured under their policies.

165.   All conditions precedent to the filing of this cause of action have been performed by Plaintiffs and the Class or have been waived by Underwriters.

166.   At all times material to this case, Plaintiffs and the Class have fully complied with their obligations as set forth in their respective policies.

167.   A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

168.   Because of the adhesive quality of insurance contracts, the duty of good faith and fair dealing toward insureds is implied as a "consequence of the relationship established by contract."  The insured is a beneficiary of the contract of insurance and so the duty extends to all persons acting under authority of that contractual relationship.

169.   The duty of good faith and fair dealing also may spring from state statutory mandates upon all persons that transact the business of insurance.  The Hawaii Legislature has unequivocally declared in HRS §431:1-102 that "[t]he business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters [and further] [u]pon the insurer, the insured and their representatives rests the duty of preserving inviolate the integrity of insurance." Consequently, HRS §431:1-101 clearly mandates that "[n]o person shall transact a business of insurance in [Hawaii] without complying with the applicable provisions of this code."

170.   Lloyd's Minimum Standards also mandate that Underwriters act in good faith and in the best interests of insureds, including in developing insurance products that are appropriate for the target market.

171.   Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.  Plaintiffs do not seek to vary the express terms of the insurance contracts, but to ensure that Underwriters exercise their discretion in good faith and in compliance with the expectations of Plaintiffs and the Class.

172.   Underwriters are afforded substantial discretion offering coverage through their surplus lines insurance, but have an obligation to exercise the discretion afforded in good faith and not capriciously or in bad faith.

173.   Underwriters breached their covenant of good faith and fair dealing in developing, marketing, and selling an insurance product – homeowner's insurance with a Lava Exclusion – that was wholly inappropriate for the target market – to Plaintiffs and the Class, who are homeowner's with properties in Lava Zones 1 and 2.   Underwriters sold Plaintiffs and the Class an insurance product that did not provide them with valuable insurance coverage and did not meet their needs and expectations.   Indeed, during the Class Period, other brokers offered and sold Lloyd's surplus lines homeowner's insurance policies that provided coverage for damage caused by volcanic eruption to homeowners with properties in Lava Zones 1 and 2.   Underwriters also failed to oversee and proactively manage Monarch to ensure it acted lawfully, which it did not.

174.   Furthermore, Underwriters breached their implied covenant of good faith and fair dealing in exploiting the lack of regulation over its rates and forms in order to provide this insurance product.   Insurers in the standard insurance market were unable or unwilling to offer coverage for damage caused by volcanic eruption. Instead of filling the gap in the insurance market and providing insurance coverage for catastrophic losses, which is the purpose of surplus lines insurance, Underwriters

provided only basic insurance coverage that was inadequate for Plaintiffs and the Class's needs.

175.   Underwriters' conduct involves a continuing course of conduct such that Underwriters breached the implied duty of good faith and fair dealing every time Plaintiffs and the Class paid premiums and renewed a contract with Underwriters.

176.   As a result of Underwriters' misconduct, Plaintiffs and the Class were injured because they were underinsured with less comprehensive insurance than they otherwise would have had and suffered catastrophic losses when they were denied coverage for the damage they suffered in the 2018 Kilauea Volcano eruption.

177.   But for Underwriters' bad faith conduct, Plaintiffs and the Class would have been able to obtain homeowners insurance through HPIA or certain a non-Monarch brokered Lloyd's policy that offered coverage for damage incurred as a result of volcanic eruption.  Plaintiffs and the Class therefore suffered damages in their payment of premiums to Underwriters as a result of breaches of the implied covenant of good faith and fair dealing by Underwriters.

## COUNT III
## Negligence
## (Against Moa and Aloha)

178.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

179.   Plaintiffs bring this claim individually and on behalf of Class members.

180.   Plaintiffs and Class members desired comprehensive homeowner's insurance that would provide insurance coverage for foreseeable risks.   Since Kilauea Volcano has been continuously erupting since 1983, and Plaintiffs and Class members owned properties in Lava Zones 1 and 2, damage to Plaintiffs and the Class's properties as a result of volcanic eruption was a foreseeable risk.

181.   At all relevant times, Moa and Aloha owed a duty to Plaintiffs and Class members to perform the due diligence required under HRS §431:8-301(a).  Moa and Aloha each breached this duty by failing to perform the required due diligence to ascertain whether the requested coverage was available in the standard market. Indeed, Moa and Aloha disregarded the availability of HPIA insurance.

182.   Moa also owed a duty to the Aquilina Plaintiffs and Class members to exercise reasonable care, skill, and judgment in procuring insurance the Aquilina Plaintiffs and Class members requested.   A special relationship between Moa and the Aquilina Plaintiffs and Class members existed.  Moa held itself out as a surplus lines broker with specialized knowledge and experience in placing homeowner's insurance on properties in Lava Zones 1 and 2.  The Aquilina Plaintiffs and Class members relied on Moa for its specialized knowledge and experience.   Moa breached this duty when it procured and placed the Aquilina Plaintiffs and Class members in Underwriters' surplus lines homeowner's insurance with a Lava Exclusion when more comprehensive alternatives were available through HPIA and

other brokers who could obtain a Lloyd's policy without a Lava Exclusion, which Moa failed to disclose to the Aquilina Plaintiffs and Class members. The existence of alternative homeowner's insurance options that provided coverage for damage caused as a result of volcanic eruption was material to the Aquilina Plaintiffs and Class members who owned properties that were the most vulnerable to such damage and were unaware of any other options for homeowner's insurance.

183.   Aloha also owed a duty to the Corrigan Plaintiffs and Class members to exercise reasonable care, skill, and judgment in procuring insurance the Corrigan Plaintiffs and Class members requested. A special relationship between Aloha and the Corrigan Plaintiffs and Class members existed. Aloha held itself out as a surplus lines broker with specialized knowledge and experience in placing homeowner's insurance on properties in Lava Zones 1 and 2. The Corrigan Plaintiffs and Class members relied on Aloha for its specialized knowledge and experience. Aloha breached this duty when it procured and placed the Corrigan Plaintiffs and Class members in Underwriters' surplus lines homeowner's insurance with a Lava Exclusion when more comprehensive alternatives were available through HPIA and other brokers who could obtain a Lloyd's policy without a Lava Exclusion, which Aloha failed to disclose to the Corrigan Plaintiffs and Class members. The existence of alternative homeowner's insurance options that provided coverage for damage caused as a result of volcanic eruption was material to the Corrigan Plaintiffs and

Class members who owned properties that were the most vulnerable to such damage and were unaware of any other options for homeowner's insurance.

184.   Moa and Aloha each also owed Plaintiffs and Class members a statutory duty of good faith.  *See* HRS §431:1-102.  Moa and Aloha each knew they were placing surplus lines insurance, which, by its nature, is an insurance option of last resort reserved for insuring catastrophic risks that cannot be insured in the standard insurance market; knew Plaintiffs and Class members owned properties in Lava Zones 1 and 2; knew the standard market was not writing homeowner's insurance policies in Lava Zones 1 and 2; knew they were required to comply with the Hawaii Surplus Lines Act; and knew they were required to act with reasonable care in procuring the requested insurance and in good faith towards Plaintiffs and Class members.

185.   Yet, Moa and Aloha each procured surplus lines insurance with a Lava Exclusion that was wholly inappropriate for Plaintiffs and Class members, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  In procuring surplus lines homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2, Moa and Aloha each failed to exercise reasonable care in procuring the insurance requested and failed to act in Plaintiffs or Class members' best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.

186.   The breaches of duties owed to Plaintiffs and the Class proximately caused Plaintiffs and the Class to incur economic losses, including, without limitation, wrongfully induced payment of money for insurance premiums and commissions and the loss of, or displacement from, their homes without proper insurance coverage.

187.   As a result of the misconduct alleged, Plaintiffs and Class members also were injured because they were underinsured with less comprehensive insurance than they otherwise would have had and suffered catastrophic losses when they were denied coverage for the damage they suffered in the 2018 Kilauea Volcano eruption.

188.   But for Moa's and Aloha's negligence, Plaintiffs and Class members would have been able to obtain homeowners insurance through HPIA or a certain non-Monarch brokered Lloyd's policy that offered coverage for damage incurred as a result of volcanic eruption.

**COUNT IV**
**Unjust Enrichment**
**(Against All Defendants)**

189.   Plaintiffs reallege each and every allegation contained above as if fully set forth herein.

190.   Plaintiffs bring this claim individually, as well as on behalf of members of the Class.

191.   No contract between the Aquilina Plaintiffs (and Class members) and Moa exists.  No contract between the Corrigan Plaintiffs (and Class members) and Aloha exists.  No contract between Plaintiffs (and the Class) and Monarch exists.

192.   Although there is a contract between Plaintiffs (and the Class) and Underwriters, this claim is brought in the alternative as to Underwriters to the extent the Court determines that the nature of the misconduct alleged herein occurred prior to the formation of any contract between Plaintiffs (and the Class) and Underwriters and therefore does not support a claim for under those contracts breach of the implied covenant of good faith and fair dealing.

193.   This equitable claim is pleaded in the alternative to the legal claims alleged herein as the amount of restitution available under this claim may provide greater relief than the amount of damages available under the legal claims.  The Court may find at summary judgment or trial that Plaintiffs and the Class's legal damages are subject to certain offsets not applicable in equity.

194.   This equitable claim also would provide a remedy in the event that the Court holds that the legal claims alleged herein are barred by certain defenses that do not relate to the merits underlying all of the claims.  Defendants previously raised several defenses to the HRS §480-2 claim – that the exemption under HRS §480-11(b) applies and that the HRS §480-2 claim cannot be predicated on a violation of the Hawaii Insurance Code (*see* ECF Nos. 30-1 at 5-8 & 63-1 at 4-7) – that are not

applicable to a claim for unjust enrichment.  As to breach of the implied covenant of good faith and fair dealing, Underwriters previously argued that the claim was not viable because the alleged misconduct occurred prior to contract formation.  *See* ECF No. 32-1 at 25-27.  With respect to the negligence claim, Moa previously argued that a negligence claim cannot be predicated on a violation of the Hawaii Insurance Code and that it simply owes no duties to Plaintiffs and the Class.  *See* ECF No. 63-1 at 21-24.  Plaintiffs disagree with each of Defendants' arguments, but to the extent the Court agrees, this claim is appropriately pleaded in the alternative to the legal claims.  Because these arguments and defenses are specific to a particular legal claim and do not represent substantive challenges to the merits underlying all of the claims, Plaintiffs and the Class may not have any legal remedy such that this claim is permissibly pleaded in the alternative.

195.   During the Class Period, Defendants were unjustly enriched by their wrongful acts in connection with selling surplus lines insurance with a Lava Exclusion to Plaintiffs and the Class when more comprehensive homeowner's insurance was available because Defendants engaged in such conduct in disregard for the good faith and due diligence duties owed to Plaintiffs and the Class.

196.   Plaintiffs and the Class conferred upon Defendants non-gratuitous payments of premiums for surplus lines insurance and commissions for insurance-related services that Plaintiffs and the Class would not have paid, but for Defendants'

wrongdoing.  Defendants accepted or retained the non-gratuitous benefits conferred premiums and related commissions, paid by Plaintiffs and the Class, with full knowledge and awareness that Plaintiffs and the Class were sold less comprehensive surplus lines insurance that was inferior to other available insurance.

197.   Defendants have been unjustly enriched in retaining the premiums and related commissions derived from Plaintiffs and the Class's purchases of surplus lines insurance, which retention under these circumstances is unjust and inequitable for the reasons set forth below.

**Underwriters**

198.   Plaintiffs and the Class paid premiums to their respective retail brokers, which were remitted to Underwriters net of the retail and wholesale brokers' commissions.

199.   Underwriters otherwise would not have received these premiums had Underwriters: (i) acted in good faith and the insureds' best interests; and (ii) ensured that Monarch complied with HRS §§431:8-301 and 431:1-102 with regard to the placement of surplus lines insurance.

200.   Underwriters (with Monarch) developed, marketed, and sold a surplus lines insurance product – homeowner's insurance with a Lava Exclusion – that was wholly inappropriate for Plaintiffs and the Class, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava

Zones 1 and 2.  Underwriters sale of surplus lines homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2 was not Plaintiffs or the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Underwriters sold Plaintiffs and the Class an insurance product that did not provide them with valuable insurance coverage and did not meet their needs and expectations.  Indeed, during the Class Period, Lloyd's policies without the Lava Exclusion were available to provide coverage for damage caused by volcanic eruption to homeowners with properties in Lava Zones 1 and 2.  Underwriters also failed to oversee and proactively manage Monarch to ensure it acted lawfully, which it did not.

201.   Furthermore, Underwriters exploited the lack of regulation over its rates and forms in order to provide this insurance product.  Insurers in the standard insurance market were unable or unwilling to offer coverage for damage caused by volcanic eruption.  Instead of filling the gap in the insurance market and providing insurance coverage for catastrophic losses, which is the purpose of surplus lines insurance, Underwriters provided only basic insurance coverage that was inadequate for Plaintiffs and the Class's needs.

202.   Underwriters knew their surplus lines policies contained a Lava Exclusion and knew they were writing policies for homeowners in Lava Zones 1 and 2.   Underwriters, therefore, accepted and retained non-gratuitously conferred

premiums with full knowledge and awareness that they offered and sold surplus lines insurance that was inadequate for Plaintiffs and the Class's needs and that was unlawfully placed.

203. Underwriters' retention of premiums under these circumstances is unjust and inequitable.

**<u>Monarch</u>**

204. Plaintiffs and the Class paid premiums to their respective retail brokers, which were remitted net of the retail broker's commission to Monarch. Monarch then remitted the premium to Underwriters, net of its commission.

205. Plaintiffs and the Class would not have non-gratuitously conferred commissions to Monarch had Monarch complied with Lloyd's Minimum Standards, HRS §§431:1-102 and 431:8-30, and/or had Monarch ensured that retail brokers, including Moa and Aloha, complied with HRS §§431:8-301 and 431:1-102 with regard to the placement of surplus lines insurance.

206. Monarch is a Lloyd's authorized coverholder and agent of Underwriters. To operate in the Lloyd's market, Monarch is obligated to comply with all Lloyd's rules and requirements, such as Lloyd's Minimum Standards. As a Hawaii-licensed surplus lines broker, Monarch also is obligated to comply with the Hawaii Insurance Code and the Hawaii Surplus Lines Act.

207.   Monarch (with Underwriters) developed, marketed, and sold a surplus lines insurance product – homeowner's insurance with a Lava Exclusion – that was wholly inappropriate for Plaintiffs and the Class, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  Monarch's sale of surplus lines homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2 was not in Plaintiffs or the Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Monarch sold Plaintiffs and the Class an insurance product that did not provide them with valuable insurance coverage and did not meet their needs and expectations.  Indeed, during the Class Period, Lloyd's policies without the Lava Exclusion were available to provide coverage for damage caused by volcanic eruption to homeowners with properties in Lava Zones 1 and 2.

208.   Monarch also failed to comply with the Hawaii Surplus Lines Act by failing to perform the required due diligence to ascertain whether the requested coverage was available in the standard market.  Monarch also failed to oversee and proactively manage retail brokers, including Moa and Aloha, to ensure they acted lawfully, which they did not.

209.  Monarch knew that the surplus lines policies that it developed, marketed, and sold contained a Lava Exclusion and knew the policies were offered to homeowner's in Lava Zones 1 and 2.  Monarch, therefore, accepted and retained

non-gratuitously conferred commissions with full knowledge and awareness that it offered and sold surplus lines insurance that was inadequate for Plaintiffs and the Class's needs and unlawfully placed.

210.   Monarch's retention of commissions under these circumstances is unjust and inequitable.

**Moa**

211.   The Aquilina Plaintiffs and Class members paid commissions to Moa that Moa otherwise would not have received had Moa complied with HRS §§431:8-301 and 431:1-102 and acted with reasonable care, diligence, and judgment with regard to the placement of surplus lines insurance.

212.   Moa procured surplus lines insurance with a Lava Exclusion that was wholly inappropriate for the Aquilina Plaintiffs and Class members, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  In procuring surplus lines homeowner's insurance with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2, Moa failed to exercise reasonable care in procuring the insurance requested and failed to act in the Aquilina Plaintiffs or Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Furthermore, Moa failed to comply with the Hawaii Surplus Lines Act by failing to perform the required due diligence to ascertain whether the requested coverage was available in the standard

market.  Punctuating the unjust nature of Moa's conduct is that more comprehensive insurance covering damage incurred as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy.

213.   Moa knew that the surplus lines policies that it procured contained a Lava Exclusion and knew the policies were offered to homeowner's in Lava Zones 1 and 2.   Moa, therefore, accepted and retained non-gratuitously conferred commissions with full knowledge and awareness that it procured surplus lines insurance that was inadequate for the Aquilina Plaintiffs and Class members' needs and unlawfully placed.

214.   Moa's retention of commissions under these circumstances is unjust and inequitable.

**Aloha**

215.   The Corrigan Plaintiffs and Class members paid commissions to Aloha that Aloha otherwise would not have received had Aloha complied with HRS §§431:8-301 and 431:1-102 and acted with reasonable care, diligence, and judgment with regard to the placement of surplus lines insurance.

216.   Aloha procured surplus lines insurance with a Lava Exclusion that was wholly inappropriate for the Corrigan Plaintiffs and Class members, who were homeowners at the highest risk of suffering catastrophic losses because they owned properties in Lava Zones 1 and 2.  In procuring surplus lines homeowner's insurance

with a Lava Exclusion for homeowners with properties in Lava Zones 1 and 2, Aloha failed to exercise reasonable care in procuring the insurance requested and failed to act in the Corrigan Plaintiffs or Class's best interest in light of the fact that Kilauea Volcano has been continuously erupting since 1983.  Furthermore, Aloha failed to comply with the Hawaii Surplus Lines Act by failing to perform the required due diligence to ascertain whether the requested coverage was available in the standard market.   Punctuating the unfair nature of Aloha's conduct is that more comprehensive insurance covering damage incurred as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy.

217.   Aloha knew that the surplus lines policies that it procured contained a Lava Exclusion and knew the policies were offered to homeowner's in Lava Zones 1 and 2.   Aloha, therefore, accepted and retained non-gratuitously conferred commissions with full knowledge and awareness that it procured surplus lines insurance that was inadequate for the Corrigan Plaintiffs and Class members' needs and unlawfully placed.

218.   Aloha's retention of commissions under these circumstances is unjust and inequitable.

219.   Plaintiffs and the Class paid a unitary amount as a premium that Moa/Aloha, Monarch, and Underwriters divided among themselves.   There is no

other person or entity who would have a superior legal or equitable right to the disputed funds.

220.   Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.   Thus, Defendants must pay restitution to Plaintiffs and the Class for its unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief against the Defendants as follows:

A.     That the Court certify the Class under Fed. R. Civ. P. 23 and appoint Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the members of the Class;

B.     That the Court award damages sustained by Plaintiffs and the Class as a result of Defendants' violations of HRS §480-2(a), together with pre-judgment interest;

C.     That the Court award damages sustained by Plaintiffs and the Class as a result of Underwriters' breaches of the implied covenant of good faith and fair dealing and Moa and Aloha's negligence, together with pre-judgment interest;

D.      That the Court require Defendants to pay to Plaintiffs and the Class

restitution in the amount of all unjust benefits Defendants retained, together with

pre-judgment interest;

E.      That the Court award attorneys' fees and expenses under the common

fund doctrine and/or any other appropriate legal theory; and

F.      That the Court grant such other and further relief as may be just and

proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: December 12, 2019                     _/s/ Joseph P. Guglielmo_
                                             JOSEPH P. GUGLIELMO
                                             (*pro hac vice*)
                                             ERIN GREEN COMITE
                                             (*pro hac vice*)
                                             MICHELLE E. CONSTON
                                             (*pro hac vice*)
                                             **SCOTT+SCOTT**
                                             **ATTORNEYS AT LAW LLP**
                                             The Helmsley Building
                                             230 Park Avenue, 17th Floor
                                             New York, NY 10169
                                             Telephone: (212) 223-6444
                                             Facsimile:  (212) 223-6334
                                             jguglielmo@scott-scott.com
                                             ecomite@scott-scott.com
                                             mconston@scott-scott.com

                                             E. KIRK WOOD
                                             (*pro hac vice*)
                                             **WOOD LAW FIRM, LLC**
                                             P. O. Box 382434

Birmingham, AL 35238-2434
Telephone: (205) 908-4906
Facsimile:  (866) 747-3905
ekirkwood1@bellsouth.net

JEFFREY E. FOSTER #9857
**FOSTER LAW OFFICES, LLC**
PO Box 127
Captain Cook, HI 96704
Telephone: (808) 348-7800
Facsimile:  (808) 443-0277

*Counsel for Plaintiffs*