IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

```
_____
STEPHEN G. AQUILINA and LUCINA,     )
J. AQUILINA, Individually and       )
on Behalf of all Others Similarly   )
Situated; and DONNA J. CORRIGAN     )
and TODD L. CORRIGAN, Individually  )
and on Behalf of All Others         )
Similarly Situated,                 )
                                    )
              Plaintiffs,           )
                                    )
      v.                            )  Civ. No. 18-00496-ACK-KJM
                                    )
CERTAIN UNDERWRITERS AT LLOYD'S     )
SYNDICATE #2003; LLOYD'S            )
SYNDICATE #318; LLOYD'S             )
SYNDICATE #4020; LLOYD'S            )
SYNDICATE #2121; LLOYD'S            )
SYNDICATE #2007; LLOYD'S            )
SYNDICATE #1183; LLOYD'S            )
SYNDICATE #1729; BORISOFF           )
INSURANCE SERVICES, INC. d/b/a      )
MONARCH E&S INSURANCE SERVICES;     )
SPECIALTY PROGRAM GROUP, LLC        )
d/b/a SPG INSURANCE SOLUTIONS,      )
LLC; ALOHA INSURANCE SERVICES       )
INC.; ILIKEA LLC d/b/a MOA          )
INSURANCE SERVICES HAWAII;          )
and DOES 1-100,                     )
                                    )
              Defendants.           )
_____     )
```

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS CERTAIN
UNDERWRITERS AT LLOYD'S AND MONARCH'S MOTIONS TO DISMISS

Plaintiffs are residents of the Puna District of Hawai'i Island (the "Big Island") who purchased surplus lines homeowner's insurance policies brokered and underwritten by the various Defendants.  In the aftermath of the May 2018 eruption of Kilauea Volcano, Plaintiffs allegedly sustained significant

- 1 -

damage to their properties and sought coverage for the losses under their surplus lines policies.  Such coverage was denied, primarily based on an exclusion precluding coverage for lava-related damage.  Plaintiffs brought lawsuits in state court, as well as this putative class action in federal court, seeking relief for losses allegedly caused by the wrongdoing of the various Defendants.  The operative class-action complaint asserts that Defendants committed unfair business practices and breached other statutory and common-law obligations owed toward Plaintiffs in connection with the procurement of the policies.

Certain Underwriters at Lloyd's London, including Syndicates #2003, #318, #4020, #2121, #2007, #1183, #1729 ("Underwriters"), and Borisoff Insurance Services, Inc. d/b/a Monarch E&S Insurance Solutions, LLC, whose assets are owned by Specialty Program Group, LLC d/b/a SPG Insurance Solutions, LLC (together, "Monarch") have now moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim.[1/]  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Underwriters' Motion to Dismiss, ECF No. 126, and GRANTS IN PART and DENIES IN PART Monarch's Motion to Dismiss, ECF No. 128.

---

[1/]  The other two Defendants—Moa and Aloha—have separately moved to dismiss or stay the claims against them pursuant to the Colorado River abstention doctrine.  Those motions will be addressed in a separate order.

**PROCEDURAL BACKGROUND**

As mentioned, this case began in 2018 as a putative class action.  Compl. ECF No. 1.  The initial Complaint was brought by lead Plaintiffs Stephen and Lucina Aquilina and Audra and Scott Lane, and named as Defendants Underwriters; Monarch; Ilikea LLC d/b/a Moa Insurance Services Hawaii ("Moa"); and Pyramid Insurance Centre, Ltd. ("Pyramid").  Id.  It alleged that the various Defendants had engaged in a deceptive "scheme" to defraud Plaintiffs and deprive them of meaningful insurance coverage.  Id.  All four Defendants previously moved to dismiss—primarily for failure to meet the heightened pleading standard under Rule 9(b)—which the Court granted without prejudice on September 26, 2019.  ECF Nos. 106-09.

The now-operative First Amended Complaint, ECF No. 114, was filed on December 12, 2019.  It replaces the Lane Plaintiffs with Donna and Todd Corrigan, and Pyramid (the Lanes' retail broker) with Aloha Insurances Services, Inc. ("Aloha") (the Corrigans' retail broker).  See Am. Compl.  The Aquilinas and the Corrigans (together, "Plaintiffs") again purport to assert claims on behalf of themselves and a putative class of similarly-situated consumers (the "Class").[2]  This time, however, they abandon their previous allegations of a deceptive

---

[2]  The Court notes that the Class has not been certified.  References to the "Class" are for purposes of convenience in addressing the allegations in the Complaint.

- 3 -

or fraudulent scheme and reframe them to allege "unfair" practices under Hawai`i's Unfair and Deceptive Acts or Trade Practices ("UDAP") law and breaches of other statutory and common-law duties.

The Amended Complaint asserts three causes of action against Underwriters and two causes of action against Monarch:

1. *Count I*.  Against Underwriters and Monarch, violation of UDAP law, Hawai`i Revised Statutes ("HRS") § 480-2.  Am. Compl. ¶¶ 126-60.

2. *Count II*.  Against Underwriters, breach of the implied covenant of good faith and fair dealing ("bad faith").  Id. ¶¶ 161-77.

3. *Count IV*.  Against Underwriters and Monarch, unjust enrichment.  Id. ¶¶ 189-220.

Now before the Court are Underwriters' Motion to Dismiss, ECF No. 126, and Monarch's Motion to Dismiss, ECF No. 128, which were filed on February 27, 2020.  Plaintiffs filed their oppositions on April 28, ECF Nos. 140 & 141, and Defendants filed their reply briefs on May 5, ECF Nos. 151 & 152.  Moa filed a statement of no opposition to Underwriters' Motion, and Monarch and Aloha filed statements of no position as to Underwriters' Motion.  ECF Nos. 143 (Moa), 147 (Monarch), & 148 (Aloha).  Underwriters and Moa filed statements of no opposition to Monarch's Motion, and Aloha filed a statement of

no position as to Monarch's Motion.  ECF Nos. 137
(Underwriters), 142 (Moa), & 149 (Aloha).  The Court held a
telephonic hearing on both motions on Tuesday, May 19.

## FACTUAL BACKGROUND

### I.    The Policies

Plaintiffs and the Class purchased surplus lines
homeowners insurance policies to insure their residential
properties located on the Big Island.  Am. Compl. ¶ 1.  The
policies were underwritten by several syndicates of
Underwriters.  Id. ¶ 1.  Plaintiffs purchased their policies
with the help of two retail brokers, Moa and Aloha (together,
the "Retail Brokers").  Id. ¶¶ 31-32.  Moa assisted the
Aquilinas while Aloha assisted the Corrigans.  See id.  The
Retail Brokers purchased the policies through Monarch, a
licensed surplus lines broker and the coverholder to and
authorized agent of Underwriters.  Id. ¶¶ 27-28, 71-72.

### II.  The Surplus Lines Insurance Market

Surplus lines insurance is available as a last resort
when the traditional insurance market "cannot or will not
insure" due to risky characteristics."  Am. Compl. ¶¶ 2, 98-99.
The surplus lines market exists to provide coverage for high-
risk loss exposures when "admitted insurers in the standard
market do not have the flexibility" to underwrite such risks.

Id. ¶¶ 98-99.  Surplus lines insurance is provided by non-
admitted insurers who are not licensed to operate in Hawai`i and
who are not required to obtain approval for their rates, forms,
and underwriting rules.  Id. ¶ 99.  "[S]urplus lines insurers
often fill the gap to provide insurance coverage for high-risk
perils, but are only permitted to do so under specified
circumstances."  Id. ¶ 99.

      Specifically, Section 301 of the Hawai`i insurance
code establishes various requirements to allow for the placement
of surplus lines insurance.  See HRS § 431:8-301; Am.
Compl. ¶¶ 101-02.  First, surplus lines insurance may only be
placed through a "licensed surplus lines broker."  Am.
Compl. ¶ 101 (citing HRS § 431:8-301(a)).  And a surplus lines
broker must perform a "diligent search" of the insurance market
before placing a surplus lines policy to determine whether the
insurance can be obtained from "authorized" insurers; whether
the insurance is in addition to or in excess of the amount and
coverage that can be procured from authorized insurers; and
whether the insurance is procured at a rate lower than the
lowest rate that is generally acceptable to authorized insurers
transacting that kind of business and providing insurance

affording substantially the same protection.[3/]  Id. ¶ 102 (citing HRS § 431:8-301(a)(2)-(4)).

### III. Plaintiffs' Allegations of "Inadequate" or "Inappropriate" Insurance Coverage

The Amended Complaint alleges that Defendants unlawfully brokered or sold surplus lines policies with "inadequate" or "inappropriate" coverage to Plaintiffs and the Class when more comprehensive coverage was available.  Am. Compl. ¶ 4.  As a result, in the devastating aftermath of the recent Kilauea eruption, Plaintiffs were denied coverage under their policies for significant losses to their homes and properties.  Id. ¶¶ 7-9, 114-117.

Plaintiffs live in high-risk lava "zones."  Id. ¶ 1. Because of the location of their homes, the traditional, voluntary insurance market does not offer any form of property insurance.  Id. ¶ 2.  For that reason, Plaintiffs were placed

---

[3/]  HRS § 431:8-301(a) states in full:

(a)   . . . [I]nsurance may be procured from an unauthorized insurer; provided that:
  (1)   The insurance is procured through a surplus lines broker licensed in the insured's home state;
  (2)   The full amount or kind of insurance cannot be obtained from insurers who are authorized to do business in this State; provided that a diligent search is made among the insurers who are authorized to transact and are actually writing the particular kind and class of insurance in this State each time the insurance is placed or renewed;
  (3)   The surplus lines insurance procured is in addition to or in excess of the amount and coverage which can be procured from the authorized insurers; and
  (4)   The insurance is not procured at a rate lower than the lowest rate that is generally acceptable to authorized insurers transacting that kind of business and providing insurance affording substantially the same protection.

with insurance through the surplus lines market, which—as noted above—allows unlicensed insurers to provide coverage.  Id.  In other words, the surplus lines market essentially insures what the regulated market will not.  Id.

The surplus lines policies sold to Plaintiffs and the Class contained an exclusion that precludes coverage for "the peril of lava and/or lava flow causing direct or indirect physical damage or loss of use of the insured property" (the "Lava Exclusion").  Am. Compl. ¶ 1.  This despite the fact that Plaintiffs allegedly sought homeowner's insurance that would include lava coverage, given the nature of the location of their homes.  Id. ¶¶ 45-46, 54.  Plaintiffs allege that they relied on Defendants' "knowledge, experience, and expertise regarding the appropriateness and availability of coverages in the Hawaii insurance market," and that Defendants "knew and understood" that Plaintiffs' homes were located in high-risk lava zones— making coverage for damages caused by lava flow necessary—yet still sold them policies containing the Lava Exclusion.  Id. ¶¶ 46, 54.  While Plaintiffs do not claim that they interacted directly with Underwriters or Monarch, the Amended Complaint alleges that Monarch (Underwriters' agent) used its retail brokers (Moa and Aloha) to coordinate in the procurement of the policies and that Monarch and Underwriters would or should have been aware of the particular need for lava coverage based on the

- 8 -

location of Plaintiffs' properties.  Id. ¶ 76, 133, 139.  Now
that Plaintiffs' homes have allegedly suffered damages resulting
from the recent eruption, Plaintiffs claim that Defendants
should be held liable for placing Plaintiffs with inappropriate
coverage without complying with certain statutory requirements
and without advising them of other available insurance that
would have included lava coverage.

　　　Plaintiffs allege that Defendants failed to comply
with the statutory requirements in Section 301 for placing
surplus lines coverage, which require a "diligent search" to
determine whether "[t]he full amount or kind of insurance"
cannot be obtained from "authorized" insurers.  Am.
Compl. ¶¶ 37-38, 42-43, 61-62; see also HRS § 431:8-301(a).
Defendants, according to the Amended Complaint, knew or should
have known that Plaintiffs lived in high-risk areas, yet they
still failed to advise Plaintiffs that they would have qualified
for more comprehensive coverage (including volcanic eruption)
through other channels.  Am. Compl. ¶¶ 46, 48, 54, 57.  The
Amended Complaint focuses in particular on coverage through the
Hawai`i Property Insurance Association ("HPIA" or the
"Association").  The HPIA is a statutorily-created association
of authorized insurers who issue coverage for 16 perils,
including fire and volcanic eruption.  Am. Compl. ¶ 50.  The
HPIA was established to make property insurance available to

"persons who are unable to obtain basic property insurance in the private market from a licensed insurer." Id. (citing HRS § 431:21-110). The legislature when creating the HPIA described the purpose underlying the program:

> The legislature finds that the recent Kilauea volcano eruption and lava flows have caused a serious problem for residents of certain areas of the Big Island. The actual and potential losses caused by the volcanic activity has also resulted in the unavailability of basic property insurance for persons having insurable interests in properties in the vicinity which has caused great personal suffering and financial hardship and has contributed to uncertainty in the community. The legislature finds it is in the interest of the State to foster stability for people adversely affected by major natural disasters, and this purpose will be served by making basic property insurance available to such persons.
>
> The purpose of this Act is to create an entity which will provide appropriately priced basic property insurance for owners and occupants of property in high risk areas for major natural disasters. This extraordinary action is being taken to provide limited relief to meet the unique and pressing needs of these persons who are currently unable to obtain any property insurance.

1991 Haw. Sess. Laws Act 284 § 2; see also Am. Compl. ¶¶ 8-9. The legislative history reflects the intent to establish a program that would ensure property coverage for individuals whose homes are at great risk of damages because of their proximity to active volcanoes on the Big Island and the continuous eruption thereof.

According to the Amended Complaint, Plaintiffs' and the Class's properties would have qualified for HPIA insurance, but Defendants represented to Plaintiffs that the Underwriters' policies were the only available property insurance coverage. Am. Compl. ¶¶ 45-46, 52-54, 105.  The Amended Complaint also suggests that Plaintiffs may have qualified for other Lloyd's policies within the voluntary market that would not have contained a Lava Exclusion.  Id. ¶¶ 62, 106-08.  Plaintiffs allege that such policies would only have been available through a different broker—in other words, not Monarch.  Id. ¶¶ 106-07.

Plaintiffs allege that each Defendant violated various duties owed to them when placing Plaintiffs and the Class in surplus lines insurance without advising them of the availability of HPIA insurance or other policies that would have included lava coverage.  Am. Compl. ¶¶ 61, 104.  They claim that Underwriters and Monarch regularly conduct business selling insurance on the Hawai`i islands, and they therefore should have been cognizant of the unique geographical concerns—including the eruption history—as well as of the existence of the state-established HPIA program.  Id. ¶¶ 12, 28, 70-71, 108-09. Plaintiffs allege that Underwriters are liable for their own conduct and that they are vicariously liable for the conduct of their agent, Monarch.  Id. ¶¶ 71, 78, 110.

### STANDARD

Rule 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the Court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff.  Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012).  The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Mere conclusory statements in a complaint or "formulaic recitation[s] of the elements of a cause of action" are not sufficient.  Twombly, 550 U.S. at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929.  Thus, the Court discounts conclusory statements,

- 12 -

which are not entitled to a presumption of truth, before determining whether a claim is plausible.  Iqbal, 556 U.S. at 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868.  However, "[d]ismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment."  Harris v. Cty. of Orange, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam)).

## DISCUSSION

Underwriters and Monarch assert several overlapping grounds for dismissal.  Underwriters argue that Plaintiffs' theory of the case fails because insurers do not have any general obligation to ensure the "suitability" of a policy. Underwriters' Mot. 9-14.  They also dispute the alleged duties Plaintiffs rely on to support the UDAP and bad faith claims. Underwriters' Mot. 14-16.  Monarch argues in part that it did not breach the "diligent search" requirement in Section 301 and, even if it did, a diligent search would not prevent the sale of Underwriters' policies.  Monarch's Mot. 7-14.  Both Underwriters and Monarch also argue that any additional duties asserted by Plaintiffs would be owed by the Retail Brokers, not Monarch or Underwriters, and that offering policies with lava exclusions is not "unfair" for UDAP purposes.  Id. at 4-5, 18; Underwriters'

Mot. 17-20.  Based on those arguments, Underwriters and Monarch maintain that they are not liable for Plaintiffs' purported losses.  Plaintiffs in response accuse Underwriters and Monarch of mischaracterizing the relevant standards and sidestepping various duties they owe under state statutory law or common law. Monarch's Mot. 8-11; Underwriters' Mot. 6-10.

For the reasons detailed below, the Court holds that Plaintiffs have pleaded cognizable claims of UDAP against Underwriters and Monarch, and bad faith against Underwriters. Plaintiffs have failed to plead a cognizable claim for unjust enrichment against both Underwriters and Monarch.  The Court will address each of the three causes of action in turn.

## I.   UDAP Claim Against Underwriters & Monarch

Count I of the Amended Complaint alleges a UDAP claim under HRS § 480-2(a), which provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."  See Compl. ¶¶ 132-37.  As explained below, the Court holds that Plaintiffs have adequately pleaded a plausible UDAP claim.

### a. Plaintiffs' Allegations

The allegations supporting Plaintiffs' UDAP claim can be summarized as follows:

- As sellers of surplus lines insurance, Underwriters and Monarch knew or should have known that Plaintiffs and the

Class owned properties in high-risk zones and would have desired comprehensive homeowners coverage, with lava coverage.  Am. Compl. ¶¶ 133-34, 139.

- Underwriters and Monarch "developed and sold" an insurance product that was "wholly inappropriate" and "not in Plaintiffs [sic] or the Class's best interest." Id. ¶¶ 134, 140-41.

- Underwriters and Monarch "took advantage" of the lightly-regulated surplus lines market to sell insurance that excluded coverage for "the very catastrophic risk that the standard insurance market cannot and will not cover—defeating the very purpose of surplus lines insurance." Id. ¶¶ 135, 141.

- Underwriters and Monarch knew or should have known that they were required to comply with the Surplus Lines Act and act in the best interest of the insureds.  Id. ¶ 134-39.

- Monarch failed to comply with the Hawaii Surplus Lines Act by "failing to perform, or ensuring that retail brokers, such as Moa and Aloha, performed, the required due diligence to ascertain whether the requested coverage was available in the standard market."  Id. ¶ 143.

- "[M]ore comprehensive insurance covering damage incurred

as a result of volcanic eruption was available from HPIA and even a non-Monarch brokered Lloyd's policy." <u>Id.</u> ¶ 140. Plaintiffs were never informed of the availability of more comprehensive insurance that would have covered the lava damage. <u>Id.</u> ¶ 135.

The UDAP claim stems generally from violations of the "good faith owed" to Plaintiffs and the Class "embodied in common law, as expressed in Lloyd's Minimum Standards, and codified in the Hawai`i Insurance Code, HRS §431:1-102." Am. Compl. ¶¶ 135, 142-43. Underwriters' and Monarch's conduct also, according to Plaintiffs, "contravenes the purpose behind establishing HPIA" and "plainly violate[s] the express public policy that Hawaiian homeowners should be afforded property insurance with coverage for damage caused by 'major national disasters,' specifically the Kilauea Volcano eruption." <u>Id.</u> ¶¶ 136, 142-43.

### b. Analysis

#### i. Whether Plaintiffs Must Plead that Underwriters and Monarch Owed Them an Independent Duty of Care

As a general matter, Underwriters' and Monarch's arguments hinge on a theory that Plaintiffs must connect their UDAP claim to a breach of a duty of care. This reasoning implies that there can be no UDAP violation without allegations that Underwriters and Monarch owed and breached a distinct duty of care, independent of HRS § 480-2. The Court agrees with

Plaintiffs that this reasoning is based on a faulty premise.
See Opp. to Underwriters' Mot. 6-9; see also Compton v.
Countrywide Fin. Corp., 761 F.3d 1046, 1055-56 (9th Cir. 2014).

"The UDAP statute imposes an independent duty on all
businesses to refrain from 'unfair or deceptive acts and
practices.'"  In re Gibbs, 522 B.R. 282, 289 (Bankr. D. Haw.
2014).  "Nothing in the plain language" of § 480-2 calls for an
allegation of a breach of an underlying duty of care independent
from the statute itself.  Compton, 761 F.3d at 1055.  "Rather
than requiring proof of a common law duty of care, section 480-2
is better interpreted as imposing a statutory duty on
[businesses] not to engage in 'unfair or deceptive acts or
practices in the conduct of any trade or commerce."[4/]  Id. at
1056; see also In re Gibbs, 522 B.R. at 289 (citing Compton to
reject the argument that UDAP claim failed because plaintiff did
not establish that defendant "owed and breached some other

_____

    [4/]  The Court is not persuaded by Underwriters' attempt in their Reply
to distinguish Compton and the other cases cited by Plaintiffs as limited to
the lender-borrower context.  See Underwriters' Reply 4-6.  Contrary to what
Underwriters say, the Ninth Circuit in Compton did not "preface[] its ruling
by limiting it to UDAP claims between a borrower and a lender."
Underwriters' Reply 4 (citing Compton, 761 F.3d at 1056-57).  That the court
used language consistent with the facts of the case before it does not mean
that the broad principles are limited to a specific context.  The Court
simply sees no reason that Compton's reading of the "plain language" of §
480-2 would be limited to only UDAP claims brought by borrowers against
lenders.  See Compton, 761 F.3d at 1055-57; see also Admor HVAC Products,
Inc. v. Lessary, Civ. No. 19-00068 SOM-KJM, 2019 WL 3430766, at *6 (D. Haw.
July 30, 2019) (involving allegations of unfair business competition outside
the lender-borrower context and noting that an unfair act does not depend on
"violation of a statute or satisfaction of the elements of an analogous
claim"); In re Gibbs, 522 B.R. at 289 (noting that the obligation not to
engage in "unfair or deceptive" practices rests on "all businesses").

duty"); Field, Tr. of Estate of Aloha Sports Inc. v. Nat'l Collegiate Athletic Ass'n, 143 Haw. 362, 373, 431 P.3d 735 (2018) (holding that lower court erred in finding it necessary for plaintiff to prove a claim of tortious interference with a prospective business advantage to support HRS § 480-2(a) violation).

Thus, when considering the validity of Plaintiffs' UDAP claim, the Court need only decide whether the Amended Complaint adequately alleges either unfair or deceptive acts, "without looking to negligence law to determine whether [Underwriters or Monarch] breached a common law duty of care." Compton, 761 F.3d at 1055-56. So even if Underwriters and Monarch are right that they did not owe Plaintiffs any suitability obligation or other duty of care (which the Court need not decide), that conclusion would not be fatal to Plaintiffs' UDAP claim.[5/] See id.; see also Underwriters' Mot.

---

[5/] This is not contrary to the Courts ruling in Ryan v. Salisbury, 382 F. Supp. 3d 1031 (D. Haw. 2019), which involved allegations that the defendant sold the plaintiff "unsuitable" life insurance policies. As explained above, the Court must consider the particular factual allegations underlying a UDAP claim to decide whether they establish conduct that "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." The Court in Ryan considered the factual allegations and concluded that they could not support a plausible claim of unfair or deceptive conduct. In its analysis, the Court noted that there is no general obligation on insurers to offer a "suitable" policy. See id. at 1054-55 & n.7.

Underwriters now imply that Ryan's recognition that no "suitability" obligation exists means that the allegations here of "inappropriate" or "inadequate" coverage cannot support a UDAP claim. Underwriters have read Ryan too broadly. The lack of an independent "suitability" requirement alone (Continued . . . )

9-16.  The Court instead must consider the substance of Plaintiffs' allegations to decide whether they plausibly allege unfair or deceptive acts and practices.

### ii. Whether Plaintiffs have Plausibly Alleged Unfair or Deceptive Acts and Practices on the Part of Underwriters and Monarch

"HRS § 480-2 . . . was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both honest consumers and honest business[persons]."  Haw. Cmty. Fed. Credit Union v. Keka, 94 Haw. 213, 228, 11 P.3d 1 (2000) (quoting Ai v. Frank Huff Agency, Ltd., 61 Haw. 607, 616, 607 P.2d 1304 (1980), overruled on other grounds by Roberts Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc., 91 Haw. 224, 982 P.2d 853 (1999)) (latter alteration in Keka).  To state a UDAP claim, Plaintiffs must plausibly allege that (1) they are "consumers"; (2) Underwriters and Monarch violated HRS § 480-2(a) prohibiting "unfair or deceptive acts or practices in the conduct of any trade or

---

did not warrant dismissal in Ryan.  In fact, the Court implied that the allegations with "commensurate deception" could plausibly support a claim under the "deceptive" prong of UDAP.  See id. at 1054-55.  And as for the "unfair" prong, the Court simply found that the complaint contained "insufficient factual detail for the Court to find it plausible that defendants' actions 'offend[ed] established public policy' or were 'immoral, unethical, oppressive, unscrupulous[,] or substantially injurious to consumers.'"  Id. at 1055 (quoting Balthazar v. Verizon Haw. Inc., 109 Haw. 69, 77, 123 P.3d 194 (2005)).  Thus, Ryan does not—as Underwriters suggest— stand for the idea that allegations of unsuitability always fail to support a UDAP claim.

commerce"; and (3) Plaintiffs suffered injury resulting in damages.  <u>Compton</u>, 761 F.3d at 1056 (citing HRS § 480-2).  "Any injury must be fairly traceable to the defendant's actions."  <u>In re Kekauoha-Alisa</u>, 674 F.3d 1083, 1092 (9th Cir. 2012) (citing <u>Flores v. Rawlings Co., LLC</u>, 117 Haw. 153, 167 n.23, 177 P.3d 341, 355 n.23 (2008)).

As a threshold matter, Underwriters and Monarch have not disputed that Plaintiffs qualify as "consumers" and that the activities at issue involve the "conduct of any trade or commerce."  <u>See</u> HRS §§ 480-2(a), 480-2(d), 480-13(b).  Applying the rest of the UDAP framework here, the Court holds that Plaintiffs have plausibly alleged that Underwriters and Monarch engaged in "unfair or deceptive acts or practices" and that Plaintiffs suffered damages for purposes of withstanding a motion to dismiss.

In alleging their UDAP claim, Plaintiffs have abandoned the original complaint's allegations of deception.  They now focus exclusively on the "unfair" prong.  Accordingly, the Court will only address whether Plaintiffs' allegations adequately plead a claim under the "unfair" prong of UDAP.[6]  A

---

[6]  At the hearing, Underwriters tried to walk back their reading of the Amended Complaint as only asserting "unfair" practices, presumably in an attempt to invoke Rule 9(b)'s heightened pleading standard.  Counsel for Underwriters suggested that the allegations that Plaintiffs were, as a result of Defendants' conduct, caused to act in a particular way (purchasing the surplus lines policies with inadequate coverage) could be read as falling
(Continued . . . )

practice is unfair when it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Balthazar v. Verizon Haw., Inc., 109 Haw. 69, 77, 123 P.3d 194 (2005) (quoting Keka, 94 Haw. at 228, 11 P.3d 1). "[T]he question of whether a practice constitutes an unfair or deceptive trade practice is ordinarily a question of fact." Hungate v. Law Office of David B. Rosen, 139 Haw. 394, 410, 391 P.3d 2 (quoting Balthazar, 109 Haw. at 72 n.4, 123 P.3d 194); see also Soule v. Hilton Worldwide, Inc., 1 F. Supp. 1084, 1096 (D. Haw. 2014) (quoting Kukui Nuts of Haw. Inc. v. Baird & Co., Inc., 7 Haw. App. 598, 612, 789 P.2d 501 (Ct. App. 1990)).

　　　　The gist of the UDAP claim here, as otherwise detailed above, is that Underwriters and Monarch knew or should have known that Plaintiffs desired and needed lava coverage based on their homes' locations in high-risk lava zones; that Underwriters and Monarch acted unfairly by issuing and selling policies containing Lava Exclusions anyway, without advising of other available coverage in the admitted market; that Monarch

---

within the "deceptive" prong.  The Court rejects this changed interpretation.  It was never argued in the Motions or associated briefing.  In fact, even when Plaintiffs noted in their opposition briefs that Defendants had effectively conceded that Rule 9(b) would not apply, neither Monarch nor Underwriters responded in their reply briefs.  Thus, the Court limits its analysis to the "unfair" prong of UDAP viewed through the lens of the Rule 8 pleading standard.  See Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1300 (4th ed.) (collecting cases holding that a "a party who fails to object to the manner in which fraud or mistake is pleaded at the pleading stage waives the specificity requirement set out in Rule 9(b)").

failed to conduct (and Underwriters failed to ensure that their agent conducted) the requisite diligent search to determine whether other insurance was available in the admitted market; and that had the diligent search been performed, Underwriters and Monarch would have discovered other available insurance <u>with</u> lava coverage, either through other policies sold by Underwriters or through the HPIA.

Considering these allegations, the Court finds that the Amended Complaint adequately pleads a practice that "offends established public policy" and is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Plaintiffs have alleged plausible facts indicating that Underwriters' and Monarch's conduct in these narrow circumstances—selling and placing insurance that did not comply with the obvious needs and express requests (to the Retail Brokers) of the uniquely-situated homeowners—"offends public policy" and is "unscrupulous or substantially injurious to consumers."

One of the main themes in the Amended Complaint is that Defendants' conduct offends or contravenes the public policy established by the HPIA.  To undermine this, Underwriters and Monarch first make the unpersuasive point that, because they were not writing HPIA coverage, the statute's purpose or public policy does not apply to them.  It is enough, however, for UDAP

purposes that conduct violates the "spirit" of a law or "offends" a general public policy. See Kapunakea Partners v. Equilon Enters. LLC, 679 F. Supp. 2d 1203, 1209-10 (D. Haw. 2009).  The HPIA program stands for the broad public policy—unique to Hawai`i—of ensuring property insurance for residents of high-risk lava zones with unique geographical and climate concerns.  The legislature specifically sought to ensure "appropriately priced basic property insurance" for homeowners in these lava zones, which are at "high risk" for "major natural disasters."  1991 Haw. Sess. Laws Act 284 § 2.  In doing so, it announced a general policy or principle—consistent with other pro-insured principles—that would account for the unique concerns of vulnerable homeowners located in high-risk lava zones.  The "major natural disasters" language would plainly include the nearby, erupting volcanoes.  Indeed, the law enacting the HPIA was a direct response to existing shortcomings in the market because of the dangers of ongoing volcanic eruptions.  And even though Underwriters were not authorized or licensed in Hawai`i, they and Monarch were still required to comply with certain conditions of Hawai`i's insurance laws. Moreover, Underwriters' and Monarch's experience issuing insurance for homeowners in Hawai`i would presumably make them well aware of the other state-established insurance programs

(like HPIA) and other policies and principles to protect individuals residing in vulnerable locations.[7]

Monarch and Underwriters argue that Plaintiffs misinterpret the purpose and public policy underlying HPIA. They argue that the purpose of the HPIA is to ensure that property owners could get only "basic property insurance," not "lava coverage."  Underwriters' Mot. 5; Underwriters' Reply 13-14.  And, according to Monarch and Underwriters, because "basic property insurance" does not explicitly include lava coverage, selling surplus lines policies excluding lava coverage is nonetheless consistent with any policy or purpose underlying the HPIA.

The bill establishing the HPIA program indeed emphasizes the "unavailability of basic property insurance" for persons in the at-risk lava zones and states that the law's purpose is to "mak[e] basic property insurance available for such persons."  Am. Compl. ¶ 36 (quoting 1991 Haw. Sess. Laws Act 284 § 1) (emphasis added).  And the purpose of the Association is to "[a]ssure the availability of basic property insurance."  HRS § 431:21-101(2).  "Basic property insurance" is defined in the statute as "insurance against direct loss to real

_____

[7]  The Court notes that factual discovery may very well establish that it was the Retail Brokers rather than Underwriters and Monarch who are responsible for Plaintiffs' allegedly-inadequate coverage.  But for the initial pleading hurdle, the Court cannot say that Plaintiffs have not pleaded "unfair" practices by Underwriters and Monarch as a matter of law.

or tangible personal property from perils insured under the standard fire policy and extended coverage endorsement." Id. § 431:21-102; see also id. § 431:21-109(a) ("All properties qualifying for coverage under the plan of operation shall be eligible for the standard fire policy and extended coverage endorsement" and the "association shall provide additional coverages when directed by the commissioner or when approved by the commissioner").  Hawai`i's "standard form fire insurance policy" follows the one authorized under § 3404 of the New York insurance code, which provides that any policy insuring against the peril of fire must incorporate terms and provisions "no less favorable to the insured than those contained in the [standard policy.]"[8/]  N.Y. Ins. Law § 3404(f)(1)(A).

While the Court recognizes that this definition of "basic property insurance" alone may not expressly include or exclude lava coverage, that is somewhat beside the point.  The impetus for enacting the HPIA statute was the regularly-occurring lava flow resulting from volcanic eruptions on the Big Island.  See 1991 Haw. Sess. Laws Act 284 § 2 ("The legislature finds that the recent Kilauea volcano eruption and lava flows

---

[8/]  The standard fire policy does not specify the scope of the specific type coverages required, nor does it indicate whether lava damage would naturally fall within the definition of coverage for the peril of "fire." Rather, the New York policy outlines the minimum standards for other contractual terms and conditions in a policy that insures loss caused by fire (e.g., clauses for "other insurance," "innocent insureds," contribution, waiver, and cancellation).

have caused a serious problem for residents of certain areas of the Big Island.").  The program was enacted specifically because individuals with homes in the high-risk zones faced certain vulnerabilities from natural disasters—i.e., the inevitable danger of damage resulting from volcanic eruption.  See 1991 Haw. Sess. Laws Act 284 § 2 ("The legislature finds it is in the interest of the State to foster stability for people adversely affected by major natural disasters . . . .").  The legislature gave the Association authority to define the requisite coverages and perils necessary for the qualified homeowners with properties in the relevant areas.  Based on that authority, the Association added several additional perils meant to address other risks, at least one of which—lava flow—is unique to Hawai`i.  The enactment of the HPIA was recognized to be an "extraordinary" legislative action being undertaken to address the "unique and pressing needs" of the homeowners who were "unable to obtain any property insurance."  See 1991 Haw. Sess. Laws Act 284 § 2.  Thus, these purposes, policies, and principles underly Hawai`i law, and are relevant for considering whether conduct "offends" or contravenes public policy for purposes of stating a UDAP claim.[9]

---

[9]  Although Plaintiffs have pleaded plausible facts in support of their interpretation of the purpose and public policy underlying the HPIA program, the Court makes no specific finding at this juncture of the relevant public policy.

In any event, the factual allegations in the Amended Complaint assert that—independent of their statutory obligations—the various Defendants were or should have been aware that Plaintiffs sought and needed lava coverage specifically based on the precise risks within lava zones, and that Underwriters and Monarch would or should have been aware that these particularly-vulnerable homeowners in the lava zones would have sought such coverage. While it is true that Underwriters and Monarch dispute such knowledge, the Court and the parties are bound by the allegations of the Amended Complaint until the litigation progresses. Without the benefit of a more-developed factual record, and viewing the allegations in the light most favorable to Plaintiffs, Plaintiffs have sufficiently alleged facts showing that Underwriters and Monarch were or should have been aware of Plaintiffs unique vulnerabilities and concern.[10/] Taken together with the public policy underlying the HPIA and the few requirements for conducting surplus lines business, the Amended Complaint has alleged plausible facts that would support an "unfair" claim under UDAP.

---

[10/] While the Amended Complaint does not say outright that Plaintiffs advised Underwriters or Monarch of the coverage they sought—or even communicated with them at all—Plaintiffs do make clear that Underwriters or Monarch (the agent and coverholder who would have communicated with Plaintiffs or their Retail Brokers) were or should have been aware of plaintiffs unique needs and failed to advise Plaintiffs of other available coverage sources.

Notably, Plaintiffs concede that their position is not that Defendants may <u>never</u> issue insurance with lava exclusions. Opp. to Underwriters' Mot. 21-22.  Instead, they clarify that Defendants' conduct within the specific circumstances here was unfair.  According to Plaintiffs, they and the Class requested, desired, and plainly needed lava coverage, and Underwriters and Monarch were aware of those desires and needs and the existence of more comprehensive coverage sources.  In those narrow circumstances, Plaintiffs say, the surplus lines policies could be sold "only after a diligent search" and after at least advising Plaintiffs and the Class of other coverage sources that would have responded to their particular need of lava coverage. Opp. to Underwriters' Mot. 22.

That leads logically into the next point: Underwriters and Monarch dispute Plaintiffs' allegations that (1) other Lloyd's policies containing lava coverage would have been available to Plaintiffs and (2) insurance through the HPIA program would or should have been disclosed in a "diligent search" under Section 301 of the Surplus Lines Act.  The former is plainly a factual question.  The latter also raises factual issues, albeit more complex ones.

Underwriters and Monarch argue that Monarch complied with Section 301 of the Surplus Lines Act.  They say that HPIA coverage does not fall within the "admitted market" such that it

would have come up in a due diligence search or precluded Monarch and Underwriters from selling the surplus lines policies.  The HPIA is an "association of all licensed insurers authorized to write property and casualty insurance in Hawaii." See General Info: Why Isn't the HPIA listed in Best's Rating Guide?, Haw. Prop. Ins. Ass'n (2016), http://www.hpiainfo.com/general-info/why-isnt-the-hpialisted-in-bests-rating-guide/ (last visited June 9, 2020); see also HRS §§ 431:21-102 & 431:21-103(a).  As discussed, Section 301 requires the surplus lines broker to perform a "diligent search" among "insurers who are authorized to transact and are actually writing the particular kind and class of insurance in this State."  HRS § 431:8-301(a)(2).  If "authorized" insurers are writing the "particular kind and class of insurance," then the surplus lines policies cannot be sold.  Id.

        The parties in their briefing quarrel over the nature of the HPIA program and to what extent it would count as insurance available through "authorized" insurers.  Plaintiffs argue that had Monarch properly performed its search obligations under Section 301, it would not have placed insurance through the surplus lines market.  Underwriters and Monarch, on the other hand, argue that the HPIA is not part of the "voluntary" or "admitted" insurance market and therefore is not the type of "authorized" insurance referenced in Section 301.

- 29 -

While Underwriters and Monarch frame this issue as one of purely statutory interpretation to maintain that Plaintiffs' theory fails as a matter of law, in reality it raises factual disputes.  Deciding whether Section 301 would have precluded surplus lines coverage given the presence of HPIA coverage would benefit from further evidence and factual development, including depositions, witness reports or declarations, and other comparisons of the coverages at issue and the industry practices.  The Court thus declines to rule on this issue at the motion to dismiss stage.[11/]  Moreover, Plaintiffs have also alleged that other Underwriters policies within the voluntary market may have been available that would have included lava coverage.  And the Amended Complaint contains allegations independent of Section 301's statutory requirements; Plaintiffs here sought and reasonably needed a specific type of coverage

---

[11/]  The Court notes that Underwriters and Monarch raise an interesting point that, if HPIA does qualify as an "authorized" insurer writing the same type of coverage, the practical result would be that homeowners could never obtain surplus lines coverage.  In other words, they could not choose between HPIA coverage and surplus lines coverage (because Section 301 would preclude the placement of surplus lines coverage in the first place).  This is particularly concerning given that Underwriters have stated that HPIA coverage is significantly more expensive (though there is nothing in the pleadings comparing the pricing of the various policies and coverages).  Again, the Court need not reconcile the two statutory schemes (surplus lines and HPIA) at this juncture because Plaintiffs have, at the very least, alleged sufficient factual allegations to establish "unfair" conduct.

Moreover, regardless of whether the presence of HPIA insurance precluded the placement of surplus lines coverage, the Amended Complaint contains other allegations that Underwriters and Monarch knew or should have known that Plaintiffs sought and needed a specific type of coverage, the implication being that businesses selling insurance in the State of Hawaii would have been aware of the HPIA program, independent of any obligation under Section 301.

unique to the vulnerable location of their homes.  So whether or not the HPIA coverage would technically have fallen within the authorized market for "diligent search" purposes, the Amended Complaint has adequately alleged conduct that "offends established public policy" and a practice that "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  Keka, 94 Haw. at 228, 11 P.3d 1.

     In any event, the Court has already clarified that Plaintiffs need not prove a specific breach of an independent statutory or common-law duty.  So regardless of those questions, it is ultimately up to the fact-finder to determine whether Underwriters and Monarch committed an unfair act when they issued the policies the way that they did.  For now, the Court must accept as true all of Plaintiffs' allegations in the Amended Complaint.  Doing so and viewing the Amended Complaint in the light most favorable to Plaintiffs, Underwriters' and Monarch's conduct plausibly rises to the level of an "unfair" business practice.

     Having concluded that Plaintiffs have adequately pleaded the first three elements of a UDAP claim, the Court turns briefly to the final element of a UDAP claim, which requires that Plaintiffs plead damages.  Plaintiffs argue that they suffered catastrophic losses that would otherwise have been covered had they been issued policies without Lava Exclusions or

policies through the HPIA program.  The Amended Complaint also details the premiums paid by Plaintiffs in procuring and renewing their insurance policies.[12/]  The Court holds that these allegations are sufficiently pleaded to survive a motion to dismiss.  This is particularly so given Hawai`i's "low bar" for pleading damages.  See Compton, 761 F.3d at 1056.

In sum, with this second iteration of their Complaint, Plaintiffs have "nudged" their UDAP claim "across the line from conceivable to plausible."  Id. at 1057 (quoting Twombly, 550 U.S. at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929).  Plaintiffs have pleaded facts that could plausibly support a factual finding of "oppressive, unscrupulous or substantially injurious" behavior.  For that reason, the Court holds that Plaintiffs' UDAP claim does not fail as a matter of law.  Underwriters' Motion is DENIED as to the Count I.

## II.  Bad Faith Claim Against Underwriters

Count II of the Amended Complaint alleges that Underwriters breached the implied covenant of good faith and

---

[12/]  At the hearing, while arguing against the Retail Brokers' abstention motions, Plaintiffs' counsel stated that the only form of damages Plaintiffs and the Class seek in this case is the return of the premiums they paid for the policies.  This was a surprising assertion.  In the Court's view, the Amended Complaint's prayer for relief pleads damages more broadly than that. In fact, the Amended Complaint only characterizes damages as paid premiums in connection with the unjust enrichment count, which is in the alternative to the legal claims.  See, e.g., Am. Compl. ¶¶ 6, 104, 111.  And, as discussed below, this Order ultimately dismisses Plaintiffs' unjust enrichment claim. In any event, the Court need not clarify the scope of the damages sought at this juncture.

fair dealing.  Am. Compl. ¶¶ 161-77.  The Hawai'i Supreme Court first recognized a bad faith cause of action in the first-party insurance context in Best Place, Inc. v. Penn Am. Ins. Co., 82 Haw. 120, 920 P.2d 334 (1996).  The court held that "there is a legal duty, implied in a first- and third-party insurance contract, that the insurer must act in good faith in dealing with its insured, and a breach of that duty of good faith gives rise to an independent tort cause of action."  Id. at 132, 920 P.2d 334.  The recognition of the bad faith claim was grounded on the "atypical" relationship between the insured and the insurer and the "adhesionary aspects of an insurance contract [that] justify the availability of tort recovery."  Id. Moreover, the duty of "good faith" is also codified and incorporated by the legislature into the Hawai`i insurance code. See HRS § 431:1-102.  It recognizes that "[t]he business of insurance is one affected by the public interest" and requires "good faith" conduct in "all insurance matters."[13/]  Id.

The factual allegations underlying Count II are the same as those underlying the UDAP claim.  Am. Compl. ¶¶ 173-76. Plaintiffs rest those allegations on the common-law and

---

[13/]  The full text of § 431:1-102 states:
   The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception and practice honesty and equity in all insurance matters.  Upon the insurer, the insured and their representatives rests the duty of preserving inviolate the integrity of insurance.

statutory good-faith obligations stemming from the ongoing contractual relationship between themselves and Underwriters during the relevant period.  Id. ¶¶ 163-64, 169.  Plaintiffs assert a "continuing course of conduct" on the part of Underwriters, who Plaintiffs argue breached the good-faith obligation "every time Plaintiffs and the Class paid premiums and renewed" the policies.  Id. ¶ 175.  Underwriters in response argue that dismissal of Count II is warranted for the same overarching reasons they sought dismissal of the UDAP claim. Specifically, they say that "[b]ecause Underwriters' alleged liability is premised upon the same non-existent duties, dismissal of the entire FAC is appropriate."  Underwriters' Mot. 21.

        In the Court's Order Granting Defendants Certain Underwriters at Lloyd's Motion to Dismiss, ECF No. 109, the Court emphasized this district's reticence to "restrictively limit the tort of bad faith to only specified contexts."  The Court recognized the "decidedly pro-insured principles set forth in Hawai`i case law."  Id. at 59 (quoting Aloha Petroleum, Ltd. V. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, Civ. No. 13-0296 DKW-RLP, 2014 WL 3359933, at *5 (D. Haw. July 8, 2014)).  The tort of bad faith stems both from the contractual relationship between the insurer and the insured, as well as from the codified "good faith" obligation incorporated into the Hawai`i

insurance code.  Id. at 56; see also Aloha Petroleum, 2014 WL
3359933 at *5 (noting that bad faith does not necessarily turn
on the terms of the contract or whether a claim was covered or
not; instead, "it turns on the conduct of the insurance company
in handling the claim." (quoting Enoka v. AIG Haw. Ins. Co.,
Inc., 109 Haw. 537, 552, 128, P.3d 850 (2006))).

        No decisions in this district or in Hawai`i state
courts have addressed whether the scope of the bad faith tort
extends to the specific context here.  Still, the Court finds
that Plaintiffs have adequately pleaded a claim sufficient to
survive the initial pleading standard.  In a sense,
Underwriters' arguments fail for the same reasons their UDAP
arguments failed.  They have identified no authority limiting
the bad faith claim to specific breach of independent duties.
To the contrary, bad faith case law in Hawai`i tends to favor a
broader array of contexts, "pro-insured principles," and a
"reasonableness" standard.  Aloha, 2014 WL 3359933 at *6.  This
is not to say that evidence of statutory or other violations
would not serve to bolster a common-law bad faith claim.  See
Aloha at *7.  But the absence of such precise violations or
statutory obligations is not conclusive.  As the Hawai`i Supreme
Court recognized in Best Place, "[t]he implied covenant is
breached . . . when [the insurer's] conduct damages the very
protection or security which the insured sought to gain by

buying insurance." Best Place, 82 Haw. at 132, 920 P.2d 334
(citation omitted).   Plaintiffs here have alleged just that.
They allege that they were left with deficient coverage because
their Retail Brokers and insurer (through its agent and
coverholder) failed to advise of or sell other, more
comprehensive coverage that Plaintiffs maintain they
specifically sought and needed.

Again, the evidence may ultimately show that
Underwriters and Monarch were not the ones communicating with
Plaintiffs and were not the ones with any opportunity to advise
Plaintiffs of other available coverages, to the extent any such
duty rests on any individual Defendant.   For now, though,
Underwriters simply dispute the truth of many of Plaintiffs'
allegations.   While they may very well be able to disprove the
veracity of Plaintiffs' claims or establish that their conduct
was entirely reasonable, the Court must accept the allegations
in the pleading as true for purposes of the motion to dismiss.
Doing so, the Court finds that Plaintiffs have adequately
pleaded their bad faith claim to survive the initial pleading
stage.

Moreover, "[t]he Best Place analysis focuses on the
reasonableness of the insurer's actions." Gov't Emps. Ins. Co.
v. Dizol, 176 F. Supp. 2d 1005, 1034-35 (D. Haw. 2001).   And
what is reasonable is ordinarily a question of fact reserved for

the jury.  Tran v. State Farm Mut. Auto Ins. Co., 999 F. Supp. 1369, 1372 (D. Haw. 1998).  Thus, unless the Court can say as a matter of law that Underwriters did not act in bad faith, Underwriters' Motion must be denied.  See Dizol, 176 F. Supp. 2d at 1035 (granting summary judgment because it was "able to rule as a matter of law that Plaintiff did not use bad faith").  The Court cannot make that conclusion here.

The Court holds that Plaintiffs have pleaded a cognizable claim.  Accordingly, Underwriters' Motion is DENIED as to Count II.

## III. Unjust Enrichment Claim Against Underwriters & Monarch

The Amended Complaint's final count against Underwriters and Monarch is an alternative claim for unjust enrichment.  Am. Compl. ¶¶ 192-94.  To recover on an unjust enrichment claim, a plaintiff must show that (1) the defendant received a benefit without adequate legal basis; and (2) the defendant unjustly retained the benefit at the expense of the plaintiff.  Chapman v. Journal Concepts, Inc., Civ. No. 27-00002 JMS/LEK, 2008 WL 5381353, at *21 (D. Haw. Dec. 24, 2008) (citing Small v. Badenhop, 67 Haw. 626, 636, 701 P.2d 647 (1985)); see also Durrette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 502-04, 100 P.3d 60 (2004).  Unjust enrichment is a "broad and imprecise term."  Durrette, 105 Haw. at 502, 100 P.3d 60. (citation omitted).  In reviewing unjust enrichment claims,

courts must be guided by the "underlying conception of restitution, the prevention of injustice." Id. (quoting Small, 67 Haw. 626, 701 P.2d 647)

"Hawai'i law has approved 'the principle, long-invoked in the federal courts, that equity has always acted only when legal remedies were inadequate.'" Swartz v. City Mortg., Inc., 911 F. Supp. 2d 916, 938 (D. Haw. 2012) (quoting Porter v. Hu, 116 Haw. 42, 55, 169 P.3d 994 (Ct. App. 2007)) (internal quotation marks omitted), abrogated on other grounds as stated in Compton, 761 F.3d at 1054-55). Thus, the absence of an adequate remedy at law is a "necessary prerequisite" to maintaining an equitable claim. Soule, 1 F. Supp. 3d at 1102 (citing Swartz, 911 F. Supp. 2d at 938).

Underwriters and Monarch spend little time discussing the merits of the unjust enrichment claim. They allege simply that the claim must fail because the conduct underlying the unjust enrichment claim and the legal claims is the same. See Underwriters' Mot. 21-22; Monarch's Mot. 23-24. As detailed above, the Court has rejected Underwriters' and Monarch's arguments that the legal claims fail. The Court must thus take a closer, independent look at the validity of Plaintiffs' unjust enrichment claim.

The unjust enrichment claim is pleaded solely in the alternative to the legal claims. Am. Compl. ¶¶ 192-93.

Plaintiffs allege that they have a legal remedy in the form of the UDAP and bad faith claims.  For the unjust enrichment claim, the Amended Complaint alleges that Plaintiffs would be entitled to restitution in the form of "non-gratuitous payments of premiums for surplus lines insurance and commissions for insurance-related services that Plaintiffs and the Class would not have paid, but for Defendants' wrongdoing."  Id. ¶ 196; see also id. ¶¶ 197-99.  The Amended Complaint states without any explanation that restitution "may provide greater relief" than the damages available through the legal claims because the legal damages may be "subject to certain offsets not applicable in equity."  Id. ¶ 193.  At the hearing on the Motions, however, Plaintiffs' counsel stated that the Amended Complaint as a whole—including the legal claims—seeks damages solely in the form of paid premiums.[14]

Plaintiffs' unjust enrichment claim has two fatal flaws.  Plaintiffs have not established that the legal claims would be inadequate, and they have not sufficiently pleaded the elements of an unjust enrichment claim such that they would be entitled to equitable relief even in the event their legal claims fail.

_____

[14]  As noted earlier, the Court does not necessarily read the Complaint's prayer for relief that way.

- 39 -

The Court previously dismissed the original complaint's unjust enrichment claim for failing to plausibly allege how the legal claims would be inadequate and failing to satisfy the pleading standard.  See Aquilina, 407 F. Supp. 3d at 1084-85.  The current iteration of the claim faces the same initial problem.  Plaintiffs have alleged the same conduct to support their legal and equitable claims.  Indeed, they purport to allege the exact same damages as well.  Their argument is basically that equitable relief would be appropriate if Defendants are successful in defending the legal claims.  This reasoning is flawed.

Unjust enrichment often fills in when a breach-of-contract claim fails, usually when a contract is otherwise void or not strictly enforceable.  This case is not a breach-of-contract case; it asserts other statutory and common-law claims based on Defendants' allegedly wrongful business practices.  At the hearing, counsel for Plaintiffs could not explain to the Court how—if the legal claims fail—Plaintiffs would be able to prove unjust enrichment.  After all, if the UDAP and bad faith claims fail, it follows that Plaintiffs would not have shown any wrongful conduct on the part of Monarch and Underwriters.  Any benefit received would not have been without adequate legal basis and would not have been unjustly retained.  Plaintiffs have not alleged, for instance, that the insurance policies are

void, or that they paid for lava coverage and then were denied it.

For these reasons, Plaintiffs have failed to adequately plead the elements of an unjust enrichment claim. Their UDAP and bad faith claims against Underwriters and Monarch are—by implication of Plaintiffs' own admission—sufficient to remedy the parties' dispute.  Thus, this case is not like Sunday's Child, where it was unclear whether the dispute could be "answered entirely" by the legal and contract-based claims. See Sunday's Child, LLC v. Irongate AZREP BW LLC, Civ. No. 13-00502 DKW-RLP, 2017 WL 561338, at *6-7 (D. Haw. Feb. 10, 2017) (holding that early dismissal of unjust enrichment would be premature).

Underwriters' and Monarch's Motions are therefore GRANTED as to Count IV of the Amended Complaint.


### CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Underwriters' Motion to Dismiss, ECF No. 126, and GRANTS IN PART and DENIES IN PART Monarch's Motion to Dismiss, ECF No. 128.  Defendants' Motions are granted, with respect to Count IV for unjust enrichment, and that claim is dismissed without prejudice.  Any amended complaint must be filed within thirty days of the issuance of this Order.  The

- 41 -

Court emphasizes that leave to amend is limited to curing the defects described in this order as to Count IV for unjust enrichment.  The Court has not granted Plaintiff leave to make other changes, such as adding new parties or entirely new claims.  Defendants' Motions are otherwise denied with respect to the remainder of the claims against Underwriters and Monarch.

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, June 10, 2020.



Alan C. Kay
Sr. United States District Judge

Aquilina, et al. v. Certain Underwriters at Lloyd's, et al., Civ. No. 18-0496-ACK-KJM, Order Granting in Part and Denying in Part Defendants Certain Underwriters at Lloyd's and Monarch's Motions to Dismiss.

- 42 -